## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHAEL GILL, STATE OF CALIFORNIA *ex rel.* MICHAEL GILL, STATE OF COLORADO *ex rel.* MICHAEL GILL, STATE OF CONNECTICUT *ex rel.* MICHAEL GILL, STATE OF DELAWARE *ex rel.* MICHAEL GILL, DISTRICT OF COLUMBIA *ex rel.* MICHAEL GILL, STATE OF FLORIDA *ex rel.* MICHAEL GILL, STATE OF GEORGIA *ex rel.* MICHAEL GILL, STATE OF HAWAII *ex rel.* MICHAEL GILL, STATE OF ILLINOIS *ex rel.* MICHAEL GILL, STATE OF INDIANA *ex rel.* MICHAEL GILL, STATE OF IOWA *ex rel.* MICHAEL GILL, STATE OF LOUISIANA *ex rel.* MICHAEL GILL, STATE OF MARYLAND *ex rel.* MICHAEL GILL, COMMONWEALTH OF MASSACHUSETTS    *ex rel.* MICHAEL GILL, STATE OF MICHIGAN *ex rel.* MICHAEL GILL, STATE OF MINNESOTA *ex rel.* MICHAEL GILL, STATE OF MONTANA *ex rel.* MICHAEL GILL, STATE OF NEVADA *ex rel.* MICHAEL GILL, STATE OF NEW JERSEY *ex rel.* MICHAEL GILL, STATE OF NEW MEXICO *ex rel.* MICHAEL GILL, STATE OF NEW YORK *ex rel.* MICHAEL GILL, STATE OF NORTH CAROLINA *ex rel.* MICHAEL GILL, STATE OF OKLAHOMA *ex rel.* MICHAEL GILL, STATE OF RHODE ISLAND *ex rel.* MICHAEL GILL, STATE OF TENNESSEE *ex rel.* MICHAEL GILL, STATE OF TEXAS *ex rel.* MICHAEL GILL, STATE OF VERMONT *ex rel.* MICHAEL GILL, COMMONWEALTH OF VIRGINIA    *ex rel.* MICHAEL GILL, STATE OF WASHINGTON *ex rel.* MICHAEL GILL, STATE OF WISCONSIN *ex rel.* MICHAEL GILL, and MICHAEL GILL, individually, <br><br>                      Plaintiffs, <br><br>      v. <br><br> CVS HEALTH CORP. (f/k/a CVS CAREMARK CORP.), CVS PHARMACY, INC., CAREMARK Rx L.L.C., CAREMARKPCS HEALTH LLC, PROCARE PHARMACY, LLC, CORAM, LLC, CORAM ALTERNATE SITE SERVICES, INC., and OMNICARE, INC. <br><br>                      Defendants. | Case No. 18-cv-6494 <br><br><br> HON. STEVEN C. SEEGER <br><br> JURY TRIAL DEMANDED <br><br> THIRD AMENDED FALSE CLAIMS ACT COMPLAINT |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE .......................................................................................... 4

PARTIES ............................................................................................................................. 5

THE STATUTORY FRAMEWORK .................................................................................. 8

    A. The Federal and State False Claims Acts ........................................................... 8

    B. The Medicare and Medicaid Programs ............................................................. 10

    C. Federal and State Anti-Kickback Statutes ....................................................... 12

    D. State Escheatment Laws ................................................................................... 14

DEFENDANTS' FRAUDULENT CONDUCT ................................................................ 15

I.  CVS and Coram Concealed and Avoided Their Obligations to Return and Escheat
    Overpayments in Violation of the False Claims Act. ............................................... 15

    A. CVS Discovers Overpayments Prior to Acquiring Coram. .............................. 17

    B. After the Coram Acquisition, CVS and Coram Meet in St. Louis to Discuss
       Coram's History of Recognizing Overpayments as Income........................... 23

    C. CVS Consciously Decided Not to "Revisit" the $98 Million-Plus in
       Overpayments Coram Took to Income Pre-Closing...................................... 30

    D. CVS Keeps the Lion's Share of Coram's Pending Overpayments Post-Closing. ........... 31

    E. CVS' Concealment and Failure to Return Government Overpayments Violates the
       False Claims Act. .......................................................................................... 34

    F. CVS' Concealment and Failure to Escheat Commercial Overpayments to
       Delaware Violates State False Claims Acts.................................................. 35

    G. CVS Specialty Pharmacy and Omnicare ACS Also Failed to Return Government
       and Commercial Overpayments in Violation of False Claims Acts. ............... 40

II.  CVS Processed Prescriptions from Doctors Barred from Government Healthcare
    Programs. ................................................................................................................. 42

    A. Federal and State Laws Prohibit Government Reimbursement for Prescription
       Drugs Prescribed by Excluded Prescribers.................................................. 42

    B. For Years, CVS Retail Pharmacy, Omnicare, and Coram Had No Mechanism to
       Screen for State-Excluded Providers and Other Dispensing Requirements. ........... 45

    C. The CVS Caremark PBM Submitted Claims to Government Payors for Drugs
       Prescribed by Excluded Providers. ............................................................... 50

III. CVS Pharmacies Improperly Accepted Copay Cards from Government Healthcare
    Beneficiaries. ........................................................................................................... 53

    A. Background Concerning Copay Cards and OIG Guidance. .............................. 53

i

B. CVS Pharmacies Promoted the Use of Copay Cards, While Knowing that Copay Cards Were Routinely and Unlawfully Used on Government Healthcare Programs. .................................................................................................. 56

C. CVS Knew that It Generated Substantial Profits from Government-Funded Prescriptions Driven by Fraudulent Use of Copay Cards. ................................ 57

D. CVS Pharmacies Lacked Training and an Automated Process to Prevent Illegal Copay Card Usage. ........................................................................................... 61

IV. Coram's FOCUS Care Program Traded Free Care for Hospital Referrals in Violation of Anti-Kickback Statutes. ................................................................................... 67

A. Background Concerning Infusion Care. .................................................... 67

B. Coram Provided Free Goods and Services to Induce Hospital Referrals. ...... 70

V. CVS Improperly Sent Prescription Drugs to States Where It Was Not Licensed. ........ 78

A. CVS' "Site Consolidation Project" Led to Non-Resident Pharmacy Licensing Violations. ................................................................................................ 80

B. After CVS Was Caught by Maine for Licensing Violations, an Internal CVS Review Identified Thousands of Prescriptions Shipped in Violation of State Licensing Laws. ....................................................................................... 81

C. CVS Misled the Government About the Extent of Its Licensing Violations. ........ 82

D. CVS Specialty Pharmacies Failed to Register with State Medicaid Programs Before Dispensing Prescription Drugs to Government Healthcare Beneficiaries. .......... 84

VI. CVS Retaliated Against and Constructively Discharged Relator. ........................... 85

COUNTS ........................................................................................................ 87

PRAYER ........................................................................................................ 158

APPENDIX A ................................................................................................. 162

APPENDIX B ................................................................................................. 164

APPENDIX C ................................................................................................. 167

APPENDIX D ................................................................................................. 177

<u>**THIRD AMENDED FALSE CLAIMS ACT COMPLAINT**</u>

Plaintiff-Relator, Michael Gill ("Relator"), acting on his own behalf and on behalf of the United States of America pursuant to the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b), as well as on behalf of the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, and Wisconsin, *ex rel.* Michael Gill, the Commonwealths of Massachusetts and Virginia, and the District of Columbia (collectively, "Plaintiffs"), for their Third Amended Complaint against CVS Health Corp. ("CVS") (f/k/a CVS Caremark Corp.), CVS Pharmacy, Inc. ("CVS Pharmacy"), CAREMARK Rx L.L.C. ("Caremark Rx"), CAREMARKPCS HEALTH LLC ("Caremark PCS"), ProCare Pharmacy, LLC ("ProCare"), Coram, LLC ("Coram"), Coram Alternate Site Services, Inc. ("CASSI" or "Coram"), and Omnicare, Inc. ("Omnicare") (collectively, "Defendants"), hereby allege as follows:

## INTRODUCTION

1.     State and federal false claims acts ("False Claims Acts") provide the government with its primary means of recovery from frauds against the public fisc. "*Qui tam*" provisions encourage private citizens with information about fraud (known as "relators") to sue on the government's behalf. Relator worked for defendants CVS and Caremark Rx for more than 25 years, from 1992 to 2018, including years as a Director of Regulatory Compliance and Integrity. As detailed below, Relator discovered five separate schemes carried out by CVS and its subsidiaries to steal taxpayer funds in violation of False Claims Acts.[1]

---

[1] The term "government," as used throughout this Third Amended Complaint, shall include both the United States and the Plaintiff States, unless otherwise indicated.

1

2. The *first* scheme was revealed during CVS' 2014 stock acquisition of Coram LLC, one of the nation's largest providers of at home specialty care. In examining Coram's books, CVS discovered that Coram improperly took tens of millions of dollars in overpayments and potential overpayments (collectively referred to as "credit balances") to income each year. These credit balances involved government and commercial payers (including private insurers and patients). After the Coram acquisition, CVS continued to take Coram's credit balances to income. Between January 2008 and April 2016, CVS took well in excess of $200 million of credit balances to income.

3. Coram and CVS were not entitled to keep this money that they did not earn. Federal healthcare law required CVS to promptly return government overpayments to the government. State law required CVS to escheat most of the commercial credit balances to Delaware, where CVS and Coram are incorporated. CVS neither returned the money to the appropriate payer nor escheated the funds to Delaware, as required. CVS instead chose to pocket the credit balances as income, in violation of the False Claims Act. Notably, CVS' unlawful actions enabled it to exceed Wall Street's earnings expectations, and prop up its stock price.

4. *Second*, Defendants unlawfully billed the government for prescriptions from excluded providers, *i.e.*, doctors that have been barred from government healthcare programs. The government does not allow payment for drugs prescribed by excluded providers. Consequently, pharmacies are required to screen for excluded prescribers to avoid improper claims. Moreover, pursuant to prior False Claims Act settlements with the government and Corporate Integrity Agreements ("CIAs") with the U.S. Department of Health and Human Services ("HHS"), CVS and Omnicare are specifically prohibited from billing the government for prescriptions from excluded prescribers. Nonetheless, Defendants had no system to reject claims from excluded

2

prescribers. As a result, the government paid for thousands of illegal claims billed by the Defendants.

5.      *Third*, CVS pharmacies have unlawfully accepted copay cards from pharmaceutical manufacturers and other third parties to pay for prescription drugs funded by government programs. This conduct violates the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (the "AKS"), state anti-kickback statutes, and the False Claims Acts. Copay cards improperly induce beneficiaries to order certain drugs, increase costs to government programs, and are detrimental to government healthcare programs. CVS knows this conduct is unlawful, as HHS has stated explicitly that these programs violate the AKS. CVS could easily implement computer software edits to prevent the improper use of these copay cards. Still, they have declined to do so in pursuit of higher profits.

6.      *Fourth*, Coram enters into illegal *quid pro quo* contracts, called "FOCUS Care Agreements," in violation of the AKS, state anti-kickback statutes, and False Claims Acts. The FOCUS Care Agreements obligate hospitals to refer home health care patients to Coram. In exchange, Coram subsidizes the hospitals' "charity care" budgets by providing an agreed-upon value of goods and services at no charge to the hospitals' uninsured patients—goods and services for which the hospitals would otherwise pay—and provides the hospital with valuable data analytics. By assuming the cost of post-discharge care for patients for which hospitals otherwise would pay, Coram provides a financial benefit to the hospitals without any money changing hands. In exchange, the hospitals steer patients to Coram.

7.      And *fifth*, in 2011, CVS discovered that its Caremark Specialty pharmacies and retail CarePlus Specialty pharmacies submitted claims for prescriptions shipped into states where the pharmacy was not licensed to dispense prescriptions. These unlicensed prescriptions should not have been filled and should not have been billed to government payors. The resulting claims

are actionable under the FCA. Moreover, CVS materially misrepresented the extent of the licensing issue to the HHS Office of the Inspector General ("OIG").

8.      In sum, Defendants have routinely and deliberately violated False Claims Acts and anti-kickback statutes, failed to take action to correct known violations, violated CIAs with the government, and deliberately covered up these violations by lying to the government. Defendants' conduct has cost taxpayers hundreds of millions of dollars.

9.      On behalf of the United States and the Plaintiff States, Relator brings this action to hold Defendants liable for their unlawful conduct and to recover treble damages and civil penalties arising from Defendants' false claims and false statements to the government, as well as other violations of the False Claims Acts. Relator also seeks relief under Illinois law and the FCA from CVS' retaliatory employment actions against him.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action arising under the laws of the United States pursuant to: (i) 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730; (ii) 28 U.S.C. § 1331, which confers federal subject matter jurisdiction; and, (iii) 28 U.S.C. § 1345, because the United States is a Plaintiff.

11.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found in, reside, or transact or have transacted business in the Northern District of Illinois.

12.     Jurisdiction over the state law claims alleged herein is proper under 31 U.S.C. § 3732(b). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

13.     This action is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation, or from the news media. To the extent there has been a public disclosure unknown to Relator, he is an original source under 31 U.S.C. § 3730(e)(4) and similar state statutes. The facts and information set forth herein are based upon Relator's personal observation and investigation. Relator has direct and independent knowledge of the information on which the allegations are based. He has voluntarily provided the information to the government before filing this *qui tam* action.

14.     Relator has provided the Attorney General of the United States, the United States Attorney for the Northern District of Illinois, the Attorneys General of the named Plaintiff States, and the California Department of Insurance with a written disclosure of substantially all material evidence and information he possesses, in accordance with the provisions of 31 U.S.C. §3730(b)(2) and relevant state statutes.

15.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391.

## PARTIES

16.     Relator Michael Gill resides in Chicago, Illinois. In 1992, Mr. Gill began working for Caremark International, Inc., which later merged into CVS. In August 2011, he became CVS Director of Regulatory Compliance and Integrity, charged with overseeing Caremark Rx pharmacy benefit management services and specialty pharmacy compliance matters. In April 2015, he was made responsible for overseeing compliance matters involving Coram, which CVS had recently acquired. In January 2018, his role expanded to include compliance matters for CVS Pharmacy and Omnicare pertaining to their billing operations. On June 1, 2018, after enduring months of intolerable work conditions, Relator resigned from CVS.

17. Defendant CVS Health Corp. is an integrated pharmacy services health care provider. In 2021, CVS was the largest pharmacy chain in the U.S., ranked fourth on the Fortune 500 list, and had annual revenues of more than $292 billion. CVS is incorporated in Delaware, headquartered in Rhode Island, has significant corporate offices in Northbrook, Illinois, and owns pharmacies in the Chicagoland area and throughout the United States. Until its September 3, 2014 name change, CVS Health Corp. was formerly known as CVS Caremark Corp.

18. Defendant CVS Pharmacy, Inc. is a subsidiary of CVS, incorporated in Rhode Island. CVS Pharmacy is the largest retail pharmacy in the United States, with over 9,700 stores in 49 states, the District of Columbia, and Puerto Rico. According to CVS' 2016 SEC Filing 10-K, Exhibit 21, dated February 9, 2017, "CVS Pharmacy, Inc. is the immediate or indirect parent of approximately 57 entities that operate drugstores, all of which drugstores are in the United States and its territories except approximately 37 drugstores that are operated by . . . an indirect subsidiary." CVS Pharmacies fill well over 35% of all retail prescriptions filled in the United States, including hundreds of millions of prescriptions per year for government healthcare beneficiaries.

19. Defendant CVS provides specialty pharmacy services through its "Pharmacy Services Segment," under names including "CVS Specialty™," and through its subsidiary, defendant ProCare Pharmacy, LLC (d/b/a CVS CarePlus), which was organized in Rhode Island in 2007. A specialty pharmacy provides pharmacy services for patients who require specialized medication or are suffering from complex conditions. CVS' specialty pharmacies primarily

6

operate by mail order, but ProCare Pharmacy operates retail specialty pharmacies that are open to the public.[2]

20.     Defendant CVS provides pharmacy benefit manager (PBM) services through various subsidiaries, including Defendant Caremark Rx, L.L.C., which is a Delaware Limited Liability Corporation, and Defendant CaremarkPCS, which is also a Delaware Limited Liability Corporation. Caremark Rx and CaremarkPCS (collectively "CVS PBM") provide PBM services for both commercial and government healthcare plans. CVS PBMs operate a national network of over 60,000 pharmacies, and collectively are one of the nation's largest PBMs.

21.     Defendant Coram LLC is a CVS subsidiary, incorporated in Delaware. CVS acquired Coram LLC, in 2014 in an all-stock transaction. Coram is one of the nation's largest providers of at home specialty care infusion services, which involve treatment delivered through needles or catheters, and enteral services, which refers to tube feeding.

22.     Defendant Coram Alternate Site Services, Inc. ("CASSI") is a Delaware corporation and wholly owned subsidiary of CVS. In relevant part, CASSI enters into *quid pro quo* agreements with hospitals requiring the referral of infusion business to Coram in exchange for valuable consideration.

23.     Defendant Omnicare, Inc. is a wholly owned subsidiary of CVS. CVS acquired Omnicare in 2015 in an all-stock transaction. Omnicare provides pharmacy services to long-term care facilities, mental and behavioral health institutions, developmental disability centers, penal

---

[2] For purposes of this complaint, unless otherwise stated, "Specialty Pharmacies" include ProCare Pharmacy, LLC, d/b/a CarePlus and CVS retail specialty pharmacies that use the CATS, HBS SPARCS, and RxConnect operating platforms. The operating platforms are software programs installed on pharmacy computers to carry out pharmacy operations, such as preparing claims, managing patient profiles, and connecting with CVS corporate.

institutions, and government facilities. The majority of Omnicare's patients are government healthcare beneficiaries.

24.     Defendants are primarily in the business of dispensing prescription drugs as pharmacies. Pharmacies are highly regulated. The defendants paid close attention to the applicable laws, regulations and guidance, particularly to those that affected pricing and profits. Defendants were well versed in the applicable laws, including those relating to prescriptions and reimbursements for drugs.

25.     Defendants' pharmacies are used by millions of low-income individuals and families, disabled persons, elderly persons, government employees, and military personnel whose prescription benefits are paid by the government. Defendants knew that their products were paid for under the federal and state Medicaid and Medicare programs, as well as under numerous other government programs.

26.     Defendants knew and intended that billions of dollars of their sales result from government reimbursements for prescriptions provided to persons receiving benefits from Medicaid (including Managed Medicaid), Medicare (all parts), the Federal Employee Health Benefit Program, Tri-Care/CHAMPUS, Veterans Affairs, state health care plans and state-operated prescription reimbursement programs (*e.g.*, Illinois SeniorCareRx). This complaint encompasses all claims made directly or indirectly to the government, as encompassed by federal and state FCAs.

## THE STATUTORY FRAMEWORK

### A.  The Federal and State False Claims Acts

27.     The FCA, 31 U.S.C. § 3729 *et seq.,* has been the federal government's primary fraud fighting tool since the Civil War era. It prohibits any person from knowingly making a false or fraudulent claim against the Government for property or money. The FCA is intended to reach

all types of fraud, without qualification, that might result in financial loss to the Government. Among its provisions, the FCA mandates that any person who:

> (A) knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> * * *
>
> (G) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, [ . . . ] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).[3]

28.     The FCA defines "knowingly" as actual knowledge, or deliberate ignorance or reckless disregard of the truth or falsity of the information; a specific intent to defraud is not required. 31 U.S.C. § 3729(b).

29.     The Plaintiff States have, respectively, enacted false claims acts that substantially track the foregoing provisions of the federal FCA. Appendix A lists the Plaintiff States' False Claims Acts.

30.     Illinois law and the FCA also protect whistleblowers from retaliatory actions by their employers, including constructive discharge:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of

---

[3] The civil penalties are adjusted for inflation, and are currently not less than $11,803 and not more than $23,607. *See* 86 Fed. Reg. 70740 (December 13, 2021).

an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

### B. The Medicare and Medicaid Programs

31.     Medicare is a federally funded health insurance program primarily for the benefit of those age 65 or older or those with certain physical conditions. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted. 42 U.S.C. § 1395 *et seq*. The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS that administers the Medicare program.

32.     Medicaid is a public assistance program providing for payment of medical expenses primarily for the poor and disabled. 42 U.S.C. § 1396 *et seq*. Funding for Medicaid is shared between the federal government and state governments.

33.     Each state has a single state agency responsible for administering the Medicaid program. For example, the Illinois Medicaid program is administered by the Illinois Department of Healthcare and Family Services.

34.     Under the Medicare and Medicaid Programs, providers have an "obligation" to return overpayments to the government within 60 days after the overpayment has been "identified." 42 U.S.C. § 1320a-7k(d).

35.     Medicare and Medicaid programs have the authority to exclude providers who violate certain rules. After a provider has been excluded, federal and state healthcare programs will not pay for any items prescribed or ordered by that provider, while he or she is excluded. 42 C.F.R. § 402.209 ("no payment is made by Medicare, Medicaid, and, where applicable, any other Federal health care programs for any item or service furnished by the excluded person or at the

direction or request of the excluded person when the person furnishing the item or service knew or had reason to know of the exclusion, on or after the effective date of the exclusion as specified in the notice of exclusion."); *see also* 42 C.F.R. § 1001.1901; 42 C.F.R. § 1002.6(a)(1).

36.     Medicare and Medicaid regulations require that government funded healthcare services "be provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a).

37.     Under Medicare and Medicaid rules and regulations, entities that furnish healthcare services to government beneficiaries must certify compliance with Medicare and Medicaid program requirements. These certifications are contained in provider agreements and Compliance Attestations. Entities that must complete Compliance Attestations, include so-called "FDR" entities, which are "first tier entities," "downstream entities" and "related entities." *See* 42 C.F.R. §423.501 (defining terms).

38.     FDR entities provide Compliance Attestations to government contractors that operate government health care programs, such as Medicare Advantage, Medicare Part D, and Managed Medicaid plans. These attestations certify compliance with Medicare and Medicaid program requirements, *see* 42 C.F.R. Parts 422 and 423, and certify that the FDR maintains adequate compliance controls. *See, e.g.,* 42 C.F.R. §§ 422.503(b)(4)(vi), and 423.504(b)(4)(vi). These requirements are also described in Chapter 9 of the Prescription Drug Benefit Manual (PDBM), and Chapter 21 of the Medicare Managed Care Manual (MMCM), and at 42 C.F.R. §438.608(a)(1)(i).

### C. Federal and State Anti-Kickback Statutes

39.     The AKS prohibits the exchange (or offer to exchange) of anything of value, in an

effort to induce (or reward) the referral of federal health care program business. It mandates that:

> Whoever knowingly and willfully offers or pays any remuneration (including any
> kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in
> kind to any person to induce such person--
>
>> **(A)** to refer an individual to a person for the furnishing or arranging for the
>> furnishing of any item or service for which payment may be made in
>> whole or in part under a Federal health care program, or
>>
>> **(B)** to purchase, lease, order, or arrange for or recommend purchasing,
>> leasing, or ordering any good, facility, service, or item for which payment
>> may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more
> than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2).

40.     "Remuneration" has been interpreted broadly and includes the transfer of anything

of value, directly or indirectly, overtly or covertly, in cash or in kind.

41.     The anti-kickback statute does not require "actual knowledge" or a "specific intent

to commit a violation" of the statute, to establish a violation of the statute. 42 U.S.C. § 1320a-

7b(h).

42.     A claim that is submitted to the government in violation of the anti-kickback statute

constitutes a false or fraudulent claim for purposes of the federal False Claims Act. 42 U.S.C.

§ 1320a-7b(g).

43.     Compliance with the AKS is a condition of payment under federally funded health

care programs. A claim that includes items or services resulting from a violation of the AKS

constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-

7b(g). Such a claim is false or fraudulent under the FCA because providers of such services are

ineligible to participate in government health care programs and because the government would not have paid such claims had it known of the kickbacks.

44.      The States also have enacted statutes prohibiting kickbacks in connection with State Medicaid services. Pursuant to State statutes, regulations, and other administrative materials, the States have made compliance with both federal and State anti-kickback statutes and rules a prerequisite to a physician's right to receive or retain reimbursement payments from state-funded health care programs. *See* Cal. Welf. & Inst. Code §§ 14107.2(a), (b), 14107.11-(a)(2); 10 Colo. Code Regs. §§ 2505-10-8.076.1(7)(b), (j); Conn. Gen. Stat. §§ 53a-161c, 53a-161d; Conn. Agencies Reg. § 17b-262-531(b); D.C. Code § 4-802(c)–(d); Fla. Stat. §§ 409.907, 409.920(2)(e); 305 Ill. Comp. Stat. 5/8A-3(b)(2), (c)(2); Ind. Code §§ 12-15-22-1, 12-15-24-2; 405 Ind. Admin. Code 1-1-4(a)(6); Iowa Code § 249A.47(f); La. Rev. Stat. Ann. § 46:438.2(2)(A)(2); Md. Code Ann., Crim. Law §§ 8-511, 8-516; Md. Code Regs. § 10.09.03.09; Mass. Gen. Laws ch. 118E § 41; 130 Mass. Code Regs. §§ 450.249(B)-(c), 450.261; Mich. Comp. Laws § 400.604; Minn. Stat. §§ 256B.064-1a(7), 256B.064-1b; Minn. R. §§ 9505.2165-4(C), 9505.2215-1A; Mont. Code Ann. § 45-6-313(1)(b)(i); Nev. Rev. Stat. § 422.560(1)(a); N.J. Stat. Ann. § 30:4d-17(c); N.J. Admin. Code § 10:49-5.5(a)(17); N.M. Stat. Ann. § 30-44-7(A)(1); N.M. Code R. §§ 8.302.1.11, 8.351.2.9-13; N.Y. Soc. Serv. Law § 366-D(2); N.Y. Comp. Codes R. & Regs., tit. 18, §§ 515.2(b)(5), 518.1-2; N.C. Gen. Stat. §§ 108A-63(g), (h), 108A-70.16; N.C. Admin. Code 22F.0301(5); Okla. Stat., tit. 56, § 1005(A)(6); R.I. Gen Laws §§ 5-48.1-3(a), (b), 40-8.2-3(a)(2); R.I. Code R. § 0301.20(1); Tenn. Code Ann. §71-5-118; Tenn. Comp. R. & Regs. §§ 1200-13-1-.05(1)(a)(6), 1200-13-1-.21(2), (3); Tex. Hum. Res. Code Ann. §§ 32.039(b), 32.039(c)(1); Tex. Penal Code Ann. § 35A.02(a)(5); Va. Code Ann. § 32.1-315; Wash. Rev. Code § 74.09.240; Wash. Admin. Code § 182-502-0016(1); *see also* Florida Medicaid Provider Handbook; Georgia

Medicaid Manual; Illinois Medicaid Handbook; Indiana Medicaid Provider Manual; Louisiana Medicaid Provider Manual; Michigan Medicaid Provider Manual; Minnesota Medicaid Provider Manual; Nevada Medicaid Services Manual; Oklahoma Medicaid Provider Billing and Procedure Manual; Virginia Medicaid Provider Manual.

45.     Many states, including California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and the District of Columbia, also require Medicaid providers to enter into provider agreements obligating them to comply with all applicable federal and State Medicaid laws (sometimes with specific emphasis on the AKS) and/or conditioning the right to payment on compliance with those laws.

46.     As detailed below, Defendants knowingly and willfully violated federal and state Anti-Kickback statutes.

**D. State Escheatment Laws**

47.     Escheat laws are designed to protect the rights of missing and unknown owners of unclaimed property, while also providing a source of revenue for state governments. Escheat laws make clear that unclaimed property is not meant to be a windfall for the debtor. Rather, it is to be reported and delivered to the state where it can be put to use for the benefit of all state residents.

48.     Escheat laws generally require businesses to report and return unclaimed property after a certain amount of time elapses. Unclaimed property may include intangible property such as credit balances, customer overpayments, or unclaimed refunds. Under Supreme Court precedent, intangible property escheats to the state of the last known address of the creditor, according to the debtor's books and records. However, when there is no record of address for the creditor *or* the last known address is in a state which does not provide for escheat of the property owed, the debtor's state of incorporation gains priority.

49.     Appendix C lists escheat laws enacted by the Plaintiff States. Escheat laws create an obligation to pay or transmit money to state government that is enforceable under state False Claims Acts.

## DEFENDANTS' FRAUDULENT CONDUCT

I.      **CVS and Coram Concealed and Avoided Their Obligations to Return and Escheat Overpayments in Violation of the False Claims Act.**

50.     CVS acquired Coram LLC in January 2014 in an all-stock transaction. From at least January 2008 until April 2016 (after the acquisition), CVS and Coram unlawfully took to income well in excess of $200 million worth of overpayments and potential overpayments (collectively referred to as "credit balances") from government and commercial payers. Government payors, including Medicare, Medicaid, TriCare, and the VA, accounted for approximately one third of the credit balances, and the remaining two-thirds were from commercial payors.

51.     A credit balance shows the amount paid to Defendants in excess of the amount due. Credit balances are not earned income, nor are they funds that Defendants were entitled to keep. Overpayments are funds received by Defendants that they were not entitled to keep. Since the term "overpayments" has a legal meaning, Defendants and their agents often used the term "credit balances" euphemistically for overpayments. All of the credit balances identified by Coram and CVS were overpayments and potential overpayments. After Defendants identified a credit balance, they had an obligation to return that amount to the government in a fixed amount of time. They had obligations under federal healthcare law to return payments from the government, and obligations under state escheat laws to return payments from commercial payors. As set forth below, Defendants knowingly concealed, avoided, and decreased these obligations.

52.     **Government Payors** – Under federal healthcare law, Defendants were required to return overpayments within 60 days after they were identified. 42 U.S.C. § 1320a–7k(d). The sixty-

day clock begins ticking when a company is put on notice of a potential overpayment. The credit balances put Coram and CVS on notice of potential overpayments. Thus, Coram and CVS were required to return funds within 60 days notice of the credit balances. They did not do so.

53.      **Non-Government Payors** – Under Delaware and other state escheatment laws, credit balances and overpayments are considered "unclaimed property" after a specified period of time elapses. Delaware law requires defendants to escheat credit balances and overpayments after a five-year dormancy period. *See* 12 Del Code § 1133(6) and (17); *see also* 12 DE ADC 104-2.0, 2.21. The five-year clock begins to run after the owner of the property first has a right to demand the property or the obligation to pay or distribute the property arises. *Id*. Here, the clock began to run no later than the time the credit balances were identified. As detailed below, this five-year period has expired, and Defendants failed to report and escheat the funds as required.

54.      CVS and Coram are incorporated in Delaware. Companies incorporated in Delaware must escheat all unclaimed property to Delaware *unless* the company's records show that the last known address of the owner of the unclaimed property is in a state other than Delaware. *See* 12 Del Code § 1141(a). For the vast majority of credit balances, Coram and CVS did not retain the relevant records, let alone records sufficient to identify the state of the last known address of the owner of the unclaimed property. This means that CVS and Coram were legally obligated to escheat most of the funds to Delaware.

55.      CVS' and Coram's knowing failure to return credit balances and overpayments owed to Government Payors is actionable under the federal and state False Claims Acts.

56.      Defendants' knowing failure to escheat commercial credit balances and overpayments to Delaware or the appropriate state government(s) is actionable under each state's respective False Claims Act.

57.     Other CVS entities, including CVS Specialty and Omnicare Advanced Care Scripts, also failed to return credit balances and overpayments in violation of federal and state False Claims Acts.

### A.  CVS Discovers Overpayments Prior to Acquiring Coram.[4]

58.     In 2013, CVS retained Deloitte & Touche LLP ("Deloitte") to conduct a due diligence investigation in connection with CVS' plan to acquire Coram. Deloitte produced a report to CVS which detailed Deloitte's findings (the "Deloitte Report"). Relevant excerpts from the Deloitte Report are attached as Exhibit ("Ex.") 1. The "Scope" of the report focused on the business aspects of the acquisition and excluded legal and regulatory review: "In this regard, [Deloitte] analyzed selected historical financial information and other accounting, financial, tax, IT and operating data of Coram." Ex. 1 at pp. 2-3.

59.     The Deloitte Report identified $98 million in "credit balances" Coram improperly recognized as revenue between 2011 and June of 2013:

* **"Management recognized credit balances of [$30.2] million in FY11, [$32.7] million in FY12 and [$35.0] million in LTM Jun-13 as revenue."**



**Credit balances recognized as income**

The following table summarizes credit balances recognized by the Target as income during FY11, FY12 and LTM Jun-13.

**Recognition of credit balance to the income statement**

| US$ in thousands | FY11 | FY12 | LTM Jun-13 |
|---|---|---|---|
| Credit balances | [ 29,528 ] | [ 27,095 ] | [ 28,125 ] |
| Refunds paid | [(6,411)] | [(5,905)] | [(5,131)] |
| Total credit balances recognized as income (Coram/IV) | 23,118 | 21,190 | 22,994 |
| Enteral credit balances recognized to income | [ 7,110 ] | [ 11,543 ] | [ 11,974 ] |
| **Total credit balances recognized as income** | 30,228 | 32,733 | 34,968 |

Source: Management schedule

---

[4] The term "overpayment," when used below, includes both credit balances (as potential overpayments) and overpayments.

*Id*. at pp. 15 and 86 (emphasis added).

60.     The Deloitte Report also identified $42.3 million in cash in a suspense account,

which included overpayments and would eventually be taken to income:

- **"Management indicated that when it receives payments from payors in excess of its expected reimbursement, these amounts are classified as cash in suspense. As of Jun-13, Coram has approximately $42.3 million of cash in suspense, reducing gross AR."**

| Key finding | Observations |
|---|---|
| Credit balances | • Management indicated that when it receives payments from payors in excess of its expected reimbursement, these amounts are classified as cash in suspense. As of Jun-13, Coram has approximately $42.3 million of cash in suspense, reducing gross AR. |

*Id*. at p. 15 (emphasis added).

- **"Management identified certain credit balances (which reduces gross AR), which it believes to be overpayments or over-contractualizations which will be eventually taken into income."**

– *Credits to be reclassified from suspense AR* - Management identified certain credit balances (which reduces gross AR), which it believes to be overpayments or over-contractualizations which will be eventually taken into income. As the AR model does not include these amounts, management believes that the AR reserve requirement is overstated for the cash overpayments (or over-contractualizations) already received. See Credit Balance section for further discussion.

*Id*. at p. 101 (emphasis added).

61.     The Deloitte Report also confirmed that Coram did not escheat any credit balances

or analyze the nature of the credit balances:

- **"[Coram] Management indicated that it does not escheat credit balances received from commercial insurers. These credit balances are recognized as income after a set period of time."**

18

> 21. **Recognition of credit balances** – We have included a placeholder to adjust EBITDA based on the completion of an analysis of credit balances in accounts receivable recorded by management as revenue. Historically, Coram has recognized credit balances (net of refunds) of [$30.2] million in FY11, [$32.7] million in FY12 and [$35.0] million in LTM Jun-13. Management indicated that it does not escheat credit balances received from commercial insurers. These credit balances are recognized as income after a set period of time. See *Other Quality of Earnings* section of this report for further discussion. [We have requested but have not received information from management in order to further evaluate the credit balances recognized as revenue in the historical income statements.]

*Id*. at p. 83 (emphasis added).

- **"Management indicated that it does not analyze the nature of these credit balances to determine if they are the result of true overpayments …"**

*Id*. at p. 86 (emphasis added).

62.     Further, Deloitte recommended a review of Coram's "internal audit reports related to escheat during the past ten years." *Id*. at p. 180.

63.     Under "Finance Matters for Follow Up," Deloitte noted that additional detail and support was needed "regarding the Company's credit balances in accounts receivable and their recognition to income," and Coram's "[t]reatment of credit balances in accounts receivable related to Medicare and Medicaid." *Id*. at p. 181.

64.     Finally, Deloitte recognized that CVS should perform additional diligence into Coram's handling of credit balances:

- **"CVSC may consider performing additional diligence related to the nature of these credit balances and whether potential overpayments are being properly refunded in accordance with its payor contracts."**

**Analysis of credit balances**

We have provided Coram management with a sample of credits recognized as income, which we will re-adjudicate based on the pricing terms of the specific payor contract. As of the date of this report, we have not been provided with the supporting information needed to complete this analysis.

CVSC may consider performing additional diligence related to the nature of these credit balances and whether potential overpayments are being properly refunded in accordance with its payor contracts.

*Id.* at p. 86 (emphasis added).

65.     In short, the Deloitte Report clearly put CVS on actual notice of (1) the existence of tens of millions of dollars in credit balances to both government and commercial payors, and (2) Coram's unlawful recognition of these credit balances as income.

66.     Moreover, CVS understood that these credit balances arose because Coram utilized gravely deficient billing and claim processing procedures. CVS also knew that Coram never took corrective actions to fix these billing and claims processing procedures.

67.     For example, Coram routinely billed payors using an out-of-network corporate NPI (national provider identifier), even though Coram was required to use the local NPI number associated with the individual Coram facility that provided the services. The NPI is a unique identification number that health care providers must use in their transactions. Because the corporate NPI number was not the correct identifier, Coram's claims were improperly adjudicated and resulted in duplicate payments, incorrect payments, and erroneous crossover claims. This includes claims paid at the incorrect "list" price as opposed to the contracted price. It also includes "bill for denial" claims submitted with the corporate NPI and improper billing modifiers to Medicare payors. Providers "bill for denial" to obtain a claim denial (e.g., on a non-covered service) so that a secondary payor can pay. Such claims must use the "GY" modifier to clearly

notify the government payor that the claim is for an excluded service or should otherwise not be paid. Coram did not use the proper "GY" modifier, and so government payors paid Coram for excluded services. Coram closely monitored its books to identify any underpayment for follow up with the payor, but overpayments that were identified were simply pocketed as income after an artificial one-year waiting period.

68.  CVS executives discussed Coram's corporate NPI billing practices and documented the process by which Coram used incorrect NPIs to generate "credits." But even after identifying this improper billing practice, CVS and Coram continued to bill with the incorrect corporate NPI. As a result, Coram continued to generate overpayments even after it was acquired by CVS. Worse, Coram and CVS continued to illegally sweep the overpayments to income.

69.  Another way Coram generated overpayments was to bill twice for the same services. These double claims were often paid because Coram would knowingly enter slightly different information in the second claim, such as different "Dates of Service" or different "Units" of drugs. These deliberate changes further demonstrate that the double-billings were not clerical mistakes but a scheme to receive double reimbursement.

70.  The Deloitte Report specifically identified numerous instances in which claims were billed twice with different "Dates of Service" or with different "Units." CVS recognized that these duplicate claims should not have been paid, but did not attempt to return any of these overpayments. Coram continued its improper billing practices even after CVS completed the acquisition and took control of Coram's business. Accordingly, CVS and Coram not only failed to return known overpayments, they also engaged in improper billing practices that were specifically designed to generate overpayments.

71.     In the Deloitte Report and subsequent reviews, CVS uncovered numerous issues involving Coram's handling of government and commercial billing, going back to at least 2008. In the below document, circulated in March of 2014, Deloitte identified numerous "scenarios" in which Coram generated credit balances, including patient overpayments. Deloitte shared this document with CVS management, including David Falkowski (at the time CVS VP Chief Internal Audit Officer, he is now a CVS Executive Vice President and Chief Compliance Officer).

**Example Credit Balance Scenarios**

DRAFT – FOR DISCUSSION PURPOSES ONLY

*Note: Some examples may be applicable depending on the provider billing type. In addition, not all possible scenarios listed below.*

| Example # | Reason/Cause | Who overpaid? | | |
|---|---|---|---|---|
| | | Primary Payor | Secondary Payor | Patient |
| 1 | Credit balance caused by a contractual adjustment error (e.g., billing system expected payment amount inaccurate generating a credit balance that is actually a contractual adjustment). Not a true overpayment. No refund due. | | | |
| 2 | Medicare paid as primary, and two different commercial payors paid as secondary. | | ✓ | |
| 3 | Secondary payor overpaid coinsurance. | | ✓ | |
| 4 | Two payors paid as primary. | | ✓ | |
| 5 | The same payor paid twice as secondary payor. Can be commercial or government payor making second payment. Not always a duplicate payment. | | ✓ | |
| 6 | A commercial payor and a state/grant program both paid as secondary. | | ✓ | |
| 7 | Secondary payor paid incorrect co-insurance amount due to adjustment in Medicare fee schedule impacting co-insurance due. | | ✓ | |
| 8 | Secondary payor payment error. Secondary payor paid more than the net amount due in error. | | ✓ | |
| 9 | Medicare paid as primary, and Medicaid and another payor both paid as primary. | ✓ | | |
| 10 | Medicare should have been secondary payor due to spousal primary coverage. | ✓ | | |
| 11 | Medicare paid as primary, however patient was within a Skilled Nursing Facility (SNF) period and therefore subject to SNF Consolidated Billing. | ✓ | | |
| 12 | Primary payor payment error. Primary payor paid more than contracted amount due in error. | ✓ | | |
| 13 | Billed wrong payor. Patient had a change in health plan coverage. Wrong payor paid and correct payor paid. | ✓ | | |
| 14 | Primary payor and secondary payor pay correct amount. Patient makes a payment in error. | | | ✓ |
| 15 | Medicare billed for denial. Medicare denies claims and crosses claim over to another payor. The other payor pays the crossover claim. The provider also bills the other payor directly via second manual claim. The other payor pays both the crossover claims and the second manual claim. Overpayment may result from the primary and/or secondary claim. | ✓ | ✓ | |
| 16 | Coding error resulting in overpayment. Overpayment may result from the primary payor, secondary payor and patient. | ✓ | ✓ | ✓ |
| 17 | Multiple reasons/causes for the outstanding credit balance. | ✓ | ✓ | ✓ |

Key Considerations:

- Is the overpayment a result of a payment error or a billing error? Billing errors pose significantly greater legal and compliance risk.

(Updated March 11, 2014)

Ex. 2.

72.     Another reason for credit balances and other unearned income was the use of a single claim identification number that was assigned to multiple members (beneficiaries). That

22

should not have occurred. Each individual claim identification should be unique and not result in payments on behalf of multiple members. Deloitte excluded $32 million from Coram's reimbursement data for claims that were paid from July 2012 through June 2013 because "a claim ID was assigned to multiple members." (Ex. 1 at p. 41).

**B. After the Coram Acquisition, CVS and Coram Meet in St. Louis to Discuss Coram's History of Recognizing Overpayments as Income.**

73.     After the Coram acquisition, CVS and Coram held a meeting in St. Louis on March 12 and 13, 2014 (the "St. Louis Meeting") to discuss Coram's overpayment practices. The "Discussion Document" used at the meeting is attached as Exhibit 3-A. Relator attended this meeting along with representative from CVS senior management, including Falkowski and Jim (James) Clark (at the time Vice President Finance and Accounting, currently Senior VP, Controller and Chief Accounting Officer). *See* Ex. 3-A p. 3 (listing attendees).

74.     Coram's Senior Vice President, Danny Claycomb, led the discussion at the St. Louis Meeting. Claycomb was in a leadership position at Coram and largely responsible for the billing and revenue practices that generated the overpayments and caused Coram to take the overpayments to income. About one year after the acquisition, Claycomb was no longer employed by CVS/Coram.

75.     Below are the "Meeting Objectives" of the St. Louis Meeting. The first item listed is "provide sufficient information and 'grounding' in Coram's historical practice dealing with overpayments."

*Id*. at p. 4.

76. Under the "Facts" slide, copied below, the first bullet point states that the **"Deloitte Coram Diligence assessment … has raised concerns 'at very high levels' within CVS regarding [the] handling of overpayments."** (emphasis added) The concerned individuals in "very high levels" within CVS would include: (1) Jonathan Roberts (President of CVS Caremark Pharmacy Services at that time and now EVP and Chief Operating Officer for CVS); (2) David Denton (Chief Financial Officer of CVS at the time); and (3) Eva Boratto (Chief Accounting Officer at the time and subsequently Chief Financial Officer of CVS).



*Id*. at p. 6.

77.     The below issues were of particular concern to the CVS management "at very high levels":

- Coram's policy of holding credit balances and overpayments for one year, after which it would improperly transfer (or "sweep") the balance to income;

- Coram's failure to identify Medicare Part D Sponsors, Medicare Advantage Carriers, and Managed Medicaid as government payors, unlike "traditional" government payors (Coram considered Fee-For-Service Medicaid and Medicare Part B as traditional government payors because there was a direct contractual relationship with the government);

- Coram's failure to adequately notify government and commercial payors of potential overpayments; and

- Coram's failure to implement and consistently follow adequate policies and procedures for billing and escheatment.

78.     The next slide identified $27.3 million in "recoveries" taken to income involving approximately 750 different payors between January 2013 and January 2014. "Recoveries" is another euphemism for credit balances improperly taken to income.

*Id.* at p. 7.

79. During the St. Louis Meeting, CVS and Coram representatives reviewed a document identifying examples of "Potential Overpayments" from various payors. The examples included a total of $117,228 in the "Potential Overpayment Error Amount," and specified the "Amount Swept to Recovery" and the "Date Swept to Recovery." A table summarizing some of the overpayment examples is attached as Exhibit 3-B.

80. The St. Louis meeting also confirmed that Coram historically failed to escheat any overpayments to state entities, as required by state law. The following graphic was used to discuss Coram's handling of "non-government" overpayments (which included Managed Medicaid and Medicare payers). Overpayments "Under $500" were swept to income without any notification to the party who overpaid. Overpayments "over $500" were swept to income unless the payor responded to Coram's "Inquiry Letter" within 60 days.



*Id.* at p. 9.

81.     Coram's "Inquiry Letter," attached as Exhibit 4, was highly misleading because it did not notify payers that Coram had identified an overpayment. Instead, the template letter stated that Coram had "a question concerning a payment," and concluded: "If you determine that the payment was less than the amount required, please submit and [sic] additional payment promptly. If you believe a refund is required, please be sure to identify how the check should be made payable and where the check should be sent…." Further, Coram stopped sending *any* notifications to commercial payors after January 2013, per the Deloitte Report. *See* Ex. 1 at p. 86 ("Historically, management sent notifications to commercial payors related to these credit balances, however this practice ceased in Jan-13.").

82.     Although Coram published policies and procedures regarding refunds and overpayments for government and commercial payers, Coram did not follow their own policies and procedures. These documents were typically used for compliance certifications and attestations. *See* supra ¶¶ 37-38 (regarding certifications from FDR entities). As noted in the "Facts" slide 6 above, Deloitte "approved [Coram's] financials since 2009 under the current Coram policies." That is, Deloitte approved the Coram "policies" that concealed the reality of Coram's business practices.

83.     For example, Coram's policy on "Non-Government Refunds & Credit Balances," (policy number 08.08.01), states that all "Non-Government overpayments will be researched

within 2 business days of receipt." This did not happen. Similarly, Coram's policy on "Government Refunds Overpayments," (policy number 08.08.02), states that "Coram shall promptly report to the relevant Federal Health Care Program payer any error that requires the return of a payment received from that payer and shall respond promptly to overpayment requests initiated by Federal Health Care Program payers. Coram shall timely return confirmed overpayments. Additionally, Coram shall take the appropriate corrective action to prevent the recurrence of billing errors." This too did not happen.

84.     Other Coram policies, such as its policy on "Government Billing," (policy number 08.05.07), clearly recognize that "Government sponsored healthcare programs" include all Medicare and Medicaid, including "Medicare Advantage Plans," and "Managed Medicaid Plans." Nonetheless, Coram internally treated Managed Medicaid Plans as commercial payers.

85.     These policies underscore that Coram understood its obligations, but deliberately elected not to follow them.

86.     In deciding what to do about these overpayments, CVS recognized that returning the overpayments that had been "swept" to income would negatively affect earnings.

87.     At the St. Louis Meeting, CVS used a "Decision 4-Square" to graph how different approaches to the overpayment issue, including the "historical" credit balance, would affect corporate profits (stated as "EBITDA," earnings before interest, tax, depreciation, and amortization, a measure of the company's financial performance). Below is the "Decision 4-Square" Defendants used to decide whether overpayments should be returned. In the two "HIGHER EBITDA IMPACT" categories, were "Determine historical remediation," *i.e.* return overpayments. The "LOWER EBITDA IMPACT" did not include historical remediation.



Ex. 3-A at p. 14 (emphasis added).

88.     The Decision 4-Square shows that CVS weighed doing the analysis required by law ("historical remediation") against the impact of following the law on corporate earnings.

89.     Ultimately, CVS' senior management consciously decided not to refund any of the $98 million in "historical" overpayments already recorded as income. In addition to the $98 million, Coram took tens of millions of dollars in credit balances per year to income in 2008, 2009, and 2010. Coram also took tens of millions of dollars in credit balances to income just prior to the CVS closing. Together, these sums are referred to as credit balances taken to income "pre-closing," and described in Section C below. CVS also took credit balances to income after the Coram acquisition, *i.e.*, "post-closing," as described in Section D. CVS took these credit balances to income "without review, consistent with [Coram's] pre-acquisition sweep process." In total, CVS improperly kept

29

well in excess of $200 million in credit balances as income. CVS prioritized profits over compliance with the law.

### C. CVS Consciously Decided Not to "Revisit" the $98 Million-Plus in Overpayments Coram Took to Income Pre-Closing.

90.     In the Deloitte Report and during CVS' subsequent reviews of Coram's overpayment practices, CVS discovered that from January 1, 2011 to June 30, 2013, Coram illegally transferred approximately $98 million from credit balances directly to income. CVS was also on notice that before this time period, Coram had likely taken tens of millions of dollars more in overpayments to income per year in 2008, 2009, and 2010. CVS also knew that as of June 2013, Coram held $42.3 million in a suspense account, most of which Coram took to income just prior to the CVS acquisition. This included both government and commercial overpayments.

91.     Nonetheless, after CVS completed the Coram acquisition, CVS failed to return or otherwise remediate any overpayments Coram recognized as income pre-closing.

92.     Because CVS acquired Coram via a stock purchase agreement, CVS became responsible for Coram's liabilities. Coram was not entitled to keep this money, and neither was CVS. Further, the Coram overpayments taken to income pre-closing represented a liability that CVS should have recorded on its books and records and disclosed to shareholders. CVS has never done either.

93.     As a CVS compliance director, Relator was closely monitoring the resolution of Coram's overpayments. In April 2016, Relator met with a CVS executive familiar with Coram's overpayments. Relator was told that CVS senior management – including, Denton, Falkowski, and Boratto – made the decision to not "revisit" the overpayments Coram had swept to income pre-closing. Thus, CVS knowingly concealed *at least* $98 million in overpayments from government and commercial payors.

30

**D. CVS Keeps the Lion's Share of Coram's Pending Overpayments Post-Closing.**

94.     In addition to the credit balances that Coram recorded as income pre-closing, Coram held millions of dollars more in pending credit balances waiting to be taken to income. And Coram continued to accrue overpayments up until July 1, 2015, after the CVS acquisition. Following Coram's playbook, CVS took most of the pending overpayments to income post-closing.

95.     While a small percentage of the overpayments were refunded to government payors, the vast majority was not. By the end of the first quarter of 2016, CVS "swept" at least $65 million more in overpayments to income, as CVS described: "without review, consistent with [Coram's] pre-acquisition sweep process."

96.     By March 31, 2016 (the end of the first quarter of 2016), CVS had disclosed only a small portion of these overpayments to the government. CVS issued $8.5 million in refunds to government healthcare programs, including Medicare, Medicaid, and TriCare, purportedly for the overpayments. However, even these refunds were not fully processed because CVS failed to match overpayments to specific government claims.

97.     CVS made no effort to return or escheat the remaining credit balances, which totaled over $65 million. CVS fraudulently swept this money directly to income only days before CVS closed the company's financial books on the first quarter of 2016.

98.     Some internal CVS documents mischaracterized these overpayments taken to income as a "write off." This includes $7.9 million that was written off "without review, consistent with [Coram's] pre-acquisition sweep process," and $3.3 million that was written off "without review, consistent with [Coram's] sweep process prior to CVS policy change." Another $1.6 million was written off "without review, [because it was] too small to pursue." And $49.2 million was written off and taken to income despite the fact that it was purportedly to be "work[ed] according to new Policy & Procedures."

99.     These and other "write offs" were taken illegally as profits. CVS did not perform the analyses required by law.

100.     This was confirmed during Relator's April 2016 meeting with the CVS executive familiar with Coram's overpayments. During the meeting, Relator was told that CVS took the $65 million in pending overpayments to income. These were primarily commercial overpayments that should have been escheated to Delaware, not kept as profits. The decision to take these overpayments as income consistent with Coram's pre-acquisition sweep process was made by CVS senior management and implemented only days prior to CVS closing its books on the first quarter of 2016. The CVS senior managers include Denton, Falkowski, and Boratto. Mr. Denton and Ms. Boratto both signed CVS' Form 10-K for 2015 and 2016.

101.     That quarter, CVS reported adjusted earnings per share (EPS) of $1.18, which was $0.01 above guidance range, as highlighted in the CVS Earnings Conference Call presentation materials below.



Ex. 5 at p. 19 (emphasis added).

102.    But for the decision to record the pending overpayments as income, CVS' adjusted earnings per share would have missed guidance, likely causing its stock price to drop. Guidance reflects the earnings expectations of investors. Stock prices typically drop when a company does not meet guidance. Similarly, if CVS had restated prior earnings (or put a liability on its books as a result of the "historical" overpayments kept as income), the impact would have further negatively affected earnings per share and ultimately the CVS stock price.

103.    Thus, the millions in falsely inflated earnings distorted the total earnings per share CVS reported for the quarter in 2016 and fraudulently impacted the CVS share price. This is further evidence of Defendants' *scienter* in violating the False Claims Act.

104.    In sum, between January 2008 and April 2016, Coram and CVS took to income well in excess of $200 million in commercial and government credit balances. When CVS acquired Coram in January 2014, CVS identified the problem, but until April 2016 continued to sweep credit balances to income "consistent with [Coram's] pre-acquisition sweep process."

105.    By engaging in the conduct described above:

a.  CVS violated the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a), and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) and 17 C.F.R § 240.10b-5;

b.  CVS violated the internal controls and books and records provisions of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5) and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]; and the lying to accountants provision of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2;

c.  David Denton, Executive Vice President and Chief Financial Officer, and Eva Boratto, Senior Vice President-Controller and Chief Accounting Officer violated the certification provision of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]; and the clawback provision of Section 304(a) of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act") [15 U.S.C. § 7243(a)]; and

d.  David Denton, Executive Vice President and Chief Financial Officer, and Eva Boratto, Senior Vice President-Controller and Chief Accounting Officer aided and

abetted CVS' violations of the antifraud, reporting, books and records, and internal controls provisions of Sections 10(b), 13(a), 13(b)(2)(A), and 13 (b)(2)(A)-(B)] and Exchange Act Rules 100b-5, 12b-20, 13a-1, and 13a-11 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-11].

**E. CVS' Concealment and Failure to Return Government Overpayments Violates the False Claims Act.**

106.    Congress deliberately made healthcare providers responsible for quickly addressing overpayments and returning any overpayments to the public fisc. In amending the FCA under the Fraud Enforcement and Recovery Act of 2009 (FERA), Congress specifically targeted the conduct at issue here.

107.    As one of the Congressional authors of the 2009 statute stated:

Liability for all non-disclosed overpayments of the same type also should be imposed once an organization or other person is on notice that it has been employing a practice that has led to multiple instances of overpayment. For example, if a corporation learns after-the-fact that it has been violating a billing rule or a contract requirement in its billing, and it nonetheless fails to comply with a legal obligation to disclose the resulting overpayments, this amendment renders the corporation liable under the [FCA] for all overpayments resulting from the violation of the billing rule or contract requirement, even those not specifically identified or quantified.

Speech of Hon. Howard L. Berman, June 3, 2009, Congressional Record, E1295 at E1299.

108.    Congressman Berman's statement applies exactly to CVS' and Coram's unlawful practice of sweeping overpayments to income.

109.    Under the Medicare and Medicaid Programs, providers are required to self-report overpayments and have a relatively short deadline for repayments. 42 U.S.C. § 1320a-7k(d). Providers, such as CVS and Coram, have an "obligation" to return overpayments to the government within 60 days after the overpayment has been "identified." *Id*.

110.    Under the 2009 amendments to the FCA, CVS and Coram are liable for "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Thus, by knowingly

concealing an obligation to refund millions of dollars in overpayments to government payors, CVS and Coram violated the FCA.

### F. CVS' Concealment and Failure to Escheat Commercial Overpayments to Delaware Violates State False Claims Acts.

111.    Under state escheatment laws, CVS and Coram were obligated to report and escheat all commercial overpayments and credit balances that were "unclaimed property" to the appropriate state entity. Escheat "priority rules," established by the Supreme Court in *Texas v. New Jersey*, 379 U.S. 674 (1965), dictate which is the appropriate state to escheat unclaimed property. The "first priority rule" provides for escheatment to the state in which the owner of the unclaimed property is located, based on the books and records of the holder of the unclaimed property (the holder here is CVS/Coram). If the holder of the unclaimed property cannot identify the state of the last known address, the "second priority rule" provides for escheatment *to the state where the holder is incorporated*.

112.    Both CVS and Coram are incorporated in Delaware, thus Delaware law applies to any unclaimed property subject to the second priority rule. *See also* 12 Del. Code § 1141.

113.    Under Delaware law, "Customer Overpayments" and "Credit Balances" are a "Reportable Property Type" of unclaimed property. *See* 12 DE ADC 104-2.0, 2.21. Once the holder has had possession of such property for five years (the "dormancy period"), the property must be reported and escheated to the state of Delaware. *See* Del. Code §§ 1141-42, 1152.

114.     Thus, the only question here is whether Coram and CVS have adequate records establishing the last known address of the owners of the overpayments and credit balances. If the answer is "no," then the overpayments escheat to Delaware.[5]

115.     As described below, Coram failed to maintain adequate records of the property owners' last known address for the vast majority of the commercial overpayments at issue in this lawsuit. Although Delaware law requires Coram and CVS to retain records of such information for at least ten years, *see* 12 Del. Code § 1145, Coram's records were in a disarray and often missing, inaccurate, incomplete, or destroyed.

116.     Specifically, after the Coram acquisition, Deloitte carefully reviewed Coram's books and records as part of the "Coram Infusion Revenue Cycle Assessment," dated May 2015. Relevant excerpts from the assessment are attached as Exhibit 6. In the assessment, Deloitte identified numerous areas where Coram failed to maintain adequate records. This includes examples where manual processes and paper-based records led to incorrect or incomplete information. Coram also failed to maintain adequate computer-based systems. In sum, Deloitte identified the following "Key themes":

- **"Limited system edits to prevent inaccurate, incomplete, or inconsistent information"**

- **"Heavy reliance on manual, paper-based processes"**

---

[5] Even if Coram does have records sufficient to identify the last known address for a limited subset of credit balances, then that state's escheat laws would apply. For example, if Coram's books and records identify Connecticut as the state of the creditor's last known address, then Connecticut escheat laws would apply. Under Connecticut law, property that remains "unclaimed by the owner for more than three years after it became due, payable or distributable, is presumed abandoned." Gen. Stat. Ann. § 3-64a. "Within ninety days after the close of the calendar year in which property is presumed abandoned, the holder shall pay or deliver such property to the Treasurer." Conn. Gen. Stat. Ann. § 3-65a(b). Thus, after three years, Coram's overpayments were presumed abandoned, and CVS and Coram were required to report and deliver unclaimed property to the Connecticut Treasurer. Neither Coram nor CVS reported or escheated any of these commercial credit balances to any of the Plaintiff States.

- **"Cumbersome and manual reporting tools that are often duplicative, un-actionable, and/or sometimes inaccurate"**

- **"Policies and procedures are well documented but not consistently followed"**



Ex. 6 at p. 9 (emphasis added).

117. The Deloitte assessment went on to identify numerous other billing and record keeping problems, such as the following:

- "Insurance information is entered as free text in RPM, which increases the risk of billing errors and prevents the system from creating automatic tasks or actions based on this information."

- "Authorization process is manual and primarily paper driven…. Staff maintain authorization requests in physical folders."

- "Communication to resolve issues … including missing documentation and authorizations, is inefficiently managed."

- "[C]hanges to claims are taking place [in one system], which creates misalignment of information [in other systems]."

- "Staff enters data manually into multiple disparate systems."

- "Audits are not in place to track the revenue that is removed from the account."

*Id*. at pp. 19, 20, 31, 32, and 33.

118.     After the Coram acquisition, CVS also hired FTI, another consultant, to review Coram's pending credit balances. Like Deloitte's review, FTI's review confirms that Coram did not retain adequate records.

119.     As part of these reviews, Deloitte and FTI confirmed that the vast majority of the credit balances were in fact overpayments. They also found that a very high percentage of the credit balances could not be returned or otherwise resolved due to "data matching" failures and a general lack of records.

120.     One reason for this was because Coram relied on deficient software systems to record credit balances. One system recorded credit balances with the patient, but did not connect the credit balance to a specific invoice or invoice-specific data fields. Other systems identified credit balances with multiple payers and invoices, without identifying the responsible party and relevant invoices.

121.     Coram also improperly relied on paper claims and manual pricing which made it nearly impossible to identify the proper party to issue a refund. These paper claims were often destroyed or contained incomplete information. And Coram was unable to accurately match paper payments with credit balances recorded in its software systems.

122.    As described above, even after CVS agreed to a limited refund of pending overpayments to government payers, CVS was unable to provide claim-specific detail regarding the refunds. As a result, the refunds could not be properly processed by government payers. This was because CVS and Coram did not have the vast majority of the claim and payor data. Instead, CVS had to rely on a random sampling analysis performed by FTI. This random sampling was performed simply to justify limited refunds to government payers.

123.    Deloitte and FTI both recognized that credit balances that could not be refunded due to data mismatch or other system limitations, become unclaimed property that must be escheated.

124.    Given that CVS and Coram are both incorporated in Delaware, and given that the Second Priority Rule applies to monies which could not be "matched" to an owner, the great majority of commercial overpayments that CVS and Coram improperly "swept" to income should have been escheated to the State of Delaware. This is because: (1) Coram did not maintain adequate records to identify the last known address for the owner of the unclaimed property, and thus Delaware escheatment law applies; (2) Delaware law states that credit balances and overpayments constitute property that must be escheated to the State after the five-year dormancy period is satisfied; and (3), the overpayments at issue here have been dormant more than five years.

125.    For example, the tens of millions of dollars Coram accrued in overpayments in 2008, CVS should have escheated in 2014, the year CVS completed the Coram acquisition. The $30.2 million in credit balances Coram recognized as income in fiscal year 2011, CVS should have escheated to Delaware no later than 2017. The $32.7 million in credit balances Coram recognized as income in fiscal year 2012, CVS should have escheated to Delaware no later than 2018. The $34.9 million in credit balances recognized as income by June 2013, CVS should have escheated

39

to Delaware no later than 2019. The tens of millions of dollars more in overpayments that Coram accrued through July 2015, CVS should have escheated to Delaware no later than 2021.

126.    CVS is a sophisticated business and understands its obligations under state escheat laws. Because CVS is domiciled in Delaware, it has regularly reported "unclaimed property" to the Delaware state escheator during the relevant time period, while knowingly and unlawfully excluding the hundreds of millions of dollars in overpayments sitting in its corporate coffers.

### G.  CVS Specialty Pharmacy and Omnicare ACS Also Failed to Return Government and Commercial Overpayments in Violation of False Claims Acts.

127.    Coram was not the only CVS entity to improperly retain overpayments. Both CVS Specialty and the Omnicare specialty unit Omnicare ACS (Advanced Care Scripts) failed to return government overpayments.

128.    Specialty pharmacies are particularly prone to overpayments because specialty medications can be very expensive and involve complicated reimbursement methodologies. As a result, both CVS Specialty and Omnicare ACS should have robust procedures in place to identify and return overpayments, but they did not.

129.    Moreover, CVS Specialty and Omnicare ACS receive billions of dollars in revenue (CVS Specialty does 20 times as much business as Coram). This volume increases the likelihood of overpayments and the potential damages to the government.

130.    CVS Specialty and Omnicare ACS also share the same CVS leadership as Coram and have the same incentives to sweep overpayments to income.

131.    Before the Relator was constructively discharged from his position at CVS, he performed work relating to government overpayments across multiple CVS entities, including CVS Specialty and Omnicare ACS.

132.     CVS Specialty pharmacies use an operating system called HBS SPARCS (CVS Retail Specialty pharmacies and CarePlus pharmacies use a different operating system). The HBS SPARCS system identifies underpayments – but not overpayments. On one occasion the CVS IT team accidentally discovered millions in CVS Specialty overpayments. These overpayments were not identified by the CVS Specialty team, because CVS Specialty had no process to identify overpayments. CVS Specialty Head of Finance, Chris Giuliano (who previously worked at Deloitte on the Coram overpayment issue) had no explanation why these overpayments were identified by CVS IT and not the CVS Specialty team. Nor did he have an explanation for why CVS Specialty has a process to identify underpayments, but not overpayments. If CVS Specialty had a process to identify overpayments, the millions in overpayment identified by the IT team would have been identified by CVS Specialty.

133.     Relator informed his supervisor about these overpayment issues, but CVS took no action. CVS Specialty also ignored commercial overpayments and had no escheatment policies or procedures in place to track credit balances until July 1, 2016. This means that the earliest CVS Specialty will escheat credit balances to Delaware or any state entity will be five years later, *i.e.*, the 2021-22 reporting period.

134.     Omnicare ACS uses a different operating system, but it also fails to properly identify and return overpayments. A substantial amount of Omnicare ACS revenue comes from government health care programs, and Omnicare has demonstrated an aggressive approach to government payments in the past, resulting in numerous FCA actions.

135.     Because of Relator's work relating to government overpayments, CVS planned an overpayment audit for Omnicare ACS to identify the extent of the overpayment issue. Based on Relator's initial assessments, this audit would likely reveal millions in overpayments the company

unlawfully took to income. However, Relator was discharged from CVS before the audit was completed.

136.     Because CVS Specialty and Omnicare ACS unlawfully kept government and commercial overpayments, Defendants violated the False Claims Acts and state escheat laws.

## II.     CVS Processed Prescriptions from Doctors Barred from Government Healthcare Programs.

### A.  Federal and State Laws Prohibit Government Reimbursement for Prescription Drugs Prescribed by Excluded Prescribers.

137.     Providers that have been excluded from federal and state healthcare programs cannot prescribe, order, or otherwise cause the government to reimburse claims for their services. Federal law mandates that "no payment is made by Medicare, Medicaid, and, where applicable, any other Federal health care programs for any item or service furnished by the excluded person or at the direction or request of the excluded person when the person furnishing the item or service knew or had reason to know of the exclusion, on or after the effective date of the exclusion as specified in the notice of exclusion." 42 C.F.R. § 402.209; *see also* 42 U.S.C § 1396a(39); 42 C.F.R. § 1001.1901; 42 C.F.R. § 1002.6(a)(1).

138.     Likewise, state healthcare programs do not pay for items prescribed or ordered by an excluded provider. Appendix B lists state authorities regarding excluded prescribers. For example, in Illinois, the Illinois Handbook for Providers of Pharmacy Services states that the Department of Healthcare and Family Services "will reject claims submitted for prescriptions if the prescriber is barred, terminated, or suspended from participation in the Medicaid Program." (Chapter P-200, 202.5). The website for the Office of Inspector General for the Department of

Healthcare and Family Services states that "no payment may be made to any business or facility that submits bills for payment of items or services provided by [a sanctioned] individual or entity."[6]

139.     Providers can be excluded from government healthcare programs for various reasons, including convictions for program-related fraud and patient abuse, licensing board actions, and default on Health Education Assistance Loans.

140.     When a provider is excluded, he or she is identified in a federal excluded prescriber list issued by the OIG and in excluded prescriber lists issued by 37 states (and the District of Columbia). Under the Affordable Care Act, prescribers identified in a state exclusion list are excluded from all state Medicaid programs, not just the state in which the exclusion list is published. 42 U.S.C. § 1396a(39).

141.     It is well established that pharmacies that submit claims to government healthcare programs must screen prescribers to avoid liability for submitting improper claims. In 2013, the Office of Inspector General for the U.S. Department of Health and Human Services issued guidance stating that pharmacies should screen prescriptions "at the point of service" to ensure the prescriber is not excluded:

> Many providers that furnish items and services on the basis of orders or prescriptions, such as laboratories, imaging centers, durable medical equipment suppliers, and pharmacies, have asked whether they could be subject to liability if they furnish items or services to a Federal program beneficiary on the basis of an order or a prescription that was written by an excluded physician. *Payment for such items or services is prohibited. To avoid liability, providers should ensure, at the point of service, that the ordering or prescribing physician is not excluded.*

---

[6]     HFS OIG website, available here (last visited June 30, 2022): https://www.illinois.gov/hfs/oig/Pages/SanctionsList.aspx; *see also* OIG 2011 Annual Report, available here: https://www2.illinois.gov/hfs/oig/Pages/AnnualReports.aspx (last visited June 30, 2022).

The guidance is available here: https://oig.hhs.gov/exclusions/files/sab-05092013.pdf (last visited June 30, 2022) (emphasis added).

142. Further, since March 25, 2014, CVS and its subsidiaries have operated under a CIA that specifically states that they cannot bill government healthcare programs for prescriptions from excluded prescribers. Relevant excerpts from the CIA are attached as Exhibit 7.[7] The CIA states that "CVS Caremark understands that items or services furnished, ordered, or prescribed by excluded persons are not payable by Federal health care programs." Ex. 7 at p. 13, ¶ 2.

143. Likewise, since at least 2009, Omnicare has been under a CIA that prohibits Omnicare from billing the government for services furnished by an excluded provider. Relevant excerpts from the CIA are attached as Exhibit 8. The CIA mandates Omnicare to "refrain from billing Federal health care programs for items or services furnished, ordered, or prescribed by an Ineligible Person." Ex. 8 at p. 25. An Ineligible Person is defined as an individual who "is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs; or has been convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible." *Id*. at 24.

144. Pharmacists rely on CVS computer systems to avoid filling prescriptions from doctors barred from government programs. If the computer system does not prevent such illegal prescriptions from being filled, the pharmacist will fill the prescription. Defendants knew that such prescriptions were regularly being filled, charged to the government, and taxpayer funded.

---

[7] The CIA was entered into before CVS Caremark Corp. changed its name to CVS Health Corp.

**B. For Years, CVS Retail Pharmacy, Omnicare, and Coram Had No Mechanism to Screen for State-Excluded Providers and Other Dispensing Requirements.**

145.    For years, CVS Retail Pharmacy, which operates thousands of CVS pharmacies across the country, had no mechanism to screen prescribers against state excluded provider lists.

146.    The below table is an excerpt from an internal CVS document titled "Prescriber Data Validation" (attached as Exhibit 9) showing that up until at least March 16, 2017, CVS Retail and Specialty Retail pharmacies operated without implementing software edits to validate prescribers against the various states' excluded prescriber lists. Under "State Exclusion Edit" (column on the far right), the red box states "Validation not in place," which means that CVS Retail and Specialty Retail pharmacies had no automated screening mechanism to block claims from prescribers on a state's exclusion list. The same is true for screening mechanisms to block prescribers who were inactive under the "State Controlled Substance Registration (CSR)" (column fourth to the left). Prescribers who are not active with the CSR cannot legally prescribe controlled substances.

| Business Unit | RX Type | State License Number (SLN) Active/ Inactive | State Controlled Substance Registration (CSR) Active/ Inactive | DEA # Active/ Inactive | DEA # Expired | DEA License Restriction Indicators 2N & 3N | DEA Prescribing Auth (SLN/CSR) - Midlevel Providers | NPI # Active/ Inactive | OIG Exclusion Edit | State Exclusion Edit |
|---|---|---|---|---|---|---|---|---|---|---|
| **CVS Retail & Specialty Retail** | | | | | | | | | | |
| CVS Retail and Specialty Retail pharmacies | Medicare, Medicaid & Commercial | Validation in place | Validation not in place | Validation in place | Validation in place | Validation in place | Validation in place | Validation in place | Validation in place | Validation not in place / Validation in place for NY |

Ex. 9 (certain rows excluded for clarity).

147.    Further, in late 2016 CVS Pharmacy implemented a stop-gap screening mechanism to screen for excluded prescribers in a single state, New York. For that reason, the table entry above reads: "Validation in place for NY." This edit was purchased from, and implemented by, an

outside contractor, McKesson Corp. McKesson offers a suite of edits for pharmacy claims processing called "RelayHealth" edits. CVS could have used McKesson to implement RelayHealth edits for all of its pharmacies across the country, but elected not to do so.

148. Further, the RelayHealth edit for New York was implemented only because of Relator's persistent efforts that CVS take action to prevent the improper filling of prescriptions from excluded providers.

149. Ultimately, on June 17, 2016, Relator emailed his supervisor (the Business Compliance Officer for CVS Retail and Omnicare), reiterating the need to screen for excluded providers and attaching a press release from the New York Attorney General's Office (the "New York AG") warning pharmacies to screen for excluded providers. The press release announced a government settlement with Vacuscript, Inc. (a non-party pharmacy) that allegedly submitted, and received payment for, approximately 4,600 claims written by an excluded provider. The New York AG made clear in the press release that: "Before filling a prescription, pharmacies are required under Medicaid billing rules to first ascertain whether the prescriber's services are eligible for reimbursement."[8]

150. In Relator's June 17 email to his supervisor, which attached the New York AG press release, Relator explained:

> Last month Attorney General Eric Schneiderman, State of New York, announced that his office has entered into a settlement agreement with a pharmacy to resolve allegations that it billed Medicaid for prescriptions, which were written by an excluded Medicaid provider.… **In light of this recent settlement, it may prove prudent to reassess the risk level and timeline for the implementation of the State Medicaid Exclusion Edit within RxConnect.** This is especially important given CVS Retail large presence (465+ pharmacies) in the state, including two CVS Specialty Retail pharmacies (fka CarePlus). In addition, there are 36 other states

---

[8] The press release is available here: https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-pharmacy-billed-medicaid-4600-prescriptions.

that also have their own Medicaid Excluded Prescriber List. As part of their Medicaid enrollment process there may exist similar conditions for CVS Retail to be a Medicaid provider in those states and hence may also pose potential compliance issues.

(Emphasis added.)

151.   As a result, CVS Pharmacy purchased a limited RelayHealth edit to prevent claims for prescriptions ordered by excluded providers in New York. CVS ignored Relator's warning about the "36 other states that also have their own Medicaid Excluded Prescriber List." Thus, for the rest of the nation and the millions of government healthcare beneficiaries outside of New York, CVS Pharmacy had no edit or any screening system to prevent prescriptions ordered by prescribers that were excluded from state healthcare programs.

152.   Likewise, CVS Pharmacy did not have a screening mechanism to validate whether prescribers were actively registered with the state Controlled Substance Registration (CSR). The resulting claims were submitted in violation of federal and state laws and in violation of CVS' CIAs stating that they cannot bill government healthcare programs for prescriptions from excluded prescribers. The claims for these prescriptions that CVS Pharmacy submitted to government healthcare programs violated the False Claims Act.

153.   When CVS acquired Omnicare in 2015 in an all-stock transaction, it discovered that Omnicare similarly failed to implement software edits or any screening system for a number of dispensing requirements, including the requirement to validate prescribers against state excluded prescriber lists.

154.   The table below is an excerpt from another internal CVS prescriber data validation summary (attached as Exhibit 10) showing that Omnicare has no software edits or screening system to validate prescribers against the various states' excluded prescriber lists. Under "State Exclusion Edit," (column on the far right) the red box states "**<u>Current State</u>: This functionality**

47

**is not currently available.**" (emphasis added) What "This functionality is not currently available" means is that Omnicare has no automated screening mechanism to block claims from prescribers on state exclusion lists. As demonstrated by the other red boxes, Omnicare also failed to implement automated edits to validate the prescriber's "State License Number," "State Controlled Substance Registration (CSR)," and "DEA Prescribing Authority."

| Business Unit | RX Type | Validation Question | State License Number (SLN) Active/ Inactive | State Controlled Substance Registration (CSR) Active/ Inactive | DEA # Active/ Inactive[1] | DEA # Expired | DEA License Restriction Indicators 2N & 3N | DEA Prescribing Auth (SLN/CSR) - Midlevel Providers | NPI # Active/ Inactive | OIG Exclusion Edit | State Exclusion Edit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Omnicare Adjudication** | | | | | | | | | | | |
| CHXS and OmniDX Systems | | Where do we get the information? | Current State: This functionality is not currently available. Future State: RxDW/Med File. | Current State: This functionality is not currently available. Future State: RxDW/Med File. | Current State: RelayHealth Future State: RxDW/RHS file | Current State: RelayHealth Future State: RxDW/RHS file *State business has confirmed this validates all prescriber schedules not just 2N and 3N | Current State: RelayHealth Future State: RxDW/RHS file *Note: business has confirmed this validates all prescriber schedules not just 2N and 3N | Current State: This functionality is not currently available. Future State: RxDW/Med File. | Current State: OSCAR Going Live in Aug 2017) Future State: RxDW/RHS file | Current State: RxDW/Med file | Current State: This functionality is not currently available. Future State: RxDW/Med File. |

Ex. 10 (certain rows excluded for clarity).

155.    Like CVS, Omnicare strategically purchased RelayHealth edits for some requirements. These limited edits were implemented in approximately July 2016. Prior to that time, Omnicare did not have edits in place *for any* of the above fields. The table above shows RelayHealth edits were used to validate DEA numbers, for example. Before July 2016, Omnicare had no edits to validate DEA numbers. Omnicare could have implemented RelayHealth edits for all the prescription requirements, but elected not to do so.

156.    As a result, Omnicare, which services millions of government healthcare beneficiaries (approximately 70% of its business is Medicare and 10% is Medicaid), filled prescriptions ordered by prescribers that were excluded from government healthcare programs, in violation of federal and state laws and in violation of Omnicare's CIA. It also submitted claims without validating whether: (1) the prescriber had an active "State License Number"; (2) the prescriber was registered with the CSR; and (3) mid-level practitioners were authorized to prescribe controlled substances in the jurisdiction in which they practice, as required under the

Controlled Substances Act, 21 U.S.C. 801 *et seq*. The claims submitted to government healthcare programs for these prescriptions violated the False Claims Act.

157.    Similarly, after CVS purchased Coram in an all-stock transaction, CVS discovered that Coram had no automated mechanism in place to prevent claims from excluded providers on either the state or federal excluded prescriber lists.

158.    As of March 16, 2017, CVS internal "Prescriber Data Validation" report shows that Coram had only a "manual validation in place" and no software edits or screening system to validate prescribers against the federal exclusion list and the various states' excluded prescriber lists. *See* Ex. 9 (Coram Infusion and Enteral listed in last row). Coram also failed to implement automated edits to validate the prescriber's "State License Number," "State Controlled Substance Registration (CSR)," "DEA Prescribing Authority," and "NPI #." *Id*.

159.    CVS knew the specific claims that it paid for excluded providers. For example, in 2018, CVS ran a report identifying more than 500 improper claims Coram submitted to government healthcare programs between 2013 and 2017 for enteral services (tube feeding) that involved excluded providers based on the federal OIG exclusion list (attached as Exhibit 11). The report identifies: (1) the specific government "Payor Type" ("Federal Medicare," "State," etc.), "physician Status" ("Excluded"), "Service Date," "Status ("After Exclusion"), "Claims Status" ("Paid"), and paid amounts. An excerpt of the report is copied below:

| Service Date | Invoice Number | Prim Payor | Payor Type | Patient ID | Physician Status | Exclusion Date | Status | Claim Status | Submit Status | Claim Status Date | Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05-Jul-13 | 00YS2269 | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 31-Jul-13 | -149.59 |
| 05-Jul-13 | 00YS227A | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 31-Jul-13 | -123.48 |
| 05-Aug-13 | 00YW138F | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 27-Aug-13 | -149.59 |
| 05-Aug-13 | 00YW138G | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 27-Aug-13 | -123.48 |
| 04-Sep-13 | 00YX164V | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 05-Sep-13 | -149.59 |
| 04-Sep-13 | 00YX164W | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 05-Sep-13 | -123.48 |
| 04-Oct-13 | 00ZA636M | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 07-Oct-13 | -149.59 |
| 04-Oct-13 | 00ZA636N | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 07-Oct-13 | -123.48 |
| 01-Nov-13 | 00ZF6644 | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 06-Nov-13 | -123.48 |
| 01-Nov-13 | 00ZF6645 | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 06-Nov-13 | -149.59 |
| 11-Dec-13 | 00ZK951S | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 12-Dec-13 | -149.59 |
| 11-Dec-13 | 00ZK951S | *CT99 | Federal (Medicare) | AHH150 | Excluded | 06-Apr-13 | After Exclusion | PAID | BILLED | 12-Dec-13 | -123.48 |
| 18-Nov-14 | 00801451 | *MI131 | State | AEG515 | Excluded | 30-Jan-14 | After Exclusion | PAID | BILLED | 20-Nov-14 | -323.7 |
| 18-Nov-14 | 00801451 | *MI131 | State | AEG515 | Excluded | 30-Jan-14 | After Exclusion | PAID | BILLED | 20-Nov-14 | -233.48 |
| 07-Jan-15 | 00967878 | *MI131 | State | AEG515 | Excluded | 30-Jan-14 | After Exclusion | PAID | BILLED | 13-Jan-15 | -323.7 |
| 07-Jan-15 | 00967878 | *MI131 | State | AEG515 | Excluded | 30-Jan-14 | After Exclusion | PAID | BILLED | 13-Jan-15 | -233.48 |

Ex. 11.

160. After identifying these improper claims, CVS did nothing to reimburse or notify the government. Nor did CVS even attempt to identify the number of improper claims that were submitted involving excluded providers based on the states' excluded provider lists. CVS management dismissed the claims as "yesterday's news."

161. Each of the claims described above are actionable under the FCA.

**C. The CVS Caremark PBM Submitted Claims to Government Payors for Drugs Prescribed by Excluded Providers.**

162. The CVS Caremark PBM (pharmacy benefit manager) serves millions of Medicare Part D patients and over twenty million Managed Medicaid members. For at least three years (from 2014 until 2017), due to faulty software, the CVS PBM failed to reject claims involving prescriptions from certain excluded providers, leading to the submission of false claims for prescription drugs.

163. The software issue was discovered in early 2017. An internal CVS email describes the problem as follows:

**Root Cause:** When a prescriber is already excluded and a subsequent exclusion update is received for that same prescriber that overlaps with the current exclusion date, the current exclusion record is inactivated, resulting in the prescriber being either:

50

- Removed from the exclusion database or
- Reverting to a prior time period where the start and end dates of the exclusion may be incorrect for that prescriber.

164.    After discovering the problem, CVS ran reports showing that it improperly processed over 15,000 Medicare Part D claims between 2014 and 2017, costing the government over $4.7 million. However, these reports fail to capture the majority of government claims improperly processed by the CVS PBM. There are two reasons for this: (1) The reports exclude claims where Managed Medicaid plans were the primary payor (the reports include Medicaid only as a secondary payor); and (2) the reports are limited to prescribers excluded on the federal OIG list and do not include prescribers excluded in state exclusion lists. The limited refunds CVS issued (about $4.4 million to Medicare Part D primary payers and $223,109 to Medicaid secondary payers) were thus knowingly deficient.

165.    Moreover, CVS purportedly ran a report identifying improper payments where Managed Medicaid plans were the primary payor, but CVS senior leadership decided not to authorize any refunds to Managed Medicaid plans. Based on the number of Medicare Part D claims affected and the nature of the CVS software problem, Managed Medicaid refunds would likely total at least $20 million, far greater than the Medicare Part D refunds.

166.    By failing to issue refunds to Managed Medicaid payors and other government payors that were improperly billed for claims involving excluded providers, CVS knowingly concealed an obligation to refund at least $20 million in overpayments, in violation of the FCA.

167.    The CVS PBM also knowingly violated state Managed Medicaid payor agreements by processing claims in violation of requirements that state providers may not submit claims for services provided by providers on a state's excluded provider list.

168.    For example, the Texas Medicaid Managed Care Handbook (relevant excerpts attached as Exhibit 12) states that "No Medicaid payments can be made to an MCE [managed care entity] for any item or services directed or prescribed by an excluded physician or other authorized person if the MCE either knew or should have known of the exclusion." (Ex. 12 at Section 2.2.4)

169.    CVS' PBMs also violated the 2014 CVS Corporate Integrity Agreement, which mandates that they must "refrain from billing [or becoming subject to liability for billing] Federal health care programs for items or services furnished, ordered, or prescribed by excluded persons. CVS Caremark understands that items or services furnished by excluded persons are not payable by Federal health care programs…." Ex. 7 at p. 13.

170.    The CVS CIA also requires the CVS PBM to report and repay all PBM overpayments. "PBM Overpayments" is defined as "the amount of money the PBM Operations have received in excess of the amount due and payable under any Federal health care program requirements." (*Id*. at p. 14)

171.    Because the CVS PBM improperly processed claims from excluded prescribers and did not report or repay the Managed Medicaid payors for claims improperly reimbursed, it violated the CIA.

172.    Moreover, the CVS PBM *knew* that CVS pharmacies in its network had no mechanism to screen for excluded prescribers, in violation of the CVS/Caremark Provider Manual. The CVS/Caremark Provider Manual (relevant excerpts attached as Exhibit 13) expressly states that providers in its network "must maintain a process to identify and detect prescriptions prescribed or claims for items or services furnished by an excluded or debarred Prescriber, and prevent those prescriptions and claims for items or services from being submitted to Caremark for adjudication and payment." Ex. 13. Yet the CVS PBM knew that CVS pharmacies in their

networks had no such processes to identify and detect prescriptions ordered by excluded prescribers, as described above.

173.    Thus, CVS' failure to identify and deny claims from excluded prescribers at its PBM and at CVS pharmacies, including, Omnicare and Coram, violates the False Claims Act.

### III.    CVS Pharmacies Improperly Accepted Copay Cards from Government Healthcare Beneficiaries.

#### A.  Background Concerning Copay Cards and OIG Guidance.

174.    Copay cards may be any form of direct support offered by manufacturers or other third parties to insured patients to reduce or eliminate immediate out-of-pocket costs for specific prescription medications. They include print coupons, electronic coupons, debit cards, and direct reimbursements.

175.    While the use of a copay card may decrease the financial burden on a patient, it increases the financial burden on government health care programs and taxpayers. A major reason for this increase is that the use of copay cards allows brand name drugs to be more affordable for patients, and patients often end up choosing brand name drugs with a copay card over less expensive equivalent drugs and/or therapeutic alternatives (even though there is typically not a material therapeutic difference between them). As such, the use of copay cards can substantially increase the costs of healthcare to government healthcare programs.

176.    By way of example, one carton (30 syringes of 20 mg/ml) of the brand name drug Copaxone, which is an immunomodulator used to reduce the frequency of relapses in patients with multiple sclerosis, has an average retail price ("ARP") of $10,383. In contrast, Glatopa, the generic equivalent of Copaxone, has a reduced price of approximately $1,182 for the same dosage, reflecting an 88% price differential of approximately $9,201. When a pharmacy accepts a Copaxone copay card on federally funded prescriptions, it thus greatly increases the cost of such

prescriptions for the federal government.

177. In part because of these concerns, at the outset of the Medicare Part D program in 2005, the OIG issued a Special Advisory Bulletin addressing pharmaceutical manufacturers' copay assistance, stating:

> [W]e believe such subsidies for Part D drugs would implicate the anti-kickback statute and pose a substantial risk of program and patient fraud and abuse. Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (*i.e.*, the subsidy) to beneficiaries to use its product.
>
> Where a manufacturer offers subsidies tied to the use of the manufacturer's products (often expensive drugs used by patients with chronic illnesses), the subsidies present all of the usual risks of fraud and abuse associated with kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing beneficiaries' incentives to locate and use less expensive, equally effective drugs.

OIG Special Advisory Bulletin On Patient Assistance Programs For Medicare Part D Enrollees, 70 Fed. Reg. 70623 at 70625 (Nov. 22, 2005) (footnote omitted, spacing added).[9]

178. By 2014, the OIG issued another "Special Advisory Bulletin" (the "2014 Bulletin") stating that "copayment coupons" (including copay cards) qualify as remuneration under the AKS.[10] By this time, the use of copay cards had substantially increased as drug manufacturers (often through third parties) provided more subsidies to supplement the cost of obtaining their drugs.

---

[9] https://www.federalregister.gov/documents/2005/11/22/05-23038/publication-of-oig-special-advisory-bulletin-on-patient-assistance-programs-for-medicare-part-d (last visited June 30, 2022).

[10] The OIG bulletin is available here (last visited June 30, 2022): https://oig.hhs.gov/documents/special-advisory-bulletins/878/SAB_Copayment_Coupons.pdf

179.    In the 2014 Bulletin, the OIG clearly and explicitly stated that "these coupons constitute remuneration offered to consumers to induce the purchase of specific items." It continues:

> Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated. A claim that includes items or services resulting from a violation of the anti-kickback statute constitutes a false or fraudulent claim for purposes of the False Claims Act.

180.    While the 2014 Bulletin focused on manufacturers, the OIG also made clear that "[P]harmacies that accept manufacturer coupons for copayments owed by Federal health care program beneficiaries also may be subject to sanctions under the anti-kickback statute, the beneficiary inducement CMP, and the False Claims Act." *Id*. at 2 n.6.

181.    The 2014 Bulletin stated that most manufacturers implement "claims edits" (*i.e.* software screening or other "hard edits"), which electronically prevent copay cards from being used for federally funded prescriptions. *Id.* at 3. Given the availability of generally effective claims edits, manufacturers were warned that they would be liable "if they fail to take appropriate steps to ensure that such coupons do not induce the purchase of Federal health care program items…" *Id.*

182.    OIG expected manufacturers to take "appropriate steps" to ensure that such edits were in place, even though manufacturers had less information about copay card transactions than pharmacies, such as the Defendants. Indeed, pharmacies are in the best position to prevent the improper use of copay cards using software edits because the pharmacy accepts the copay card and submits the claim for payment to the government healthcare program.

183.    CVS management knew about the OIG bulletins and the legal risks posed by copay cards because the bulletins triggered compliance recommendations. But while most manufacturers

were able to effectively utilize claims edits, Defendants failed to implement screening or other adequate safeguards to prevent the unlawful use of copay cards on government programs. Further, CVS Specialty and Retail Pharmacies actively promoted the use of manufacturer copay cards to drive its business at the taxpayers' expense.

**B. CVS Pharmacies Promoted the Use of Copay Cards, While Knowing that Copay Cards Were Routinely and Unlawfully Used on Government Healthcare Programs.**

184.    Since at least 2011, both CVS Specialty Pharmacies and CVS Retail Pharmacies (collectively, "CVS Pharmacies") improperly accepted, and continue to accept, copay cards for government healthcare beneficiaries despite the OIG's clear and explicit directives against doing so.[11]

185.    During this time, CVS Pharmacies vigorously promoted the use of copay cards without implementing effective safeguards to prevent their unlawful use. Starting in 2014, CVS Specialty began proactively offering copay card assistance with each patient interaction. CVS Retail tracked which pharmacies provided the most copay cards and circulated the data internally, comparing pharmacies against each other to compete in the use of copay cards.

186.    CVS Pharmacies considered it critical to their business to aggressively promote copay cards because copay cards materially increase "drug utilization," which drives profits. That is, copay cards decrease the financial burden on the patient, which increases the likelihood the

---

[11] CVS Retail and CVS Specialty both report to the same CVS executive leadership but have separate management organizations. CVS Specialty and Retail also use different software operating systems. CVS Retail Pharmacies use the RxConnect operating system. CVS Specialty Pharmacies use the HBS SPARCS operating system. However, CVS CarePlus, which is a specialty/retail pharmacy under CVS Specialty management, uses the retail RxConnect operating system. Both systems collected information about copay card usage on government-funded prescriptions and could have implemented edits to prevent such usage.

patient will purchase medication from a CVS Pharmacy. In accepting copay cards, CVS Pharmacies gain an edge over competitor pharmacies that follow the law.

187.    CVS Pharmacies and CVS Specialty in particular also receive significant manufacturer rebates for dispensing expensive brand name drugs, such as Copaxone. Thus, CVS Pharmacies are further incentivized to accept – and did accept – copay cards for Copaxone and other brand name drugs because of the substantial rebates CVS receives. In short, it is in CVS' financial interest to promote copay cards.

188.    But by promoting and unlawfully allowing the use of copay cards on government healthcare programs, CVS Pharmacies substantially increase the cost of government funded healthcare. Government expenditures would have been reduced significantly if CVS did not allow the use of copay cards on federally funded prescriptions, as this would have incentivized the use of less expensive equivalent drugs and/or therapeutic alternatives.

## C. CVS Knew that It Generated Substantial Profits from Government-Funded Prescriptions Driven by Fraudulent Use of Copay Cards.

189.    CVS Pharmacies knew they were generating substantial revenue from the use of copay cards both in billing for prescription drugs and in receiving manufacturer rebates. CVS Pharmacies can easily run reports showing copay card usage and the number of claims billed to government healthcare programs.

190.    For example, CVS Specialty created a lengthy report (the "Specialty Report") identifying thousands of instances between June 1, 2016 and June 28, 2017 where CVS Specialty billed a government payer for a prescription where a copay card was used. Relevant excerpts of the Specialty Report are attached as Exhibit 14. During the 13-month period, the Specialty Report lists more than $80 million paid by government primary payers for tainted claims. The copay "assistance coordination amount" for these claims was over $5.4 million. Moreover, the Specialty

Report was limited in scope (as described in more detail below) and did not attempt to identify all copay card usage during this time period. Thus, the actual numbers of tainted claims are likely much higher.

191.    The Specialty Report and other reports also contain entries that appear to show zero dollars as the co-pay. A "zero dollar copay" is where the manufacturer pays the costs of an expensive drug up to a certain limit, so that the patient will choose that drug and stay on it past the point where the manufacturer stops paying and another party picks up the cost. *See*, *e.g.*, www.zerocopaysupport.com. While such programs are only for commercial users, CVS allowed their use on government programs. "Zero dollar copays" are actually also illegal kickbacks that cannot be accepted on government programs.

192.    CVS Specialty knew that the claims identified in the Specialty Report were tainted with copay cards and should be reversed. The CVS Specialty policy and procedure on "Manufacturer Coupons," clearly states that "Manufacturer Coupon offers are not valid and must not be honored for prescriptions paid for in whole or in part by State and or Federal health care programs."

193.    But CVS Specialty did not reverse any claims, return any of funds, or disclose to the government the extent of the copay card problem.

194.    Nor did CVS Specialty analyze known, tainted claims submitted to the government prior to June 1, 2016, which was the start date for the Specialty Report. Even though it had internal reports identifying government claims where copay cards were used, analyzing prior years would have uncovered millions of dollars more in improper claims.

195.    Instead, CVS Specialty attempted to cover up the results of the Specialty Report by reclassifying claims, after the fact, from "non-needs based" to "needs based." These terms refer to

financial need. Under limited circumstances pharmacies are permitted to waive a patient's copay "after determining in good faith that the individual is in financial need," if other qualifications are met. 42 C.F.R. § 1001.952(k)(3). As described above, the CVS Specialty Report was limited in scope to what CVS identified as "non-needs based" copay cards.

196.    CVS Specialty did not meet the requirements for any "needs based" waivers. Until June 2017, CVS Specialty made no distinction between "needs based" and "non-needs based" in its processing of copay cards. That is, only *after* it ran the Specialty Report identifying thousands of tainted claims submitted to government payers, did CVS Specialty go back and reclassify claims as "needs based" that had been previously classified as "non-needs based." From at least 2014 until 2017, CVS made no distinction between "needs based" and "non-needs based" copay cards. Consequently, because the CVS Specialty Report was limited in scope to "non-needs based" claims, it fails to identify tainted claims that had been improperly designated as "needs based."

197.    After the Specialty Report, CVS Specialty continued running regular internal reports of government funded prescriptions identifying where "non-needs based" copay cards were used. These reports were typically issued and disseminated internally on a weekly basis, and followed the same general format as the Specialty Report.

198.    By the end of 2017, after rolling out limited training to reduce the improper use of copay cards, CVS Specialty Pharmacies submitted about 125 government claims per week tainted with copay cards. These improper claims were reimbursed around $8,000 per claim. Thus, in one week, CVS Specialty Pharmacies submitted approximately $1 million of tainted claims to the government.

199.    On or about December 13, 2017, Relator met with Ariane Andler, a CVS Specialty Senior Advisor, to discuss these problems in his office. Andler confirmed that CVS Specialty ran

weekly reports generating hundreds of claims a week involving copay cards that were submitted to government payers. Andler also confirmed that CVS Specialty has not reimbursed government payers for any tainted claims to date.

200.    In some instances, it appears CVS Specialty reversed the copay assistance received from the copay card manufacturer or other third party, but in those instances, the patient did not pay the full copay amount, and so the government claim remains tainted. That is, in conducting these feigned "reversals," CVS Specialty would refund the drug manufacturer and write off the copay amount, effectively waiving the copay. CVS Specialty did not return any money to the government during this process, as confirmed by Andler and others within CVS management. This does nothing to address the AKS violations or tainted government claims.

201.    As described below, the reason CVS Pharmacies submitted so many tainted copay card claims to government payers is because CVS Pharmacies failed to implement the requisite automated safeguards to prevent the improper use of copay cards. CVS Retail fills over 35% of all prescriptions in the United States and approximately 500 million government beneficiary prescriptions each year – and yet the RxConnect operating system has *no* screening mechanism to prevent the improper use of copay cards and is used by thousands of CVS Retail and CVS CarePlus (specialty/retail) pharmacies. This lack of automated edits has led the Defendants to submit a significant number of tainted claims, including the thousands of claims identified in the Specialty Report.

202.    These claims, tainted with remuneration in the form of copay cards, violate both federal and state anti-kickback statutes and the False Claims Acts.

### D. CVS Pharmacies Lacked Training and an Automated Process to Prevent Illegal Copay Card Usage.

203.    Despite actively pushing copay card usage for years, CVS Pharmacies failed to properly train employees or provide the necessary automated safeguards to prevent the unlawful use of copay cards. Not until October of 2017 – after years of promoting copay cards – did CVS Specialty begin to provide some training for its employees on the prohibitions concerning the use of copay cards on government healthcare programs.

204.    Moreover, despite the OIG's clear directives in the 2014 Bulletin, CVS Pharmacies failed to implement the requisite software "claims edits" to prevent the improper use of copay cards.

205.    CVS pharmacists, technicians and other employees must rely on CVS' computer systems to comply with copay card requirements. Due to the volume of business, time pressures, the difficulty of determining the ultimate payor and numerous other reasons, CVS employees cannot manually determine whether a copay card can or cannot be used on every prescription. Without an effective claims edit, CVS knowingly caused the routine illegal use of copay cards.

206.    CVS Pharmacies have all the requisite information needed to implement such a hard edit: it knows when it bills a government healthcare program, it knows when a copay card is used, and it knows how to implement edits in the RxConnect and HBS SPARCS computer systems. CVS Pharmacies are in the best position of all relevant parties to prevent the unlawful use of copay cards. But CVS management did not want to spend the money to implement the edits, and it did not want to risk the substantial revenue derived from copay cards and increased "drug utilization."

207.    Indeed, both CVS Specialty and CVS Retail *considered* such a hard edit, but elected not to implement one.

208.     In early 2017, CVS Specialty conducted an internal audit of Specialty's copay card program that confirmed the pharmacy software system, HBS SPARCS, did not automatically prevent the use of copay cards on claims paid for by government healthcare programs.

209.     The audit shows that the CVS Specialty Pharmacy software system does not automatically prevent such claims from being processed; however, CVS Specialty Pharmacies (including CarePlus, which uses the RxConnect system), have been instructed not to accept copay cards from government healthcare beneficiaries.

210.     A CVS Specialty IT (information technology) document, dated March 2018, confirms that the CVS Specialty software does not "restrict or prevent billing of a Non-Needs based Copay Card," and that this poses a "non-compliance scenario" (relevant excerpts of the document are attached as Exhibit 15):

- **"Currently, the HBS/SPARCS dispensing systems do not apply validations to restrict or prevent billing of a Non-Needs based Copay Card based on a Government payer being included in the billing of the same dispense. This is a non-compliance scenario and poses regulatory risk along with the possibility of sanctions."**



Ex. 15 at p. 8. (emphasis added).

211.     As described above, CVS Specialty understood that the lack of an automated software edit "poses a regulatory risk along with the possibility of sanctions." That is, CVS

Pharmacies knew that without a hard edit, claims tainted with copay cards were unlawfully submitted to government health care programs.

212. Accordingly, the Relator, CVS Specialty Compliance, a Director of Reimbursement, and others recommended a copay card hard edit, as described in the OIG 2014 Bulletin, as a high priority. The CVS Director of Reimbursement, Erin Mullen, explained in an internal email dated May 3, 2017, the "Goal" of the edit was to "prevent billing of a non needs based copay card if there is a government payer involved in the billing of the same dispense." This was "required to ensure compliance with government regulations surrounding non needs based copay cards."

213. The proposed claims edit project was divided into two phases. Phase I was a limited "soft edit" with pop-up warnings, and Phase II was the automated "hard edit" to ensure AKS compliance. CVS Specialty knew how to implement the hard edit, which was "required to ensure compliance with government regulations," but the funding was withheld.

214. In October 2017, when it appeared the Phase II project would not be funded, Relator again emphasized the importance of the hard edit to the CVS Executive Vice President in charge of CVS Specialty, Prem Shah (currently Chief Pharmacy Officer and Co-President of CVS Pharmacy). Relator explained that the acceptance of copay cards on federal healthcare programs could trigger regulatory violations under the AKS and FCA.

215. In response, Shah confirmed that CVS understood the risk and expressed doubt whether any pharmacy, CVS Retail included, implemented copay card hard edits. (As described in more detail below, Shah was correct that CVS Retail did not implement copay card edits.)

216. At this time, Shah was aware of the Specialty Report (described in Section C, above), identifying thousands of improper copay card claims. Shah compared the volume of

improper claims to the potential cost of a hard edit. The cost of the hard edit was approximately $1 million. In comparison, CVS Specialty billed government payers about $1 million for tainted copay card claims *each week*.

217.    CVS Specialty chose not to fund the hard edit. The decision was made by CVS executive management, including Falkowski and the current Chief Operating Officer, Jonathan Roberts. CVS Specialty did not want to spend the $1 million purportedly because it would negatively impact the business IT budget and decrease "drug utilization." But perhaps more importantly, CVS management did not want to take any action that might acknowledge that CVS Pharmacies owe government payers hundreds of millions of dollars for tainted copay card claims submitted to government payers over the past decade.

218.    Instead of issuing refunds for tainted claims and implementing a hard edit to prevent further unlawful claims, CVS Specialty chose to rely on "soft" edits and training to mitigate the number of improper copay card claims in the future. Previous tainted claims that used copay cards remained unaffected. Notably, among other things, CVS retroactively reclassified how it categorized copay cards from "non-needs based" to "needs based," to create the misimpression that CVS was in compliance with the AKS. Further, CVS employees scrubbed and whitewashed CVS reports to justify the decision to suspend the hard edit.

219.    But without hard edits, CVS Specialty continued to bill government payers for tainted copay card claims. In 2018, after the limited Phase I "soft" edits were implemented, CVS Specialty submitted between 30 and 40 tainted claims to government payers each week. At approximately $8,000 a claim, the tainted claims totals between $12.4 and $16.6 million a year.

220.    CVS Specialty also tried to "correct" the copay card problem by removing copay cards from patients' profiles and adding notes stating that the patient is on a government funded

plan and should be advised that copay cards cannot be used. Similar to other insufficient efforts, this measure fell far short. CVS Specialty knew these profile notes did not and would not stop the use of copay cards on government programs. Rather, they only highlighted the need for a hard edit to systematically correct the problem.

221.    This is because copay cards could still be used on government programs after notes were added to a patient's profile. These notes could easily be changed or ignored. It was nearly impossible to control the system without the necessary hard edit. This was confirmed to Relator in conversations in February 2018 with Andler, who advised that CVS Specialty "service reps" routinely add copay cards *back* to a patient's profile. "Service reps" refer to Benefits Verification Specialists, who are hourly employees that service CVS Specialty patients.

222.    In sum, CVS executive management understood the regulatory risks and the volume of CVS Specialty business that involved copay cards and government payors, but rather than solve the problem, CVS executive management chose to continue business as usual.

223.    Similar to CVS Specialty, CVS Retail Pharmacies *considered* implementing a copay card hard edit between 2011 and 2012, but CVS Retail and executive management decided against it. At the time, CVS Retail was implementing other software edits within the RxConnect system. A hard edit was proposed to prevent the improper use of copay cards on government funded prescriptions. CVS Retail considered it, and rejected it.

224.    Relator discovered that CVS Retail lacked copay card edits in the RxConnect system in December 2017. At that time, Relator was recently made responsible for enterprise-wide compliance relating to billing, including billing within CVS Retail. In December 2017, Relator held several meetings with the CVS Senior Director of Payer Relations, Susan Colbert, to understand what claims edits were available in the CVS Retail RxConnect operating system.

Colbert oversaw billing and adjudication for CVS Retail and was the "subject matter expert" (SME) regarding edits within the RxConnect operating system. Colbert stated that there were no hard edits to prevent the improper use of copay cards in the RxConnect operating system, which was used by thousands of CVS Retail pharmacies across the United States. Colbert also confirmed that there were no soft edits, pop-up warnings, RelayHealth edits, or any other mechanism to prevent the improper use of copay cards. And CVS Retail did not perform any audits or monitoring to capture improper copay card claims. Colbert had been at CVS for many years and would know if there were claims edits in place in RxConnect. There were not.

225.     Colbert explained that a copay card edit was *considered* during a CVS Retail IT project between 2011 and 2012, but was "carved out" at the last minute by CVS management.

226.     Relator understood the lack of automated software edits in the RxConnect software pose significant regulatory risk. This risk is compounded because of the incredible volume of government prescriptions CVS Retail fills. Without automated edits in place, *billions* of dollars in government claims are susceptible to the improper use of copay cards.

227.     When Relator reported this information to his supervisors and the CVS Risk Assessment Group, he was told "that's embarrassing," and instructed not to bring it up again.

228.     At the time Relator left CVS, the RxConnect system lacked both soft edits and hard edits to prevent the improper use of copay cards on government funded prescriptions.

229.     CVS Pharmacies could have implemented a comprehensive software edit to prevent these claims from being processed, but it chose not to. CVS reaps substantial profits from accepting copay cards on government funded prescriptions.

230.    As a result, CVS Pharmacies continues to permit copay cards to be used on government programs and has taken no action to remediate past claims in violation of the AKS and the FCA.

231.    Further, since 2014, CVS and its subsidiaries have operated under various CIAs that obligate CVS to detect and report AKS violations. *See, e.g.*, Ex. 7 (2014 CIA); Ex. 16 (CVS Health CIA, entered October 11, 2016). Both the 2014 and the 2016 CIAs mandated that CVS Health enforce corporate-wide practices to promote compliance with federal healthcare program requirements, such as compliance with the AKS.

232.    The 2016 CIA includes a section specifically on "Compliance with the Anti-Kickback Statute," (Ex. 16 at pp. 15-17), which requires written policies and training for all CVS employees "who are engaged in or have job responsibilities relating to the sale of or billing for items or services payable by the Federal health care programs." *Id*. at p. 4. CVS is required to implement "effective responses when suspected violations of the Anti-Kickback Statute are discovered, including disclosing Reportable Events and quantifying and repaying Overpayments…." *Id*. at 17. In other words, these CIAs set forth clear, corporate-wide expectations that CVS would comply with the AKS.

## IV.    Coram's FOCUS Care Program Traded Free Care for Hospital Referrals in Violation of Anti-Kickback Statutes.

### A. Background Concerning Infusion Care.

233.    Defendant Coram provides infusion therapy. Infusion therapy involves the administration of medication through a needle or catheter. In general, it is prescribed when a patient's condition cannot be treated effectively by oral medications. Typically, "infusion therapy" refers to the administration of a drug intravenously, but the term also may refer to the provision of drugs through other non-oral routes, including intramuscular injections, epidural routes, or

67

surgically placed ports. Infusion therapy may also involve enteral nutrition (the administration of nutrition through a tube) or parenteral nutrition (the intravenous administration of nutrition for patients who cannot obtain sufficient nutrition by eating or enteral nutrition). Diseases commonly requiring infusion therapy include cancer, dehydration, gastrointestinal diseases and disorders, and oral antibiotic-resistant infections, among many others. Infusion therapy originates with a prescription order from a qualified physician overseeing the care of the patient.

234.    Infusion therapy can be provided in a hospital, in a clinic, or in the patient's home. When provided in the home, infusion therapy usually is provided by a pharmacy that specializes in home or alternate-site infusion therapy.

235.    When hospitals provide infusion services to people admitted to those hospitals for inpatient services or emergency treatment, the hospitals typically bill the patients' insurers (including government health insurance programs) under applicable billing procedures. If a hospital provides those services to uninsured patients, it may attempt to recover some or all of the cost from the patients themselves, it may seek to enroll the patients in patient-assistance programs, or it may write off the value of the care as charity care.

236.    In some circumstances, a hospital also may assume responsibility for paying third-party vendors to provide home infusion care—including drugs or nutrition, supplies, and/or infusion services—to some uninsured patients after those patients have been discharged from the hospital. Hospitals acquire an obligation to treat uninsured patients in a variety of ways. For example, the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA") requires hospitals with emergency departments to provide emergency care regardless of a patient's ability to pay, and cannot discharge a patient receiving emergency treatment until the patient's condition has "stabilized," which may require the continued provision of infusion therapy. 42 U.S.C. §

1395dd. Many nonprofit hospitals provide care to the uninsured for free or with financial assistance in order to establish a right to favorable tax treatment. 13 U.S.C. § 501(c)(3); I.R.S. Rev. Rul. 69-545. Other hospitals may undertake the care of uninsured patients to satisfy state laws, a sense of civic duty, or institutional principles.

237.    Hospitals that admit uninsured patients who need infusion therapy as part of their treatment often find it fiscally prudent to pay a third party to provide that therapy in-home or at alternate sites once the patient no longer requires other services from the hospital. This is because a variety of laws—EMTALA, state regulations, and medical malpractice law among them—effectively prohibit hospitals from discharging patients when the conditions for which they were admitted require continued treatment but the patients lack the ability to pay for that treatment themselves. In those circumstances, a hospital may decide to discharge a patient and pay for post-discharge home infusion services rather than keep the patient in the hospital, thus freeing up hospital capacity for insured patients and avoiding the additional uncompensated costs of an extended patient stay. Accordingly, hospitals commonly agree to pay home-infusion providers to provide infusion services, drugs, and supplies to uninsured patients after their discharge from the hospitals. Coram itself recommends this: "For patients who are uninsured or underinsured, creative strategies can be considered. For example, the hospital may be able to play the role of payer for the home infusion therapy, which would enable home care instead of a continued hospital stay." *Healthline, Coram's Continuing Education Program*, Vol. 19 at 3 (2015).

238.    Infusion care providers are paid in a variety of ways. For some infusion therapy, they submit claims to, and are reimbursed by, Medicare contractors under Medicare Part B's durable medical equipment benefit. For Medicare beneficiaries covered by some Medicare Part C Medicare Advantage plans, and for subscribers to Medicare Part D plans, infusion care providers

submit claims to, and are reimbursed by, the Medicare Advantage insurers for covered services, drugs, and supplies. For services covered by CHAMPVA, providers typically bill the Veterans' Administration. For services and goods covered by state Medicaid plans, infusion care providers submit claims to, and are reimbursed by, the state plans or Medicaid HMOs. For services and goods covered by Tricare, infusion care providers submit claims to, and are reimbursed by, Tricare in accordance with their benefits and claims policies.

239. Hospital referrals are the principal source of infusion care providers' business.

**B. Coram Provided Free Goods and Services to Induce Hospital Referrals.**

240. Defendants converted hospitals' burden of paying for the care of indigent patients into an opportunity to buy those hospitals' lucrative referrals with free services purportedly given to alleviate some of that burden.

241. The health of Coram's business depends in large part on the decisions hospitals and their affiliated providers make every day to refer their insured patients—including patients insured by government programs—to Coram for infusion services, rather than to Coram's competitors. To develop and maintain an edge over those competitors, for several years Coram has given, and continues to give, Coram's hospital customers—including those operated by the Hospital Defendants—valuable free services as an explicit inducement for referrals under contracts between Coram's customer hospitals and Coram's affiliate, CASSI. Defendants' conduct violates the federal AKS and similar state laws.

242. Coram, through its affiliate CASSI, has executed a standard Infusion Services Coordinator Agreement (the "ISC Agreement") with numerous hospitals. A copy of an example of the ISC Agreement between CASSI and Halifax Hospital Medical Center ("Halifax") is attached as Exhibit 17. The ISC Agreement and the *quid pro quo* arrangement described in it are key elements of Defendants' national FOCUS Care program, which Coram markets as an "integrated

solution" for hospital post-acute care, including as a solution for "Under-Funded Patient Care Coordination." "FOCUS" is an acronym for **F**inancial impact **O**utcomes data **C**are transition **U**nified goals **S**atisfaction. The FOCUS Care Program is part of Coram's home health care business.

243.     Coram's provision of valuable remuneration in exchange for referrals is an explicit component of its standard ISC Agreement. That agreement provides that Coram will provide services for uninsured patients discharged from a signatory hospital facility. Ex. 17 at p. 3, ¶ 2(f). The Agreement further provides that:

> [I]n the event that, on a quarterly basis, the value of indigent/charity care provided to patients (based on CORAM's hospital payor grid rates … discharged by [a signatory] HOSPITAL to CORAM for Infusion Services exceeds [a fixed dollar amount that varies by ISC Agreement] (the "Indigent Care Threshold"), HOSPITAL agrees that CORAM shall invoice HOSPITAL, and HOSPITAL shall reimburse CORAM, for the cost of such Infusion Services exceeding the Indigent Care Threhsold at CORAM'S hospital payor grid rates … within thirty (30) days following CORAM's submission of such invoice.

*Id.* at p. 4, ¶ 2(g)(iii).

244.     In other words, the ISC Agreement provides that Coram will provide, at no charge, a specific amount of "indigent/charity" infusion care for free each quarter. The signatory hospital—Coram's counterparty to the agreement—would otherwise pay for that infusion care. Indeed, after exhaustion of the quarterly amount of free infusion care, the signatory hospital is required to pay Coram for that care. *Id.*

245.     The ISC Agreement also provides that Coram:

> [M]ay place one or more liaisons at all or some of HOSPITAL's facilities, to facilitate weekday and weekend coverage needs … [to] perform administrative functions in coordinating and facilitating the provision of Infusion Services by CORAM after a physician has prescribed home infusion for a patient and that patient has selected CORAM as his or her provider for such Infusion Services.

71

*Id.* at pp. 1-2, ¶ 2(a). Pursuant to this provision, Coram places the equivalent of a full-time employee in the signatory hospital's facility to perform discharge planning services for which the hospital otherwise would have to pay its own employees.

246. In exchange for the valuable services provided above, signatory hospitals—including the Hospital Defendants—agree, under the ISC Agreement, to refer as many of their insured patients as possible to Coram. The agreement provides that:

> HOSPITAL shall inform patients of their freedom to choose any infusion care provider they prefer. HOSPITAL shall inform patients who do not have a preferred home infusion care provider, either through personal choice or through the patient's third party payer or insurance company, that CORAM is HOSPITAL's preferred Care Coordinator for Infusion Services.

*Id.* at pp. 4-5, ¶ 3(a). In addition, the agreement requires each signatory hospital to:

> [I]nform HOSPITAL's Case Management and Discharge Planners that CORAM is HOSPITAL's preferred home infusion care provider. CORAM shall educate HOSPITAL's Discharge Planning and Coordination of Care Functions on CORAM's Care Coordination for Infusion Services.

*Id.* at p. 5, ¶ 3(b). In other words, the ISC Agreement requires signatory hospitals to steer as many patients as possible to Coram, and to inform all of their case management and discharge planning staff of that obligation.

247. Exhibit 3 to the ISC Agreement, copied in relevant part below, identifies a "Proposed Target" of greater than or equal to 95% "of all Home Infusion Appropriate patients referred to Coram":

72

**EXHIBIT 3**

**PERFORMANCE MEASURES**

| | | Patient Flow Management | | |
|---|---|---|---|---|
| | **Performance Measure** | **Definition** | **Proposed Target** | **Data Source** |
| 1 | Referral Notification to CORAM | % of all Home Infusion Appropriate patients referred to CORAM | ≥ 95% compliance | HOSPITAL |

*Id.* at p. 30.

248.    The ISC Agreement also requires Coram to serve on a professional advisory committee to monitor and track the quality of infusion care provided by both Coram and the hospital, and to participate in a discharge planning committee and an operations group. *Id.* at p. 2, ¶¶ 2(b)-2(d). The signatory hospital also must provide discharge planning and must share patient information with Coram to the extent necessary to facilitate discharge planning and transition to Coram for infusion care (as it would be required to do independently of the ISC Agreement), and to provide office space, at the market rate, to Coram for the purpose of discharging Coram's duties under the agreement. *Id.* at p. 5, ¶¶ 3(c)-3(e).

249.    In sum, the ISC Agreement requires Coram to provide a variety of valuable services, including free infusion care for which the hospitals would otherwise pay, to signatory hospitals. In exchange, the only requirement that the signatory hospitals do anything they would not do in the absence of the agreement is the hospitals' obligation to refer patients to Coram.

250.    Coram's provision of an agreed-upon amount of free services in order to obtain all or most of a hospital's referrals is a key element of the FOCUS Care program. In a presentation describing "How FOCUS Care Works," Coram indicated that either Coram or the signatory hospital would "offer FHA [financial hardship assistance]," but that the "[e]ntity responsible for FHA [is] determined contractually." In other words, in exchange for the hospital's agreement to

73

make Coram its preferred infusion-care coordinator, Coram and the hospital would contractually divide responsibility for post-discharge care for indigent patients, for which the hospital otherwise would be solely responsible. In another presentation describing the parties' respective obligations under the FOCUS Care program, the Coram described "participat[ion] in care for indigent patients requiring home infusion services" as a Coram responsibility and "designat[ion of] Coram as [hospital's] preferred coordinator for home infusion services" as a hospital responsibility.

251.    Coram trained regional sales management, including in sessions at Coram's Denver offices, how to pitch the FOCUS Care program to hospitals as a way to alleviate the hospitals' uncompensated care costs. Coram's Senior Vice President Danny Claycomb, who was intricately involved in Coram's practice of taking overpayments to income (described in Section I), was also involved in Coram's FOCUS Care program.

252.    If hospitals showed interest, Coram obtained information from hospitals concerning the volume of those hospitals' referrals and their payer mix (that is, what percentage of their referrals were for Medicare beneficiaries, Medicaid beneficiaries, privately insured patients, or uninsured patients). Coram's staff, under the supervision of Jeff England (who was responsible for the FOCUS Care program both before and after CVS Health's acquisition of Coram), then prepared financial analyses to determine the optimal amount of free services Coram could provide while still ensuring that the contract would be profitable to Coram as a result of anticipated referrals. The amount of infusion care Coram would provide at no charge to the hospital was directly correlated to the value of referrals Coram expected from the hospital. As one hospital administrator stated, referring to Coram's demand for 95% of the hospital's infusion-care referrals under a FOCUS Care proposal, Coram "need[s] the volume to justify putting up $500,000 for indigent

74

care." That comment was later forwarded to England and other Coram executives and sales management.

253.     Other management, including Coram's Vice President of Infusion Sales and its Regional Sales Manager for the target hospital's region participated in preparing Defendants' proposal to the target hospitals. Steven Abbate was Coram's Vice President of Infusion Sales, and Steve Schlachta was the Regional Sales Manager for Florida. Both Abbate and Schlachta participated in the solicitation and negotiation of at least one FOCUS Care agreement that was to include the provision of free services (for which the hospital would otherwise pay) in exchange for an agreement to refer infusion-care business to Coram.

254.     The FOCUS Care contracts are based on a "Model Contract" created by Coram. Although Coram and the signatory hospitals negotiated edits to Defendants' standard FOCUS Care agreements, and some provisions therefore may have varied from agreement to agreement, the core components of the ISC Agreement—including Coram's provision of free infusion care, its provision of staff to perform discharge planning, and the hospitals' agreement to refer patients to Coram—appeared in each of the contracts. Generally, the contracts have an initial term of three years and automatically renew for up to ten consecutive years.

255.     Pursuant to the FOCUS Care contracts, Coram also provides valuable data analytics to the hospital by tracking and reporting patient outcomes after discharge. Under the Model Contract, Coram agrees to provide "reporting and performance monitoring" on a quarterly basis. This data reporting includes discharge and readmission rates, and patient satisfaction scores. Coram also agrees to provide "educational services" on a quarterly basis to assist the hospital. By providing data, educational services, and taking uninsured patients, Coram in return receives all of the hospital's lucrative government healthcare program beneficiary patients.

256.    In a bid to obtain more patients for the FOCUS Care Program, the Coram sales team has pursued large hospital systems in urban areas. As of August 2016, Coram entered into contracts with approximately 21 hospital systems with 52 total hospitals across the country. A non-exhaustive list of hospitals with whom Coram, through CASSI, entered into FOCUS Care ISC Agreements includes the following:

- Emory Healthcare, Inc, pertaining to Emory University Hospital in Atlanta, Georgia. Kristine Kerber Blase, a Clinical Service Liaison later promoted to Territory Manager, was the Coram employee responsible for Coram's relationship with Emory at the time that Coram first began providing free services in exchange for a commitment by Emory to refer business to Coram. Coram's arrangement with Emory began in or around 2010 or 2011, and became the template for Coram's subsequent FOCUS Care ISC Agreements.

- Good Samaritan Medical Center, Inc., pertaining to Good Samaritan Medical Center in West Palm Beach, Florida. Good Samaritan enrolled in the FOCUS Care program in or around 2011 or 2012. Coram employees responsible for Coram's relationship with Good Samaritan at different times included Orlando DeCastro, Mindy Richmond, and Nicole Nonnemacher.

- Martin Memorial Health Systems, Inc. and Martin Memorial Medical Center, Inc., pertaining to the Martin Health System, based in Stuart, Florida. Those entities enrolled in the FOCUS Care program in or around 2013 or 2014. Coram's Jeff England and Mindy Richman initially presented the FOCUS Care program to the Martin Health System, and Leslie Campo-Killfeather, a Coram Clinical Service Liaison, was responsible on a day-to-day basis for Coram's relationship with the Martin Health System.

- Baptist Hospital of Miami, Inc., pertaining to Baptist Hospital in Miami, Florida. BHMI enrolled in the FOCUS Care Program in or around 2017 or 2018. In addition to Baptist Hospital in Miami, other hospitals in the Baptist Health South Florida system may have enrolled in the FOCUS Care ISC Agreement. Heather Lawrie was the Coram Regional Sales Manager responsible for Coram's relationship with BHMI.

- Piedmont Healthcare, Inc., pertaining to Piedmont Atlanta Hospital in Atlanta, Georgia. PHI enrolled in the FOCUS Care Program in or around the 2013-2015 time period. Kristine Kerber Blase was Coram's principal point of contact with Piedmont Atlanta Hospital.

- Halifax Hospital Medical Center dba Halifax Medical Center on behalf of Halifax Health, Inc., pertaining to Halifax Medical Center in Daytona Beach, Florida. A copy of that agreement is attached as Exhibit 17 hereto.

- Scripps Health, pertaining to five different hospitals based in San Diego, California.

257.    Coram also entered into similar agreements with other hospitals throughout the nation.

258.    Coram circulated notices of the enrollment of numerous other hospitals (whose names Relator does not recall) in other regions.

259.    The FOCUS Care ISC Agreements were successful in inducing referrals. For example, prior to the execution of the Halifax Medical Center agreement (Ex. 17), a majority of Halifax's referrals were to infusion care providers other than Coram. After the execution of that agreement, however, Halifax referred nearly all of its home infusion cases to Coram other than those for patients whose insurance required a different provider.

260.    Internally, some Coram employees were concerned about the legality of the FOCUS Care program. Marge Brown, a Coram SVP of Compliance prior to the CVS acquisition, and subsequently a Director at CVS, reported the issue to Relator in 2016. Relator then informed CVS Risk Assessment about the FOCUS Care program. In August of 2016, CVS Risk Assessment interviewed individuals involved in the FOCUS Care Program.

261.    Subsequently, the CVS Risk Assessment team identified the FOCUS Care Program as a high compliance risk. In the following months, however, the CVS risk assessment investigation was terminated. Around November 2016, CVS purportedly hired outside counsel to review Coram's FOCUS Care Agreements.

262.    Neither Relator nor the CVS risk assessment team was privy to the results of the outside counsel's purported review; however, Coram's business practices have continued and

expanded. Coram continues to treat uninsured patients in exchange for referrals for government healthcare beneficiaries, and Coram has sought out additional hospital groups to enter into referral contracts (such as Scripps Health in San Diego).

263.    The kickback scheme described herein implicates the precise risks that Congress sought to address in enacting the AKS. Because the amount of free care Coram is willing to provide under a FOCUS Care contract with any particular hospital is premised upon the volume and profitability of the referrals Coram expects to receive under that contract, hospitals enrolling in the FOCUS Care program have a financial incentive to refer as much business to Coram as possible. The greater the number of insured patients the hospital can refer to Coram, the greater the amount of free care Coram will be willing to provide in any adjustment or renewal of the FOCUS Care agreements. Accordingly, the ISC Agreements create a risk that hospitals will pressure their doctors to prescribe infusion care to discharged insured patients, or to refer those patients to Coram even if other infusion care providers are more suitable, out of the hospitals' own self-interest.

264.    Defendants submitted claims for payment to the United States (or its contractors) under the Medicare, TRICARE, CHAMPVA, and Federal Employee Health Benefit programs, and to the States (or their contractors) under state Medicaid programs, as a result of referrals from hospitals that entered into FOCUS Care ISC Agreements.

## V.    CVS Improperly Sent Prescription Drugs to States Where It Was Not Licensed.

265.    Since at least 2009, CVS Specialty Pharmacies, including Caremark Specialty pharmacies and retail CarePlus Specialty pharmacies, have shipped tens of thousands of

prescriptions across state lines into states where the shipping pharmacy did not hold the required nonresident license to dispense prescriptions.[12]

266.    Unlike traditional retail pharmacies, CVS Specialty Pharmacies dispense specialty medications that can be used to treat complex conditions. These specialty drugs can be much more expensive than prescriptions filled at a traditional retail pharmacy and often cost thousands of dollars per prescription.

267.    A non-resident pharmacy license is generally required to ship prescriptions from one state into another state.[13] For example, in Illinois, the Department of Financial and Professional Regulation "shall require and provide for an annual nonresident special pharmacy registration for all pharmacies located outside of this State that dispense medications for Illinois residents and mail, ship or deliver prescription medications into this State, including home pharmacies of remote pharmacies located in Illinois that are located outside of Illinois." Ill. Admin. Code tit. 68, § 1330.550.

268.    The Illinois licensing application makes clear that a pharmacy may not operate in Illinois without the proper licenses: "A pharmacy may not operate until a license is issued. Any operation without a license is considered unlicensed practice by the Department and therefore subject to discipline." Under the Illinois Pharmacy Act, those who practice without a license "shall, in addition to any other penalty provided by law, pay a civil penalty to the Department in an amount not to exceed $10,000 for each offense as determined by the Department." 225 ILCS 85/5.5.

---

[12] For purposes of this section, the term "CVS Specialty Pharmacies" refers to Caremark Specialty pharmacies and retail CarePlus Specialty pharmacies. These CVS entities used three different operating systems: CATS, HBS, and RxConnect.

[13] At the relevant time, three states did not require a non-resident license to ship drugs into the state: Georgia, Massachusetts, and Pennsylvania. Appendix D lists state licensing laws.

79

269.     Any pharmacy not properly licensed in Illinois may be immediately terminated, suspended, or excluded from the Illinois Medicaid Program. 89 Ill. Adm. Code 140.16.

270.     The same is generally true for all states that require non-resident pharmacies to obtain a license prior to practicing pharmacy in the state.

### A. CVS' "Site Consolidation Project" Led to Non-Resident Pharmacy Licensing Violations.

271.     In 2009, CVS closed nearly a third of its CVS Specialty Pharmacies. The process of closing these pharmacies was internally referred to as the "Site Consolidation Project." After the Site Consolidation Project was completed, the number of CVS Specialty Pharmacies was reduced to about twenty-one pharmacies across the country.

272.     After a pharmacy was closed, its business was consolidated with a different CVS Specialty Pharmacy. Consequently, prescriptions that had been filled in one state were in some cases now filled and shipped from a CVS Specialty Pharmacy in a different state.

273.     Because of the Site Consolidation Project, a number of CVS Specialty Pharmacies were now filling and shipping prescription drugs into a state where the pharmacy was not licensed to practice pharmacy. At this point, the proper course of conduct for CVS was to stop filling such prescriptions until it obtained the necessary non-resident pharmacy licenses. CVS did not do that. Instead, CVS had to wait up to a year, in some states, before being able to obtain non-resident pharmacy licenses. During this time, CVS continued to improperly fill and ship thousands of prescription drugs into states where it was not licensed—including prescriptions paid for by government healthcare programs.

**B. After CVS Was Caught by Maine for Licensing Violations, an Internal CVS Review Identified Thousands of Prescriptions Shipped in Violation of State Licensing Laws.**

274.    On July 13, 2011, the Maine Board of Pharmacy issued a Consent Agreement, whereby a CVS mail order pharmacy located in Indiana was placed on probation and ordered to pay a civil penalty of $11,000 for violating state licensure laws.

275.    CVS was required to report the licensing issue to the Office of the Inspector General ("OIG") for the U.S. Department of Health and Human Services. At the time, CVS was operating under a Corporate Integrity Agreement that required CVS to disclose certain events to the OIG. On September 8, 2011, CVS notified the OIG of the settlement with the Maine Board of Pharmacy for CVS Pharmacy #6570, and of a review of state non-resident pharmacy license requirements.

276.    CVS subsequently identified thousands of shipments of prescription drugs from CVS Specialty Pharmacies into states in which the shipping pharmacy did not have the required non-resident license to practice pharmacy. These unlicensed shipments included medications paid for by government healthcare programs.

277.    Further, many of these shipments involved controlled substances. Not only did the CVS Specialty Pharmacies lack non-resident licenses, they also lacked the necessary DEA licenses to ship controlled substances.

278.    Relator has direct knowledge of these improper shipments and government claims, as he was closely involved in the licensing review and application process for the relevant CVS Specialty Pharmacies. Relator knows which CVS Specialty Pharmacies lacked non-resident licenses, which pharmacies shipped into states without a non-resident license, and which claims were paid by government payers. During 2011 and 2012, Relator received regular reports and updates identifying instances of improper, unlicensed shipments.

279.    Relator also knows the date CVS purportedly activated a software edit to prevent further improper, unlicensed shipments. Beginning April 9, 2012, CVS notified staff that a new software edit will be in effect in the CVS Specialty operating system to check the shipping address of an order to a list of states that the pharmacy is allowed to ship to. Accordingly, from 2009 until at least April 9, 2012, CVS Specialty Pharmacies improperly shipped medications without the required licenses. Relator is aware of thousands of such improper shipments, including shipments of medications paid for by government healthcare programs.

280.    These improper shipments of controlled substances and other medications violate both the FCA and DEA regulations governing controlled substances.

**C.  CVS Misled the Government About the Extent of Its Licensing Violations.**

281.    After identifying these systemic licensing and DEA violations, CVS fraudulently misled the OIG regarding the extent and breadth of the problem.

282.    On October 21, 2011, CVS wrote to the OIG in response to a number of questions the OIG asked about the licensing issue. In its response, CVS admitted that it dispensed prescriptions without a valid non-resident license in jurisdictions other than Maine, but stated that these violations were "isolated" transactions involving "unique patients" and need not be reported to the various states boards of pharmacy.

283.    Exhibit 18 is the letter CVS' VP of Compliance, Kirk Dobbins, sent to the OIG on October 21, 2011. It states:

> After identifying certain isolated shipments into states in which Caremark Specialty pharmacies and retail CarePlus Specialty pharmacies did not have non-resident licenses….
>
> ***
>
> It is important to consider that many of the shipments at issue were isolated transactions for unique patients who require specialized pharmaceutical care. This is significant for at least two reasons. First, a non-resident license was not required in every shipped-to jurisdiction…. Second, the volume of shipments from each store into every state was very small (typically fewer than five shipments).

Ex. 18 at pp. 2, 5.

284.    First, CVS' statement that the volume of shipments from each store was generally "fewer than five," is refuted by CVS' internal data. As described above, before communicating with the OIG, CVS identified thousands of shipments that were shipped across the country in violation of state licensing laws.

285.    Further, numerous stores shipped substantially more than the "five" shipments CVS represented to the OIG.

286.    And as described above, some of these shipments contained controlled substances, such as morphine, oxycodone, and amphetamine, which are strictly regulated by the Drug Enforcement Agency. CVS failed to mention that controlled substances were among the drugs improperly shipped across state lines.

287.    Second, CVS misleadingly claims that a "non-resident license was not required in every shipped-to jurisdiction." While this is technically true (three states did not require a non-resident license at the relevant time, *see supra* fn. 13), this statement conceals the fact that CVS identified thousands of prescription drugs sent into states that *do* require non-resident licenses. Only a handful of claims CVS identified involve states that do not require non-resident licenses.

288.    Moreover, the reason for the improper claims was not because CVS was serving "unique patients" – as claimed in its letter to the OIG – but because of a failure at CVS corporate to monitor non-resident licenses for its CVS Specialty Pharmacies. The licensing violations were not caused by unexpected medical emergencies (as represented to OIG), but as a result of the CVS "Site Consolidation Project," which caused a number of CVS Specialty Pharmacies to close.

289.    In light of the deliberate corporate restructuring that led to the issue, and internal reporting identifying thousands of improper claims, CVS' statement to the OIG that the non-

resident license issue was for "isolated transactions" and for "unique patients" is grossly misleading. Indeed, "isolated transaction" is defined in certain statutes to be a single transaction; other states allow more.[14]

### D. CVS Specialty Pharmacies Failed to Register with State Medicaid Programs Before Dispensing Prescription Drugs to Government Healthcare Beneficiaries.

290.    In addition to the non-resident licensing and DEA issues, CVS management was also aware that certain CVS Specialty Pharmacies dispensed prescription drugs in states where the pharmacy did not enroll or otherwise register to participate in the state's Medicaid program. CVS also concealed this issue from the OIG.

291.    CVS knew that pharmacies that were not licensed to practice pharmacy in a state were generally unable to participate in the state's Medicaid program. Typically, to enroll in a state Medicaid program, a provider must be licensed to practice in that state and certify accordingly. For example, in Illinois, to enroll as a pharmacy provider, the provider "must maintain current certification or licensure as a condition of participation in the Medicaid Program."[15]

292.    If a provider is not enrolled in the state's Medicaid program, it cannot seek Medicaid reimbursement from that state.

---

[14] The term "isolated transactions" has legal significance in states that allow non-resident pharmacies to conduct "isolated transactions" without a non-resident license. *See*, *e.g.*, Fla. Stat. Ann. § 465.0156; Fla. Admin. Code Ann. r. 64B16-32.005 ("(1) A nonresident pharmacy is exempt from obtaining a nonresident pharmacy permit if the nonresident pharmacy limits its dispensing activity to a one time, per calendar year, isolated transaction. (2) An isolated transaction is defined as making a one-time delivery of a dispensed medicinal drug(s) to a single identifiable patient in Florida."); N.Y. Comp. Codes R. & Regs. tit. 8, § 63.8 ("Isolated transaction means for pharmacies only 600 or fewer prescriptions per calendar year for drugs and/or other devices delivered into New York State").

[15]    *See*    Illinois    provider    enrollment    web    page: https://www.illinois.gov/hfs/impact/Pages/ProviderEnrollment.aspx    ("If your profession requires a certification or licensure in the State of Illinois, these qualifications must be active at the time of enrollment or revalidation.")

293.    Based on CVS' internal reports, CVS knew that claims were submitted to state Medicaid programs from CVS Specialty Pharmacies that shipped drugs into states where the shipping pharmacy lacked appropriate licenses.

294.    By submitting claims for prescription drugs shipped into states where the shipping pharmacy was not licensed, CVS submitted false claims in violation of federal and state False Claims Acts and violated state Medicaid program requirements. CVS also knowingly concealed this issue from the OIG.

## VI.    CVS Retaliated Against and Constructively Discharged Relator.

295.    On June 1, 2018, after enduring months of intolerable work conditions, Relator was left no other option but to resign from his position with CVS.

296.    After Relator began investigating and organizing the information for this False Claims Act Complaint, his working conditions at CVS severely deteriorated.

297.    Relator was asked to perform unethical acts, assigned sham investigations, given projects that were deliberately outside his scope of expertise, and was generally isolated at work.

298.    For example, in September 2017, Relator was asked to mislead the state of New Hampshire with respect to an investigation the state was then conducting. Relator refused. He was then pressured to use "talking points" to communicate with the state, but again, the talking points misrepresented certain issues, so Relator refused.

299.    Additionally, in December 2017, Relator communicated significant concerns about CVS Retail Pharmacy billing practices. These concerns were dismissed.

300.    Following these experiences, Relator's work environment grew steadily worse. The last straw occurred on approximately May 25, 2018, when Relator was assigned to oversee a sham investigation into multiple ethics complaints involving fraud, waste, and abuse concerning Medicare Part D.

301. Relator was assigned the job specifically because he was unfamiliar with the particular issues involved and therefore his superiors believed he would be unable to complete a thorough investigation.

302. Relator had previously been assigned a Medicare Part D investigation for exactly those reasons. During the earlier investigation, Relator did not have access to databases necessary to complete a thorough investigation, and his supervisors constantly pressured him to finish the investigation. When Relator submitted his final report, it stated that certain issues should be further investigated and that he was unable to verify other aspects of the investigation.

303. Relator's supervisors, however, misrepresented the results of the investigation to appear more favorable, claiming that the investigation revealed "no evidence" of fraud, waste and abuse, and that the allegations investigated were "unsubstantiated." These, however, were not the findings Relator reported.

304. At the time, Relator's supervisor and other CVS compliance management told Relator in relation to ethics complaints: "We can't control what comes in, but we can control what comes out." Relator subsequently understood this to mean that CVS compliance could control the scope of an investigation to arrive at a desired outcome.

305. Because of this previous experience, when Relator was tasked to investigate another Medicare Part D issue, he told his supervisors he could not lead the investigation. He also directed his supervisors to CVS policy that states Medicare Part D issues should be investigated by specific employees, not including Relator. After suggesting that the investigation be performed by the appropriate individuals, CVS supervisors told Relator that he was specifically selected to lead the investigation. Under CVS policy, it was not his responsibility to lead such an investigation, nor did Relator have the resources to complete the investigation. Further, when Relator suggested

that the ethics complaints may have merit, his concerns were ignored. Rather than participate in what appeared to be a sham investigation, Relator resigned.

306.    These conditions, and others like it, cumulatively created an intolerable work environment, such that a reasonable person would be left with no choice but to resign. In particular, as described in the allegations above, senior management within CVS Compliance, including David Falkowski, who served as the CVS Chief Compliance Officer since 2015 and reports to the CVS Board, has routinely ignored compliance violations and condoned unlawful conduct. It was because of these conditions that Relator resigned.

307.    For years, Relator received positive work reviews. The intolerable work conditions began soon after he started investigating and organizing the facts for this False Claims Act suit.

308.    As described above, before filing this action, Relator voluntarily disclosed to various law enforcement and government entities, substantially all material evidence and information in his possession.

309.    There is no other explanation for the intolerable work conditions but that Relator's supervisors, or other individuals employed by Defendant, knew of Relator's actions and chose to retaliate against him.

## COUNT I

### Violation of the Federal False Claims Act

310.    The allegations contained in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

311.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the False Claims Act of the United States, 31 U.S.C. § 3729 *et seq*.

312. Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

313. Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

314. Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of 31 U.S.C. § 3729(a)(1)(D).

315. Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

316. Through the acts and omissions described above, Defendants have conspired to commit violations of the False Claims Act, within the meaning of 31 U.S.C. § 3729(a)(1)(C).

317. Defendants' acts and omissions were made knowingly, as defined in 31 U.S.C. § 3729(b)(1).

318. Defendants' acts and omissions were material, as defined in 31 U.S.C. § 3729(b)(1).

319. The United States, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

320.    Because of the Defendants' acts and omissions, the United States has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

321.    The United States is additionally entitled to the maximum civil penalty for each and every violation of the False Claims Act.

322.    Through the acts and omissions described above, Defendants have taken retaliatory actions against the Relator, including constructive discharge, in violation of the False Claims Act, 31 U.S.C. § 3730(h). As described above, Relator was engaged in protected conduct in furtherance of an action under the FCA, Defendant was aware of his conduct, and Defendants discriminated against Relator in the terms and conditions of his employment because of Relator's lawful acts in furtherance of the FCA.

## COUNT II

### California False Claims Act

323.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

324.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the California False Claims Act (Cal. Gov't Code § 12650 *et seq.*).

325.    The term "State" as used in this Count shall have the meaning as defined in the California False Claims Act, including the State of California, any agency of State government, county, municipality and other entities (Cal. Gov't Code § 12650(b)(6)).

326.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the California False Claims Act (Cal. Gov't Code § 12651(a)(1)).

327.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of California False Claims Act (Cal. Gov't Code § 12651(a)(2)).

328.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of California False Claims Act (Cal. Gov't Code § 12651(a)(4)).

329.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the California False Claims Act (Cal. Gov't Code § 12651(a)(7)).

330.     Through the acts and omissions described above, Defendants have conspired to commit violations of the California False Claims Act, within the meaning of the California False Claims Act (Cal. Gov't Code § 12651(a)(3)).

331.     Defendants' acts and omissions were made knowingly, as defined in the California False Claims Act (Cal. Gov't Code § 12650(b)(3)(A-C)).

332.     Defendants' acts and omissions were material, as defined in the California False Claims Act (Cal. Gov't Code § 12650(b)(4)).

333.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

334. Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

335. The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under California escheatment law.

336. The State is additionally entitled to the maximum civil penalty for each and every violation of the False Claims Act.

## COUNT III

### California Insurance Frauds Prevention Act

337. The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

338. The California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871.7 *et seq.* ("CIFPA"), is designed to combat fraud committed against private insurance companies. The CIFPA allows individuals to bring an action on behalf of the state against individuals or companies that are defrauding private insurance companies, including for violations of any provision of Section 549, 550, or 551 of the California Penal Code.

339. Through the various schemes, described above, Defendants violated the CIFPA, making or causing fraudulent health care claims to be made to California private insurers and defrauding private insurers out of overpayments. By doing so, Defendants substantially increased private insurer's costs and in turn increased the costs of their participants' coverage.

340. Because of the acts and omissions described above, Defendants are liable for a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000) for each fraudulent claim presented to an insurance company, plus an assessment of not more than three times the amount of each claim for compensation, in addition to restitution, and other

damages and penalties under the California Insurance Frauds Prevention Act (Cal. Ins. Code § 1871.7(b).

## COUNT IV

### Colorado Medicaid False Claims Act

341.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

342.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–303.5 *et seq.*).

343.     The term "State" as used in this Count shall have the meaning as used in the Colorado Medicaid False Claims Act, including the State of Colorado, any officer, employee, or agent of the state, or any contractor, grantee, or other recipient of monies or property designated to be spent or used on behalf of the State of Colorado or to advance a program or interest therewith (Colo. Rev. Stat. Ann. §25.5-4–304(1)(a)(I-II)).

344.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–303.5(a)).

345.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–305(1)(b)).

346.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered,

or caused to be delivered, less than all of that money or property, within the meaning of Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–305(1)(c)).

347.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–305(1)(f)).

348.     Through the acts and omissions described above, Defendants have conspired to commit violations of the Colorado Medicaid False Claims Act, within the meaning of the Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–305(1)(g)).

349.     Defendants' acts and omissions were made knowingly, as defined in the Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–304(3)(a-b)).

350.     Defendants' acts and omissions were material, as defined in the Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–304(4)).

351.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

352.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

353.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Colorado escheatment law.

354.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Colorado Medicaid False Claims Act.

## COUNT V

### Connecticut False Claims Act

355.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

356.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Connecticut False Claims Act (Conn. Gen. Stat. § 4-274 *et seq.*).

357.     The term "State" as used in this Count shall have the meaning as defined in the Connecticut False Claims Act, including the State of Connecticut, any agency of State government, county, municipality and other entities (Conn. Gen. Stat. § 4-274(5)).

358.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Connecticut False Claims Act (Conn. Gen. Stat. § 4-275(a)(1)).

359.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Connecticut False Claims Act (Conn. Gen. Stat. § 4-275(a)(2)).

360.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Connecticut False Claims Act (Conn. Gen. Stat. § 4-275(a)(4)).

361.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Connecticut False Claims Act (Conn. Gen. Stat. § 4-275(a)(7)).

362.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Connecticut False Claims Act, within the meaning of the Connecticut False Claims Act (Conn. Gen. Stat. § 4-275(a)(3)).

363.    Defendants' acts and omissions were made knowingly, as defined in the Connecticut False Claims Act (Conn. Gen. Stat. § 4-274(1)(A-C)).

364.    Defendants' acts and omissions were material, as defined in the Connecticut False Claims Act (Conn. Gen. Stat. § 4-274(6)).

365.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

366.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

367.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Connecticut escheatment law.

368.    The State is additionally entitled to the maximum civil penalty for each and every violation of the Connecticut False Claims Act.

## COUNT VI

### Delaware False Claims and Reporting Act

369.    The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

370.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Delaware False Claims and Reporting Act (6 Del. Code Ann. § 1201 *et seq.*).

371.    The term "State" as used in this Count shall have the meaning as defined in the Delaware False Claims and Reporting Act, including the State of Delaware, any agency of State government, county, municipality and other entities (6 Del. Code Ann. § 1202(2)).

372.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Delaware False Claims and Reporting Act (6 Del. Code Ann. § 1201(a)(1).

373.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Delaware False Claims and Reporting Act (6 Del. Code Ann. § 1201(a)(2).

374.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Delaware False Claims and Reporting Act (6 Del. Code Ann. § 1201(a)(4)).

375.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Delaware False Claims and Reporting Act (6 Del. Code Ann. § 1201(a)(7)).

376.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Delaware False Claims and Reporting Act, within the meaning of the Delaware False Claims and Reporting Act (6 Del. Code Ann. § 1201(a)(3)).

377.    Defendants' acts and omissions were made knowingly, as defined in the Delaware False Claims and Reporting Act (6 Del. Code Ann. § 1202(3)(a-c)).

378.    Defendants' acts and omissions were material, as defined in the Delaware False Claims and Reporting Act (6 Del. Code Ann. § 1202(4).

379.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

380.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

381.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Delaware escheatment law.

382.    The State is additionally entitled to the maximum civil penalty for each and every violation of the Delaware False Claims and Reporting Act.

## COUNT VII

### District of Columbia False Claims Act

383.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

384.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the District of Columbia False Claims Act (D.C. Code § 2-381.01 *et seq.*).

385.     The term "District" as used in this Count shall have the meaning as used in the District of Columbia False Claims Act, including the District of Columbia, any of its officers, employees, or agents, or a contractor, grantee, or other recipient of monies or property to be spent or used on behalf of the District of Columbia or to advance any program or interest therewith (D.C. Code § 2-381.01(1)).

386.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the District of Columbia False Claims Act (D.C. Code § 2-381.02(a)(1)).

387.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of District of Columbia False Claims Act (D.C. Code § 2-381.02(a)(2)).

388.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the District and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of District of Columbia False Claims Act (D.C. Code § 2-381.02(a)(3)).

389.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or

transmit money or property to the District, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the District, within the meaning of the District of Columbia False Claims Act (D.C. Code § 2-381.02(a)(6)).

390.     Through the acts and omissions described above, Defendants have conspired to commit violations of the District of Columbia False Claims Act, within the meaning of the District of Columbia False Claims Act (D.C. Code § 2-381.02(a)(7).

391.     Defendants' acts and omissions were made knowingly, as defined in the District of Columbia False Claims Act (D.C. Code § 2-381.01(7)(A-B)).

392.     Defendants' acts and omissions were material, as defined in the District of Columbia False Claims Act (D.C. Code § 2-381.01(8)).

393.     The District, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

394.     Because of the Defendants' acts and omissions, the District has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

395.     The District is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under District of Columbia escheatment law.

396.     The District is additionally entitled to the maximum civil penalty for each and every violation of the District of Columbia False Claims Act.

## COUNT VIII

### Florida False Claims Act

397.    The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

398.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Florida False Claims Act (Fla. Stat. §§ 68.081 *et seq.*).

399.    The term "State" as used in this Count shall have the meaning as defined in the Florida False Claims Act, including the State of Florida, any agency of State government, county, municipality and other entities (Fla. Stat. § 68.082(1)(d)).

400.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Florida False Claims Act (Fla. Stat. § 68.082(2)(a)).

401.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Florida False Claims Act (Fla. Stat. § 68.082(2)(b)).

402.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Florida False Claims Act (Fla. Stat. § 68.082(2)(d).

403.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Florida False Claims Act (Fla. Stat. § 68.082(2)(g)).

404.     Through the acts and omissions described above, Defendants have conspired to commit violations of the Florida False Claims Act, within the meaning of the Florida False Claims Act (Fla. Stat. § 68.082(2)(c)).

405.     Defendants' acts and omissions were made knowingly, as defined in the Florida False Claims Act (Fla. Stat. § 68.082(2)(c)(1-3)).

406.     Defendants' acts and omissions were material, as defined in the Florida False Claims Act (Fla. Stat. § 68.082(1)(d)).

407.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

408.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

409.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Florida escheatment law.

410.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Florida False Claims Act.

## COUNT IX

### Georgia Taxpayer Protection False Claims Act

411.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

412.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. § 23-3-120 *et seq.*).

413. The term "State" as used in this Count shall have the meaning as defined in the Georgia Taxpayer Protection False Claims Act, including the State of Georgia, any agency of State government, county, municipality and other entities (Ga. Code Ann. § 23-3-120)(6)).

414. Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. § 23-3-121(a)(1)).

415. Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. § 23-3-121(a)(2)).

416. Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. § 23-3-121(a)(4)).

417. Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. § 23-3-121(a)(7)).

418. Through the acts and omissions described above, Defendants have conspired to commit violations of the Georgia Taxpayer Protection False Claims Act, within the meaning of the Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. § 23-3-121(a)(3)).

419.    Defendants' acts and omissions were made knowingly, as defined in the Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. § 23-3-120(2)(A-C)).

420.    Defendants' acts and omissions were material, as defined in the Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. § 23-3-120(4).

421.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

422.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

423.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty allowable under Georgia escheatment law.

424.    The State is additionally entitled to the maximum civil penalty for each and every violation of the Georgia Taxpayer Protection False Claims Act.

## COUNT X

### Georgia's State False Medicaid Claims Act

425.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

426.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under Georgia's State False Medicaid Claims Act (Ga. Code Ann. § 49-4-168 *et seq.*).

427.    The term "State" as used in this Count shall have the meaning as used in Georgia's State False Medicaid Claims Act, including the State of Georgia, any officer, employee, fiscal intermediary, grantee, agent, or contractor of the Georgia Medicaid program, or any other persons or entities receiving payments from the Georgia Medicaid Program (Ga. Code Ann. § 49-4-168(1)).

103

428.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of Georgia's State False Medicaid Claims Act (Ga. Code Ann. § 49-4-168.1(a)(1)).

429.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Georgia's State False Medicaid Claims Act (Ga. Code Ann. § 49-4-168.1(a)(2)).

430.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Georgia's State False Medicaid Claims Act (Ga. Code Ann. § 49-4-168.1(a)(4)).

431.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of Georgia's State False Medicaid Claims Act (Ga. Code Ann. § 49-4-168.1(a)(7)).

432.    Through the acts and omissions described above, Defendants have conspired to commit violations of Georgia False Medicaid Claims Act, within the meaning of the Georgia's State False Medicaid Claims Act (Ga. Code Ann. § 49-4-168.1(a)(3)).

433.    Defendants' acts and omissions were made knowingly, as defined in Georgia's State False Medicaid Claims Act (Ga. Code Ann. § 49-4-168(2)(A-C)).

434.    Defendants' acts and omissions were material, as defined in Georgia's State False Medicaid Claims Act (Ga. Code Ann. § 49-4-168(3)).

435. The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

436. Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

437. The State is additionally entitled to the maximum civil penalty for each and every violation of Georgia's State False Medicaid Act.

## COUNT XI

### Hawaii False Claims Act – False Claims to the State

438. The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

439. Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under Hawaii's False Claims to the State (Haw. Rev. Stat. §§ 661-21 *et seq.*).

440. The term "State" as used in this Count shall have the meaning as used in Hawaii's False Claims to the State, including the State of Hawaii, any agency of State government, and any officer, employee, or agent of the State (Haw. Rev. Stat. § 661-21).

441. Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of Hawaii's False Claims to the State (Haw. Rev. Stat. § 661-21(a)(1)).

442. Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Hawaii's False Claims to the State (Haw. Rev. Stat. § 661-21(a)(2)).

443. Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Hawaii's False Claims to the State (Haw. Rev. Stat. § 661-21(a)(3)).

444. Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of Hawaii's False Claims to the State (Haw. Rev. Stat. § 661-21(a)(6)).

445. Through the acts and omissions described above, Defendants have conspired to commit violations of Hawaii's False Claims to the State, within the meaning of Hawaii's False Claims to the State (Haw. Rev. Stat. § 661-21(a)(8)).

446. Defendants' acts and omissions were made knowingly, as defined in Hawaii's False Claims to the State (Haw. Rev. Stat. § 661-21(e)(1-3)).

447. Defendants' acts and omissions were material, as defined in Hawaii's False Claims to the State (Haw. Rev. Stat. § 661-21(e)(3)).

448. The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

449. Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

450.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Hawaii escheatment law.

451.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Hawaii's False Claims Act.

## COUNT XII

### Illinois False Claims Act

452.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

453.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Illinois False Claims Act (740 ILCS 175/1 *et seq.*).

454.     The term "State" as used in this Count shall have the meaning as defined in the Illinois False Claims Act, including the State of Illinois, any agency of State government, county, municipality and other entities (740 ILCS 175/2(a)).

455.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Illinois False Claims Act (740 ILCS 175/3(a)(1)(A)).

456.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Illinois False Claims Act (740 ILCS 175/3(a)(1)(B)).

457.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Illinois False Claims Act (740 ILCS 175/3(a)(1)(D)).

458. Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Illinois False Claims Act (740 ILCS 175/3(a)(1)(G)).

459. Through the acts and omissions described above, Defendants have conspired to commit violations of the Illinois False Claims Act, within the meaning of the Illinois False Claims Act (740 ILCS 175/3(a)(1)(C)).

460. Defendants' acts and omissions were made knowingly, as defined in the Illinois False Claims Act (740 ILCS 175/3(b)(1)).

461. Defendants' acts and omissions were material, as defined in the Illinois False Claims Act (740 ILCS 175/3(b)(4)).

462. The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

463. Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

464. The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Illinois escheatment law.

465. The State is additionally entitled to the maximum civil penalty for each and every violation of the Illinois False Claims Act.

## COUNT XIII

### Illinois Insurance Frauds Prevention Act

466.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

467.     The Illinois Legislature enacted the Illinois Insurance Claims Frauds Prevention Act, 740 ILCS § 92/1 *et seq*. ("IICFPA"), to combat abusive practices aimed at defrauding private insurance providers. The legislation was enacted specifically to address the social costs of fraud on private insurance providers, noting that the penalties in the IICFPA are "remedial" and intended to achieve the "goals of disgorging unlawful profit, restitution, compensating the State for the costs of investigations and prosecution, and alleviating the social costs of increased insurance rates due to fraud." 740 ILCS § 92/5(c).

468.     Through the various schemes, described above, Defendants violated the IICFPA, making or causing fraudulent health care claims to be made to Illinois private insurers and defrauding private insurers out of overpayments. By doing so, Defendants substantially increased private insurer's costs and in turn increased the costs of their participants' coverage.

469.     Because of the acts and omissions described above, Defendants are liable for the maximum damages and penalties under the Illinois Insurance Claims Frauds Prevention Act (740 ILCS § 92/1 *et seq*.).

## COUNT XIV

### Indiana False Claims and Whistleblower Protection Act

470.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

471.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act (Ind. Code §§ 5-11-5.5-1 *et seq.*).

472.     The term "State" as used in this Count shall have the meaning as defined in the Indiana False Claims and Whistleblower Protection Act, including the State of Indiana, any agency of State government, county, municipality and other entities (Ind. Code § 5-11-5.5-1(7)).

473.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Indiana False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.5-2(b)(1)).

474.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Indiana False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.5-2(b)(2)).

475.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Indiana False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.5-2(b)).

476.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Indiana False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.5-2(b)(6)).

477.     Through the acts and omissions described above, Defendants have conspired to commit violations of the Indiana False Claims and Whistleblower Protection Act, within the meaning of the Indiana False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.5-2(b)(7)).

478.     Defendants' acts and omissions were made knowingly, as defined in the Indiana False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.5-1(4)).

479.     Defendants' acts and omissions were material, as defined in the Indiana False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.7-1(b)(5)).

480.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

481.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

482.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Indiana escheatment law.

483.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Indiana False Claims and Whistleblower Protection Act.

## COUNT XV

### Indiana Medicaid False Claims and Whistleblower Protection Act

484.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

485.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act (Ind. Code §§ 5-11-5.7 *et seq.*).

486.     The term "State" as used in this Count shall have the meaning as defined in the Indiana Medicaid False Claims and Whistleblower Protection Act, including the State of Indiana, any agency of State government, county, municipality and other entities (Ind. Code § 5-11-5.7-1(b)(9)).

487.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Indiana Medicaid False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.7-1(b)(1)(A)).

488.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Indiana Medicaid False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.7-1(b)(1)(B)).

489.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Indiana Medicaid False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.7-2(a)(3)).

490. Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Indiana Medicaid False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.7-2(a)(6)(A-B)).

491. Through the acts and omissions described above, Defendants have conspired to commit violations of the Indiana Medicaid False Claims and Whistleblower Protection Act, within the meaning of the Illinois False Claims Act (Ind. Code § 5-11-5.7-2(a)(7)).

492. Defendants' acts and omissions were made knowingly, as defined in the Indiana Medicaid False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.7-1(b)(4)(A-C)).

493. Defendants' acts and omissions were material, as defined in the Indiana Medicaid False Claims and Whistleblower Protection Act (Ind. Code § 5-11-5.7-1(b)(5)).

494. The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

495. Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

496. The State is additionally entitled to the maximum civil penalty for each and every violation of the Indiana Medicaid False Claims and Whistleblower Protection Act.

## COUNT XVI

### Iowa False Claims Act

497.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

498.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Iowa False Claims Act (Iowa Code §§ 685.1 *et seq.*).

499.     The term "State" as used in this Count shall have the meaning as defined in the Iowa False Claims Act, including the State of Iowa, any agency of State government, county, municipality and other entities (Iowa Code § 685.1(15)).

500.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Iowa False Claims Act (Iowa Code § 685.2(1)(a)).

501.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Iowa False Claims Act (Iowa Code § 685.2(1)(b)).

502.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Iowa False Claims Act (Iowa Code § 685.2(1)(d)).

503.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Iowa False Claims Act (Iowa Code § 685.2(1)(g)).

504.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Iowa False Claims Act, within the meaning of the Iowa False Claims Act (Iowa Code § 685.2(1)(c)).

505.    Defendants' acts and omissions were made knowingly, as defined in the Iowa False Claims Act (Iowa Code § 685.1(7)(a-b)).

506.    Defendants' acts and omissions were material, as defined in the Iowa False Claims Act (Iowa Code § 685.1(8)).

507.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

508.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

509.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Iowa escheatment law.

510.    The State is additionally entitled to the maximum civil penalty for each and every violation of the Iowa False Claims Act.

## COUNT XVII

### Louisiana Medical Assistance Programs Integrity Law

511.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

512.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. §§ 46:437.1 – 46:440.3)

513.    The term "State" as used in this Count shall have the meaning as used in the Louisiana Medical Assistance Programs Integrity Law, including the State of Louisiana, any officer, employee, agent, or Louisiana Department of Health, or any contractor, grantee, or other recipient of money or property to be spent or used in any manner in any program administered by the Louisiana Department of Health (La. Rev. Stat. Ann. § 46:437.3(5)).

514.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 46:438.3(A)).

515.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 46:438.3(B)).

516.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 46:438.3(c)).

517.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 46:438.3(C)).

518.     Through the acts and omissions described above, Defendants have conspired to commit violations of the Louisiana Medical Assistance Programs Integrity Law, within the meaning of the Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 46:438.3(D)).

519.     Defendants' acts and omissions were made knowingly, as defined in the Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 46:437.3(11)).

520.     Defendants' acts and omissions were material, as defined in the Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. § 46:437.3(13)).

521.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

522.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

523.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Louisiana escheatment law.

524.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Louisiana Medical Assistance Programs Integrity Law.

## COUNT XVIII

### Maryland False Health Claims Act

525.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

526.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Maryland False Health Claims Act (Md. Code Ann. §§ 2-601 *et seq.*).

527.     The term "State" as used in this Count shall have the meaning as defined in the Maryland False Health Claims Act, including the State of Maryland, any agency of State government, county, municipality and other entities (Md. Code Ann. § 2-601).

528.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Maryland False Health Claims Act (Md. Code Ann. § 2-602(a)(1)).

529.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Maryland False Health Claims Act (Md. Code Ann. § 2-602(a)(2)).

530.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Maryland False Health Claims Act (Md. Code Ann. § 2-602(a)(4)).

531.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Maryland False Health Claims Act (Md. Code Ann. § 2-602(a)(7)).

532.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Maryland False Health Claims Act, within the meaning of the Maryland False Health Claims Act (Md. Code Ann. § 2-602(a)(3)).

533.    Defendants' acts and omissions were made knowingly, as defined in the Maryland False Health Claims Act (Md. Code Ann. § 2-601(f)(1-2)).

534.    Defendants' acts and omissions were material, as defined in the Maryland False Health Claims Act (Md. Code Ann. § 2-601(g)).

535.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

536.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

537.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Maryland escheatment law.

538.    The State is additionally entitled to the maximum civil penalty for each and every violation of the Maryland False Health Claims Act.

## COUNT XIX

### Massachusetts False Claims Act

539.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

540.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 §§ 5A *et seq.*).

541.     The term "Commonwealth" as used in this Count shall have the meaning as used in the Massachusetts False Claims Act, including the Commonwealth of Massachusetts, any officer, employee, agent, or other representative of the common wealth or a political subdivision thereof, or any contractor, subcontractor, grantee or other person, to whom money or property is to be spent or used on of or to advance a program or interest of the Commonwealth of Massachusetts or a political subdivision thereof (Mass. Gen. Laws ch. 12 § 5A).

542.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 § 5B(a)(1)).

543.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 § 5B(a)(2).

544.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 § 5B(a)(5)).

545.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 § 5B(a)(9)).

546.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Massachusetts False Claims Act, within the meaning of the Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 § 5B(a)(3)).

547.    Defendants' acts and omissions were made knowingly, as defined in the Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 § 5A).

548.    Defendants' acts and omissions were material, as defined in the Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 § 5A).

549.    The Commonwealth, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

550.    Because of the Defendants' acts and omissions, the Commonwealth has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

551.    The Commonwealth is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Massachusetts escheatment law.

552.    The Commonwealth is additionally entitled to the maximum civil penalty for each and every violation of the Massachusetts False Claims Act.

## COUNT XX

### Michigan Medicaid False Claim Act

553.    The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

554.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Michigan Medicaid False Claim Act (Mich. Comp. Laws §§ 400.601 *et seq.*).

555.    The term "State" as used in this Count shall have the meaning as used in the Michigan Medicaid False Claim Act, including the State of Michigan, any employee or officer of the State of Michigan, and other entities, including the Michigan department of community health (Mich. Comp. Laws § 400.602).

556.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Michigan Medicaid False Claim Act (Mich. Comp. Laws § 400.607(1)).

557.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Michigan Medicaid False Claim Act (Mich. Comp. Laws § 400.607(2)).

558.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Michigan Medicaid False Claim Act (Mich. Comp. Laws § 400.610(4)).

559.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or

transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Michigan Medicaid False Claim Act (Mich. Comp. Laws § 400.607(c)).

560.     Through the acts and omissions described above, Defendants have conspired to commit violations of the Michigan Medicaid False Claim Act, within the meaning of the Michigan Medicaid False Claim Act (Mich. Comp. Laws § 400.606).

561.     Defendants' acts and omissions were made knowingly, as defined in the Michigan Medicaid False Claim Act (Mich. Comp. Laws § 400.602(f)).

562.     Defendants' acts and omissions were material, as used in the Michigan Medicaid False Claim Act.

563.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

564.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

565.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Michigan escheatment law.

566.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Michigan Medicaid False Claim Act.

## COUNT XXI

### Minnesota False Claims Act

567.    The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

568.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Minnesota False Claims Act (Minn. Stat. §§ 15C.01 *et seq.*).

569.    The term "State" as used in this Count shall have the meaning as defined in the Minnesota False Claims Act, including the State of Minnesota, any agency of State government, county, municipality and other entities (Minn. Stat. § 15C.01(8)).

570.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Minnesota False Claims Act (Minn. Stat. § 15C.02(a)(1)).

571.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Minnesota False Claims Act (Minn. Stat. § 15C.02(a)(2)).

572.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Minnesota False Claims Act (Minn. Stat. § 15C.02(a)(4)).

573.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Minnesota False Claims Act (Minn. Stat. § 15C.02(a)(7)).

574.     Through the acts and omissions described above, Defendants have conspired to commit violations of the Minnesota False Claims Act, within the meaning of the Minnesota False Claims Act (Minn. Stat. § 15C.02(a)(3)).

575.     Defendants' acts and omissions were made knowingly, as defined in the Minnesota False Claims Act (Minn. Stat. § 15C.01(3)(1-3)).

576.     Defendants' acts and omissions were material, as defined in the Minnesota False Claims Act (Minn. Stat. § 15C.01(3a)).

577.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

578.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

579.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Minnesota escheatment law.

580.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Minnesota False Claims Act.

## COUNT XXII

### Montana False Claims Act

581.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

582.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Montana False Claims Act (Mont. Code Ann. §§ 17-8-401 *et seq.*).

583. The term "State" as used in this Count shall have the meaning as defined in the Montana False Claims Act, including the State of Montana, any agency of State government, county, municipality and other entities (Mont. Code Ann. § 17-8-402(3)(a-c)).

584. Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Montana False Claims Act (Mont. Code Ann. § 17-8-403(1)(a)).

585. Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Montana False Claims Act (Mont. Code Ann. § 17-8-403(1)(b)).

586. Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Montana False Claims Act (Mont. Code Ann. § 17-8-403(1)(d)).

587. Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Montana False Claims Act (Mont. Code Ann. § 17-8-403(1)(g)).

588. Through the acts and omissions described above, Defendants have conspired to commit violations of the Montana False Claims Act, within the meaning of the Montana False Claims Act (Mont. Code Ann. § 17-8-403(1)(c)).

589. Defendants' acts and omissions were made knowingly, as defined in the Montana False Claims Act (Mont. Code Ann. § 17-8-402(4)(a)-(b)).

590.     Defendants' acts and omissions were material, as defined in the Montana False Claims Act (Mont. Code Ann. § 17-8-402(5)).

591.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

592.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

593.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Montana escheatment law.

594.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Montana False Claims Act.

## COUNT XXIII

### Nevada False Claims Act

595.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

596.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Nevada False Claims Act (Nev. Rev. Stat. Ann. §§ 357.010 *et seq.*).

597.     The term "State" as used in this Count shall have the meaning as used in the Nevada False Claims Act, including the State of Nevada, any officer, employee or agent of the State of Nevada or any political subdivision thereof, or any contractor, grantee or other recipient of money, property or services to be spent or used on behalf of the State of Nevada or a political subdivision thereof (Nev. Rev. Stat. Ann. § 357.020).

598.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Nevada False Claims Act (Nev. Rev. Stat. Ann. § 357.040(1)(a)).

599.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Nevada False Claims Act (Nev. Rev. Stat. Ann. § 357.040(1)(b)).

600.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Nevada False Claims Act (Nev. Rev. Stat. Ann. § 357.040(1)(d)).

601.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Nevada False Claims Act (Nev. Rev. Stat. Ann. § 357.040(1)(g)).

602.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Nevada False Claims Act, within the meaning of the Nevada False Claims Act (Nev. Rev. Stat. Ann. § 357.040(1)(c)).

603.    Defendants' acts and omissions were made knowingly, as defined in the Nevada False Claims Act (Nev. Rev. Stat. Ann. § 357.040(2)(a)-(c)).

604.    Defendants' acts and omissions were material, as defined in the Nevada False Claims Act (Nev. Rev. Stat. Ann. § 357.022).

605.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

606.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

607.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Nevada escheatment law.

608.    The State is additionally entitled to the maximum civil penalty for each and every violation of the Nevada False Claims Act.

## **COUNT XXIV**

### **New Jersey False Claims Act**

609.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

610.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the New Jersey False Claims Act (N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*).

611.    The term "State" as used in this Count shall have the meaning as defined in the New Jersey False Claims Act, including the State of New Jersey, any agency of State government, county, municipality and other entities (N.J. Stat. Ann. § 2A:32C-2(2.A)).

612.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the New Jersey False Claims Act (N.J. Stat. Ann. § 2A:32C-3((3.A)(a)).

613.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of New Jersey False Claims Act (N.J. Stat. Ann. § 2A:32C-3(3.A)(b)).

614.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of New Jersey False Claims Act (N.J. Stat. Ann. § 2A:32C-3(3.A)(d)).

615.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the New Jersey False Claims Act (N.J. Stat. Ann. § 2A:32C-3(3.A)(g).

616.    Through the acts and omissions described above, Defendants have conspired to commit violations of the New Jersey False Claims Act, within the meaning of the New Jersey False Claims Act (N.J. Stat. Ann. § 2A:32C-3(3.A)(c)).

617.    Defendants' acts and omissions were made knowingly, as defined in the New Jersey False Claims Act (N.J. Stat. Ann. § 2A:32C-2((2.A)(1-3)).

618.    Defendants' acts and omissions were material, as used in the New Jersey False Claims Act.

619.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

620.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

621.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under New Jersey escheatment law.

622.    The State is additionally entitled to the maximum civil penalty for each and every violation of the New Jersey False Claims Act.

## COUNT XXV

### New Mexico Medicaid False Claims Act

623.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

624.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the New Mexico Medicaid False Claims Act (N.M. Stat. Ann. §§ 27-14-1 *et seq.*).

625.    The term "Department" as used in this Count shall have the meaning as defined in the New Mexico Medicaid False Claims Act, including the State of New Mexico and the Human Services Department, (N.M. Stat. Ann. § 27-14-3(B)).

626.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the New Mexico Medicaid False Claims Act (N.M. Stat. Ann. § 27-14-4(A-B)).

627.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of New Mexico Medicaid False Claims Act (N.M. Stat. Ann. § 27-14-4(C)).

628.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Department, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Department, within the meaning of the New Mexico Medicaid False Claims Act (N.M. Stat. Ann. § 27-14-4(E)).

629.     Through the acts and omissions described above, Defendants have conspired to commit violations of the New Mexico Medicaid False Claims Act, within the meaning of the New Mexico Medicaid False Claims Act (N.M. Stat. Ann. § 27-14-4(D)).

630.     Defendants' acts and omissions were made knowingly, as used in the New Mexico Medicaid False Claims Act.

631.     Defendants' acts and omissions were material, as used in the New Mexico Medicaid False Claims Act.

632.     The Department, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

633.     Because of the Defendants' acts and omissions, the Department has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

634.     The Department is additionally entitled to the maximum civil penalty for each and every violation of the New Mexico Medicaid False Claims Act.

## COUNT XXVI

**New Mexico Fraud Against Taxpayers Act**

635.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

636.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act (N.M. Stat. Ann. §§ 44-9-1 *et seq.*).

637.     The term "State" as used in this Count shall have the meaning as defined in the New Mexico Fraud Against Taxpayers Act, including the State of New Mexico, any agency of State government, county, municipality and other entities (N.M. Stat. Ann. § 44-9-2(E)).

638.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the New Mexico Fraud Against Taxpayers Act (N.M. Stat. Ann. § 44-9-3(A)(1)).

639.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of New Mexico Fraud Against Taxpayers Act (N.M. Stat. Ann. § 44-9-3(A)(2)).

640.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of New Mexico Fraud Against Taxpayers Act (N.M. Stat. Ann. § 44-9-3(A)(5)).

641.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the New Mexico Fraud Against Taxpayers Act (N.M. Stat. Ann. § 44-9-3(A)(8)).

642.    Through the acts and omissions described above, Defendants have conspired to commit violations of the New Mexico Fraud Against Taxpayers Act, within the meaning of the New Mexico Fraud Against Taxpayers Act (N.M. Stat. Ann. § 44-9-3(A)(3-4)).

643.    Defendants' acts and omissions were made knowingly, as defined in the New Mexico Fraud Against Taxpayers Act (N.M. Stat. Ann. § 44-9-2(C)(1-3)).

644.    Defendants' acts and omissions were material, as used in the New Mexico Fraud Against Taxpayers Act.

645.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

646.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

647.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under New Mexico escheatment law.

648.    The State is additionally entitled to the maximum civil penalty for each and every violation of the New Mexico Fraud Against Taxpayers Act.

## COUNT XXVII

### New York False Claims Act

649.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

650.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the New York False Claims Act (N.Y. State Fin. Law §§187-194).

651.     The term "State" as used in this Count shall have the meaning as defined in the New York False Claims Act, including the State of New York, any agency of State government, county, municipality and other entities (N.Y. State Fin. Law §188(7)).

652.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the New York False Claims Act (N.Y. State Fin. Law §189(1)(a)).

653.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of New York False Claims Act (N.Y. State Fin. Law §189(1)(b)).

654.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of New York False Claims Act (N.Y. State Fin. Law §189(1)(d)).

655.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the New York False Claims Act (N.Y. State Fin. Law §189(1)(g)).

656. Through the acts and omissions described above, Defendants have conspired to commit violations of the New York False Claims Act, within the meaning of the New York False Claims Act (N.Y. State Fin. Law §189(1)(c)).

657. Defendants' acts and omissions were made knowingly, as defined in the New York False Claims Act (N.Y. State Fin. Law §188(a)-(c)).

658. Defendants' acts and omissions were material, as defined in the New York False Claims Act (N.Y. State Fin. Law §188(5)).

659. The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

660. Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

661. The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under New York escheatment law.

662. The State is additionally entitled to the maximum civil penalty for each and every violation of the New York False Claims Act.

## COUNT XXVIII

### North Carolina False Claims Act

663. The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

664. Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the North Carolina False Claims Act (N.C. Gen. Stat. §§ 1-605 *et seq.*).

665.    The term "State" as used in this Count shall have the meaning as used in the North Carolina False Claims Act, including the State of North Carolina, any officer, employee, or agent of the State of North Carolina, or any contractor, grantee, or other recipient of money or property to be spent or used on behalf of the State of North Carolina or to advance a program or interest therewith. (N.C. Gen. Stat. § 1-606(2)).

666.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the North Carolina False Claims Act (N.C. Gen. Stat. § 1-607(a)(1)).

667.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of North Carolina False Claims Act (N.C. Gen. Stat. § 1-607(a)(2)).

668.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of North Carolina False Claims Act (N.C. Gen. Stat. § 1-607(a)(4)).

669.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the North Carolina False Claims Act (N.C. Gen. Stat. § 1-607(a)(7)).

670.    Through the acts and omissions described above, Defendants have conspired to commit violations of the North Carolina False Claims Act, within the meaning of the North Carolina False Claims Act (N.C. Gen. Stat. § 1-607(a)(3)).

671.     Defendants' acts and omissions were made knowingly, as defined in the North Carolina False Claims Act (N.C. Gen. Stat. § 1-606(4)(a-c)).

672.     Defendants' acts and omissions were material, as defined in the North Carolina False Claims Act (N.C. Gen. Stat. § 1-606(6)).

673.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

674.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

675.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under North Carolina escheatment law.

676.     The State is additionally entitled to the maximum civil penalty for each and every violation of the North Carolina False Claims Act.

## COUNT XXIX

### Oklahoma False Claims Act

677.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

678.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Oklahoma Medicaid False Claims Act (63 Okl. Stat. § 5053 *et seq.*).

679.     The term "State" as used in this Count shall have the meaning as defined in the Oklahoma Medicaid False Claims Act, including the State of Oklahoma, any agency of State government, county, municipality and other entities (63 Okl. Stat. § 5053).

680. Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Oklahoma Medicaid False Claims Act (63 Okl. Stat. § 5053.1(B)(1)).

681. Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Oklahoma Medicaid False Claims Act (63 Okl. Stat. § 5053.1(B)(2)).

682. Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Oklahoma Medicaid False Claims Act (63 Okl. Stat. § 5053.1(B)(4)).

683. Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Oklahoma Medicaid False Claims Act (63 Okl. Stat. § 5053.1(B)(7)).

684. Through the acts and omissions described above, Defendants have conspired to commit violations of the Oklahoma Medicaid False Claims Act, within the meaning of the Oklahoma Medicaid False Claims Act (63 Okl. Stat. § 5053.1(B)(3)).

685. Defendants' acts and omissions were made knowingly, as defined in the Oklahoma Medicaid False Claims Act (63 Okl. Stat. § 5053.1(A)(2)(a)-(c)).

686. Defendants' acts and omissions were material, as defined in the Oklahoma Medicaid False Claims Act (63 Okl. Stat. § 5053.1(A)(3)).

687.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

688.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

689.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Oklahoma escheatment law.

690.    The State is additionally entitled to the maximum civil penalty for each and every violation of the Oklahoma Medicaid False Claims Act.

## COUNT XXX

### Rhode Island – State False Claims Act

691.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

692.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under Rhode Island's State False Claims Act (R.I. Gen. Laws §§ 9-1.1 *et seq.*).

693.    The term "State" as used in this Count shall have the meaning as defined in Rhode Island's State False Claims Act, including the State of Rhode Island, any agency of State government, county, municipality and other entities (R.I. Gen. Laws § 9-1.1-2(a)).

694.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of Rhode Island's State False Claims Act (R.I. Gen. Laws § 9-1.1-3(a)(1)).

695.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Rhode Island's State False Claims Act (R.I. Gen. Laws § 9-1.1-3(a)(2)).

696.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Rhode Island's State False Claims Act (R.I. Gen. Laws § 9-1.1-3(a)(4)).

697.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of Rhode Island's State False Claims Act (R.I. Gen. Laws § 9-1.1-3(a)(7)).

698.     Through the acts and omissions described above, Defendants have conspired to commit violations of Rhode Island's State False Claims Act, within the meaning of Rhode Island's State False Claims Act (R.I. Gen. Laws § 9-1.1-3(a)(3)).

699.     Defendants' acts and omissions were made knowingly, as defined in Rhode Island's State False Claims Act (R.I. Gen. Laws § 9-1.1-3(b)(1)-(3)).

700.     Defendants' acts and omissions were material, as defined in Rhode Island's State False Claims Act (R.I. Gen. Laws § 9-1.1-3(b)(4)).

701.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

702.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

703.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Rhode Island escheatment law.

704.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Rhode Island's State False Claims Act.

## COUNT XXXI

### Tennessee False Claims Act

705.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

706.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Tennessee False Claims Act (Tenn. Code Ann. §§ 4-18-101 *et seq.*).

707.     The term "State" as used in this Count shall have the meaning as used in the Tennessee False Claims Act, including the State of Tennessee, any employee, officer, or agent of the State of Tennessee or of any political subdivision thereof, or any contractor, grantee, or other recipient of money, property, or services requested or demanded issued from, or provided by, the state or any political subdivision thereof. (Tenn. Code Ann. § 4-18-102(1)).

708.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Tennessee False Claims Act (Tenn. Code Ann. § 4-18-103(a)(1)).

709.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Tennessee False Claims Act (Tenn. Code Ann. § 4-18-103(a)(2)).

710.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Tennessee False Claims Act (Tenn. Code Ann. § 4-18-103(a)(4)).

711.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Tennessee False Claims Act (Tenn. Code Ann. § 4-18-103(a)(7)).

712.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Tennessee False Claims Act, within the meaning of the Tennessee False Claims Act (Tenn. Code Ann. § 4-18-103(a)(3)).

713.    Defendants' acts and omissions were made knowingly, as defined in the Tennessee False Claims Act (Tenn. Code Ann. § 4-18-102(2)(A)-(C)).

714.    Defendants' acts and omissions were material, as used in the Tennessee False Claims Act.

715.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

716.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

717.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Tennessee escheatment law.

718.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Tennessee False Claims Act.

## COUNT XXXII

### Tennessee Medicaid False Claims Act

719.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

720.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Tennessee Medicaid False Claims Act (Tenn. Code Ann. §§ 71-5-181 *et seq.*).

721.     The term "State" as used in this Count shall have the meaning as used in the Tennessee Medicaid False Claims Act, including the State of Tennessee, any employee, officer, or agent of the State of Tennessee, or any contractor, grantee, or other recipient of money or property that is to be spent or used on behalf or to advance a program or interest of the State of Tennessee. (Tenn. Code Ann. § 71-5-182(c)).

722.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Tennessee Medicaid False Claims Act (Tenn. Code Ann. § 71-5-182(a)(1)(A)).

723.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent

claim, within the meaning of Tennessee Medicaid False Claims Act (Tenn. Code Ann. § 71-5-182(a)(1)(B)).

724.　Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Tennessee False Claims Act (Tenn. Code Ann. § 71-5-182(a)(1)(D)).

725.　Through the acts and omissions described above, Defendants have conspired to commit violations of the Tennessee Medicaid False Claims Act, within the meaning of the Tennessee Medicaid False Claims Act (Tenn. Code Ann. § 71-5-182(a)(1)(C)).

726.　Defendants' acts and omissions were made knowingly, as defined in the Tennessee Medicaid False Claims Act (Tenn. Code Ann. § 71-5-182(b)(1)-(3)).

727.　Defendants' acts and omissions were material, as defined in the Tennessee Medicaid False Claims Act (Tenn. Code Ann. § 71-5-182(e)).

728.　The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

729.　Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

730.　The State is additionally entitled to the maximum civil penalty for each and every violation of the Tennessee Medicaid False Claims Act.

## COUNT XXXIII

### Texas Medical Assistance Program, Damages and Penalties

731.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

732.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under Texas' Medical Assistance Program, Damages and Penalties (Tex. Hum. Res. Code Ann. § 32.039).

733.     The term "State" as used in this Count shall have the meaning as used in the Texas' Medical Assistance Program, Damages and Penalties law, including the State of Texas, any agency of State government, county, municipality and other entities.

734.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of Texas' Medical Assistance Program, Damages and Penalties (Tex. Hum. Res. Code Ann. § 32.039 (b)(1)).

735.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Texas' Medical Assistance Program, Damages and Penalties (Tex. Hum. Res. Code Ann. § 32.039).

736.     Through the acts described above, Defendants solicited remuneration for referrals in violation of Texas' Medical Assistance Program. (Tex. Hum. Res. Code Ann. § 32.039(b)(1-b)).

737.     Defendants' acts and omissions were made knowingly, as defined in Texas' Medical Assistance Program, Damages and Penalties (Tex. Hum. Res. Code Ann. § 32.039(a)(4)).

146

738.     Defendants' acts and omissions were material, as used in Texas' Medical Assistance Program, Damages and Penalties.

739.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

740.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

741.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Texas Medical Assistance Program.

## **COUNT XXXIV**

### **Texas Award for Reporting Medicaid Fraud, Abuse, or Overcharges**

742.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

743.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under Texas' Award for Reporting Medicaid Fraud, Abuse, or Overcharges (Tex. Gov. Code Ann. § 531.101).

744.     The term "State" as used in this Count shall have the meaning as used in the Texas' Award for Reporting Medicaid Fraud, Abuse, or Overcharges, including the State of Texas, any agency of State government, county, municipality and other entities.

745.     Through the acts and omissions described above, Relator is reporting activity that constitutes fraud or abuse of funds in Medicaid and reports overcharges in Medicaid within the meaning of Texas' Award for Reporting Medicaid Fraud, Abuse, or Overcharges (Tex. Gov. Code. Ann. § 531.1011).

746.    The State, unaware of the activities constituting the fraud or abuse, and continues to pay claims that would not be paid but for Defendants' acts and omissions. (Tex. Gov. Code. Ann. § 531.101(a)).

747.    Relator is entitled an award under Tex. Gov. Code. Ann. § 531.101(b), because of the Defendants' acts and omissions which have caused the State to sustain damages, and the State continues to sustain damages, in substantial amount to be determined at trial.

## COUNT XXXV

### Texas Medicaid Fraud Prevention Act

748.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

749.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under Texas' Medicaid Fraud Prevention (including actions by private persons) (Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*).

750.    The term "State" as used in this Count shall have the meaning as used in the Texas' Medicaid Fraud Prevention Act, including the State of Texas, any agency of State government, county, municipality and other entities.

751.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of Texas' Medicaid Fraud Prevention (including actions by private persons) (Tex. Hum. Res. Code Ann. § 36.002(6)).

752.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Texas' Medicaid Fraud Prevention (including actions by private persons) (Tex. Hum. Res. Code Ann. § 36.002(7)).

753.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of Texas' Medicaid Fraud Prevention (including actions by private persons) (Tex. Hum. Res. Code Ann. § 36.002(12)).

754.    Through the acts and omissions described above, Defendants have conspired to commit violations of Texas' Medicaid Fraud Prevention (including actions by private persons), within the meaning of Texas' Medicaid Fraud Prevention (including actions by private persons) (Tex. Hum. Res. Code Ann. § 36.002(9)).

755.    Defendants' acts and omissions were made knowingly, as defined in Texas' Medicaid Fraud Prevention (including actions by private persons) (Tex. Hum. Res. Code Ann. § 36.0011(a)-(b)).

756.    Defendants' acts and omissions were material, as defined in Texas' Medicaid Fraud Prevention (including actions by private persons) (Tex. Hum. Res. Code Ann. § 36.001(5-a)).

757.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

758.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

759.    The State is additionally entitled to the maximum civil penalty for each and every violation of Texas' Medicaid Fraud Prevention Act.

## COUNT XXXVI

### Vermont False Claims Act

760.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

761.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Vermont False Claims Act (32 Vt. Stat. Ann. §§ 630 *et seq.*).

762.     The term "State" as used in this Count shall have the meaning as defined in the Vermont False Claims Act, including the State of Vermont, any agency of State government, county, municipality and other entities (32 Vt. Stat. Ann. § 630(8)).

763.     Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Vermont False Claims Act (32 Vt. Stat. Ann. § 631(a)(1)).

764.     Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Vermont False Claims Act (32 Vt. Stat. Ann. § 631(a)(2)).

765.     Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Vermont False Claims Act (32 Vt. Stat. Ann. § 631(a)(5)).

766.     Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Vermont False Claims Act (32 Vt. Stat. Ann. § 631(a)(9)).

767.     Through the acts and omissions described above, Defendants have conspired to commit violations of the Vermont False Claims Act, within the meaning of the Vermont False Claims Act (32 Vt. Stat. Ann. § 631(a)(12)).

768.     Defendants' acts and omissions were made knowingly, as defined in the Vermont False Claims Act (32 Vt. Stat. Ann. § 630(2)(A)-(B)).

769.     Defendants' acts and omissions were material, as defined in the Vermont False Claims Act (32 Vt. Stat. Ann. § 630(3)).

770.     The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

771.     Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

772.     The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Vermont escheatment law.

773.     The State is additionally entitled to the maximum civil penalty for each and every violation of the Vermont False Claims Act.

## COUNT XXXVII

### Virginia Fraud Against Taxpayers Act

774.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

775.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.1 *et seq.*).

776.    The term "Commonwealth" as used in this Count shall have the meaning as defined in the Virginia Fraud Against Taxpayers Act, including the Commonwealth of Virginia, any agency of state government, and any political subdivision of the Commonwealth. (Va. Code Ann. § 8.01-216.2).

777.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.3(A)(1)).

778.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.3(A)(2)).

779.    Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the Commonwealth and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.3(A)(4)).

780.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Commonwealth, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth, within the meaning of the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.3(A)(7)).

781.     Through the acts and omissions described above, Defendants have conspired to commit violations of the Virginia Fraud Against Taxpayers Act, within the meaning of the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.3(A)(3)).

782.     Defendants' acts and omissions were made knowingly, as defined in the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.3(C)(i)-(iii)).

783.     Defendants' acts and omissions were material, as defined in the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.2).

784.     The Commonwealth, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

785.     Because of the Defendants' acts and omissions, the Commonwealth has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

786.     The Commonwealth is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Virginia escheatment law.

787.     The Commonwealth is additionally entitled to the maximum civil penalty for each and every violation of the Virginia Fraud Against Taxpayers Act.

## COUNT XXXVIII

### Washington State Medical Fraud False Claims Act

788.      The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

789.     Because of the acts and omissions described above, Defendants are liable for treble damages and penalties under the Washington State Medical Fraud False Claims Act (RCW § 74.66.005 *et seq.*).

790. The term "State" as used in this Count shall have the meaning as used in the Washington State Medical Fraud False Claims Act, including the State of Washington, any officer, employee, or agent of a government entity of the State of Washington, or to any contractor, grantee, or other recipient of money or property to be spent or used on a government of the State of Washington's behalf or to advance a program or interest thereof.

791. Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Washington State Medical Fraud False Claims Act (RCW § 74.66.020(1)(a)).

792. Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Washington State Medical Fraud False Claims Act (RCW § 74.66.020(1)(b)).

793. Through the acts and omissions described above, Defendants have had possession, custody, or control of property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of Washington State Medical Fraud False Claims Act (RCW § 74.66.020(1)(d)).

794. Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Washington State Medical Fraud False Claims Act (RCW § 74.66.020(1)(g)).

795.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Washington State Medical Fraud False Claims Act, within the meaning of the Washington State Medical Fraud False Claims Act (RCW § 74.66.020(1)(c)).

796.    Defendants' acts and omissions were made knowingly, as defined in the Washington State Medical Fraud False Claims Act (RCW § 74.66.010(7)(a)-(b)).

797.    Defendants' acts and omissions were material, as defined in the Washington State Medical Fraud False Claims Act (RCW § 74.66.010(8)).

798.    The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

799.    Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

800.    The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Washington escheatment law.

801.    The State is additionally entitled to the maximum civil penalty for each and every violation of the Washington State Medical Fraud False Claims Act.

## COUNT XXXIX

### Wisconsin False Claims Act (Repealed July 14, 2015)

802.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

803.    Because of the acts and omissions described above, Defendants are liable for treble damages and penalties for violations of the Wisconsin False Claims Act that occurred before July 14, 2015. (Wis. Stat. Ann. § 20.931, repealed July 14, 2015).

155

804.    Under Wisconsin law, the repeal of a statute "shall not remit, defeat or impair any civil or criminal liability for offenses committed, penalties or forfeitures incurred or rights of action accrued under such statute before the repeal thereof…." (Wis. Stat. Ann. § 990.04).

805.    The term "State" as used in this Count shall have the meaning as used in the Wisconsin False Claims Act, including the State of Wisconsin, any agency of State government, county, municipality and other entities.

806.    Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval within the meaning of the Wisconsin False Claims Act. (Wis. Stat. Ann. § 20.931(2)(a), repealed July 14, 2015).

807.    Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of Wisconsin False Claims Act. (Wis. Stat. Ann. § 20.931(2)(b), repealed July 14, 2015).

808.    Through the acts and omissions described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State, within the meaning of the Wisconsin False Claims Act. (Wis. Stat. Ann. § 20.931(2)(g), repealed July 14, 2015).

809.    Through the acts and omissions described above, Defendants have conspired to commit violations of the Wisconsin False Claims Act, within the meaning of the Wisconsin False Claims Act. (Wis. Stat. Ann. § 20.931(2)(c), repealed July 14, 2015).

810. Defendants' acts and omissions were made knowingly, as defined in the Wisconsin False Claims Act. (Wis. Stat. Ann. § 20.931(1)(d), repealed July 14, 2015).

811. The State, unaware of the false and fraudulent nature of Defendants' acts and omissions, paid and continues to pay claims that would not be paid but for Defendants' acts and omissions.

812. Because of the Defendants' acts and omissions, the State has sustained damages, and continues to sustain damages, in substantial amount to be determined at trial.

813. The State is entitled to the total amount of overpayments Defendants improperly retained plus the maximum civil penalty and amount of interest allowable under Wisconsin escheatment law.

814. The State is additionally entitled to the maximum civil penalty for each and every violation of the Wisconsin False Claims Act.

## COUNT XL

### Illinois Common Law Retaliatory Discharge

815. The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

816. Because of the acts and omissions described above, Defendants are liable under Illinois common law for retaliatory discharge.

817. Through the acts and omissions described above, Defendants have taken retaliatory actions against the Relator in violation of Illinois common law. As described above, Relator was constructively discharged in retaliation for Relator's activities in pursing this FCA action and in refusing to participate in illegal and unethical conduct. Relator's constructive discharge violates a clear public policy to encourage whistleblowers to report fraudulent, illegal and unethical activity.

157

## COUNT XLI

### Illinois Whistleblower Act Retaliatory Discharge

818.     The allegations alleged in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

819.     Because of the acts and omissions described above, Defendants are liable under the Illinois Whistleblower Act (740 ILCS 174/1 *et seq.*).

820.     Through the acts and omissions described above, Defendants have taken retaliatory actions against the Relator, including constructive discharge, in violation of the Illinois Whistleblower Act. As described above, Relator was constructively discharged in retaliation for Relator's activities in pursing this FCA action, including disclosing information to the government agencies regarding Defendants' alleged FCA violations, and in refusing to participate in illegal and unethical conduct. Relator's constructive discharge violates a clear public policy to encourage whistleblowers to report fraudulent, illegal and unethical, activity.

### PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

821.     That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.* and the analogous state laws cited above;

822.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the named plaintiff states have sustained because of Defendants' actions, plus the maximum civil penalties provided for each violation of 31 U.S.C. § 3729 *et seq.*, and the analogous state laws and escheatment laws cited above;

823.     That Relator be awarded the maximum amount relators share allowed pursuant to 31 U.S.C. § 3730(d) and the analogous state laws cited above;

824.    That Relator be awarded the maximum amount of relief from Defendant's retaliatory actions, pursuant to 31 U.S.C. § 3730(h)(2), the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*, and the Illinois common law;

825.    That Relator be awarded all costs of this action, including attorney's fees and expenses pursuant to 31 U.S.C. §3730(d) and analogous state laws cited above;

826.    That the United States and plaintiff states be awarded their costs and all other relief provided by law;

827.    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

828.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a jury trial.

Respectfully submitted,

UNITED STATES OF AMERICA
   *ex rel.* MICHAEL GILL,
STATE OF CALIFORNIA *ex rel.* MICHAEL GILL,
STATE OF COLORADO *ex rel.* MICHAEL GILL,
STATE OF CONNECTICUT
   *ex rel.* MICHAEL GILL,
STATE OF DELAWARE *ex rel.* MICHAEL GILL,
DISTRICT OF COLUMBIA *ex rel.* MICHAEL GILL,
STATE OF FLORIDA *ex rel.* MICHAEL GILL,
STATE OF GEORGIA *ex rel.* MICHAEL GILL,
STATE OF HAWAII *ex rel.* MICHAEL GILL,
STATE OF ILLINOIS *ex rel.* MICHAEL GILL,
STATE OF INDIANA *ex rel.* MICHAEL GILL,
STATE OF IOWA *ex rel.* MICHAEL GILL,
STATE OF LOUISIANA *ex rel.* MICHAEL GILL,
STATE OF MARYLAND *ex rel.* MICHAEL GILL,
COMMONWEALTH OF MASSACHUSETTS
   *ex rel.* MICHAEL GILL,
STATE OF MICHIGAN *ex rel.* MICHAEL GILL,
STATE OF MINNESOTA *ex rel.* MICHAEL GILL,
STATE OF MONTANA *ex rel.* MICHAEL GILL,

STATE OF NEVADA *ex rel.* MICHAEL GILL,
STATE OF NEW JERSEY *ex rel.* MICHAEL GILL,
STATE OF NEW MEXICO *ex rel.* MICHAEL GILL,
STATE OF NEW YORK *ex rel.* MICHAEL GILL,
STATE OF NORTH CAROLINA
   *ex rel.* MICHAEL GILL,
STATE OF OKLAHOMA *ex rel.* MICHAEL GILL,
STATE OF RHODE ISLAND
   *ex rel.* MICHAEL GILL,
STATE OF TENNESSEE *ex rel.* MICHAEL GILL,
STATE OF TEXAS *ex rel.* MICHAEL GILL,
STATE OF VERMONT *ex rel.* MICHAEL GILL,
COMMONWEALTH OF VIRGINIA
   *ex rel.* MICHAEL GILL,
STATE OF WASHINGTON *ex rel.* MICHAEL GILL,
STATE OF WISCONSIN *ex rel.* MICHAEL GILL,
and
MICHAEL GILL, individually


By: */s/ Michael I. Behn*_____

Date: June 30, 2022

BEHN & WYETZNER, CHARTERED

*/s/ Michael I. Behn*_____
Michael I. Behn (ARDC No. 6209610)
Daniel R. Hergott (ARDC No. 6306157)
10 N. Dearborn Street, 6th Floor
Chicago, IL 60602
312-629-0000 (Ph)
312-237-4162 (Fax)
mbehn@behnwyetzner.com
dhergott@behnwyetzner.com

HOWARD LAW, LLC

*/s/ Bruce C. Howard*_____
Bruce C. Howard
10 N. Dearborn Street, 6th Floor
Chicago, IL 60602
630-740-9662 (Ph)
Bhoward@siprut.com

DICELLO LEVITT GUTZLER

s/ *F. Franklin Amanat*
F. Franklin Amanat
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, New York 10165
646-933-1000 (Ph)
famanat@dicellolevitt.com

*Attorneys for Plaintiff-Relator*
*United States ex rel. Michael Gill, et al.*

## APPENDIX A
## STATE FALSE CLAIMS ACTS[16]

| State | Citation |
|---|---|
| California | California False Claims Act (Cal. Gov't Code §§ 12650–12656) |
| Colorado | Colorado Medicaid False Claims Act (Colo. Rev. Stat. Ann. §25.5-4–305-25.5-4-310) |
| Connecticut | Connecticut False Claims Act (Conn. Gen. Stat. §§ 4-274 – 4-289) |
| Delaware | Delaware False Claims and Reporting Act (6 Del. Code Ann. §§ 1201-1211) |
| District of Columbia | District of Columbia False Claim Act (D.C. Code §§ 2-381.01–2-381.10) |
| Florida | Florida False Claims Act (Fla. Stat. §§ 68.081-68.092) |
| Georgia | Georgia Taxpayer Protection False Claims Act (Ga. Code Ann. §§ 23-3-120 to 23-3-127); <br><br> State False Medicaid Claims Act (Ga. Code Ann. §§ 49-4-168—49-4-168.6) |
| Hawaii | Hawaii False Claims Act: False Claims to the State (Haw. Rev. Stat. §§ 661-21–661-29); <br><br> False Claims to the Counties (Haw. Rev. Stat. §§ 46-171–46-179) |
| Illinois | Illinois False Claims Act (740 Ill. Comp. Stat. §§ 175/1-8) |
| Indiana | Indiana False Claims and Whistleblower Protection Act (Ind. Code §§ 5-11-5.5-1–5-11-5.5-18); <br><br> Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7-1 5-11-5.7-18 |
| Iowa | Iowa False Claims Act (Iowa Code §§ 685.1–685.7) |
| Louisiana | Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. §§ 46:437–46:440) |
| Maryland | Maryland False Health Claims Act (Md. Code Ann. §§ 2-601–2-611) |
| Massachusetts | Massachusetts False Claims Act (Mass. Gen. Laws ch. 12 §§ 5A–5O ) |
| Michigan | Michigan Medicaid False Claims Act, (Mich. Comp. Laws §§ 400.601–400.615) |
| Minnesota | Minnesota False Claims Act, (Minn. Stat. §§ 15C.01–15C.16) |
| Montana | Montana False Claims Act (Mont. Code Ann. §§ 17-8-401—17-8-416) |
| Nevada | Nevada – Submission of False Claims to State or Local Government (Nev. Rev. Stat. Ann. § 357.010–357.250) |
| New Jersey | New Jersey False Claims Act (N.J. Stat. Ann. §§ 2A:32C-1–2A:32C-17) |

[16] Current as of September 2018.

162

| State | Citation |
|---|---|
| New Mexico | New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1–27-14-15 |
| New York | New York False Claims Act (N.Y. State Fin. Law §§187-194) |
| North Carolina | North Carolina False Claims Act (N.C. Gen. Stat. §§ 1-605–1-618) |
| Oklahoma | Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053.1–5053.7) |
| Rhode Island | The State False Claims Act (R.I. Gen. Laws §§ 9-1.1–9.1.1-9) |
| Tennessee | Tennessee False Claims Act (Tenn. Code Ann. §§ 4-18-101–108); Tennessee Medicaid False Claims Act (Tenn. Code Ann. § 71-5-181–71-5-185) |
| Texas | Medical Assistance Program, Damages and Penalties (Tex. Hum. Res. Code Ann. § 32.039); Medicaid Fraud Prevention (including actions by private persons), Tex. Hum. Res. Code Ann. §§ 36.001–36.132; Award for Reporting Medicaid Fraud, Abuse, or Overcharges (Tex. Gov. Code Ann. §§ 531.101–531.1203) |
| Vermont | Vermont False Claims Act (Vt. Stat. Ann. tit. 32, §§ 630–642) |
| Virginia | Virginia Fraud Against Taxpayers Act (FATA) (Va. Code Ann. §§ 8.01-216.1–8.01-216.19) |
| Washington | Washington State Medicaid Fraud False Claims Act (RCW §§ 74.66.005–74.66.130) |
| Wisconsin | Wis. Stat. § 20.931 *et seq.*, (repealed July 14, 2015) |

**APPENDIX B**
**STATE AUTHORITY ON EXCLUDED PROVIDERS[17]**

| State | Citation |
|---|---|
| California | Cal. Welf. & Inst. Code § 14043.61(a);<br>Cal. Code Regs. tit. 22, § 51303(j), (k);<br>http://files.medi-cal.ca.gov/pubsdoco/SandILanding.asp<br>Cal. Welf. & Inst. Code § 14450 (a) (regarding managed care programs) |
| Colorado | 10 Colo. Code Regs. § 2505-10:8.130.35(B)<br>Colo. Rev. Stat. § 25.5-5-404(4)(a) (regarding managed care programs) |
| Connecticut | https://www.ctdssmap.com/CTPortal/Information/Get%20Download%20File/tabid/44/Default.aspx?Filename=pb10_23.pdf&URI=Bulletins/pb10_23.pdf |
| Delaware | https://medicaid.dhss.delaware.gov/Default.aspx?TabId=2102&AspxAutoDetectCookieSupport=1 |
| District of Columbia | Relies on federal regulations. |
| Florida | http://ahca.myflorida.com/Executive/Inspector_General/medicaid.shtml (sanctioned and excluded providers) |
| Georgia | https://dch.georgia.gov/exclusions ("Excluded Individuals and Entities are not allowed to receive reimbursement for providing Medicare and Medicaid services in any capacity, even if they are not on this listing by the Georgia Medicaid Agency."). |
| Hawaii | https://medquest.hawaii.gov/en/plans-providers/provider-exclusion-reinstatement-list.html ("An excluded provider is an individual or entity that is not allowed to receive reimbursement for providing Medicare and Medicaid services in any capacity, even if they are not on this listing by the Med-QUEST Division."). |
| Illinois | Chapter P-135,<br>https://www.illinois.gov/hfs/SiteCollectionDocuments/9517Chapter100PolicyFinal.pdf ("Payments may be denied, recovered or suspended from a provider or alternate pay to provider for any of the following reasons . . . [w]hen the provider rendered services while terminated, suspended, or while terminated or excluded from particpation in another state or mederal medical assistance or health care program.") |
| Indiana | Ind. Code § 12-15-13-2(b) (relying on federal reimbursement criteria); Ind. Code § 12-15-13-1.6; Ind. Code § 12-15-12-12 (regarding managed care programs)<br>http://provider.indianamedicaid.com/ihcp/Bulletins/BT200715.pdf |

---

[17] Current as of September 2018.

164

| State | Citation |
|---|---|
| Iowa | http://dhs.iowa.gov/ime/providers/enrollment/excluded-individuals-and-entities; http://dhs.iowa.gov/sites/default/files/1130_ExclusionfromParticipationinFederalHealthCarePrograms_0.pdf ("Claims paid by the Medicaid program for services rendered by an excluded individual or entity could be subject to repayment.") |
| Louisiana | La. Stat. § 14:126.3.1(A)(3). |
| Maryland | http://maryland.beaconhealthoptions.com/provider/alerts/2017/071117-OIG-Exclusion-List.pdf; https://mmcp.health.maryland.gov/Pages/Provider-Information.aspx (Maryland Medicaid Sanctioned Providers List) |
| Michigan | Michigan Provider Manual 7.1, Michigan Department of Health and Human Services. http://www.mdch.state.mi.us/dch-medicaid/manuals/MedicaidProviderManual.pdf ("Medicaid does not reimburse providers for any services/items that were ordered, prescribed, referred or rendered by sanctioned (suspended, terminated, or excluded) providers.") |
| Minnesota | http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=DHS-295094 (providers on the excluded list "are not eligible for payment from MHCP effective the date of the notification.") |
| Montana | Mont. Admin. R. 37.85.401; Mont. Admin. R. 37.85.506 |
| Nevada | http://dhcfp.nv.gov/Providers/PI/PSExclusions/ (excluded and sanctioned provider list) |
| New Jersey | N.J.A.C. 10:49–11.1(b) |
| New Mexico | N.M. Admin. Code 8.308.22.9 (regarding managed care programs) |
| New York | N.Y. Comp. Codes R. & Regs. tit. 18, § 515.5 |
| North Carolina | https://dma.ncdhhs.gov/excluded-providers |
| Oklahoma | https://www.ok.gov/health/Protective_Health/Health_Resources_Development_Service/Nurse_Aide_and_Nontechnical_Services_Worker_Registry/Office_of_Inspector_General_List_of_Excluded_Individuals_Entities/index.html |
| Rhode Island | https://www.riproviderportal.org/HCP/hp/ushc/docs/provider/Exclusion%20Letter_en-us.pdf |
| Tennessee | https://www.tn.gov/tenncare/fraud-and-abuse/terminated-provider-list.html ("No TennCare funds will be used to pay for health care services provided, ordered or prescribed by these individuals.") |
| Texas | Texas Medicaid Provider Procedures Manual: Vol. 1 1.3.1, http://www.tmhp.com/Manuals_PDF/TMPPM/TMPPM_Living_Manual_Current/1_01_Provider_Enrollment.pdf Texas Medicaid Provider Procedures Manual: Vol. 1 1.3.1, http://www.tmhp.com/Manuals_PDF/TMPPM/TMPPM_Living_Manual_Current/1_01_Provider_Enrollment.pdf (regarding managed care programs) |

| State | Citation |
|---|---|
| Vermont | 12-7 Vt. Code R. § 1 ("No payment will be made for certain items and services including . . . Items and services ordered by an individual not enrolled as a Medicaid provider.")<br><br>12-6 Vt. Code R. § 4 ("Suspension or exclusion from participation of any provider shall preclude such provider from submitting claims for payment, either personally or through claim submitted by any clinic, group, corporation or other association to the Department of Mental Health or its fiscal agent for any services or supplies provided prior to the effective date of the suspension or exclusion.") |
| Virginia | https://www.ecm.virginiamedicaid.dmas.virginia.gov/WorkplaceXT/getConte nt?impersonate=true&id={60FCF95C-0000-C811-839C- 22A950ED1665}&vsId={3A84E03E-0EE3-4901-9BD7- 4E8CE352EFCA}&objectType=document&objectStoreName=VAPRODOS1 , p. 8 ("Medicaid payments cannot be made for items or services furnished, ordered, or prescribed by an excluded physician or other authorized person when the individual or entity furnishing the services either knew or should have known about the exclusion.") |
| Washington | https://www.hca.wa.gov/billers-providers/apple-health-medicaid- providers/provider-termination-and-exclusion-list<br>Wash. Admin. Code 182-538A-160(5) (regarding managed care programs) |

**APPENDIX C**
**STATE ESCHEATMENT LAWS[18]**

| State | Citation |
|---|---|
| California | Cal. Civ. Proc. Code § 1520(a) (providing all tangible and intangible property otherwise not addressed, "that is held or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than three years" escheats to the state.); Cal. Civ. Proc. Code § 1510 (providing conditions for the escheatment for intangible personal property)<br><br>Cal. Civ. Proc. Code § 1530 (duty to report property subject to escheat to the state)<br><br>Cal. Civ. Proc. Code § 1532 (delivery of property subject to escheat to the state)<br><br>Cal. Civ. Proc. Code § 1576 (providing for penalties); Cal. Civ. Proc. Code § 1577 (providing for interest) |
| Colorado | Colo. Rev. Stat. Ann. § 38-13-103 (providing intangible property, not otherwise addressed, "that is held, issued, or owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than five years . . . is presumed abandoned."); Colo. Rev. Stat. Ann. § 38-13-104 (providing conditions for subjecting intangible personal property to custody of the state)<br><br>Colo. Rev. Stat. Ann. § 38-13-110 (duty to report tangible or intangible property presumed abandoned to the state)<br><br>Colo. Rev. Stat. Ann. § 38-13-112 (delivery of abandoned property to the state)<br><br>Colo. Rev. Stat. Ann. § 38-13-127 (providing for penalties and interest). |

---

[18] Current as of September 2018.

| State | Citation |
|---|---|
| Connecticut | Conn. Gen. Stat. Ann. § 3-64a (all property, otherwise not provided for or excluded, "which is held or owing in this state and has remained unclaimed by the owner for more than three years after it became due, payable or distributable, is presumed abandoned."); Conn. Gen. Stat. Ann. § 3-66b (providing conditions for subjecting intangible personal property to custody of the state)<br><br>Conn. Gen. Stat. Ann. § 3-65a(b) (duty to report property presumed abandoned to the state)<br><br>Conn. Gen. Stat. Ann. § 3-65a(b) (delivery of abandoned property)<br><br>Conn. Gen. Stat. Ann. § 3-65b(a) (providing for an interest penalty) |
| Delaware | Del. Code Ann. tit. 12, § 1133(17) (property presumed abandoned "if it is unclaimed by the owner at the time specified for . . . property not specified in this section or § 1134 of this title, the earlier of 5 years after the owner first has a right to demand the property or the obligation to pay or distribute the property arises.") (eff. Feb. 2, 2017); Del. Code Ann. tit. 12, § 1197 (property deemed abandoned shall escheat to the state) (repealed Feb. 2, 2017); Del. Code Ann. tit. 12, § 1198(9) (property deemed abandoned after "the full and continuous period of 5 years . . . during which an owner has ceased, failed or neglected to exercise dominion or control over property or to assert a right of ownership or possession or to make presentment and demand for payment and satisfaction or to do any other act in relation to or concerning such property.")<br><br>Del. Code. tit. 12 § 1142 (duty to report property presumed abandoned) (eff. Feb. 2, 2017); Del. Code Ann. tit. 12, § 1199 (similar) (repealed Feb. 2, 2017)<br><br>Del. Code. tit. 12 § 1152 (delivery of abandoned property) (eff. Feb. 2, 2017); Del. Code Ann. tit. 12, § 1201 (similar) (repealed Feb. 2, 2017)<br><br>Del. Code tit. 12, §§ 1183, 1184 (providing for interest and penalties) (eff. Feb. 2, 2017); Del. Code Ann. tit. 12, § 1159 (similar) (redesignated Feb. 2, 2017) |
| District of Columbia | D.C. Code Ann. § 41-103(a) ("All intangible personal property . . . that is held or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than 3 years after it became payable or distributable is presumed abandoned."); D.C. Code Ann. § 41-104 (conditions for abandonment)<br><br>D.C. Code Ann. § 41-117 (duty to report property presumed abandoned)<br><br>D.C. Code Ann. § 41-119 (delivery of abandoned property)<br><br>D.C. Code Ann. § 41-135(a) (providing interest and penalties) |

| State | Citation |
|---|---|
| Florida | Fla. Stat. Ann. § 717.102(1) ("All intangible property . . . that is held, issued, or owing in the ordinary course of the holder's business and the owner fails to claim such property for more than 5 years after the property becomes payable or distributable is presumed unclaimed, except as otherwise provided by this chapter."); Fla. Stat. Ann. § 717.103 (conditions for abandonment) <br><br> Fla. Stat. Ann. § 717.117 (duty to report property presumed unclaimed) <br><br> Fla. Stat. Ann. § 717.119 (delivery of unclaimed property) <br><br> Fla. Stat. Ann. § 717.134 (providing for penalties and interest) |
| Georgia | OCGA § 44-12-193 ("all tangible and intangible property, including any income or increment thereon . . . that is held, issued, or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than five years after it became payable or distributable is presumed abandoned, except as otherwise provided by this article."); OCGA § 44-12-194 (conditions for intangible property presumed abandoned) <br><br> OCGA § 44-12-214 (duty to report and remit property presumed abandoned) <br><br> OCGA § 44-12-227(b) (providing for penalties) |
| Hawaii | Haw. Rev. Stat. Ann. §§ 523A-3(a)(4), (15) (property presumed abandoned after five years for a debt of a business association, or all other property not otherwise provided); Haw. Rev. Stat. Ann. § 523A-5 (conditions for presumption of abandonment) <br><br> Haw. Rev. Stat. Ann. § 523A-8 (duty to report property presumed abandoned) <br><br> Haw. Rev. Stat. Ann. § 523A-9 (delivery of abandoned property) <br><br> Haw. Rev. Stat. Ann. § 523A-24 (providing for interest and penalties) |

| State | Citation |
|---|---|
| Illinois | 765 ILCS 1026/15-201(5), (15) (property presumed abandoned after three years for debt of a business association, and for other property not specified, the earlier of, after three years, "the owner first has a right to demand the property or the obligation to pay or distribute the property arises.") (eff. Jan. 1, 2018); 765 ILCS 1025/9 ("All personal property, not otherwise covered by this Act . . . that has remained unclaimed by the owner for more than 5 years is presumed abandoned.") (eff. July 23, 1997 to Dec. 31, 2017); 765 ILCS 1026/15-301-305, *et seq.* (rules for taking custody of property presumed abandoned) (eff. Jan. 1, 2018)<br><br>765 ILCS 1026/15-401 (duty to report property presumed abandoned) (eff. Jan. 1, 2018); 765 ILCS 1025/11 (similar) (eff. Nov. 2, 2005 to Dec. 31, 2017)<br><br>765 ILCS 1026/15-603 (delivery of abandoned property) (eff. Jan. 1, 2018); 765 ILCS 1025/11 (similar) (eff. Nov. 2, 2005 to Dec. 31, 2017)<br><br>765 ILCS 1026/15-1204-1205 (providing interest and penalties) (eff. Jan. 1, 2018); 765 ILCS 1025/25 (providing for penalties) (eff. July 1, 1999 to Dec. 31, 2017) |
| Indiana | Ind. Code Ann. §§ 32-34-1-20(c)(3), (15) ("Property that is held, issued, or owed in the ordinary course of a holder's business is presumed abandoned" after three years after a credit becomes payable, or for any property not provided for, the earlier of three years after "the owner's right to demand the property" or "the obligation to pay or distribute the property" arises) (eff. July 1, 2015); *Id.* at (c)(3), (14) (eff. June 30, 2010 to June 30, 2015) (same); Ind. Code Ann. § 32-34-1-21 (conditions for presumption of abandonment)<br><br>Ind. Code Ann. § 32-34-1-26 (duty to report property presumed abandoned)<br><br>Ind. Code Ann. § 32-34-1-27 (delivery of abandoned property)<br><br>Ind. Code Ann. § 32-34-1-45 (providing for interest); *Id.* (providing for interest and penalties) (eff. to July 1, 2005 to June 30, 2011) |
| Iowa | Iowa Code Ann. § 556.9(1)(a) (intangible property not otherwise covered "that is held or owing in this state in the ordinary course of the holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned.")<br><br>Iowa Code Ann. § 556.11 (duty to report property presumed abandoned)<br><br>Iowa Code Ann. § 556.13 (delivery of abandoned property)<br><br>Iowa Code Ann. § 556.25 (providing for interest and penalties) |

| State | Citation |
|-------|----------|
| Louisiana | La. Stat. Ann. § 9:154(A)(17) ("All other property [is presumed abandoned], five years after the obligation to pay or distribute the property arises."); La. Stat. Ann. § 9:154); La. Stat. Ann. § 9:156 (conditions for presumption of abandonment) <br><br> La. Stat. Ann. § 9:159 (duty to report property presumed abandoned) <br><br> La. Stat. Ann. § 9:160 (delivery of abandoned property) <br><br> La. Stat. Ann. § 9:176 (providing for interest and penalties) |
| Maryland | Md. Code Ann., Com. Law § 17-308(b) ("All intangible personal property, not otherwise covered by this title . . . that is held or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than 3 years after it became payable or distributable, is presumed abandoned.") <br><br> Md. Code Ann., Com. Law § 17-310 (duty to report property presumed abandoned) <br><br> Md. Code Ann., Com. Law § 17-312 (delivery of abandoned property) <br><br> Md. Code Ann., Com. Law § 17-323 (providing for penalties) |
| Massachusetts | Mass. Gen. Laws Ann. ch. 200A, § 1A (providing for presumption of intangible personal property after given conditions are satisfied) <br><br> Mass. Gen. Laws Ann. ch. 200A, § 7 (duty to report property presumed abandoned) <br><br> Mass. Gen. Laws Ann. ch. 200A, § 8A (delivery of abandoned property) <br><br> Mass. Gen. Laws Ann. ch. 200A, § 12 (providing for interest and penalties) |
| Michigan | Mich. Comp. Laws Ann. § 567.223(1) ("all property . . . that is held, issued, or owing in the ordinary course of a holder's business and remains unclaimed by the owner for more than 3 years after it becomes payable or distributable is presumed abandoned."); *Id.* (providing, similarly, that such property is presumed abandoned after a period of 5 years) (eff. Mar. 28, 1996 to Oct. 5, 2010)); Mich. Comp. Laws Ann. § 567.224 (conditions for property presumed abandoned) <br><br> Mich. Comp. Laws Ann. § 567.238 (duty to report property presumed abandoned) <br><br> Mich. Comp. Laws Ann. § 567.240 (delivery of abandoned property) <br><br> Mich. Comp. Laws Ann. § 567.255 (providing for interest and penalties) |

| State | Citation |
|---|---|
| Minnesota | Minn. Stat. Ann. § 345.39 ("All intangible personal property, not otherwise covered . . . that is held or owing in this state in the ordinary course of the holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned.")<br><br>Minn. Stat. Ann. § 345.41 (duty to report property presumed abandoned)<br><br>Minn. Stat. Ann. § 345.43 (delivery of abandoned property)<br><br>Minn. Stat. Ann. § 345.55 (providing for interest and criminal penalties) |
| Montana | Mont. Code Ann. §§ 70-9-803(1)(d), (q) (property presumed abandoned after five years for debt of a business association, or, if not otherwise provided, the earlier of "the owner's right to demand the property or after the obligation to pay or distribute the property arises"); Mont. Code Ann. § 70-9-805 (conditions for property presumed abandoned)<br><br>Mont. Code Ann. § 70-9-808 (duty to report property presumed abandoned)<br><br>Mont. Code Ann. § 70-9-809 (delivery of abandoned property)<br><br>Mont. Code Ann. § 70-9-824 (providing for interest and penalties) |
| Nevada | Nev. Rev. Stat. Ann. §§ 120A.500(1)(d), (n) (property presumed abandoned after three years, for any debt of a business association, and all other property not otherwise provided for, the earlier of, "the owner's right to demand the property or after the obligation to pay or distribute the property arises"); Nev. Rev. Stat. Ann. § 120A.530 (conditions for property presumed abandoned)<br><br>Nev. Rev. Stat. Ann. § 120A.560 (duty to report property presumed abandoned)<br><br>Nev. Rev. Stat. Ann. § 120A.570 (delivery of abandoned property)<br><br>Nev. Rev. Stat. Ann. § 120A.730 (providing interest and penalties) |

| State | Citation |
|-------|----------|
| New Jersey | N.J. Stat. Ann. § 46:30B-7 ("all property . . . that is held, issued, owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned."); N.J. Stat. Ann. § 46:30B-10 (conditions for property presumed abandoned)<br><br>N.J. Stat. Ann. § 46:30B-46 (duty to report property presumed abandoned); N.J. Stat. Ann. § 46:30B-49 (duty to timely file report for property presumed abandoned)<br><br>N.J. Stat. Ann. § 46:30B-57 (delivery of abandoned property)<br><br>N.J. Stat. Ann. §§ 46:30B-103-105.3 (providing interest and penalties) |
| New Mexico | N.M. Stat. Ann. §§ 7-8A-2(A)(4), (15) (property presumed abandoned after five years, for debt of a business association and all other property not otherwise stated, the earlier of the "owner's right to demand the property or the obligation to pay or distribute the property arises"); N.M. Stat. Ann. § 7-8A-4 (conditions for property presumed abandoned)<br><br>N.M. Stat. Ann. § 7-8A-7 (duty to report property presumed abandoned)<br><br>N.M. Stat. Ann. § 7-8A-8 (delivery of abandoned property)<br><br>N.M. Stat. Ann. § 7-8A-24 (providing interest and penalties) |
| New York | N.Y. Aband. Prop. Law § 1316(1) ("Any amount issued and payable on or after July first, nineteen hundred seventy-four payable to a resident of this state on or because of a policy of insurance other than life insurance, which is held or owing by a domestic insurer or a foreign insurer authorized to do business in this state or by an agent or agency of such insurer, shall be deemed abandoned property if unclaimed for three years by the person entitled thereto.")<br><br>N.Y. Aband. Prop. Law § 1316(3) (duty to delivery and report this abandoned property)<br><br>N.Y. Aband. Prop. Law § 1412 (providing interest and penalties) |

| State | Citation |
|---|---|
| North Carolina | N.C. Gen. Stat. Ann. §§ 116B-53(c)(5), (16) (presumption of abandonment after three years for a debt of a business association, or for other property not mentioned, the earlier of "five years after the owner's right to demand the property or after the obligation to pay or distribute the property arises"); N.C. Gen. Stat. Ann. § 116B-56 (conditions for property presumed abandoned)<br><br>N.C. Gen. Stat. Ann. § 116B-60 (duty to report property presumed abandoned)<br><br>N.C. Gen. Stat. Ann. § 116B-61 (delivery of abandoned property)<br><br>N.C. Gen. Stat. Ann. § 116B-77 (providing interest and penalties) |
| Oklahoma | Okla. Stat. Ann. tit. 60, § 657.4(A) ("All intangible property . . . held by a business association . . . if the owner has not claimed such property or corresponded in writing with the holder concerning the property within three (3) years after the date prescribed for payment or delivery by the issuer . . . is presumed abandoned"); Okla. Stat. Ann. tit. 60, § 658(A) ("all intangible personal property . . . that is held, issued, or owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than five (5) years after becoming payable or distributable is presumed abandoned."); Okla. Stat. Ann. tit. 60, § 659 (conditions for property presumed abandoned)<br><br>Okla. Stat. Ann. tit. 60, § 661 (duty to report property presumed abandoned)<br><br>Okla. Stat. Ann. tit. 60, § 663 (delivery of abandoned property)<br><br>Okla. Stat. Ann. tit. 60, § 680 (providing interest and penalties) |
| Rhode Island | 33 R.I. Gen. Laws § 33-21.1-2(a) ("all intangible property . . . that is held, issued, or owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than three (3) years after it became payable or distributable is presumed abandoned."); 33 R.I. Gen. Laws Ann. § 33-21.1-3 (conditions for property presumed abandoned)<br><br>33 R.I. Gen. Laws § 33-21.1-17 (duty to report property presumed abandoned)<br><br>33 R.I. Gen. Laws Ann. § 33-21.1-19 (delivery of abandoned property)<br><br>33 R.I. Gen. Laws Ann. § 33-21.1-34 (providing interest and penalties) |

| State | Citation |
|---|---|
| Tennessee | Tenn. Code Ann. §§ 66-29-105(a)(4), (14) (property presumed abandoned after three years for a debt of a business association, or for property not specified, the earlier of "three (3) years after the owner first has a right to demand the property or the obligation to pay or distribute the property arises.") (eff. July 1, 2017); Tenn. Code Ann. § 66-29-112 (providing "[a]ll property, not otherwise covered by this part . . . that is held or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than five (5) years after it became payable or distributable is presumed abandoned.") (eff. July 1, 1993 to June 30, 2017); Tenn. Code Ann. § 66-29-103 (conditions for property presumed abandoned) (eff. July 1, 1993 to June 30, 2017)<br><br>Tenn. Code Ann. § 66-29-123 (duty to report property presumed abandoned) (eff. July 1, 2017); Tenn. Code Ann. § 66-29-113 (similar) (eff. July 1, 1993 to June 30, 2017)<br><br>Tenn. Code Ann. § 66-29-134 (delivery of abandoned property) (eff. July 1, 2017); Tenn. Code Ann. § 66-29-115 (similar) (eff. July 1, 1993 to June 30, 2017)<br><br>Tenn. Code Ann. §§ 66-29-173, 174 (providing for penalties) (eff. July 1, 2017); Tenn. Code Ann. § 66-29-129 (providing for penalties) (eff. June 3, 2003 to June 30, 2017) |
| Texas | Tex. Prop. Code Ann. § 72.101(a) ("personal property is presumed abandoned if, for longer than three years: (1) the existence and location of the owner of the property is unknown to the holder of the property; and (2) according to the knowledge and records of the holder of the property, a claim to the property has not been asserted or an act of ownership of the property has not been exercised."); Tex. Prop. Code Ann. § 72.001 (conditions for property presumed abandoned)<br><br>Tex. Prop. Code Ann. § 74.101 (duty to report property presumed abandoned)<br><br>Tex. Prop. Code Ann. § 74.301 (delivery of abandoned property)<br><br>Tex. Prop. Code. Ann. §§ 74.705, 74.706 (providing interest and penalties) |

175

| State | Citation |
|-------|----------|
| Vermont | Vt. Stat. Ann. tit. 27, §§ 1242(a)(5), (15) (property presumed after three years for debt of a business association, or for all other property, the earlier of "three years after the owner's right to demand the property or after the obligation to pay or distribute the property arises"); Vt. Stat. Ann. tit. 27, § 1245 (conditions for property presumed abandoned)<br><br>Vt. Stat. Ann. tit. 27, § 1247 (duty to report property presumed abandoned)<br><br>Vt. Stat. Ann. tit. 27, § 1248 (delivery of abandoned property)<br><br>Vt. Stat. Ann. tit. 27, § 1264 (providing interest and penalties) |
| Virginia | Va. Code Ann. § 55-210.2:1 ("All tangible and intangible property . . . that is held, issued or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than five years after it became payable is presumed abandoned"); Va. Code Ann. § 55-210.2:2 (conditions for property presumed abandoned)<br><br>Va. Code Ann. § 55-210.12 (duty to report and remit property presumed abandoned)<br><br>Va. Code Ann. § 55-210.26:1 (providing interest and penalties) |
| Washington | Wash. Rev. Code Ann. § 63.29.020(1) ("all intangible property . . . that is held, issued, or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned."); Wash. Rev. Code Ann. § 63.29.030 (conditions for property presumed abandoned)<br><br>Wash. Rev. Code Ann. § 63.29.170 (duty to report property presumed abandoned)<br><br>Wash. Rev. Code Ann. § 63.29.190 (delivery of abandoned property)<br><br>Wash. Rev. Code Ann. § 63.29.340 (providing penalties and interest) |
| Wisconsin | Wis. Stat. Ann. § 177.02 ("all intangible property . . . that is held, issued or owing in the ordinary course of a holder's business and that has remained unclaimed by the owner for more than 5 years after it became payable or distributable is presumed abandoned."); Wis. Stat. Ann. § 177.03 (conditions for property presumed abandoned)<br><br>Wis. Stat. Ann. § 177.17 (reporting and delivery abandoned property)<br><br>Wis. Stat. Ann. § 177.34 (providing interest and penalties) |

**APPENDIX D**
**STATE NON-RESIDENT LICENSING LAWS[19]**

| State | Citation |
|---|---|
| California | Cal. Bus. & Prof. Code § 4112 ("A person may not act as a nonresident pharmacy unless he or she has obtained a license from the board. The board may register a nonresident pharmacy that is organized as a limited liability company in the state in which it is licensed.") |
| Colorado | Colo. Rev. Stat. § 12-42.5-130(1) ("Any prescription drug outlet located outside this state that ships, mails, or delivers, in any manner, drugs or devices into this state is a nonresident prescription drug outlet and shall register with the board ….") |
| Connecticut | Conn. Gen. Stat. § 20-627 ("A nonresident pharmacy shall be registered with the department.") |
| Delaware | Del. Code Ann. tit. 24, § 2538 ("A person who operates a pharmacy located outside the State and delivers in any manner a prescription drug into the State without having obtained a permit to conduct business in this State pursuant to this chapter commits the offense of operating a nonresident pharmacy without a permit and may be fined not more than $50 for each day that the offense occurs and/or continues.") |
| District of Columbia | D.C. Mun. Regs. tit. 22-B, § 1903.2 ("Nonresident pharmacies which dispense, distribute, ship, mail, or deliver in any manner, prescription drugs or medical devices into the District of Columbia, directly or indirectly, shall, in addition to complying with all applicable federal laws, be registered by the Department ….") |
| Florida | Fla. Stat. § 465.0156(1) ("Any pharmacy which is located outside this state and which ships, mails, or delivers, in any manner, a dispensed medicinal drug into this state shall be considered a nonresident pharmacy, shall be registered with the board, shall provide pharmacy services at a high level of protection and competence, and shall disclose to the board the following specific information ….") |
| Georgia | Ga. Code § 26-4-114.1(a) ("Any person, pharmacy, or facility located outside this state may apply to the board for a nonresident pharmacy permit which shall entitle the holder thereof to ship, mail, or deliver dispensed drugs, including but not limited to dangerous drugs and controlled substances, into this state.") (effective 2013) |

---

[19] Current as of February 2019.

177

| State | Citation |
|---|---|
| Hawaii | Haw. Rev. Stat. § 461-15(a)(7) ("It shall be unlawful . . . For any out-of-state pharmacy or entity engaging in the practice of pharmacy, in any manner to distribute, ship, mail, or deliver prescription drugs or devices into the State without first obtaining a permit from the board; provided that the applicant shall ….") |
| Illinois | 225 ILCS 85/16a(b) ("The Department shall require and provide for a nonresident pharmacy license for all pharmacies located outside of this State that dispense medications for Illinois residents and mail, ship, or deliver prescription medications into this State. A nonresident pharmacy license shall be granted by the Department upon the disclosure and certification by a pharmacy ….") |
| Indiana | Ind. Code § 25-26-17-3 ("A nonresident pharmacy must register with the board. To register with the board, a nonresident pharmacy must submit the following to the board ….") |
| Iowa | Iowa Code § 155A.13A(1) ("A pharmacy located outside of this state that delivers, dispenses, or distributes by any method, prescription drugs or devices to an ultimate user in this state shall obtain a nonresident pharmacy license from the board.") |
| Louisiana | La. Stat. § 37:1232(A) ("A pharmacy located outside this state which does business in this state within the meaning of this Chapter shall hold a current pharmacy permit as provided in this Chapter.") |
| Maryland | Md. Code, Health Occ. § 12-703 ("A person may not establish or operate a pharmacy in this State or a nonresident pharmacy unless the person holds a pharmacy permit issued by the Board.") |
| Michigan | Mich. Comp. Laws § 333.17748(1) ("To do business in this state, a pharmacy, manufacturer, or wholesale distributor, whether or not located in this state, must be licensed under this part.") |
| Minnesota | Minn. Stat. § 151.19(c) ("No license shall be issued for a pharmacy located outside of the state unless the applicant agrees to operate the pharmacy in a manner prescribed by federal law and, when dispensing medications for residents of this state, the laws of this state, and Minnesota Rules.") |
| Montana | Mont. Code § 37-7-703 ("Each out-of-state mail service pharmacy must be registered with the board of pharmacy.") |
| Nevada | Nev. Rev. Stat. § 639.2328(1) ("Every pharmacy located outside Nevada that provides mail order service to or solicits or advertises for orders for drugs available with a prescription from a resident of Nevada must be licensed by the Board.") |
| New Hampshire | N.H. Rev. Stat. § 318:37(II) ("No person shall conduct or operate a mail-order pharmacy located outside of this state by shipping, mailing, or delivering prescription drugs into this state unless such pharmacy is registered in New Hampshire and a permit has been issued by the New Hampshire pharmacy board.") |

| State | Citation |
|---|---|
| New Jersey | N.J. Stat. § 45:14-73 ("Any pharmacy located in another state which ships, mails, distributes or delivers in any manner, legend drugs or devices pursuant to a prescription into this State, shall register with the board and provide the board with the following information….") |
| New Mexico | N.M. Stat. § 61-11-14 ("Any person who desires to operate or maintain the operation of a pharmacy or who engages in a wholesale drug distribution business in this state shall apply to the board for the proper license and shall meet the requirements of the board and pay the fee for the license and its renewal.") |
| New York | N.Y. Educ. Law § 6808-b ("All nonresident establishments that ship, mail, or deliver prescription drugs and/or devices to other registered establishments, authorized prescribers, and/or patients into this state shall be registered with the department ….") |
| North Carolina | N.C. Gen. Stat. § 90-85.21A(a) ("Any pharmacy operating outside the State which ships, mails, or delivers in any manner a dispensed legend drug into this State shall annually register with the Board on a form provided by the Board.") |
| Oklahoma | Okla. Admin. Code 535:15-3-9 ("A non-resident pharmacy shall: (1) make application and receive an annual non-resident pharmacy license at a fee set by the Board …") |
| Rhode Island | 5 R.I. Gen. Laws § 5-19.1-11(a) ("Any pharmacy located outside this state that ships, mails, or delivers, in any manner, legend drugs, controlled substances, or devices into this state is a nonresident pharmacy and shall be licensed by the department.") |
| Tennessee | Tenn. Code § 63-10-210 ("A pharmacy that dispenses and mails a prescription into Tennessee from another state shall first pay the licensure fee required of a Tennessee pharmacy in accordance with the fees established by the board under the authority of § 63-10-308.") |
| Texas | Tex. Occ. Code § 560.001(b) ("A pharmacy located in another state may not ship, mail, or deliver to this state a prescription drug or device dispensed under a prescription drug order, or dispensed or delivered as authorized by Subchapter D, Chapter 562,1 unless the pharmacy is licensed by the board or is exempt under Section 560.004.") |
| Vermont | 20-4 Vt. Code R. § 1400 (non-resident pharmacy initial licensure process) |
| Virginia | Va. Code § 54.1-3434.1(A) ("Any pharmacy located outside the Commonwealth that ships, mails, or delivers, in any manner, Schedule II through VI drugs or devices pursuant to a prescription into the Commonwealth shall be considered a nonresident pharmacy, shall be registered with the Board, shall designate a pharmacist in charge who is licensed as a pharmacist in Virginia and is responsible for the pharmacy's compliance with this chapter ….") |
| Washington | Wash. Rev. Code § 18.64.370(1) ("A nonresident pharmacy that has not obtained a license from the department of health shall not conduct the business of selling or distributing drugs in this state.") |