IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel. MICHAEL GILL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 18 C 6494** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **CVS HEALTH CORP. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff has filed a Motion to Compel the production of what it calls the "Due Diligence Supplement." For the following reasons, the motion [Dkt. #112] is granted.

**I.**

From an exceedingly brief association with this case – Judge Seeger's discovery referral came barely a month ago – it seems to be a bit of a nightmare. It stems from an astoundingly prolix, four-and-a-half-year-old, 820-paragraph, 41-count Complaint. That Complaint is now in its fourth iteration, and it is currently subject to a multi-part, thirty-page, motion to dismiss. It took the lawyers on both sides three months to brief that motion [Dkt. ##67, 78, 86, 87], currently pending before Judge Seeger. There is no shortage of lawyers in this case: There are eighteen from eight different Firms spread across five cities. Numerosity never ensures efficiency, and it is often a portent of trouble, as it has proven to be in this case.

The case has passed briefly before Chief Judges Ruben Castillo and Rebecca Pallmeyer, and before Judge Virginia Kendall – while the case was sealed – and, finally or at least presently, has

come to rest with Judge Steven Seeger. As already noted, we only came into this case after four and a half years, and unfortunately the plaintiff's motion provided little, if any, background. This is a *qui tam* case, with the plaintiff charging his former employer with a handful of fraudulent schemes in violation of the Federal Claims Act and the Anti-Kickback Statute. We know the case has proceeded in secret for most of its life: *Qui tam* plaintiffs must file their Complaints under seal and serve a copy of the Complaint, along with all material evidence, on the government. 31 U.S.C. § 3730(b)(2). The government then investigates the plaintiff's charges and decides whether to intervene, "in which case the action shall be conducted by the Government." 31 U.S.C. § 3730(b)(4)(A). While the government investigates the charges, the civil suit is on hold and the Complaint is sealed. 31 U.S.C. § 3730(b)(2)-(3). The government did three and a half years worth of investigation. [Dkt. ##12, 17, 21, 24, 31]. But, after all that, it chose not to intervene – actually, 30 of the 31 government entities originally taking a look during that long period chose not to intervene. That might not necessarily a bad sign for the plaintiff's charges, but it's not a good sign either. *See, e.g.,* 11 False Cl. Act and Qui Tam Q. Rev. 9 (October 1997).

In any event, right now, eighteen lawyers are brawling over some discovery. No wonder Judge Posner has lamented that "protracted discovery, [is] the bane of modern litigation." *Rossetto v. Pabst Brewing Co., Inc.,* 217 F.3d 539, 542 (7th Cir. 2000). While the plaintiff has received well over 160,000 pages of discovery from the defendants, he deems that production "deficient and dilatory." He has complained that much of the discovery produced was already produced to the government during its three-and-a-half-year investigation. [Dkt. #97, at 1-2]. Well, so what? That's still relevant discovery that the defendants had to produce and that's the way of a *qui tam* case which, of course, was what plaintiff chose to file. Since the government opted out of intervening, the

2

plaintiff has served, at least, a staggering 169 document requests. That's a lot, especially on top of what's already been produced. It strikes one as perhaps not terribly well targeted, perhaps casting a giant net in the hopes of coming across something, anything, after four and a half years.

Comparatively, the plaintiff has barely been touched by the burdens of discovery, producing about a tenth of what the defendants have. [Dkt. #97, at 2]. As with most plaintiffs, the plaintiff here wishes for discovery to never end. He and his attorneys are apparently still bristling at Judge Seeger's decision back on June 17, 2022, to set a fact discovery deadline of June 12, 2023. Plaintiff and his battery of lawyers insist that discovery continue into at least February 2024, which is what they demanded in the first place. [Dkt. #62]. They seem to feel entitled to get their way and, it would appear, they are working toward that end with strategies like propounding fourteen or fifteen dozen document requests.[1]

## II.

That brings us to this "Due Diligence Supplement." Again, we don't get much background from the plaintiff, but the gist seems to be that the defendant CVS may have "bought" some or all of the alleged fraud schemes plaintiff is charging when it bought Coram. In 2013, CVS hired Deloitte & Touche to take a look under Coram's hood and help CVS determine whether the acquisition made sense. Deloitte conducted a due diligence investigation beginning in August 2013

---

[1] Judge Seeger offered a word of warning back in February about Fed.R.Civ.P. 26(b)(1)'s requirement that discovery be proportional to the needs of the case. [Dkt. #100]. But, it's possible the proportionality train may be leaving the station with the plaintiff's lawyers stoking the engine. It's inaccurate at best to employ the phrase "*only* 440,000 document" and to do so with what we assume was a straight face. [Dkt. #116, at 9 (emphasis added)]. If review of each one of those "only" 440,000 documents took just five minutes, that would be 36,667 hours, or 4583 workdays. That's over 18 years. And, sure, the work could be divided among however many people, but in the end, it still adds up to 18 total years of effort. With boxcar figures like that, plaintiff's lawyers might want to go a bit farther in their showing of proportionality than saying their 820-paragraph Complaint is a matter of "serious public interest" [Dkt. #116, at 4]

that resulted in a Due Diligence Report dated October 18, 2013– we'll call that the Big Report – and a Due Diligence Supplement dated October 18, 2013 –we'll call that the Little Report. The plaintiff has had a copy of the Big Report since before he filed his case. He has attached excerpts of it to each of the iterations of his complaint. He doesn't tell the court how he got it [Dkt. #113, at 1], but it would seem that he purloined it as he left his job with CVS as the proverbial "disgruntled employee." The plaintiff wants a copy of the Little Report which, even a skim of the excerpts from the Big Report shows, deals with some of the titillating topics in plaintiff's Complaint, including what the plaintiff calls "Coram's historical and continuing practice of knowingly refusing to return (and instead recognizing as income) tens of millions of dollars in credit balances to the government and commercial payors (or alternatively to escheating States) to whom the money rightfully belonged." [Dkt. #113, at 1].

The plaintiff doesn't tell us when he requested the Little Report in discovery. Perhaps the request is simply lost among the 169 or so plaintiff has propounded. But, in a rather roundabout manner, we do learn that, on January 13, 2023, the defendants produced two privilege logs – one for documents received from Relator and his "filter counsel" and one for "Deloitte-related" documents – in which they listed the Little Report.[2] Here's what they said about it their "Relator" log:

---

[2] As to the defendants' claims of privilege and work product, plaintiff's Memorandum cites to a Declaration from one of its attorneys. The memorandum and each exhibit have been filed separately. So, the reader has to either close out the memorandum in order to open the attorney's Declaration, or scroll through until they get to Exhibit 1. That Declaration directs the reader to the exhibit which is the defendants' privilege log. So, once again, the reader has to close out the attorney's Declaration –or scroll through again – and in order to get to that exhibit and finally get look at the privilege log. For future reference, why not just cite directly to the pertinent exhibit? No one wants to go through extra steps just to read that "[a]ttached as Exhibit 3 is a copy of Defendants' January 13, 2023, transmittal letter, as well as copy of the corresponding privilege log."

Here's a word to the wise from the Seventh Circuit: "[a]n advocate's job is to make it easy for the
(continued...)

Date: 11/6/2013

Author/Sender: Deloitte

To: n/a

CC: n/a

Email/Document/Subject/Title:  Draft due diligence findings (Billing and Coding, Stark and Credit Balances)

Recipients: n/a

Lawyers: legal

Privilege Status: Privileged–Withhold

Description:  Report prepared at the direction of counsel and for use in providing legal advice regarding Billing & Coding / Credit Balance / and-or Stark Compliance
Privilege type:  Attorney Client; Work Product

[Dkt. #113-3].  They say even less about it in their "Deloitte" log. [Dkt. # 113-4].  Apparently, however, the defendants have abandoned their claim that it qualifies as work product. [Dkt. #113, at 4 n.1; #129, at 5-6].

---

[2](...continued)
court to rule in his client's favor . . . ."  *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006). Adding unnecessary steps to reviewing your motion does the opposite; it makes it more difficult.  One or two extra steps may not seem significant to the plaintiff and his large litigation team – they seem to have a habit of operating this way, *see, e.g.*, [Dkt. ##133-135] – but not everyone is as fortunate as the plaintiff who has eight lawyers and their support teams at his disposal.  And one or two unnecessary steps here and there becomes worse when those lawyers are the type that file lots of motions [Dkt. ##104, 112, 115, 125, #133, #134] and are champing at their bits to file more. [Dkt. #113, at 11 n.7].

Resolution of those discovery motions is a matter of the court's "extremely broad discretion." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013); *see also Kuttner v. Zaruba*, 819 F.3d 970, 974 (7th Cir. 2016); *James v. Hyatt Regency Chi.*, 707 F.3d 775, 784 (7th Cir. 2013).  As such, there are no real "right" answers.  In fact, "it is possible for two judges, confronted with the identical record, to come to opposite conclusions and for the appellate court to affirm both." *Mejia v. Cook Cnty., Ill.*, 650 F.3d 631, 635 (7th Cir. 2011); *United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996).  If you want your "right" answer to prevail over your opponent's "right" answer, it's best not to be difficult.

### III.

Fed.R.Civ.P. 26(b)(5)(A)(ii) requires a party withholding information from discovery to "describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." A sketchy privilege log description like the one the defendants offered, especially for what is claimed to be a significant document, is very often going to draw a motion to compel. But, that gives the defendants a second crack at it. Since they are claiming the Little Report – the entirety of it – is privileged, they have the burden of establishing all of the required elements apply to the Little Report. *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 446 (7th Cir. 2011). To determine if a communication falls within the protection of the attorney-client privilege, a court asks: (1) whether legal advice of any kind was sought ... from a professional legal adviser in his capacity as such; and (2) whether the communication was related to that purpose and made in confidence by the client. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010); *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir.1997); *see also United States v. Leonard-Allen*, 739 F.3d 948, 952 (7th Cir. 2013)("The privilege extends to confidential communications between client and attorney, made "in order to obtain legal assistance.").

The privilege is a bit of a Faustian bargain that English common law made centuries ago in that, in essence, it places a client's freedom from apprehension in consulting his legal adviser over and above the search for the truth. *See, e.g, Radiant Burners, Inc. v. Am. Gas Ass'n*, 320 F.2d 314, 318 (7th Cir. 1963). As such, the privilege is construed *narrowly* to apply only when necessary to achieve its purpose. *Leonard-Allen*, 739 F.3d at 953; *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir.2007) (internal quotation marks and citations omitted). When parties seek to claim

the privilege for documents that, by all appearances, seem to be business documents – like the defendants are trying to do here – it's often a tough claim to support. *See, e.g, Am. Nat. Bank & Tr. Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 879 (7th Cir. 2005)(discussing the difficulty of distinguishing counsels' legal advice from their business advice); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003)("Federal law extends the privilege to communications about legal subjects, and it is hard to see why a business evaluation meets that description."); *United States v. Moore, Ingram, Johnson & Steele, LLP*, No. 21-10341, 2022 WL 3134374, at *3 (11th Cir. Aug. 5, 2022)("The privilege only protects communications between an attorney and his client made for the purpose of securing legal advice. . . . It doesn't protect business advice."). That certainly rings true after reviewing the defendants response to the plaintiff's motion.

## A.

The document all these suits are fighting over dates back a decade. Ten long years ago, in August 2013, defendant, CVS, hired Deloitte to perform business diligence work in connection with CVS's contemplated acquisition of Coram LLC, a home infusion company owned by Apria Healthcare. Deloitte produced a massive, 237-page "draft report" on October 18, 2013 – we'll call it the "Big Report" – 16 pages of which the plaintiff apparently purloined when he left defendants' employ and more recently attached to his complaint. Obviously, this case proceeded in secret while the government conducted its three-and-a-half-year investigation of the plaintiff's charges. On the surface, we have to say that the defendants only became aware of the plaintiff's complaint in May 2022. [Dkt. ##45, 46, 50]. Defendants likely caught wind of the plaintiff's charges at some point but, for our purposes here, we can buy the May 2022 timeline. [Dkt. #129-1, Par. 5].

Much more difficult to buy is the defendants' story about when they became aware of what

we'll call the "Little Report." The defendants' lawyers tell the court that CVS only became aware of the Little Report when it was responding to a subpoena from the plaintiff in August 2022 and Deloitte sent it a 2013 engagement letter addressed to CVS's then-outside regulatory counsel S. Craig Holden at the law firm Ober Kaler, and signed by then in-house CVS counsel Sara Finley (who left CVS back in 2015). [Dkt. #129-1, Par. 7; #99, at 4]. That letter, according to the defendants' lawyers, addresses a regulatory engagement over three topics involving Coram: billing and coding analysis, Stark Law compliance, and certain analyses concerning "credit balances. The defendants' lawyers make that letter seem pretty significant; it's one of the things their opposition to plaintiff's motion hinges on. Yet, through two rounds of briefing, one before Judge Seeger on their motion to seal exhibits to and parts of plaintiff's Complaint [Dkt. #98], and one before me on plaintiff's motion to compel, they haven't provided a copy for the court to look at. They say they'll provide one *in camera*, if the court wants. Why the defendants' lawyers wouldn't have done that in the first place back on February 3rd when this first came up in front of Judge Seeger is anyone's guess.[3]

---

[3]As noted, the court has no idea why the defendants have withheld this significant letter, or why they will only produce it if ordered to do so and only then *in camera*. If the defendants thought the engagement letter was the coupe de grace, they should have rolled it out immediately. *See, e.g., Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 932 (7th Cir. 2018); *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). Courts do not have the time nor the resources of multiple law firms, such that it is of no consequence to go through the filings for a dispute one time without a certain document, and then again with that document. *See, e.g., Hansel 'N Gretel Brand, Inc. v. Savitsky*, 1997 WL 698179, *2 (S.D.N.Y. 1997)("Motion practice is not a series of trial balloons where you [submit] what you think is sufficient, [you] see how it flies, and if it does not, you go back and try again. If that is the way the system worked we would have motion practice going on forever.").

Moreover, the defendants make absolutely no showing that the engagement letter is privileged, such that it merited a special *in camera* presentation. Such letters generally are not. *See, e.g., United States v. Leonard-Allen*, 739 F.3d 948, 953 (7th Cir. 2013)("Because the referral statement listing reasons for seeking representation is incidental to the representation and reveals nothing confidential about [defendant's] motives, it falls outside the scope of the attorney-client privilege . . . ."); *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 405 (7th Cir. 2018)("Communications from attorney to client are privileged only
(continued...)

Defendants' lawyers can't think that their story isn't at least a little fishy: That CVS only "discovered", ten years after the fact, that it hired perhaps the largest accounting firm in the history of the planet for not only a "non-privileged engagement" (the Big Report), but also a "privileged engagement" (the Little Report). That CVS only learned through its late 2022 document review that the "privileged engagement" was to cover three issues that were separate from the "non-privileged engagement": a billing and coding analysis, Federal Stark Law compliance, and certain aspects of Coram's so-called "credit balances." [Dkt. #129-3, at 5]. That we have a non-privileged Big Report that was all due-diligence, business-type stuff and a privileged Little Report that was all due-diligence, secret, legal-type stuff . . . supposedly. That CVS corporately remembered and knew all about the first one, but the second one had completely slipped its corporate mind.

Obviously, defendants' lawyers should realize all that is difficult to believe – with or without the engagement letter. But, it gets harder to believe the more the defendants' lawyers tell us. According to an affidavit from Hilary B. Dudley, in-house counsel at CVS since approximately June 1, 2015, "[a]t the time CVS filed its first motion to seal in this case, in June 2022 (Dkt Nos. 55 & 56), its litigation team (inside and outside) handling this case was not aware of the Ober Kaler

---

[3](...continued)

if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence."); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 388 (7th Cir. 2008)(same); *Schlicksup v. Caterpillar, Inc*., No. 09-CV-1208, 2011 WL 11737159, at *5 (C.D. Ill. Aug. 19, 2011)(". . . the engagement letters do not fall under the attorney-client privilege. These letters describe the work that [the accounting firm] will perform, the terms and conditions of that performance, and the fee paid, among other non-privileged issues.").

The only privilege log from the defendants the court has before it comes courtesy of the plaintiff, is dated after CVS's supposed "discovery" that it hired Deloitte, but it makes no mention of any engagement letter in its list of Deloitte-related documents. [Dkt. #113-3]. That certainly appears to be a waiver of any privilege the defendants lawyers might think applies to the engagement letter. *Stagger v. Experian Info. Sols., Inc*., No. 21 C 2001, 2021 WL 5299791, at *5 (N.D. Ill. Nov. 15, 2021)(collecting cases).

engagement letter from 2013." [Dkt. #129-1, Par. 12). Yet, at the time CVS filed its motion to seal, it obviously had reviewed the exhibits attached to the February 2022 version of plaintiff's complaint. Exhibit 1 at to that version of the Complaint was excerpts for Deloitte's "Big Report." On the second page of Exhibit 1 – the very first page after the cover page – Deloitte lists all the things it analyzed in its due diligence review for CVS:

> Based upon our discussions with CVS Caremark . . . you have requested Deloitte . . . to perform, and we have agreed to perform, certain services in an effort to assist CVSC in performing its due diligence in connection with CVSC's proposed affiliation the company code-named Project Ocean ("Ocean", "the Company", "the Proposed Transaction"). In this regard, we have analyzed selected historical financial information and other accounting, financial, tax, IT and operating data of Coram, with a primary emphasis on:
>
>                  \*     \*     \*
>
> • Billing and Coding (to be provided under separate cover)
>
> • Stark compliance analysis (to be provided under separate cover)

[Dkt. #30-1, Page 3/17].

Right there, in a filing from February 2022 that defendants and their lawyers had reviewed no later than May 2022, was a reference to the Little Report – the report the defendants and their lawyers claim they had no knowledge of until much later in the year. The defendants even concede that this should have been a red flag. [Dkt. #129, at 8 ("Notably, the October Report explicitly commented that the three issues were not being addressed in that report, but rather that they were being addressed "under separate cover" and/or merited "further" or "additional" diligence. Ex. 5 at 2 (billing and coding analysis; Stark compliance), 15, and 86 (credit balances).")].

So, the court is to believe that defendants' in-house lawyers and its cadre of outside lawyers from Williams & Connolly, Calcagni & Kanefsky, and Cotsirilos, Tighe, Streicker, Poulos &

Campbells all missed it?

It's interesting because, on the very next page, Deloitte says, in no uncertain terms, that it wasn't be doing *any* due-diligence, secret, legal-type stuff:

> Although not intended to be an all-inclusive list of services that were not provided, the following services, among other things, have been specifically excluded from the scope of our engagement at CVSC's request:
>
> *     *     *
>
> • Legal and regulatory
>
> • Internal accounting and disclosure controls

[Dkt. #30-1, Page 4/17; 67-1, Page 6/150]. Defendants don't attempt to explain this in their brief. But, it sure looks like there was *one* Deloitte engagement, that might have been compartmentalized into a Big Report and a "separate cover" Little Report, neither of which, according to Deloitte, involved any legal and regulatory matters – the types of matters that might, possibly, upon a proper showing, be privileged.

**B.**

Aside from the engagement letter – which the defendants haven't shared with the court – and the portions of the Big Report plaintiff purloined and attached to his Complaint, the defendants' lawyers have provided the court with a Declaration from S. Craig Holden, who was with Ober Kaler in 2013. He claims the Little Report – he calls it a "draft *due diligence* report", just like what the Big Report was called – was for the purposes of "assessing certain potential legal, regulatory, and/or contractual risks that CVS might acquire as part of the acquisition, together with any policy or operational changes that Ober Kaler might recommend to CVS regarding regulatory compliance, in the event the acquisition was completed." [Dkt. #129-2, Par. 10]. That's the sort of rote,

11

conclusory, boilerplate assertion that has left courts unimpressed for years. *See, e.g., City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17 CV 50107, 2020 WL 11191830, at *2 (N.D. Ill. May 27, 2020)(rejecting conclusory descriptions of documents); *Smith v. Bd. of Educ. of City of Chicago*, No. 17 C 7034, 2019 WL 2525890, at *2 n.1 (N.D. Ill. June 19, 2019)("... courts have repeatedly held that simply describing a lawyer's advice as 'legal' without more, is conclusory and insufficient to carry out the proponent's burden of establishing attorney-client privilege."); *Melgoza v. Rush Univ. Med. Ctr.*, No. 17 C 6819, 2019 WL 2504094, at *8 (N.D. Ill. June 14, 2019)("Candidly, a description of logged document as a '[r]eport commissioned and completed under the direction of Rush legal counsel for the purpose of providing legal advice' does not provide detail sufficient to allow the Court to determine whether legal advice was sought or revealed. It's a mere conclusory statement."); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc*., 152 F.R.D. 132, 137 (N.D. Ill. 1993)(". . . any party claiming a privilege must present for each document 'a specific explanation of why the document is privileged or immune from discovery,' such that we can determine whether the discovery opponent has discharged its burden."). It also contradicts what Deloitte said in the Big Report: that it wasn't engaged to provide anything on legal or regulatory issues.

But, more importantly, assessing legal risks that come with a potential purchase is part and parcel to nearly every purchase and every due diligence review. Every purchase comes with at least potential liabilities – financial, legal, and otherwise – that inform the purchaser's decision. The purchaser has financial people to examine and consider the financial questions and legal people to assess the legal questions; but, in the end, the purpose is business and the advice is business advice.

12

That's why, in case after case – although holdings aren't unanimous[4] – courts find that these types of due diligence reports – even if they involve legal matters – are not protected by the attorney-client privilege. *See, e.g., VeroBlue Farms USA, Inc. v. Wulf*, No. 22-MC-00105-JWB-GEB, 2022 WL 2817612, at *4 (D. Kan. July 19, 2022)("Legal advice must predominate for the communication to be protected. And the attorney client privilege does not protect facts communicated to an attorney or allow a client to refuse to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent sources."); *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc*., No. CV1600300CJCRAOX, 2017 WL 8220457, at *3 (C.D. Cal. June 16, 2017)(the question is "whether the communication was generated for the purpose of obtaining or providing legal advice as opposed to business advice. If the document was prepared for purposes of simultaneous review by legal and non-legal personnel, it cannot be said that the primary purpose of the document is to secure legal advice."); *Fed. Trade Comm'n v. Abbvie, Inc*., No. CV 14-5151, 2015 WL 8623076, at *10 (E.D. Pa. Dec. 14, 2015)(". . . even if the court were to find that these due diligence presentations mention legal matters, these presentations were created for business purposes. To the extent that these due diligence documents reference legal issues, this was done to provide context for a business acquisition decision, not to obtain or provide legal advice."); *ANGEL Learning, Inc.*

---

[4] Not surprisingly, the holdings are not unanimous. As already explained, courts enjoy extremely broad discretion in resolving these types of disputes. *Jones*, 737 F.3d at 1115; *Kuttner*, 819 F.3d at 974; *James*, 707 F.3d at 784. That can mean that even if one side is "right," the court can still be "right" if it rules against them. *See Chicago Reg'l Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc*., 316 F.Supp.3d 1044, 1046 (N.D. Ill. 2018); *Infowhyse GmbH v. Fleetwood Grp*., 2016 WL 4063168, at *2 (N.D. Ill. July 29, 2016); *Native Am. Arts, Inc. v. Peter Stone Co., U.S.A.*, 222 F.Supp.3d 643, 648 (N.D. Ill. 2016). And, again, in matters of discretion, "it is possible for two judges, confronted with the identical record, to come to opposite conclusions and for the appellate court to affirm both." *Mejia*, 650 F.3d at 635; *Williams*, 81 F.3d 1437. That's why cases invariably go both ways and why it behooves the parties to do some win-win negotiating on their own– as envisioned by Local Rule 37.2 – rather than go the route that guarantees a loser, which is the route the parties have chosen here.

*v. Houghton Mifflin Harcourt Publ'g Co.*, No. 108CV01259LJMJMS, 2010 WL 11561734, at *2 (S.D. Ind. Jan. 27, 2010)(". . . the attorney-client privilege and work-product immunity don't attach to documents and communications exchanged for business purposes" such as documents related to a "due diligence investigation . . . ."); *In re Syncor ERISA Litig.*, 229 F.R.D. 636, 644–45 (C.D. Cal. 2005)(documents prepared during due diligence review as the prior to acquisition did not "fall within the ambit of the attorney-client privilege" . . . as they were created "solely for the business purpose of a potential merger."); *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020)( "If the advice sought is not legal advice, but, for example, accounting advice from an accountant, then the privilege does not exist.").  As the defendants describe it, there is nothing special or so different about the Little Report here that would take it out of the business purpose due diligence review category and put in squarely in the predominantly legal category. In the end, the Little Report, like most due diligence reports prior to acquisitions, was designed to uncover financial facts and potential legal liabilities – *see, e.g., 1100 W., LLC v. Red Spot Paint & Varnish Co.*, No. 1:05-CV-1670-LJM-JMS, 2009 WL 10687832, at *2 (S.D. Ind. Apr. 22, 2009)("[t]here are few, if any, conceivable circumstances where a scientist or engineer employed to gather data should be considered an agent within the scope of the privilege since the information collected will generally be factual, obtained from sources other than the client."); *Dombrowski v. Bell Atl. Corp.*, 128 F. Supp. 2d 216, 219 (E.D. Pa. 2000)("What plaintiff found during due diligence cannot fall within the ambit of the attorney-client privilege. The privilege protects only communications between a lawyer and client. It does not insulate underlying facts from the light of day.") – in order to inform a business decision: whether to purchase Coram.

14

Similarly unimpressive and even more vague is Mr. Holder's assertion that he "did, in fact, use information from Deloitte's November 6, 2013 Report and the underlying engagement to provide legal advice to CVS." [Dkt. #129-3, Par. 15]. We have no idea when or in what context that might have occurred. But, "a communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *Billy Goat IP LLC v. Billy Goat Chip Co. LLC*, No. 17-CV-9154, 2019 WL 10250940, at *2 (N.D. Ill. Feb. 1, 2019); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 958, 961 (N.D. Ill. 2009); *see also United States v. Ackert*, 169 F.3d 136, 139 (2d Cir.1999)("The purpose of the privilege is 'to encourage clients to make full disclosure to their attorneys.' To that end, the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client."). *See also United States v. Sadler*, 24 F.4th 515, 557 (6th Cir. 2022)(". . . communications are not protected 'when an attorney conveys to his client facts acquired from other persons or sources.'"); *In re Grand Jury Proc.*, 616 F.3d 1172, 1183 (10th Cir. 2010)(questions about information attorney received and then conveyed to client "did not request information regarding privileged legal advice provided by the attorney to his client, nor would the questions tend, directly or indirectly, to require the attorney to reveal the substance of any legal confidence.").

Mr. Holder may well have used the Little Report to provide legal advice at some later date[5],

---

[5] That mean what it says. Just because the Little Report itself was not privileged or created for the purpose of providing legal advice does not mean that communications regarding it or using it later on are fair game. At the risk of oversimplifying it, think of the difference between an accident report, and a lawyer telling his client what to do about the accident. Plaintiff and his lawyers ought to take heed before filing their next flurry of motions. [Dkt. #113, At 11 n.7]. That may only serve to bog down discovery and, while we can't speak for Judge Seeger, there's probably no guarantee of an extension of the discovery deadline, (continued...)

but when it was created, its purpose was to inform the business decision whether to purchase Coram. And, in this context, we must not forget that while Deloitte began its work in August 2013, the engagement letter the defendants make so much of did not get drawn up until October 2013, regardless of its "effective date." [Dkt. #129, at 2; #129-3, Par. 13]. The court has already mentioned the "fishy" tale regarding the timeline of when CVS "discovered" it hired Deloitte, so no more will be said about an October letter backdated to August. But these types of eyebrow raisers tend to detract from what the defendants would like to characterize as unassailable testimony. [Dkt. #129, at 7].[6] In any event, the legal advice as opposed to the business advice aspect of the Little Report seems to have materialized, if at all, at a later date.

## C.

In closing, it's worthwhile recalling two of the salient factors for determining whether the privilege applies that the Seventh Circuit set out back in 2007 in *BDO Seidman*. First: "Only those

---

[5](...continued)
especially one based on unnecessary discovery motions. [Dkt. #100, 118]. Plaintiff and his legal team should use the time between now and June 12th [Dkt. ##100, 112] wisely.

[6] While an affidavit is, technically, "sworn testimony," it's not really beyond reproach as the defendants apparently think. Bitter experience has demonstrated that the oath does not guarantee truthfulness or accuracy. Even lawyers' Declarations are often false. *See, e.g., FTC v. Advocate Health Care Network*, 162 F.Supp.3d 666, 671 (N.D. Ill. 2016); *Tellabs v. Fujitsu*, 283 F.R.D. 374, 379 (N.D.Ill. 2012). Affidavits are nearly always self-serving; that's a reason why "live" testimony is better. *Murillo v. Frank*, 402 F.3d 786, 790 (7th Cir.2005) ("Live testimony is preferable to affidavits and transcribed confessions, because cross-examination can probe its weaknesses."). So, it's a bit of a stretch to say, as the defendants do [Dkt. #129, at 7], that the court is bound to take an attorney's word that something is privileged – or, an attorney's recitation of familiar boilerplate underlying a claim of privilege – and simply rule that a document is undiscoverable without a bit of independent analysis. We don't even take attorney's words for how much they make, *Nichols v. Illinois Dep't of Transportation*, 4 F.4th 437, 442 (7th Cir. 2021), and while affidavits untested by cross-examination have evidentiary value, *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013), a court is not prohibited, as the defendants seem to think, from assessing the facts and not buying an attorney's rather vague story hook, line, sinker. *Shaffer v. Lashbrook*, 962 F.3d 313, 317 (7th Cir. 2020). It bears repeating that a lawyer's credibility is not judged differently than that of any other person and the oath or its equivalent does not assure candor or veracity based on the party's occupation. *United States v. Boliaux*, 915 F.3d 493, 497 (7th Cir. 2019).

communications which reflect the lawyer's thinking or are made for the purpose of eliciting the lawyer's professional advice or other legal assistance fall within the privilege." 492 F.3d at 815; v. *Leonard-Allen*, 739 F.3d at 953. Obviously, Deloitte's Little Report doesn't reflect Mr. Holder's thinking or that of Ober Kaler or in-house counsel. It doesn't reveal any advice from any of them. And, as has been thoroughly discussed, the Little Report was made for the purpose of making an informed business decision. The information in the report wasn't a client confidence; it didn't come from CVS. Second: "Courts construe the privilege to apply only where necessary to achieve its purpose." 492 F.3d at 815; *Leonard-Allen*, 739 F.3d at 953. That purpose, as stated earlier, is to encourage free and frank communication with counsel. It's hard to see how ruling that a due diligence report undertaken before an acquisition decision is made is privileged or not would change things one way or the other.

After all, CVS isn't even the source of the information in the Little Report. Is Deloitte going to be more thorough? Is Coram going to be more forthcoming? There just doesn't appear to be any angle to look at this from which the finding the little Report privileged advances the privilege's purpose. As already stated, such reports are *de rigueur,* and they are going to be commissioned before an acquisition in the ordinary course of business regardless of the attorney-client privilege. And, as the cases show, the privilege is very often found not to apply.[7]

---

[7] Of the remaining two considerations, one – "[b]ecause one of the objectives of the privilege is assisting clients in conforming their conduct to the law, litigation need not be pending for the communication to be made in connection to the provision of legal services," 492 F.3d at 815 – is not terribly pertinent here, but it's worth pointing that, if a due diligence examination of an acquisition target revealed a host of legal issues, it would be too late for that target company to have "conformed their conduct" and the target company isn't the client in the first place. The second one – "[b]ecause the privilege is in derogation of the search for truth, any exceptions to the requirements of the attorney-client privilege must be strictly confined", 492 F.3d at 815 – has informed this discussion throughout.

In the end, Deloitte was, essentially, employed to gather data and analyze it from a financial perspective. It matters little, for purposes of evaluating defendants' claim of privilege, what Deloitte put into the Little Report. Deloitte uncovered legal and/or regulatory issues – if it did at all – as part of an assessment of the quality of Coram in terms of an acquisition target for CVS.[8] Maybe CVS's attorneys used some things in the Little Report down the line to provide some legal advice for CVS – maybe not. Again, what matters is the circumstances under which and the purposes for which the Little Report was created in the first place. As such, the defendants have failed to carry their burden of establishing that all of the elements of the attorney-client privilege apply to the Little Report. It doesn't help the defendants' cause, of course, that their narrative includes stories that CVS forgot it hired Deloitte to compile this now-remembered-as-privileged Little Report until ten years later, or that the defendants' team of attorneys didn't notice that Exhibit 1 alerted the reader to the Little Report on its first full page, or that an engagement letter that defendants also claim – without any support whatsoever – is also privileged was essentially backdated a couple of months from October 2013 to cover work performed in August 2013.

---

[8] As such, an *in camera* review would be of no value. And, the decision of whether to conduct an *in camera* review to assess privilege claims is within the court's discretion. *Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15 C 3187, 2020 WL 3977944, at *1 (N.D. Ill. July 14, 2020); *Wier v. United Airlines, Inc.*, No. 19 CV 7000, 2021 WL 1517975, at *3 (N.D. Ill. Apr. 16, 2021); *United States ex rel. McGee v. IBM Corp.*, No. 11 C 3482, 2017 WL 1232616, at *3 (N.D. Ill. Apr. 4, 2017). Defendants have certainly not made enough of a showing to warrant one.

Accordingly, the plaintiff's "Motion to Compel Production of Deloitte Due Diligence Supplement" [Dkt. #112] is granted.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/4/23

19