IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. MICHAEL GILL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 18 C 6494 |
| | ) | |
| v. | ) | Judge Steven Seeger |
| | ) | |
| CVS HEALTH CORP. et al., | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

"The burden is on the party claiming the [attorney-client] privilege to present the underlying facts demonstrating the existence of the privilege. ... This is not to say that the party must detail the contents of each communication, for that would indeed violate the privilege. But the party must supply the court with sufficient information from which it could reasonably conclude that the communication: (1) concerned the seeking of legal advice; (2) was between a client and an attorney acting in his professional capacity; (3) was related to legal matters; and (4) is at the client's instance permanently protected."

*F.T.C. v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980)[1]

On November 30, 2023, the plaintiff filed a "Motion to Compel Documents Improperly Withheld on the Basis of Privilege." The motion asks the court to find that the defendants have waived the attorney-client privilege as to each of the 20,790 documents listed on their privilege log. [Dkt. #235]. It's one of three motions to compel discovery – two from the plaintiff, one from the defendants – that the parties have filed after the close of fact discovery in the last several weeks.

---

[1] Claims of privilege are overused on documents that do not qualify for protection; simply labeling a document as privileged will not alone suffice to warrant a proper application of the privilege. *Fisher v. United States*, 425 U.S. 391, 403 (1976); *Hickman v. Taylor*, 329 U.S. 495, 508 (1947); *United States v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003); *Smith v. Berge*, 139 F.3d 902 (7th Cir. 1998); *Towne Place Condo Assn. v. Philadelphia Indemnity Ins Co.*, 284 F.Supp.3 889, 897 (N.D.Ill. 2018); *Employers Reinsurance Corp. v. Clarendon Nat'l Ins Co.*, 213 F.R.D. 422, 430 (D.Kan. 2003).

That's generally unacceptable. *Haynes v. Alliant Food Serv., Inc.*, 93 F. App'x 71, 74 (7th Cir. 2004); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 647 (7th Cir.2001). Discovery has to close sometime, because more cases with more discovery are pending or are on the way. When parties drag their discovery squabbles past the discovery deadlines – deadlines that *they* select – they take the court's time away from the other cases in the queue, *see Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325, 329 (7th Cir. 1991), including cases in which the parties and counsel *comply* with deadlines. At some point, it becomes unfair to the other litigants.

That point is likely now. The parties' three post-discovery motions are hefty, with the opening memoranda and exhibits alone combining to total well over 3,000 pages of materials. Throw in the hundreds of pages of responses and replies and exhibits attached to those and, even if this were the court's only case, it would be clear that these disputes will not be resolved any time soon.[2] Earlier in this case, the plaintiff expressed some concern for the "public fisc." [Dkt.#116, at 4]. Well, time and judicial resources, of course, are money. Resolution of these extensive discovery battles will put at least a little dent in the public fisc, which has already been scratched for a lengthy government investigation and a fair amount of judicial resources, even before the latest trio of discovery motions were filed. [*See, e.g.,* Dkt. ##104, 105, 107, 110, 11, 112, 113, 114, 115, 116, 117, 121, 122, 123, 124, 125, 126, 128, 129, 131, 132, 133, 134, 136, 138, 144, 147, 151, 166, 167, 168, 170, 172, 176, 177, 178, 179, 186, 187, 190, 199, 201, 211, 212, 213, 214, 215, 216, 220, 221, 222, 223, 224].

---

[2] The court is not even sure when the parties will conclude their filing in those three matters as only recently the defendants have added additional exhibits to the hundreds of pages already on file in connection with the plaintiff's *other* motion to compel, a month after briefing was supposedly completed. [Dkt. ##267, 268].

2

But, here we are. The long and short of the plaintiff's instant motion [Dkt. #235] is that the defendants have waived the privilege regarding 20,790 documents listed in defendants' 1,859-page, November 20, 2023 privilege log on two bases: the privilege log is not any good and it showed up too late. We address the timeliness issue first.

### Timeliness

The plaintiff has served a host of document requests on the defendants. Plaintiff served Second, Third, and Fourth Sets of Requests for Production, each relating to one of the discrete fraud schemes that plaintiff alleged, on August 12, 2022. Plaintiff served Fifth and Sixth Sets of Requests for Production, each also relating to one of the five discrete fraud schemes that Plaintiff alleged, on October 13, 2022. Plaintiff served follow-up requests for production on December 23, 2022, and March 22, 2023, and defendants served written responses to those requests on January 23 and April 21, 2023, respectively. On August 31, 2023, plaintiff served a *Ninth* Set of Requests for Production relating to defendants' limited advice-of-counsel defense, which defendants first asserted on August 8, 2023, and defendants responded to those requests on September 20, 2023. [Dkt. #236-1, Pars. 2-4]. So, even at first blush, plaintiff's complaints about defendants taking too long to provide a privilege log seem a bit much. If you choose to go with a 180-page, 828-paragraph Complaint [Dkt. #67], and serve eight or nine or however many more sets of document production requests, the responses are going to take a very long while, and a privilege log is going to take a very long while longer.

And, it certainly did. The plaintiff, fresh off blanketing defendants with several sets of production requests on December 14, 2022, asked the defendants when they would be providing a privilege log. [Dkt. #236-2]. We don't know what the defendants said in response, but we do know

3

that as of April 12, 2023 they still had not provided a complete privilege log or – as they were producing documents on the proverbial "rolling basis" – a privilege log in installments. They claimed that they did not even know when they would, [Dkt. #263-3], despite the fact that there were attorneys from multiple law firms involved in the preparation of the required log. Yet, not one among them had any idea when they might comply with the obligatory demands of Fed.R.Civ.P. 26(b)(5)(A). And, although the plaintiff did not attach the parties' communications during that period[3] to their brief, we have no doubt that plaintiff's team of lawyers was complaining a blue streak about the absence of a privilege log.

And they weren't necessarily wrong. After all, the applicable rule says "*[w]hen* a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, *the party must*: . . . describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed.R.Civ.P. 26(b)(5)(A)(ii)(emphasis supplied). *When* were the defendants withholding information? All along, so technically they should have been providing privilege logs in installments. In retrospect, it might have made everyone's lives a lot easier and the defendants' privilege log might have been a lot better – more on the quality of that privilege log later. Although, it would also have slowed production of each batch of the rolling production and, perhaps, resulted in additional motions to compel from the plaintiff.

In any event, the defendants produced "Part 1" of their privilege log on August 7, 2023; it

---

[3] That's fine, really. If Signor Alighieri were working today, reading angry attorney email chains about discovery might be a punishment in one of the circles of Hell. Maybe not in one of the really bad circles toward the end – say the seventh, eighth, or ninth – but a pretty bad one somewhere in the middle.

4

was only 659 pages long with 5,360 entries. You'll shortly see why we said "only." A couple of weeks later, on August 21, 2023, the defendants produced a 1,984-page privilege log with 22,603 entries. It supposedly superseded that August 7th log. It sounds like the August 21st log was awful. It didn't bother to identify who were attorneys, and it didn't bother to describe over 1,000 of the documents, and didn't even claim a privilege – attorney-client or work product – for nearly 7,000 documents. At that point, the parties were about nine months into the whole document- production- privilege-log undertaking, and just ten days away from the close of fact discovery. That might have been a good time for plaintiff to have filed a motion to compel about all this.

Instead, on August 25th, the parties begged Judge Seeger for more time [Dkt. #190] and they got it: the new fact discovery deadline was September 29, 2023. [Dkt. #192]. The parties assured Judge Seeger that this would allow the:

> (c) Defendants [to] complete their production of documents or information responsive to Plaintiffs' requests for production, and third parties can complete productions of documents or information in response to third-party subpoenas issued by both sides; and (d) the parties [to] meet and confer concerning the 1,984-page privilege log that Defendants served on August 21, 2023, and resolve any issues or deficiencies, whether through negotiation or through motion practice.

[Dkt. #190, at 1]. The guess is that Judge Seeger didn't take those promises too seriously, nor should he have as things turned out.

As of September 13th, plaintiff, not surprisingly, was still "continuing to review and assess the 1,984 page/22,603 entry [August 21st] privilege log." But, even then it was clear the defendants' most recent try at a privilege log was, once again, unsatisfactory. There were some very obvious flaws that ought to have been caught long before the "log" was produced. Numerous documents defendants had withheld or produced in redacted form weren't listed; for 1316 entries, the document description was blank; and for 6703 entries, the "privilege type" column was blank. [Dkt. #236-5].

5

Surely, with only about two weeks to go before the September 29th deadline, it was time for the plaintiff to take action and file a motion to compel.

But plaintiff did not. On September 15th, defendants said that they would "re-produce the entire privilege log to you with these errors corrected." [Dkt. #236-5]. That was apparently satisfactory to plaintiff, even as the close of fact discovery on September 29th [Dkt. #192] came and went without much if any concern from the parties. [Dkt. #236-1, Pars. 10, 11]. Certainly, no one among the parties' teams of attorneys was sufficiently worried about the deadline to ask Judge Seeger for another discovery extension. More than two weeks after the September 29th deadline, on October 16th, the defendants sent plaintiff another swing at the privilege log, this time with 21,416 entries spread across 1,767 pages. [Dkt. #236-6].

But, it was another swing and miss. Unfortunately, the October 16th "privilege log" was not much better than its predecessors. It had many of the same flaws that plagued the defendants' previous attempts. For example, it did not even reliably identify who on the log was an attorney. There were no entries for at least 527 documents that defendants had redacted on the grounds of privilege. It omitted 249 documents that defendants had "mistakenly" produced with redactions. And, it suffered from a problem that is commonplace in modern litigation: email chains and email attachments were difficult, if not impossible to put together. [Dkt. ##236-8, -10, -11]. Hence, one would have thought that this had to be the time for plaintiff to file a motion to compel, or at least ask for another extension of the applicable fact discovery deadline. But curiously, that did not happen.

Instead, there followed a fourth attempt at a "privilege log." As of November 10th, defendants wrote to plaintiff that they were "continu[ing] to refine the log in response to any issues that either Defendants discover themselves or that Plaintiffs bring to our attention." [Dkt. #236-11]. The

6

attorneys sent some more emails back and forth and, on November 17, 2023, had their only Local Rule 37.2 meet and confer over this massive privilege log dispute. More on that later. The defendants provided their fourth try at their privilege log on November 20, 2023. There were, again, a lot of problems with the log.

That apparently was the tipping point for the plaintiff, who finally filed a motion to compel production of all the 20,000-odd documents listed on the defendant's fourth privilege log on November 30, 2023. [Dkt. #235]. As already noted, one of the bases the plaintiff advances for finding the defendants waived their claim of privilege for all those thousands of documents was the claimed "leisurely pace of Defendants' production and revision of the log." After all, as the plaintiff says, plaintiff "served the discovery requests at issue as long as 15 months ago [and] the discovery cutoff has passed." [Dkt. #236, at 14-15].

Indeed, it had passed two months *before* the plaintiff filed this motion. [Dkt. #192]. Consequently, the plaintiff's motion is very late.[4] As we noted earlier, courts are rarely found to have abused their discretion when they deny a motion to compel that comes after the discovery deadline. *See, e.g., Justise v. Zenith Logistics, Inc.*, 186 F. App'x 680, 683 (7th Cir. 2006)("... we cannot conclude that it was an abuse of discretion to deny [plaintiff's] motion to compel given its

---

[4] On November 16, 2023, *well after the close of discovery*, the plaintiff sought leave from Judge Seeger "to allow [plaintiff] to complete two depositions pertaining to Defendants' advice-of-counsel defense that were postponed from late October due to Defendants' belated document productions, and to file a motion relating to Defendants' advice of counsel defense and resulting waiver of privilege." [Dkt. #223, at 1, 2 ("Accordingly, with Defendants' consent, Plaintiffs seek an Order from this Court confirming that the parties can complete the remaining depositions and present Plaintiffs' motion challenging the scope of waiver resulting from Defendants' advice of counsel defense to Magistrate Judge Cole by November 30, 2023, as stipulated by the parties.")]. Judge Seeger granted the plaintiff "leave to file, before the Magistrate Judge, a motion challenging Defendants' privilege waiver by November 30 (i.e., the deadline proposed in the motion)." [Dkt. #231]. Plaintiff neither asked for, not was granted, leave to file the instant privilege log motion after the fact discovery deadline.

dilatory filing."); *Haynes v. Alliant Food Serv., Inc*., 93 F. App'x 71, 7374 (7th Cir. 2004)("... rarely will we find an abuse of discretion [denying a motion to compel] when the motion to compel came after the close of discovery"); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 647 (7th Cir.2001)("In light of... lack of diligence in pursuing the perceived inadequacies in discovery, the district court did not abuse its discretion in denying [plaintiff's] motion to compel as untimely."); *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 542 (7th Cir. 2000)(The plaintiffs complain . . . about the district court's denial of their discovery motion. The . . . complaint has no possible merit. The motion was filed two months after the date set by the court for the completion of discovery.").

In *Rossetto*, the Seventh Circuit pointed out that the plaintiff in that case "gave no excuse for their tardiness . . . ." *Rossetto*, 217 F.3d at 542. Here, one supposes the plaintiff's excuse is that plaintiff was complying with Local Rule 37.2 and trying over and over to work this whole mess out and not trouble the court with it. But, if one is attempting to make timeliness an issue, the defendants' privilege log was untimely *long before the close of fact discovery*. Meeting and conferring might hammer out flaws and defects in the log, but it was never going to result in the defendants producing their privilege *earlier* if timeliness is the issue. Time doesn't work like that. No matter how proficient a lawyer may be, time does not run backwards. *Gilpin v. American Federation of Employees*, 875 F.2d 1310, 1313 (7th Cir. 1989).

And, it has to be said that the plaintiff has an odd interpretation of Local Rule 37.2. The plaintiff tells us that the parties "met and conferred *in writing* on September 13, 2023, September 15, 2023, October 26, 2023, November 1, 2023, November 6, 2023, November 8, 2023, November 10, 2023, November 11, 2023, and November 17, 2023 concerning deficiencies in Defendants' privilege log." [Dkt. #235 (emphasis added)]. The court has no idea how people "meet" in writing.

8

And, it's a very good question, because under Local Rule 37.2, angry *letters* back and forth don't count. The Rule specifically requires "consultation in person or by telephone . . . ." N.D.Ill.LR. R. 37.2. *See also Bilek v. Fed. Ins. Co.*, No. 21 CV 1651, 2023 WL 8270362, at *8 (N.D. Ill. Nov. 29, 2023)("Written correspondence is insufficient to demonstrate that the parties exhausted their meet and confer obligations . . . ."); *Lukis v. Whitepages Inc.*, 535 F. Supp. 3d 775, 799 (N.D. Ill. 2021)("Courts in this District routinely enforce the requirement that the consultation take place orally."); *Infowhyse GmbH v. Fleetwood Grp.*, 2016 WL 4063168, at *1 (N.D. Ill. 2016)("The command in the rule could not be more explicit. Emails and letters are not enough under Rule 37.2.").

Plaintiff says the parties did meet and confer *once* "via Zoom . . . . on November 15, 2023." That's *one* attempt, a *single* meeting – the defendants claim it was two and a half hours, the plaintiff doesn't say[5] – about a dispute over an 1800-page privilege log and some 20,000 documents.[6] The court cannot believe that the plaintiff honestly thinks that one meeting about such a massive dispute was sufficient to fulfill the parties' Local Rule 37.2 obligations. *See, e.g., Vera Bradley Designs, Inc. v. Aixin Li*, 2021 WL 1088323, at *1 (N.D. Ill. 2021); *Art Akiane LLC. v. Art & SoulWorks LLC*, 2020 WL 5604064, at *1 (N.D. Ill. 2020)(size of dispute brought to the court is evidence of parties' failure to confer in good faith); *W. Bend Mut. Ins. Co. v. Zurich Am. Ins. Co.*, 308 F. Supp. 3d 954, 958–59 (N.D. Ill. 2018)("Chatting for a bit about a dispute.... is not engaging in a good faith meet

---

[5] If the defendants are correct, that would mean the parties devoted all of one minute to every 138 documents. That's a rather brisk pace for something that the parties seem to feel is important enough for judicial intervention.

[6] On November 16, 2023, the day after the parties' lone meet-and-confer, the plaintiff assured Judge Seeger that the attorneys would "continue the meet and confer" regarding the privilege log issue. [Dkt. #223, At 1 n.1, 8]. Obviously, that didn't happen.

9

and confer."); *Infowhyse*, 2016 WL 4063168, at *1-2 ("A single phone call in three months regarding a dispute ... doesn't come close to sufficing."); *Chamberlain Grp. v. Lear Corp.*, 2010 WL 2836975, at *2 (N.D. Ill. 2010)(single face-to-face meeting did not meet the local rule's requirements).

The weeks of futile email exchanges were clearly not accomplishing anything, so why keep repeating the same thing, and continue repeating the same thing after discovery closed, expecting a different result. For a mess like this privilege log dispute to be even partially resolved the parties ought to have had three or four *actual* meet and confers – as the Rule demands – if not more. The reality is that there has not been compliance with Local Rule 37.2 regarding this dispute, at least not in "good faith" as the Local Rule requires. So, attempting to comply with the Local Rule is no excuse for the plaintiff filing this motion to compel well *after* the applicable discovery deadline.

But – and I want to make this clear – I am not going to deny the plaintiff's motion for being untimely. I am, however, going to exercise the broad discretion it has in resolving discovery battles like this one, *see, e.g., Crawford-El v. Britton*, 523 U.S. 574, 598 (1998); *Equal Emp. Opportunity Comm'n v. Wal-Mart Stores E., L.P.*, 46 F.4th 587, 601 (7th Cir. 2022), and I find that the plaintiff's failure to file its motion on time operates as a waiver of any issues he may have had with the defendants' failure to provide their privilege log in a timely manner.[7] So timeliness, or lack thereof, will be out of the equation. What will remain in the equation, however, is the quality, or lack thereof, of the defendants' privilege log.

---

[7] To be fair, even if the plaintiff filed the motion to compel during discovery, it's unlikely that a court would find a blanket waiver of privilege as to 20,000 documents due to the untimeliness of the production of a privilege log. The scant bit of authority from elsewhere that the plaintiff's dozen attorneys have managed to unearth in support of the motion – four cases, from the District of New Jersey, the Western District of Missouri, the Northern District of California, and the District of Nevada [Dkt. #236, at 15]– suggest that such a result was always a longshot.

**Quality**

Consideration of many privilege logs over the years compels the conclusion that a fair portion of logs have been unacceptable. This one is not among the worst, *see, e.g., Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, No. 18 C 6109, 2019 WL 5963644, at *4 (N.D. Ill. Nov. 13, 2019)(*in camera* inspection of documents revealed any number of frivolous privilege log claims, including a claim that a photograph of a toilet was protected by the attorney-client privileged), but it leaves much to be desired. Even a glance at the log – and, remember, we're talking about a privilege log that is 1,859 pages long and contains 20,790 entries – suggests that there are still a lot of problems with it. And that's before the court even considers the plaintiff's many criticisms as a guide.

By the same token, the defendants' privilege log is about what one should expect in a case like this. As already noted, there has been a staggering amount of discovery in this case. The plaintiff has issued at least *nine* sets of document requests – that's 178 separate total requests – and garnered over *500,000* documents.[8] So the defendants had to pore over *at least* that many documents in order to protect their attorney-client privilege. Here is how the defendants describe that process:

> At the first stage, contract attorney-reviewers flagged documents for potential privilege when reviewing Defendants' documents for responsiveness. A different contract attorney-reviewer then reviewed each document flagged as potentially privileged and marked it as not privileged, fully privileged, or partially privileged and in need of redaction (and provided a privilege description for documents marked privileged). Williams & Connolly attorneys performed sample quality control checks and personally reviewed and edited thousands of entries. In sum, the process, by design, ensured each document on the log was reviewed by at least two attorneys, with a substantial percentage reviewed by more.

---

[8] Counsel may attempt to claim they are unimpressed by such numbers. *United States ex rel. Gill v. CVS Health Corp.*, No. 18 C 6494, 2023 WL 2771166, at *2 n.1 (N.D. Ill. Apr. 4, 2023). But even if each one of those 500,000 documents were a single page – and that's doubtful – the pile would stand 166 feet tall. That's about the height of a 16-story building.

11

[Dkt. #250, at 5-6]. The defendants say all that took six thousand attorney hours, and there is no reason to doubt that representation. I also think that this was a rather thorough and well-considered review, and it would be difficult, if not impossible, to fault the process or find something resembling bad faith. The plaintiff seems a bit too dismissive of it.

Now, that is not to say that mistakes were not likely to have been made or that claims were not made that will prove to be unsupportable. Again, a half-million documents and 20,000 claims of privilege will inevitably engender mistakes and unsupportable claims. All too often in privilege disputes, the phrase "it was out of an abundance of caution . . . ." is used.[9] In other words, release one arguably privileged document in good faith and your opponent pounces with a claim of subject-matter waiver. But, all too many cases demonstrate that claims of privilege should never have been made. Motions to file documents under seal – documents that often appear innocuous – are legion. And, of course, every email an attorney sends comes with a warning that it could very well be confidential and privileged, even if it is merely confirming a coffee date. There is, unfortunately, a tendency toward secrecy even when not warranted.[10]

---

[9] It's a well-worn phrase that's in the running with "a sword and a shield."

[10] Too often, the court has dealt with privilege claims that, essentially, seem to be based on attorneys being magic, with even the hint of their involvement drawing a conjurer's circle around even the most innocuous of communications. *See, e.g., Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 284 F. Supp. 3d 889, 899–900 (N.D. Ill. 2018)(email stating, "[p]lease contact me with any questions. We hope you have a good weekend" was not privileged); *Rossman v. EN Eng'g, LLC*, No. 19 C 5768, 2020 WL 5979554, at *5 (N.D. Ill. Oct. 8, 2020)(email stating, "[t]hanks again for your time today. Here are the Word versions you requested. Have a great weekend!" was not privileged); *Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 162 (N.D. Ill. 2020)("Claiming that a balance sheet sent by the other side in a purchase option negotiation is the work product of your in-house counsel is, at best, frivolous and, it inspires a healthy degree of skepticism toward any other claims the defendants make."); *Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, No. 18 C 6109, 2019 WL 5963644, at *3 (N.D. Ill. Nov. 13, 2019)(lawyer's comments like "'such a nice guy to decide to follow the documents now' or 'his way of saying, ha ha! Look at what all of your diligence gets ya this time" cannot seriously be argued as necessary to the provision of any legal advice."); *Slaven v. Great Am. Ins. Co.*, 83 F. Supp. 3d 789, 802 (N.D. Ill.
(continued...)

Then there is the concept of the "privilege log" in general. Under the Rules, a party has to "describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed.R.Civ.P. 26(b)(5)(A)(ii). That is often easier said than done. One has to reveal just enough, but not too little. It is the legal equivalent of a dress code for those attending a ball at Downton Abbey. That's why, in all too many cases, the lawyers on either side never get to the point that the lawyers in this case have gotten to. One suspects that in those other cases, the attorneys realize they are in the same boat, and reasonableness and give-and-take prevail.

But in a six-year old *qui tam* case, after years of discovery, that's probably too much to expect. Counsel here probably don't feel they're in the same boat. After all, they have been firing shots across each others' bows in countless emails and motions and responses and replies for years. So, the tenor of the plaintiff's submissions can tend to be somewhat strident, while the tenor of the defendants' submissions can tend to be a little indignant.[11] It is understandable, and perhaps it is

---

[10](...continued)
2015)(emails reflecting counsel's attempts to schedule meetings were not privileged); *Bell Microproducts, Inc. v. Relational Funding Corp.*, 2002 WL 31133195, at *1 (N.D. Ill. 2002) (instruction from an attorney to employees to copy him as a recipient on any emails or documents in order to assure the privilege was not by itself enough to make the document privileged).

[11] For example, the plaintiff takes issue with the defendants' allegations – and the court's reiteration of them (although plaintiff offers a faulty citation for that [Dkt. #262, at 10 n.5], to the first page of his own February 22, 2023 filing) – that he took company documents with him – in violation of his employment contract, according to the defendant – when he was terminated. It is, of course, just an allegation – the case remains in the allegation stage well into its sixth year – as are the many allegations the plaintiff makes against the defendants in his many filings. All those allegations may or may not be true. Nevertheless, the plaintiff argues that, although he did take company documents with him, "[a]ny company documents that remained in his personal possession at the time he was terminated had been authored, received, accessed, and/or reviewed by him in the ordinary course of his position within the company and with the full authorization of CVS." [Dkt. #262, at 10]. Fair enough, but one wonders if that's how it works when someone leaves one of the plaintiff's attorney's law firms.

(continued...)

something that cannot be put aside at this stage, even though the decorum demanded by the Rules and uniform judicial opinions require a different approach.

So, what is to be done? Not surprisingly, the plaintiff says that finding the defendants have waived the privilege as to *all 20,790* documents is the only practical option. The plaintiff explains that he:

> served the discovery requests at issue as long as 15 months ago; the discovery cutoff has passed; and Defendants already had three opportunities to provide a sufficient privilege log. The size of Defendants' privilege log, the pervasiveness of its errors, the leisurely pace of Defendants' production and revision of the log, and their inability or refusal to correct all of the identified errors means that any process of correction would take many months, likely followed by more motions if and when Plaintiffs finally receive enough information to evaluate Defendants' claims of privilege.

[Dkt. #234, at 14-15].

All that is true; but we have already discussed the plaintiff's rather one-sided take on timeliness. The size of the "privilege log," of course, is, in part, an inevitable product of the plaintiff having filed a prolix, 180-page, 828-paragraph Complaint. The pace of discovery is, in part, a product of the plaintiff serving so many sets of document requests. And, if four or five chances is too many to get a 1,859-page, 20,790-entry privilege log right, how many chances should one get at putting together a 161-page, 828-paragraph Complaint? Plaintiff is on his fourth try [Dkt. ## 67-

---

[11](...continued)
The plaintiff then adds that the allegation is not legally correct because, as a whistleblower, he is immune from civil and criminal liability for misappropriation or disclosure of such company materials under 18 U.S.C. § 1833(b)(1). Immunity, however, does not erase the deed, it erases liability for the deed. Perhaps he took the materials for a good cause, and perhaps one day, that will be proven, but as of now, it looks like that day is a long way off. But, until then, should the court have to refer to what plaintiff did when he was terminated, it will explicitly frame it as defendants' allegation, or endeavor to come up with a viable shorthand for the mouthful that would be "the plaintiff took company materials in violation of his employment agreement secure in the knowledge that he would be immune from civil or criminal liability for doing so as a result of whistleblower status."

69], and there remain extensive disputes about the quality of that as well. [Dkt. ##78, 86, 87, 187, 199].

Both sides need to be reasonable – as the rules require. It seems unlikely (to say the least) that all 20,790 entries (or even a majority) in the defendants' privilege log properly qualify as privileged. And the plaintiff is correct that, even a brief consideration leads to the conclusion that many of the privilege log entries leave something to be desired. Right off the bat, there are a lot of blank spaces where information should be, even though Rule 26(b)(5)(A)(ii) requires that the party withholding documents "*describe* the nature of the documents . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." (Emphasis supplied). Blank spaces do not describe anything.

It bears repeating that the privilege is always construed narrowly, and the burden is always on the party seeking to invoke the privilege to establish that it applies. That means the party invoking privilege has to establish all the elements of the privilege on a document-by-document basis. *See, e.g., United States v. BDO Seidman*, 337 F.3d 802, 810–11 (7th Cir. 2003); *In re Grand Jury Proceedings (Thullen)*, 220 F.3d 568, 571 (7th Cir. 2000); *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997); *United States v. White*, 950 F.2d 426, 430 (7th Cir.1991). The plaintiff points out a number of entries that are wanting, but as the parties seem dead set on having someone from outside their group – which is far more familiar with their case and its facts and its players than an "outsider" could ever hope to be – resolve their dispute, here's the perspective of an outsider on just one entry of the 20,790.

There is a document indexed as "CTRL03458481." Here is all we know about that document: We are told the document is a "Spreadsheet prepared at the direction of counsel regarding

15

specialty operations," and that it is dated May 31, 2006. We know its author was a Melissa Rabin. Presumably she works at CVS, or maybe she had worked at Coram, but we don't know who she is or what she does, other than create spreadsheets regarding "specialty operations." *Cf. United States ex rel. McGee v. IBM Corp.*, No. 11 C 3482, 2017 WL 1232616, at *2 (N.D. Ill. Apr. 4, 2017)(But a claimant "must produce a privilege log that identifies the capacities of each author and recipient at the time the document was composed and distributed."). Those sound like documents that would be prepared in the ordinary course of business. What is it about "specialty operations" – whatever those are – that takes a spreadsheet out of the realm of ordinary business documents and into the realm of confidential communications made to obtain legal advice? Perhaps the spreadsheet is filled with confidential information that will serve as a basis for legal advice back from an attorney.

But, there is no recipient list for the spreadsheet. So, how is it even a "communication"? The privilege protects only *communications* made in confidence by a client and a client's employees to an attorney acting as an attorney, for the purpose of obtaining legal advice. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010); *BDO Seidman*, 492 F.3d at 815.[12] Yet, the defendant claims the document is "privileged" and the privilege type is "attorney."

Then there is a column called "Attorney Names." The defendants clearly think this column – which they had not bothered with in their earlier logs [Dkt. #250, at 4] – is a breathtaking

---

[12] There are well over 3,000 entries that are neither authored by or addressed to attorneys that the defendants say "reflect[] a request for legal advice." The problem here is that the mere fact of consultation, the mere fact of asking for advice, is not privileged. *See, e.g., Barr v. Ewing*, 774 F. App'x 547, 551 (11th Cir. 2019); *Howell v. Jones*, 516 F.2d 53, 58 (5th Cir.1975); *In re Grand Jury Proc.-Gordon*, 722 F.2d 303, 308 (6th Cir. 1983); *Club Gene & Georgetti, LP v. XL Ins. Am., Inc*., No. 20 C 652, 2021 WL 1239197, at *5 n.1 (N.D. Ill. Apr. 2, 2021); *Jankowski v. Dean Foods Co.*, No. 16 C 50103, 2019 WL 12528767, at *7 (N.D. Ill. Sept. 19, 2019); *Beraha v. Baxter Healthcare Corp*., No. 88 C 9898, 1994 WL 494654, at *3 (N.D. Ill. Sept. 6, 1994); *Nat'l Union Fire Ins. Co. v. Cont'l Illinois Grp*., No. 85 C 7080, 1988 WL 79521, at *2 (N.D. Ill. July 22, 1988).

innovation over their previous efforts. [Dkt. #250, at 8-9]. We are given the name of an attorney, Sara Finley. Who is she, in-house counsel perhaps? We don't know. She is not a recipient; so whatever the specialty operations spreadsheet is, it looks like she never saw it. So, how would it have anything to do with legal advice?[13] That's it – aside from some information that is utterly useless to this exercise such as "May Repository Final (2).xls" and "XLS", which fall under the headings of "Filename" and "File Extension."

Again, in relation to the parties and their attorneys, the court has very little information to apply to this dispute.[14] In order to determine if the document is privileged, an outsider would need more information – more context. Are defendants seriously claiming that if an employee puts together a spreadsheet and then stows it in his or her desk or computer, and doesn't send it to anyone, let alone any lawyers, that it's a privileged document? Surely not.

---

[13] Perhaps the attorney told the employee to compile the spreadsheet about specialty operations for some legal reason, but that sounds like a compilation of data, not a communication revealing legal advice. Indeed, possibly, it would seem more in the realm of work product, if prepared in anticipation of litigation, than attorney-client privilege. *See, e.g., In re: Fluidmaster, Inc.*, No. 1:14-CV-05696, 2016 WL 6599947, at *16 (N.D. Ill. Nov. 8, 2016)(documents prepared at the direction of counsel re: strategies protected by work product doctrine); *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2010 WL 4622527, at *8 (N.D. Ill. Nov. 4, 2010)(same). But that's not a claim the defendants even make, let alone support.

[14] There are, for example, over 7,000 entries the defendants tersely describe as "reflecting legal advice." By way of contrast, the defendants describe a number of other documents as "reflecting and discussing legal advice" (69 entries), "providing legal advice" (501 entries), or "forwarding legal advice" (271 entries), so one might arguably assume that the "reflecting legal advice" don't necessarily reveal any legal advice or confidential information. But, in any event, time and again, courts – which, again, an never possess the intimate familiarity of the background of the documents the parties have – reject description like "reflecting legal advice" as vague and generic. *See, e.g., Motorola Sols., Inc. v. Hytera Commc'ns Corp*, No. 17 C 1973, 2018 WL 1281393, at *1 (N.D. Ill. Jan. 10, 2018); *RBS Citizens*, 291 F.R.D. at 218; *Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 WL 3624084, at *1 (N.D. Ill. Aug. 23, 2017); *Surgery Ctr. at 900 N. Michigan Ave., LLC v. Am. Physicians Assurance Corp., Inc.*, 317 F.R.D. 620, 633 (N.D. Ill. 2016).

As unlikely it is that all of the 20,790 documents are privileged, it's just as unlikely that none of the documents are privileged, which is the result the plaintiff is looking for.[15] This case concerns an area that is, for lack of a better phrase, a regulatory nightmare. And if "nightmare" seems a bit harsh, how about "byzantine" or "labyrinthine"? *United States v. Corp. Mgmt., Inc.*, 78 F.4th 727, 738 (5th Cir. 2023); *United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020); *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 349 (D.C. Cir. 1987). Or a "mammoth bureaucracy," *Almy v. Sebelius*, 679 F.3d 297, 310 (4th Cir. 2012), that is "notoriously complex"? *MSPA Claims 1, LLC v. Tower Hill Prime Ins. Co.*, 43 F.4th 1259, 1260 (11th Cir. 2022); *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1240 (11th Cir. 2016) (Pryor, J., dissenting). The very people for whom Congress designed the system tend to "perceive it an unfeeling bureaucracy stuffed with arcane rules and impossible-to-determine requirements." *Univ. of Chicago Med. Ctr. v. Sebelius*, 56 F. Supp. 3d 916, 925 (N.D. Ill. 2014). Is it any wonder that for every 50 documents the defendants produced, 2 might have to do with legal advice and be privileged? Under all the circumstances presented here at this point, the court cannot apply a blanket waiver to every document listed in the defendants' privilege log.

## CONCLUSION

So, the plaintiff's motion to compel the defendants to produce all 20,790 documents on their privilege log [Dkt.#235] is denied at this time for the reasons discussed above. The defendants' privilege log is faulty on several levels, most of which have been pointed out by the plaintiff, and that "log" suggests that the defendants might be applying an overly-inclusive concept of what is

---

[15] Along these lines if, after a lengthy government investigation and about two years of additional discovery resulting in the production of about a half a million documents, the plaintiff is still rather desperate for another 20,790 documents, one might begin to wonder, at least a bit, about the plaintiff's case.

properly protected by the attorney-client privilege. And, if a decision is to be made that the privilege applies to each of 20,790 documents for which privilege is asserted, more information and context than appears on this record will be needed. As such, the "privilege log" involved in this case needs to be revamped, and the parties need to have more than a single meeting regarding their differences over the "privilege log," as indicated earlier in this Opinion. And those meetings must be conducted *in good faith* as required by Local Rule 37.2. A rote statement that the Rule has been complied with is not enough. *See, e.g., Gunn v. Stevens Security & Training Servs., Inc.*, 2018 WL 1737518, at *3 (N.D. Ill. 2018); *Chicago Reg. Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D. Ill. 2018); *Infowhyse GmbH v. Fleetwood Grp.*, 2016 WL 4063168, at *1 (N.D. Ill. 2016)("... adamantly clinging to the positions with which they began" amounts to a failure "to comply, in good faith, with the requirements of Local Rule 37.2.").

      The court, of course, is aware that it is unlikely that the plaintiff is going to be satisfied with another revised log. That is just the nature of this case. Consequently, the plaintiff will, no doubt, follow through on the threat – or promise [Dkt. #236, at 15] – to file more post-discovery motions once the log is revised. Accordingly, when the parties are meeting as the Local Rules require – and perhaps more than just once this time – they should carefully consider how the present dispute might ultimately and *reasonably* be resolved. The parties – especially the plaintiff, who seems most concerned with time [Dkt. #236, at 14-15] – need to be reasonable[16] and take note of the difference between a dozen attorneys, supported by staffs from two or three law firms, and the extremely limited resources of this or any court. An *in camera* review of 20,000 documents to determine

---

[16] I do not mean to suggest that the lawyers in this dispute are deliberately being unreasonable. Just that they may need to take a step back from their zealous advocacy and to look at things from a truly objective perspective.

19

privilege would be extraordinarily time consuming – to say the least – and would significantly affect the effort and amount of time owed to other litigants and cases on the court's docket. The process of reviewing the tremendous amount of documents involved in the present dispute and ruling on each one would likely take this case well into 2025. Even if review and consideration of the privilege claim as to each document took just five minutes, [Dkt. #262, at 6], which is probably a flight of fancy, that would mean review and consideration of the entire privilege log would take over 200 days. And that is assuming that the court had no other cases on its docket and was doing nothing else, such as resolving *other* disputes from these *same* two parties in this *very* case. Obviously, that is not an appropriate solution to the problem.

Obviously, the court cannot and should not cease all judicial activity in connection with the many other cases vying for judicial attention. Resolution of the parties' controversy cannot ignore these inescapable facts. Should the parties continue to find themselves unable to negotiate toward a substantial resolution of the current problem, they and the court should look to fashion a creative method for resolving the conflict that will at once be consistent with the court's obligations to the parties in the instant case as well as to other litigants "patiently waiting in the queue for the limited time of federal judges."*Channell v. Citicorp Nat. Servs., Inc.*, 89 F.3d 379, 386 (7th Cir. 1996). The parties shall report on their efforts, progress, and ideas at a hearing on February 9, 2024, and we can discuss how best to proceed.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/2/24