## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* MICHAEL GILL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 18-cv-6494 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CVS HEALTH CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Michael Gill brought this *qui tam* suit against CVS Health Corporation and related entities about their pharmacy business practices. Gill brings a sweeping complaint about five alleged schemes to take money from the government. He seeks to recover taxpayer dollars under the False Claims Act and related state statutes. He also alleges retaliation by his employer after he raised concerns and refused to go along with improper business practices.

Defendants, in turn, moved to dismiss. For the reasons stated below, the motion to dismiss is granted in part and denied in part.

### Background

At the motion to dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *See Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

*The Parties*

The Court will begin by introducing the cast of characters on the defense side. The case is against CVS Health Corporation and several of its subsidiaries. *See* Third Am. Cplt., at ¶¶ 17–23 (Dckt. No. 67). All of them are in the drug-dispensing business. *Id.* at ¶ 24.

Defendant CVS Health Corporation ("CVS Health") is a pharmacy services health care provider. *Id.* at ¶ 17. It's the parent company. It dispenses prescription drugs through its various subsidiaries. *Id.* at ¶ 24. All of the co-defendants are CVS Health's subsidiaries.

Defendant CVS Pharmacy, Inc. is the largest retail pharmacy in the United States. *Id.* at ¶ 18.

Defendant ProCare Pharmacy, LLC provides "specialty" pharmacy services. *Id.* at ¶ 19. Specialty pharmacies provide specialized medications. *Id.*

Defendants Caremark Rx and CaremarkPCS Health, LLC (collectively, "Caremark") are pharmacy benefit manager services companies. *Id.* at ¶ 20. They process prescription drug claims. *Id.*

Defendant Coram is one of the nation's largest providers of home infusion care. *Id.* at ¶ 21. Infusion care delivers treatment through needles or catheters. *Id.*

Defendant Coram Alternate Site Services enters into referral agreements with hospitals for Coram's infusion services. *Id.* at ¶ 22.

Finally, Defendant Omnicare provides pharmacy services to long-term care facilities, penal institutions, and government facilities. *Id.* at ¶ 23.

Relator Michael Gill is on the other side of the case. He worked for CVS Health and Caremark Rx for more than 25 years. *Id.* at 1. Gill wore a series of compliance-related hats during his long tenure.

Gill's time with the pharmacy giant came to an end in 2018. *Id.* at ¶ 16. He resigned after enduring months of "intolerable" working conditions. *Id.*

***The Alleged Conduct***

The complaint alleges that CVS and its subsidiaries engaged in five separate schemes "to steal taxpayer funds in violation of False Claims Acts." *Id.* at ¶ 1.

The first scheme is about overpayments. The second scheme is about excluded medical providers (*i.e.*, banned doctors). The third scheme is about copay cards. The fourth scheme is about Coram's FOCUS Care program. The fifth and final scheme is about shipping prescriptions from out of state without a license.

The Court will summarize each scheme below.

## I.     The Failure to Return Overpayments (Scheme #1)

The first scheme involved CVS Health's and Coram's receipt of millions of dollars in "overpayments and potential overpayments" as income. *Id.* at ¶ 50. As the name reveals, an overpayment occurs when a payor pays too much. *Id.* at ¶ 51.

Typically, a provider must return the overpaid amount to the payor, or escheat the money to the state. *Id.* at ¶¶ 52–53. For context, under many state escheatment laws, if the original payor does not claim their property, businesses must return that unclaimed property to the state, including a customer's overpayments. *Id.* at ¶ 48. The money goes to the state of the last known address of the creditor, or, in some cases, the debtor's state of incorporation. *Id.*

Gill alleges that Defendants didn't follow the rules. Instead, Defendants pocketed $200 million of overpayments. *Id.* at ¶ 50.

The $200 million came from government and commercial payors. *Id.* Government payors accounted for one third of the overpayments. *Id.* The rest came from commercial payors. *Id.*

### A.      CVS Acquires Coram

The story about overpayments begins in 2013. *Id.* at ¶ 58. At the time, CVS was still considering acquiring Coram. *Id.* CVS hired Deloitte to conduct a due-diligence investigation. *Id.*

Deloitte prepared a report with its findings. *Id.* The report identified $98 million in "credit balances" that Coram improperly recognized as income between 2011 and June 2013. *Id.* at ¶ 59.

According to the complaint, a "credit balance" is a euphemism for an overpayment. *See id.* at ¶ 65. And recognizing balances as "income" means counting the cash as your own.

Putting those things together, Deloitte's report revealed that Coram had pocketed overpayments from its customers. *Id.* at ¶ 61 (quoting Deloitte Report, at 83 (Dckt. No. 67-1, at 15 of 150)).

The report also identified $42.3 million sitting in Coram's suspense account. *Id.* at ¶ 60. The funds in that account allegedly included overpayments. *Id.* Like the other credit balances, Coram eventually took the money to income. *Id.*

The findings raised some eyebrows at Deloitte. The firm recommended more due diligence. *Id.* at ¶ 64. Specifically, Deloitte suggested that CVS dig into Coram's "[t]reatment of credit balances in accounts receivable related to Medicare and Medicaid." *Id.* at ¶ 63 (quoting Deloitte Report, at 181 (Dckt. No. 67-1, at 19 of 150)).

The complaint alleges that these overpayments accrued in the first place because Coram had unsavory billing practices. *Id.* at ¶ 66. The complaint identifies a few problematic procedures.

For example, Coram generated overpayments by double-billing services. *Id.* at ¶ 69. To hide the double billing, Coram entered slightly different information when it billed the second, duplicate claim (such as a different date of service) so payors wouldn't notice the redundancy. *Id.*

Eventually, CVS acquired Coram. *Id.* at ¶ 73. Executives from both companies met to discuss Coram's overpayment practices. *Id.* Gill attended the meeting. *Id.*

The executives discussed the Deloitte report. *Id.* at ¶ 76. Specifically, CVS management highlighted Coram's policy of "sweep[ing]" credit balances to income. *Id.* at ¶ 77. They also discussed Coram's failure to identify certain payors as government payors, its failure to adequately notify government and commercial payors of potential overpayments, and its failure to implement and consistently follow adequate billing policies. *Id.* In other words, management talked about the bad billing practices.

The executives also discussed Coram's failure to escheat non-government overpayments to state entities, as required by state law. *Id.* at ¶ 80.

Coram's poor bookkeeping made escheatment difficult. *Id.* at ¶ 116. Simply put, Coram didn't do a good job keeping records. *Id.* For example, Coram neglected to update its software system. The old system led to incomplete records. *Id.* at ¶¶ 116, 120. Coram's software could not connect a credit balance to a specific invoice. *Id.* at ¶ 120.

Coram's inadequate record-keeping allegedly resulted in a failure to properly escheat millions of dollars in commercial overpayments to the state of Delaware. *Id.* at ¶ 124.

According to the complaint, CVS and Coram should have escheated "tens of millions of dollars" in commercial overpayments. *Id.* at ¶ 125. Instead, the company pocketed the money. *Id.*

Even before CVS acquired Coram, CVS executives discussed how to handle the overpayments. *Id.* at ¶ 87. Executives worried about how various approaches would affect the bottom line. *Id.* "[H]istorical remediation" – meaning sending the money to where it should go – would cut into earnings. *Id.* Meanwhile, ignoring the overpayments would preserve the status quo and maintain the bottom line. *Id.*

After the acquisition, CVS executives decided not to refund the money. *Id.* at ¶ 89. They elected to keep the $98 million in overpayments that Coram had recorded as income. *Id.* In other words, they decided to reap the profits sowed by Coram's deficient practices.

At that point, Gill was a CVS compliance director. He raised the overpayment issue with a CVS executive in 2016. *Id.* at ¶ 93. He was rebuffed. *Id.* The executive told him that CVS senior management had decided not to "revisit" the issue of the overpayments. *Id.*

According to the complaint, the overpayments boosted profits. In the first quarter of 2016, CVS reported adjusted earnings per share $0.01 above guidance range, meaning the company's public estimate of its earnings expectations. *Id.* at ¶ 101. The company (barely) exceeded expectations because it swept its overpayments under the rug. *Id.* at ¶¶ 100–02.

The complaint suggests that CVS might have kept the overpayments as a last-ditch effort to meet Wall Street expectations. According to Gill, if CVS did not record the overpayments as income, CVS would have missed the guidance range for its adjusted earnings. *Id.* at ¶ 102. The stock price might have dropped. *Id.*

### B.      Other Defendants

According to the complaint, Coram was not the only entity in the CVS corporate family to improperly retain overpayments.  *Id.* at ¶ 127.  Two other CVS subsidiaries – CVS Specialty and Omnicare Advanced Care Scripts – also allegedly failed to return government payments.  *Id.*

That's the long and the short of the first scheme.  The main point is that it involved CVS companies receiving overpayments, and keeping the money.

## II.      The Processing of Prescriptions from Excluded Providers (Scheme #2)

The second scheme involved CVS processing prescriptions written by doctors barred from government healthcare programs.  *Id.* at ¶¶ 137–73.

The federal government bars certain doctors from participating in federal healthcare programs.  *See* 42 U.S.C. § 1320a-7(a).  For example, a doctor cannot write a prescription for a patient if the doctor has a criminal conviction for abusing another patient.  *Id.* at § 1320a-7(a)(2); *see also* Third Am. Cplt., at ¶ 139 (Dckt. No. 67).  State healthcare programs often won't pay, either.  *See* Third Am. Cplt., at ¶ 138.

Within the United States Department of Health and Human Services, the Office of Inspector General maintains a list of banned doctors.  *Id.* at ¶ 140.  Think of it as a "no-fly" list.  Thirty-seven states, along with the District of Columbia, also issue excluded prescriber lists.  *Id.*

According to the complaint, the pharmaceutical industry knows that compliance with the lists creates extra work for them.  Pharmacies "that submit claims to government healthcare programs must screen prescribers to avoid liability for submitting improper claims."  *Id.* at ¶ 141.  For example, the guidance from the Office of Inspector General instructs pharmacies to "screen prescriptions at the point of service to ensure the prescriber is not excluded."  *Id.* (cleaned up).

The complaint alleges that Defendants should have been well aware of the rules. Since 2014, CVS and its subsidiaries have operated under a Corporate Integrity Agreement with the Office of Inspector General. *Id.* at ¶ 142. The agreement states that the companies "cannot bill government healthcare programs for prescriptions from excluded prescribers." *Id.* Omnicare has operated under a similar agreement since 2009. *Id.* at ¶ 143.

The complaint sketches out how the industry generally handles the obligation to screen the providers. For the most part, excluded-provider screening is automated. *Id.* at ¶ 144. Software does the work. *Id.*

Pharmacists rely on computer alerts to avoid filling prescriptions from barred doctors. *Id.* In other words, if the computer system doesn't raise an alarm, the pharmacist will fill the prescription. *Id.*

CVS Retail Pharmacy, Omnicare, and Coram allegedly didn't have this software to screen for state-excluded providers. *Id.* at ¶ 145. For a long time, they didn't have a net to catch the bad doctors.

CVS Pharmacy put up a little net in July 2016. Specifically, the company implemented a screening mechanism to identify excluded prescribers on New York's list. *Id.* at ¶ 147.

Gill emailed his supervisor and explained that the net was too small. *Id.* at ¶ 149. He warned that the company needed to screen against the lists from other states, too. *Id.* at ¶ 151. The company ignored the warning. *Id.*

CVS Retail also allegedly ignored another type of list: the State Controlled Substance Registration. *Id.* at ¶ 146. Prescribers who are not active on the list cannot legally prescribe controlled substances. *Id.* But CVS Retail didn't check to see if the doctors writing the prescriptions were on the list. *Id.*

Similar problems existed at Omnicare.  When CVS acquired Omnicare in 2015, it discovered that Omnicare didn't have a screening system for excluded prescribers.  *Id.* at ¶ 153.

Omnicare wasn't performing another search, either.  It wasn't validating that a prescribing doctor had a proper state license number or Drug Enforcement Agency prescribing authority.  *Id.* at ¶ 154.

CVS uncovered a similar problem with the Coram acquisition.  After CVS purchased Coram, it discovered that Coram also didn't have a way to catch claims from excluded providers.  *Id.* at ¶ 157.

The complaint makes similar allegations against CVS Caremark Pharmacy Benefit Manager.  *Id.* at ¶ 162.  Due to faulty software, CVS PBM failed to reject claims for prescriptions ordered by excluded providers.  *Id.*  The software glitch extended from 2014 to 2017.  *Id.*

After identifying the glitch, CVS discovered that it had improperly processed over 15,000 Medicare claims.  *Id.* at ¶ 164.  CVS issued some refunds.  *Id.*

But the refunds didn't remedy the whole problem.  *Id.* at ¶¶ 164–65.  CVS allegedly identified improper payments from managed Medicaid payors.  *Id.* at ¶ 165.  (More on that later.)  For now, it is enough to say that the company decided *not* to authorize those refunds.  *Id.*

## III.    The Copay Cards (Scheme #3)

The third scheme involved something called copay cards.  *Id.* at ¶ 5.

Copay cards are forms of "direct support" that drug manufacturers offer insured patients.  The cards "reduce or eliminate" the patient's "out-of-pocket costs" for certain prescription medications.  *Id.* at ¶ 174.

Think of them as "coupons." *Id.* For example, Pfizer might offer a copay card so a patient can buy a Pfizer drug for less money than he otherwise would have paid.

In 2014, copay cards were trending. But the Office of Inspector General issued a bulletin warning about the legal risks. According to the bulletin, copay cards "constitute remuneration offered to consumers to induce the purchase of specific items." *Id.* at ¶ 179. The anti-kickback statute criminalizes certain forms of remuneration.

The bulletin focused on manufacturers. *Id.* at ¶ 180. It explained that most manufacturers had implemented electronic methods to "prevent copay cards from being used for federally funded prescriptions." *Id.* at ¶ 181. The shield was meant to ward off anti-kickback statute liability. *Id.*

Although the bulletin focused on manufacturers, it referenced pharmacies, too. *Id.* at ¶ 180. The bulletin declared that "[p]harmacies that accept manufacturer coupons for copayments owed by Federal health care program beneficiaries" "may be subject to sanctions under the anti-kickback statute." *Id.*

The complaint alleges that CVS Specialty and CVS Retail Pharmacies got themselves into hot water with the copay cards. Allegedly, they improperly accepted copay cards for government healthcare beneficiaries. *Id.* at ¶ 184. According to the complaint, the pharmacies "failed to implement screening or other adequate safeguards to prevent the unlawful use of copay cards on government programs." *Id.* at ¶ 183.

In sum, the complaint accuses the pharmacies of failing to implement software that would prevent the improper claims, so CVS could reap "substantial profits." *Id.* at ¶ 229.

## IV.    Coram's FOCUS Care Program (Scheme #4)

The fourth scheme involved Coram's "FOCUS Care" program. *Id.* at ¶ 6.

10

Remember, Coram provides infusion therapy. *Id.* at ¶ 233. Infusion therapy administers medication through a needle or catheter. *Id.* A patient's physician prescribes infusion therapy, and it can be administered in a hospital, a clinic, or at home. *Id.* at ¶¶ 233–34.

When a hospital provides infusion services, it typically bills a patient's insurer. *Id.* at ¶ 235. But sometimes a patient who needs infusion therapy doesn't have insurance. *Id.* And sometimes a hospital assumes an obligation to *treat* an uninsured patient (and pay for that treatment). *Id.* at ¶ 236. Possible motivations include a need to comply with state law, a sense of civic duty, or a commitment to the hospital's own institutional principles. *Id.*

For "[h]ospitals that admit uninsured patients who need infusion therapy as part of their treatment," it is often cheaper to pay a third party to provide the care at the patient's home, as opposed to administering treatment in the hospital. *Id.* at ¶ 237.

Coram is one of those third parties.

According to the complaint, Coram recognized that shouldering hospitals' burdens to pay for the infusion services of indigent patients could be a lucrative business opportunity. *Id.* at ¶ 240. Coram offered free infusion therapy services to hospitals' indigent patients. *Id.* at ¶ 241. In exchange, the hospitals referred patients *with* insurance to Coram. *Id.*

Coram memorialized the *quid pro quo* arrangements with various hospitals in "Infusion Services Coordinator" agreements, called "ISC agreements." *Id.* at ¶ 242. Coram pushed the agreements as part of its "FOCUS Care program." *Id.*

Here's the *quid*: Coram provided a certain amount of free infusion care for indigent patients discharged from the signatory hospital. *Id.* at ¶¶ 243–44.

Here's the *quo*:  the hospitals referred as many insured patients as possible to Coram.  *Id.* at ¶ 246.  The agreement envisioned that a hospital would send Coram at least 95% of its patients that were prescribed home-infusion care.  *Id.* at ¶ 247.

The FOCUS Care ISC agreements raised some eyebrows internally at Coram.  *Id.* at ¶ 260.  Some "Coram employees were concerned about the legality of the FOCUS Care program."  *Id.*

For example, a Coram Senior Vice President of Compliance reported the issue to Gill.  *Id.*  Gill passed along the concern to the CVS Risk Assessment team.  *Id.*  The Risk Assessment team identified FOCUS Care as a "high compliance risk."  *Id.* at ¶ 261.

CVS allegedly hired outside counsel to review the agreements.  *Id.*  But Gill and the CVS Risk Assessment team never learned what outside counsel had advised.  *Id.* at ¶ 262.

Undeterred, Coram continued with its FOCUS Care program.  It treated uninsured patients in exchange for referrals for government healthcare beneficiaries.  *Id.*  It "submitted claims for payment" to the United States "as a result of" those referrals.  *Id.* at ¶ 264.

## V.     Unlicensed Pharmacy Shipments from Out of State (Scheme #5)

The fifth and final scheme involves the shipment of prescriptions across state lines.  *See id.* at ¶¶ 265–94.

Most states require an out-of-state pharmacy to obtain a license before shipping prescriptions into the state.  *Id.* at ¶ 267.  The complaint alleges that CVS Specialty Pharmacies "have shipped tens of thousands of prescriptions across state lines" without a proper nonresident license.  *Id.* at ¶ 265.

In 2009, CVS shuttered one-third of its specialty pharmacies. *Id.* at ¶ 271. The surviving pharmacies absorbed the business of newly closed pharmacies. *Id.* at ¶ 272. But some states were left without a specialty pharmacy within their borders. *Id.* at ¶¶ 271–72.

The business consolidation created a problem. Some CVS Specialty Pharmacies started "shipping prescription drugs into a state where the pharmacy was *not* licensed to practice pharmacy." *Id.* at ¶ 273 (emphasis added).

The unlicensed shipping eventually caught up with CVS. *Id.* at ¶ 274. In July 2011, the Maine Board of Pharmacy issued a Consent Agreement and put a CVS pharmacy in Indiana on probation. *Id.*

CVS's corporate integrity agreement with the Office of Inspector General required CVS to disclose the issue. *Id.* at ¶ 275. In September 2011, CVS sent a letter to OIG about the issue. *Id.*

Later, CVS internally "identified *thousands* of shipments of prescription drugs from CVS Specialty Pharmacies into states in which the shipping pharmacy did not have the required non-resident license." *Id.* at ¶ 276 (emphasis added). Those unlicensed shipments included drugs paid for by government healthcare programs. *Id.*

According to the complaint, CVS knew the scale of the problem. *Id.* at ¶ 281. But CVS attempted to minimize the problem, "fraudulently misle[ading]" the OIG about "the extent and breadth of the problem." *Id.*

For example, CVS sent a second letter to the OIG in October 2011. *Id.* at ¶ 282. The letter responded to a few questions that the OIG had asked. *Id.* In the letter, CVS told the government that the violations were "isolated" transactions. *Id.*

According to the complaint, CVS's statement was "grossly misleading" in light of the "internal reporting identifying thousands of improper claims." *Id.* at ¶ 289.

\*       \*       \*

In sum, the complaint at hand alleges that the CVS corporate family engaged in five schemes. The first scheme involved a failure to return overpayments. The second scheme involved processing prescriptions from excluded providers, meaning banned doctors. The third scheme involved copay cards. The fourth scheme involved Coram's FOCUS Care Program. And the fifth scheme involved unlicensed shipments of prescriptions across state lines.

## VI.    CVS's Retaliation and Gill's Constructive Discharge

The five schemes consume a lot of the real estate of the bulky complaint. But not all of it. The complaint also alleges that CVS retaliated against Gill when he raised questions and refused to go along with improper business practices.

Gill alleges that his career at CVS was smooth sailing for a long time. *Id.* at ¶ 307. But after he began "investigating and organizing" information for this federal lawsuit, he hit rough waters. *Id.* at ¶ 296. His working conditions "severely deteriorated." *Id.*

The company asked Gill "to perform unethical acts," "assigned sham investigations," and gave him projects that were "deliberately outside his scope of expertise." *Id.* at ¶ 297. The company isolated him. *Id.*

For example, in September 2017, Gill's supervisors asked him to mislead New Hampshire state officials about an investigation that the state was conducting. *Id.* at ¶ 298. Gill refused. *Id.* In response, Gill's supervisors pressured him to use other misleading "talking points." *Id.*

14

About a year later, Gill communicated his worries about CVS Retail Pharmacy billing practices. *Id.* at ¶ 299. Nobody listened to him. *Id.* Then, things got "steadily worse." *Id.* at ¶ 300.

The "last straw" happened in May 2018. *Id.* CVS assigned Gill to oversee a "sham investigation" into ethics complaints involving Medicare Part D fraud. *Id.*

Gill says that CVS put the investigation on his plate "because he was *unfamiliar* with the particular issues involved." *Id.* at ¶ 301 (emphasis added). In other words, Gill says that the company thought that a clueless investigator would be a useless investigator – and it wanted things that way. *Id.*

Gill told his supervisors that he could not lead the investigation. *Id.* at ¶ 305. He wanted to avoid déjà vu. *Id.*

Apparently, CVS had previously assigned Gill to a different Medicare Part D investigation. *Id.* at ¶ 302. Gill's supervisors "misrepresented" his final report. *Id.* at ¶ 303. The supervisors depicted Gill's report as uncovering "no evidence" of fraud – even though the report said no such thing. *Id.*

At the time, Gill's supervisor gave Gill some advice, so to speak. He delivered the following message: "We can't control what comes in, but we can control what comes out." *Id.* at ¶ 304. Gill understood the message to mean that CVS's compliance team could stack the deck. It could control investigations to reach the "desired" outcome. *Id.*

Gill didn't want to participate in a second "sham" investigation. *Id.* at ¶ 305. He resigned in June 2018. *Id.* at ¶¶ 295, 305.

## VII.    Procedural History

About three months after leaving CVS, Gill brought this lawsuit.  *See* Cplt. (Dckt. No. 1).
He filed a complaint as a relator for the United States, 29 states, and the District of Columbia.
*Id.*

Gill later amended his complaint twice.  *See* Am. Cplt. (Dckt. No. 13); Second Am. Cplt.
(Dckt. No. 30).  The United States declined to intervene.  *See* Notice of Election to Decline
Intervention (Dckt. No. 31).  The Plaintiff States (and the District of Columbia) also declined.
*See* Notice of Plaintiff States' Election to Decline Intervention (Dckt. No. 35).  But the State of
Delaware intervened.  *See* 8/2/22 Order (Dckt. No. 81).

In 2022, the case was reassigned to this Court.  *See* 2/25/22 Order (Dckt. No. 33).  After
reassignment, Gill amended his complaint a third time.  *See* Third Am. Cplt. (Dckt. No. 67).

The third amended complaint weighs in at 183 pages.  The Federal Rules contemplate a
"short and plain" statement of the claim.  *See* Fed. R. Civ. P. 8.  Whatever "short" means,
183 pages isn't it.

The 183-page complaint includes 828 paragraphs.  That's a lot of ground for even the
most intrepid reader.  The first 309 paragraphs cover the facts.  Paragraphs 310 to 828 cover the
individual counts.

The complaint includes a whopping 41 counts.  *Id.*   The first count involves the federal
False Claims Act.  *Id.* at ¶¶ 310–22.  The allegations of the count are fairly generic, and they rely
heavily on the preceding 309 paragraphs.  Most of the claim is about submitting false claims to
the government.  But part of the claim also alleges unlawful employment retaliation, too.  *Id.* at
¶ 322.

The other 40 counts fall under state law. Counts 2 through 39 bring claims under various state false claims acts and fraud statutes. *Id.* at ¶¶ 323–814. Counts 40 and 41 address Gill's employment. *Id.* at ¶¶ 815–20. They allege retaliatory discharge under Illinois common law and the Illinois Whistleblower Act. *Id.*

Defendants moved to dismiss. *See* Defs.' Mtn. to Dismiss (Dckt. No. 78). They challenge each and every claim.

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

The False Claims Act "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *See United States ex rel. Gross v. AIDS Rsch. All.-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005).

Rule 9(b) raises the bar for pleadings that allege fraud. Under Rule 9(b), a plaintiff who is "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." *See* Fed. R. Civ. P. 9(b).

"The plaintiff must describe the 'who, what, when, where, and how' of the fraud – 'the first paragraph of any newspaper story.'" *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). That said, "courts and litigants should not take an overly rigid view of the formulation." *See United States ex rel. Prose v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 739 (7th Cir. 2021) (cleaned up).

The particularity requirement aims to "discourage a 'sue first, ask questions later' philosophy." *See Heard v. Trax Recs., Inc.*, 2021 WL 3077668, at *3 (N.D. Ill. 2021) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011)). The goal is to protect a defendant's reputation from harm, minimize "strike suits" and "fishing expeditions," and provide notice of the claim to the adverse party. *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994) (citation omitted); *see also United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021) ("This more rigorous pleading standard guards against the stigmatic injury that potentially results from allegations of fraud.") (cleaned up).

Rule 9(b) does carve out an exception for allegations about knowledge. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See* Fed. R. Civ. P. 9(b).

### Analysis

This case is a *qui tam* case, which is a mercifully short version of the phrase *qui tam pro domino rege quam pro se imposo sequitur*. In other words, "[he] who brings the action as well for the king as for himself." *See United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208, 1210 n.2 (7th Cir. 1995).

In a *qui tam* case, a private party brings a claim on the government's behalf. *See United States ex rel. Lu v. Ou*, 368 F.3d 773, 774 (7th Cir. 2004). That party is called a relator. If the case succeeds, the relator can get a sizeable slice of the recovery. *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 912 (7th Cir. 2009) (citing 31 U.S.C. § 3730(d)(1)–(2)).

The federal False Claims Act authorizes these *qui tam* suits. *See* 31 U.S.C. § 3730(b). Relator Gill filed suit under that statute, claiming that the CVS entities submitted false claims to the federal government. And he alleges the same thing under state statutes, too.

Defendants moved to dismiss each of the claims.

The Court will consider each of their challenges one by one. The first five sections (below) correspond with the five schemes. The sixth section is about Gill's retaliation claims.

## I. The Failure to Return Overpayments (Scheme #1)

The first scheme is about overpayments. Gill alleges that CVS and Coram unlawfully swept more than $200 million in overpayments and potential overpayments to income. *See* Third Am. Cplt. at ¶¶ 50–136 (Dckt. No. 67). In other words, they didn't send the money where they should have.

Gill asserts that this conduct violated the federal False Claims Act, the Delaware False Claims Act, and the False Claims Acts of other states. The Court will address the federal claim, and then the Delaware claim, and then the claims involving other states.

### A. Federal False Claims Act

Gill brings a claim under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act. The relevant statutory language is a bit of a mouthful. It forbids "knowingly conceal[ing] or knowingly and improper[ly] avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G).

19

Gill's overpayment theory is a so-called "reverse false claim." *See* Third Am. Cplt., at ¶ 315 (Dckt. No. 67). The concept is simple. It is called a "reverse false claim" because it involves someone not paying money *to* the government, instead of someone obtaining money *from* the government. Either way, the government comes out behind.

The idea is that someone can't wriggle out from their obligation to pay the government. The statute prohibits flouting financial obligations at the government's expense. *See, e.g.*, *Lanahan v. County of Cook*, 41 F.4th 854, 864 (7th Cir. 2022); *United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 44 F.4th 646, 657 (7th Cir. 2022); *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 835 (7th Cir. 2011).

To state a claim, a relator must plead that the defendant "possessed funds that rightfully *belonged to* the government." *See Lanahan*, 41 F.4th at 864 (emphasis added). This ingredient is essential. It is the flour that is needed to bake a reverse false claim. A defendant can't violate an obligation to pay the government if the defendant did not owe the money to the government in the first place.

According to Defendants, the complaint leaves out the ingredient. According to them, Gill does not state a federal FCA claim because the complaint does not allege that the federal government made unrefunded overpayments to Coram and CVS. *See* Defs.' Mem., at 8–9 (Dckt. No. 78-1).

Defendants dissect one sentence in Gill's complaint. *Id.* The sentence – as Defendants snip it – alleges only that Coram and CVS "took to income well in excess of $200 million worth of overpayments and potential overpayments." *Id.* at 8 (citing Third Am. Cplt., at ¶ 50 (Dckt. No. 67)). In other words, Defendants say that the sentence does not allege *who* overpaid.

But Defendants' brief omits part of the complaint's sentence. The complete sentence alleges that Coram and CVS "unlawfully took to income well in excess of $200 million worth of overpayments and potential overpayments . . . *from government and* commercial payers." *See* Third Am. Cplt., at ¶ 50 (Dckt. No. 67) (emphasis added). So the complaint actually does identify the payment source – the *government* (at least in part).

The complaint gets even more granular. "Government payors, including Medicare, Medicaid, TriCare, and the VA, accounted for approximately one third of the credit balances, and the remaining two-thirds were from commercial payors." *Id.*

The complaint also alleges that some of those overpayments went unrefunded. True, the complaint acknowledges that Defendants may have sent back *some* of the money. *Id.* at ¶¶ 95–96, 122. But "some" is not the same thing as "everything." The complaint alleges that the refunds were not comprehensive. Although "a small percentage of the overpayments were refunded to government payers, the vast majority was not." *Id.* at ¶ 95.

The complaint's allegation is clear: Coram and CVS didn't return all the money that they were obligated to return to the federal government. *See United States ex rel. Ortiz v. Mount Sinai Hosp.*, 2015 WL 7076092, at *13 (S.D.N.Y. 2015) (holding that a complaint adequately alleged a reverse FCA claim when it alleged that defendants received overpayments, "had notice of those overpayments," and failed to return them).

Defendants challenge Gill's allegation that one-third of the $200 million in credit balances stemmed from government payors. *See* Defs.' Mem., at 8–9 (Dckt. No. 78-1); Defs.' Reply, 2 (Dckt. No. 87). According to Defendants, the complaint's more specific statements contradict that broader allegation. *See* Defs.' Mem., at 9 n.6.

21

Specifically, Defendants argue that Gill arrives at his $200 million estimate by combining three buckets of money. *Id.* at 9 n.6. Defendants point to three amounts: $65 million, $98 million, and $42 million. *Id.* Those add up to $205 million – right around Gill's estimate. *Id.* As Defendants see things, Gill's complaint alleges that each bucket of dollars was filled by *commercial* payors – *not* federal government payors. *Id.*

The Court will start (and stop) with the $65 million bucket. The $65 million bucket includes government money. That's enough to state a claim.

According to Gill, during a meeting with a CVS executive, the executive told Gill that "CVS took the $65 million in pending overpayments to income." *See* Third Am. Cplt., at ¶ 100 (Dckt. No. 67). "These [overpayments] were *primarily* commercial overpayments that should have been escheated to Delaware, not kept as profits." *Id.* (emphasis added)

Defendants' math equation asks this Court to infer that the *entire* $65 million was from commercial overpayments. But that's not what the complaint says. "Primarily" does not mean "entirely."

"Primarily" implies the opposite of "entirely." It implies that someone *other* than a commercial payor also put money into the bucket – here, the government.

Gill is entitled to plausible inferences in his favor. *See AnchorBank, FSB*, 649 F.3d at 614. So, Gill is entitled to the plausible inference that *some* of the overpayments were government overpayments.

Next, Defendants make an argument about the amount of any actual overpayments. Defendants argue that "even assuming that government payments accounted for *some part* of the $200m, the federal claim fails because there are no specific allegations showing (1) to what extent, if any, such part was an *actual* overpayment rather than a mere *potential* overpayment,

22

and (2) whether the actual overpayments exceeded $8.5m, the amount Gill admits was refunded to federal programs." *See* Defs.' Reply, at 2 (Dckt. No. 87).

Defendants raised this point in their reply brief. *Id.* So it comes too late. Litigants waive arguments raised for the first time in reply. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019).

In sum, Gill plausibly alleged that federal programs overpaid money that Coram and CVS did not refund.

### B.      Delaware False Claims and Reporting Act

Defendants switch gears and argue that the complaint does not state a claim under Delaware law. *See* Defs.' Mem., at 9–14 (Dckt. No. 78-1).

Before getting there, the Court offers a refresher. Gill alleges that CVS and Coram also failed to return *commercial* overpayments (not just government overpayments). *See* Third Am. Cplt., at ¶ 53 (Dckt. No. 67). The commercial failure allegedly ran afoul of Delaware's False Claims and Reporting Act. *Id.* at ¶ 56. The idea is that any unclaimed funds eventually should have ended up in the hands of the state government.

The Delaware statute echoes the federal statute. It prohibits improperly avoiding an obligation to transmit money to the state. *See* 6 Del. Code Ann. § 1201(a)(7). So, the theory raises another question – where did CVS and Coram's alleged obligation to transmit commercial overpayments to *Delaware* come from? To answer the question, Delaware escheatment law enters the picture.

Under Delaware escheatment law, if the owner of the property does not claim it within the allotted time, Delaware presumes that the owner abandoned it. *See* 12 Del. Code Ann. § 1133 ("When property presumed abandoned"). Delaware's statute breaks down property into

categories.  For each category, the state creates a point in time when property becomes unclaimed.

According to Gill, Delaware's statute says that the commercial overpayments became unclaimed property five years after Coram and CVS identified them.  *See* Third Am. Cplt., at ¶ 53 (citing 12 Del. Code Ann. § 1133(6), (17)).

Once the overpayments matured into unclaimed property, another Delaware statute kicked in.  *Id.* at ¶ 54.  Under the statute, "[c]ompanies incorporated in Delaware must escheat all unclaimed property to Delaware *unless* the company's records show that the last known address of the owner of the unclaimed property is in a state other than Delaware."  *Id.* (emphasis in original) (citing 12 Del. Code Ann. § 1141(a)).  In other words, if the company knows that the last known owner lived in Nebraska, Delaware wouldn't get the property.

CVS and Coram are incorporated in Delaware.  *Id.*  So, Gill argues that they were obligated to escheat the unclaimed commercial overpayments to Delaware if they did not know the payor's address.  *Id.*  And CVS and Coram "did not retain the relevant records."  *Id.*  In other words, they didn't know the addresses.  *Id.*

As a result, Gill alleges that CVS and Coram "were legally obligated to escheat most of the funds to Delaware."  *Id.*  But they didn't.  *Id.*  This failure, Gill theorizes, violated Delaware's False Claims and Reporting Act.  *Id.* at ¶ 56.

Defendants attack the claim on four fronts.  The Court will address each argument.

### 1.    Escheatable Property

First, Defendants contend that the alleged overpayments – "credit balances" – are not escheatable property under Delaware law.  *See* Defs.' Mem., at 9–12 (Dckt. No. 78-1).  To address the argument, the Court needs to cover a few more points of Delaware escheatment law.

24

Escheatment applies to "property." *See* 12 Del. Code Ann. § 1133 ("When property presumed abandoned"). Delaware defines "property." *Id.* at § 1130(19). Property includes "a *fixed and certain* interest in intangible property held, issued, or owed in the course of a holder's business." *Id.* (emphasis added).

The definition of property expressly includes a "credit balance" or a "customer's overpayment." *Id.* at § 1130(19)(b)(2).

Defendants argue that the alleged overpayments here are not escheatable property, because they are not "fixed and certain." *See* Defs.' Mem., at 9–12 (Dckt. No. 78-1). Defendants assert that they weren't sure whether the credit balances were *actually* overpayments from commercial payors. *Id.* at 10–11. In Defendants' view, the overpayments were not "certain" – they were "potential." *Id.*

That argument sits uncomfortably with the complaint. The complaint *does* allege that Defendants knew that some of the credit balances were, in fact, overpayments. The complaint does so by pointing to the Deloitte Report.

According to the report, Coram represented that when "it receives payments from payors in excess of its expected reimbursement, these amounts are classified as cash in suspense." *See* Third Am. Cplt., at ¶ 60 (Dckt. No. 67) (quoting Deloitte Report, at 15 (Dckt. No. 67-1, at 13 of 150)). And according to the complaint, Coram never sent that cash anywhere. The Deloitte Report confirmed that Coram "does not escheat credit balances received from commercial insurers. These credit balances are recognized as income after a set period of time." *Id.* at ¶ 61 (quoting Deloitte Report, at 83 (Dckt. No. 67-1, at 15 of 150)).

In sum, the complaint alleges that Coram *itself* "believe[d]" that some credit balances were *actual* "overpayments." *Id.* at ¶ 60 (quoting Deloitte Report, at 101 (Dckt. No. 67-1, at 17

of 150)). So, the complaint does enough to state a claim. It plausibly alleges that some of the credit balances were fixed and certain overpayments, and, in turn, qualified as "property" subject to Delaware's escheatment laws.

### 2. Delaware's Recoupment Statute

Second, Defendants argue that Delaware's insurance recoupment statute forecloses any claim. *See* Defs.' Mem., at 12 (Dckt. No. 78-1).

The recoupment statute bars a health insurer from initiating an overpayment recovery effort more than 24 months after it paid the claim. *See* 18 Del. Code Ann. § 2730(c). If a health insurer pays too much money and lets two years pass, the insurers can't try and get the money back.[1]

Delaware's legislature made the statute effective on June 14, 2018. *See* 81 Del. Laws 2018, ch. 216, § 1. It does not apply to recovery efforts for overpayments that happened *before* June 2018 if the health insurer had given notice *before* June 2018 that it was trying to get the money back. *See* 18 Del. Code Ann. § 2730(d).

As Defendants see things, the statute bars Gill's claims. "Because Gill's credit balance claims relate to payments received from 2008 through April 2016," Defendants think that the statute's 24-month recoupment period expired "on all amounts before this case was filed in September 2018." *See* Defs.' Mem., at 12 (Dckt. No. 67-1). In other words, Defendants think that the two-year clock ran out.

Defendants did not devote much attention to this argument in their opening brief, giving it only two paragraphs. And then, the argument took on a life of its own.

---

[1] The two-year limit does not apply to recovery efforts based on a reasonable belief of fraud. *See* 18 Del. Code Ann. § 2730(c)(1).

In his response brief, Gill pointed out that Defendants did not mention other relevant Delaware statutory provisions.  *See* Pl.'s Resp., at 5 (Dckt. No. 86).  According to Gill, Defendants failed "to even read the Delaware Unclaimed Property Law."  *Id.*  The law declares that a property owner's expired time to recover property *does not* relieve the property's *holder* of its obligation to escheat the property to the state.  *See* 12 Del. Code Ann. § 1156(a).

In reply, Defendants asked this Court to hold that the Supreme Court preempted that statute in *Delaware v. New York*.  *See* Defs.' Reply, at 4 (Dckt. No. 87); *see also Delaware v. New York*, 507 U.S. 490 (1993).  To support that argument, Defendants offered this Court one single footnote citation – a 2019 "Tax Notes State" article.  *See* Defs.' Reply, at 4 n.3.  That's it.

Then, Defendants declared that "even setting aside preemption," section 1156(a) "does not override the recoupment statute for several reasons."  *Id.* at 4.  The three reasons are squeezed into single-spaced bullet points, to fit as much text as possible onto the page.  *Id.* at 4–5.  For example, Defendants argue that applying section 1156 as Gill urges would "render the recoupment statute meaningless."  *Id.* at 5.

Here's the punch line.  Defendants did not make a developed argument about the recoupment statute, its scope, and its interaction with other provisions of the Delaware code in their opening brief.  *See* Defs.' Mem., at 12 (Dckt. No. 78-1).  Most of the substance appeared in the reply.  *See* Defs.' Reply, at 3–5 (Dckt. No. 87).

So, this Court doesn't have enough to go on.  This Court declines to address Defendants' recoupment-statute argument.  *See Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 413 (N.D. Ill. 2021) ("[F]ailure to develop a legal argument in an opening brief results in the argument's waiver.").  Defendants can tee it up at the summary judgment stage if they choose to do so.

### 3. Delaware's Ownership

Next, Defendants argue that this Court should dismiss the Delaware FCA claims because "no funds belong to Delaware." *See* Defs.' Mem., at 12–13 (Dckt. No. 78-1). In other words, Defendants argue that the complaint does not allege that Coram and CVS violated any "obligation to pay" the state. *Id.* at 13 (citing 6 Del. Code Ann. § 1201(a) (7)).

Defendants break down their broad argument into two stanchions.

First, Defendants argue that the complaint does not allege that they had an "obligation" to pay the overpayments to Delaware, under Delaware's definition of "obligation." *Id.* The statute defines an "obligation" as, among other things, an "*established* duty" arising "from the retention of any overpayment." *See* 6 Del. Code Ann. § 1202(5) (emphasis added).

In essence, Defendants incorporate by reference their earlier "fixed and certain" argument and try to revive it here. *See* Defs.' Mem., at 13 (Dckt. No. 78-1). The thrust of Defendants' argument seems to be that the credit balances were *potential* overpayments, instead of *actual* overpayments. And as a result, Defendants had a "potential" – as opposed to an "established" – duty to pay money. *Id.*; *see also* 6 Del. Code Ann. § 1202(5).

But this Court rejected Defendants' "fixed and certain" argument. So, the effort to implant it here fails.

Second, Defendants argue that "even if some of the credit balances represented *actual* overpayments, such amounts belong to the *insurers* rather than to Delaware, so no liability under Delaware's FCA can attach." *See* Defs.' Mem., at 13 (Dckt. No. 78-1) (emphasis added).

In other words, Defendants theorize that the overpayments belonged to the commercial payor, so Defendants didn't violate an obligation to send the money to the state, because the

money didn't belong to the state in the first place. *Id.* Defendants do not cite any cases supporting that proposition. *See id.*

In fact, a case Defendants cite elsewhere in their brief seems to directly undermine their argument. *See id.* at 10 (citing *State ex rel. French v. Card Compliant, LLC*, 2015 WL 11051006 (Del. Super. Ct. 2015)). In *Card Compliant*, a Delaware Superior Court implied that a failure to escheat *is* actionable under Delaware's False Claims and Reporting Act, because failing to escheat property violates an "obligation" to the state. *See Card Compliant*, 2015 WL 11051006, at *3.

Gill noted as much in his response. *See* Pl.'s Resp., at 5–6 (Dckt. No. 86). In their reply, Defendants returned to their "fixed and certain" argument. *See* Defs.' Reply, at 5 (Dckt. No. 87).

Specifically, Defendants try to distinguish *Card Compliant* by arguing that the credit balances in that case were "fixed and certain," unlike the credit balances here. *Id.* In that vein, Defendants repeat their arguments about "fixed and certain" overpayments, and "actual vs. potential" overpayments.

For reasons that this Court has already explained, the complaint adequately alleges that the overpayments were fixed and certain. So, Defendants' argument fails here too.

In sum, the complaint adequately pleads that CVS and Coram had an "obligation" to the state.

### 4.    "Knowing" Violation

Defendants make one final challenge to the claims under Delaware's FCA. Defendants argue that the complaint does not allege a "knowing" violation of any law, "as necessary to sustain a Delaware FCA violation." *See* Defs.' Mem., at 14 (Dckt. No. 87); *see also* 6 Del. Code

Ann. § 1201(a)(7) (assigning liability for "[*k*]*nowingly* and improperly avoid[ing] . . . an obligation to pay or transmit money or property to the Government") (emphasis added).

The core of Defendants' argument is that the complaint does not allege that Coram and CVS Health "knowingly" violated the law. As Defendants see it, the complaint alleges that they swept *potential* overpayments to income, as opposed to what they knew were *actual* overpayments. *See* Defs.' Mem., at 14 (Dckt. No. 78-1). In other words, Defendants explain that they couldn't have *knowingly* kept something they shouldn't have, because they weren't certain that they even *had* something they shouldn't have had. *See id.*

Defendants' argument fails. Under Rule 9(b), a complaint can allege knowledge generally, without meeting the rigors of heightened pleading requirements. *See* Fed. R. Civ. P. 9(b). The complaint at hand does enough to allege knowledge. It alleges that executives knew that the companies were handling overpayments improperly, and kept doing the same wrong thing over and over.

For example, the complaint alleges that "Coram historically failed to escheat any overpayments to state entities, as required by state law." *See* Third Am. Cplt., at ¶ 80 (Dckt. No. 67). According to the complaint, "Coram understood its obligations, but *deliberately* elected not to follow them." *Id.* at ¶ 85 (emphasis added).

When CVS entered the scene, it calculated that returning the overpayments would "negatively affect earnings." *Id.* at ¶ 86. So, it "prioritized profits over *compliance with the law*." *Id.* at ¶ 89 (emphasis added). It kept the money. *Id.* at ¶ 91.

In sum, the complaint adequately alleges that CVS and Coram acted knowingly. *Id.* at ¶ 85 ("Coram *understood* its obligations, but *deliberately* elected not to follow them.") (emphasis

added); *id.* at ¶ 93 ("CVS *knowingly* concealed *at least* $89 million in overpayments from government and commercial payors.") (first emphasis added).

So, Defendants' final attack on the Delaware FCA claim fails. The Delaware FCA claim survives.

### C.     Other States' False Claims Acts

Moving on, Defendants argue that this Court should dismiss the FCA claims asserted under the statutes of other states. *See* Defs.' Mem., at 15 (Dckt. No. 78-1).

Defendants point out that the complaint "provides no plausible or specific facts to support applying another state's FCA." *Id.* And, in their view, the logic of the complaint contradicts any application of another state's FCA. As Defendants see things, Gill's theory is that Delaware escheatment law applied because Coram did *not* maintain payors' last known addresses. *Id.* So, Defendants argue that the theory precludes an inference that Coram *did* maintain any records with a last known address that would trigger a different state's escheatment law. *Id.*

In response, Gill pointed the Court to several paragraphs that purportedly allege that Coram had "records of identifiable payors" in states other than Delaware. *See* Pl.'s Resp., at 7 (Dckt. No. 86) (citing Third Am. Cplt., at ¶¶ 54, 79–81, 114–15 (Dckt. No. 67)).

This Court reviewed those paragraphs. Gill is mistaken.

For example, three of the paragraphs don't mention any state whatsoever. *See* Third Am. Cplt., at ¶ 79 (Dckt. No. 67) ("CVS and Coram representatives reviewed a document identifying examples of 'Potential Overpayments' from various payors."); *id.* at ¶ 80 ("The St. Louis meeting also confirmed that Coram historically failed to escheat any overpayments to state entities, as required by state law."); *id.* at ¶ 81 ("Coram's 'Inquiry Letter' . . . was highly misleading because it did not notify payers that Coram had identified an overpayment.").

Another two paragraphs emphasize that Coram's records were a mess. Gaping holes abounded. *Id.* at ¶¶ 114–15 ("[T]he only question here is whether Coram and CVS have adequate records establishing the last known address of the owners of the overpayments and credit balances . . . Coram's records were in a disarray and often missing, inaccurate, incomplete, or destroyed.").

True, a footnote in one of those paragraphs states that "[e]ven *if* Coram does have records sufficient to identify the last known address for a limited subset of credit balances, then that state's escheat laws would apply." *Id.* at ¶ 114 n.5 (emphasis added). Admittedly, courts permit litigants to plead in the alternative. *See Alper v. Altheimer & Gray*, 257 F.3d 680, 687 (7th Cir. 2001). But Gill doesn't frame his footnote that way.

A footnote musing about what *might* happen in an alternative universe is not the same thing as making a factual allegation about what *does* exist in the alternative universe.

Paragraph 54 gets Gill the closest to the mark. *See* Third Am. Cplt., at ¶ 54 (Dckt. No. 67). There, the complaint alleges that for the "vast *majority* of credit balances," CVS and Coram did not retain "records sufficient to identify the state of the last known address of the owner of the unclaimed property." *Id.* (emphasis added).

The phrase "vast *majority* of credit balances" implies that in a *minority* of instances, CVS and Coram *could* identify the last known owner's address. But the complaint does not allege what states those owners may have called home. *Id.*

So, this Court dismisses the FCA claims arising under other state statutes. The complaint does not contain enough facts to give rise to a plausible claim.

### D. Other Defendants

The Court needs to add one last note about the credit-balance scheme.

Defendants argue that the complaint includes "a handful of throw-away paragraphs" about CVS Specialty and Omnicare. *See* Defs.' Mem., at 15 (Dckt. No. 78-1) (citing Third Am. Cplt., at ¶¶ 127–36 (Dckt. No. 67)). According to Defendants, the paragraphs do not adequately plead particularized allegations against those two Defendants. *Id.* at 15–16.

Gill did not respond to the argument. *See* Pl.'s Resp., at 2–7 (Dckt. No. 86); *see also* Defs.' Reply, at 7 n.5 (Dckt. No. 87) (noting the silence).

In life, silence can be golden. In litigation, silence can be waiver.

This Court construes the silence as a concession that Gill is *not* pursuing FCA claims based on the credit scheme against CVS Specialty and Omnicare. Gill waived any argument in response. Any FCA claims based on the credit scheme against CVS Specialty and Omnicare are dismissed.

## II. The Processing of Prescriptions from Excluded Providers (Scheme #2)

The second scheme is about billing the government for prescriptions from excluded providers, meaning doctors who cannot write prescriptions for payment by the government. *See* Third Am. Cplt., at ¶ 4 (Dckt. No. 67).

Defendants make three arguments in the motion to dismiss. Defendants basically divide themselves into three groups, and make a different argument about each group. For example, the first argument is about two of the Defendants, CVS Retail and Omnicare. *See* Defs.' Mem., at 16–18 (Dckt. No. 78-1). And so on.

The Court will address each group.

### A.     CVS Retail & Omnicare

Defendants lead off with an argument about CVS Retail and Omnicare.  Defendants

make an argument about whether CVS Retail and Omnicare had a legal obligation to look at the

state lists.

As they see it, the complaint does not adequately plead that the pharmacies had a "legal

obligation" to screen prescriptions against the *state* lists.  *Id.* at 16–17.  In their view, Gill didn't

identify the basis for an obligation to screen against *state* excluded provider lists, controlled

substance regulations, license number lists, and DEA number lists.  *Id.* at 16.

Gill responded by pointing to a few provisions of the United States Code and some

sections of the Code of Federal Regulations.  *See* Pl.'s Resp., at 8 (Dckt. No. 86) (citing 42

C.F.R. § 402.209; 42 U.S.C. § 1396a(39); 18 U.S.C. § 1862(e)(1)(B); 42 C.F.R. §§ 1001.1901,

1002.6(a)(1)).  The string cite did not provide much direction.  It is like giving someone

directions to a restaurant across town, by simply pointing north.

As far as this Court can tell, to the extent that the provisions even reference a list, they

create an obligation to screen against the *federal* OIG list.  Not any state list.  *See, e.g.*, 42 C.F.R.

§ 402.209 ("Under this title, persons may be excluded from the Medicare, Medicaid, and, where

applicable, any other Federal health care programs."); 42 U.S.C. § 1396a(a)(39) ("the State

agency shall exclude any specified individual or entity from participation in the program under

the State plan for the period specified by the Secretary"); 42 C.F.R. § 1001.1901 ("Exclusions of

individuals and entities under this title will be from Medicare, Medicaid, and any of the other

Federal health care programs"); 42 C.F.R. § 1002.6(a)(1) ("[N]o payment may be made by the

State agency for any item or service furnished on or after the effective date specified in the

notice:  (1) By an individual or entity excluded by the *OIG*") (emphasis added).

In other words, Gill cites provisions that seem to create an obligation to screen against OIG's *federal* list. Yet the complaint alleges that CVS Retail and Omnicare violated the False Claims Act when they violated their obligation to screen against *state* lists. *See* Third Am. Cplt., at ¶ 145 (Dckt. No. 67) ("For years, CVS Retail Pharmacy, which operates thousands of CVS pharmacies across the country, had no mechanism to screen prescribers against *state* excluded provider lists.") (emphasis added); *id.* at ¶ 153 ("When CVS acquired Omnicare . . . it discovered that Omnicare similarly failed to implement software edits or any screening system for a number of dispensing requirements, including the requirement to validate prescribers against *state* excluded prescriber lists.") (emphasis added).

So, a mismatch exists. In the motion to dismiss, Defendants questioned the basis for an obligation to look at state lists. And in response, Gill pointed to regulations that created an obligation to look at federal lists. That's not much of a response.

The Court dismisses the excluded provider scheme claims against CVS Retail and Omnicare.

## B. Coram

The claims against Coram are next. The complaint presents the theory in three paragraphs. *Id.* at ¶¶ 157–59. According to the complaint, Coram did not have an "automated mechanism" in place to prevent claims from excluded providers on the federal excluded prescriber lists. *Id.* at ¶ 157. Coram had a "manual" process, instead. *Id.* at ¶ 158.

Apparently, the manual process sometimes fell short. CVS ran a report revealing that Coram had improperly submitted 500 claims that involved providers on the federal OIG exclusion list. *Id.* at ¶ 159.

Here's the rub. The few paragraphs do not allege that Coram *knew* that its manual process let claims slip through the cracks, and kept doing the same thing so it could put more money in its pocket. The paragraphs do not allege that Coram *knew* that it should have had an automated process instead of a manual one, either.

So, the complaint does not plausibly allege that Coram "knowingly" did anything wrong. At most, the complaint alleges that Coram might have had a "compliance issue," which is not the same thing as a "false claim[]." *See United States v. Walgreens*, 417 F. Supp. 3d 1068, 1089 (N.D. Ill 2019).

The Court dismisses the excluded provider claims against Coram.

## C. Caremark

Finally, Defendants seek the dismissal of the excluded provider scheme claims against Caremark. *See* Defs.' Mem., at 17–18 (Dckt. No. 78-1). They make two arguments.

First, Defendants note that a software defect in Caremark's system caused the company to inadvertently process some excluded-provider claims. *Id.* at 17. In that vein, Defendants argue that "[i]nadvertent mistakes are not a basis for false claims liability." *Id.*

Their argument is beside the point. Gill does not contend that Caremark should be liable for the initial, inadvertent software defect. Instead, Gill's theory is that Caremark violated the False Claims Act by concealing its obligation to refund certain government payments, *after* it discovered the initial mistake. *See* Pl.'s Resp., at 13 (Dckt. No. 86).

Second, Defendants note that the money Caremark didn't refund came from "*Managed Medicaid payors.*" *See* Defs.' Mem., at 18 (Dckt. No. 78-1) (emphasis added). A little background is necessary here.

States have different ways to implement Medicaid. One way is the "fee-for-service" model, and another way is the managed Medicaid model.

In a "fee-for-service" model, a state Medicaid agency pays health care providers from public funds based on the specific care that a provider gives a patient. *Id.* So, if a patient gets a lot of care, the bill gets more expensive.

In a managed Medicaid model, a private intermediary – known as a managed care organization ("MCO") – contracts with the state agency. *Id.* The state Medicaid program pays the MCO a monthly fixed rate, based on the number of enrollees. *Id.* In turn, the MCO pays health providers for the health care that enrollees receive. *Id.*; *see also* Cong. Rsch. Serv., R43357, *Medicaid: An Overview* 16 (2023). The idea is that the government pays the MCO a fixed amount. The amount doesn't depend on how many times a patient goes to the doctor.

Here, Defendants hitch their argument to the fact that the claim involves a managed Medicaid model with MCOs. The basic idea is that providing more services to a patient in a managed Medicaid model would not lead to more costs to the government, because the government's payment is fixed anyway.

In Defendants' view, when an FCA claim involves a MCO and fixed monthly rates, a relator must allege facts showing that the false claim somehow increased the money that *the state Medicaid program paid*, not the amount of money that the MCO allegedly paid. *See* Defs.' Mem., at 18 (Dckt. No. 78-1).

Defendants rest their argument on one case from outside the Seventh Circuit. *See United States ex rel. Mbabazi v. Walgreen Co.*, 2021 WL 4453600, at *6 (E.D. Pa. 2021).

Gill responds with contrary authority from the Seventh Circuit. *See* Pl.'s Resp., at 13 (Dckt. No. 86). In another case involving the FCA, the Seventh Circuit noted that the Act covers

"false claims to intermediaries or other private entities that either *implement* government programs or *use* government funds." *See United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639 (7th Cir. 2016) (emphasis added). The Seventh Circuit also noted that the defendant's causation argument – that a "causal chain" must exist between a false claim and a government payment – had "no support." *Id.*

Defendants' reply brief distinguishes *Garbe* in one sentence. According to Defendants, this Court should ignore *Garbe* because that case did not involve a reverse false claim, meaning the type of claim at issue here. *See* Defs.' Reply, at 10 (Dckt. No. 87). Defendants did not spell out *why* that distinction should make a difference.

Defendants did include a citation to a "Health Law Connections" article in a footnote. *Id.* at 10 n.10. They attached the article as an exhibit to their brief, too. *See* Health Law Connections Article (Dckt. No. 87-1). But they didn't explain why they cited it.

The eight-page article argues that the "plain statutory language" in the FCA's reverse false claims provision "suggests" that the provision does not apply to overpayments that providers receive from MCOs. *Id.* at 3 of 8. To get there, the article breaks down the reverse false claim provision and compares it to other provisions. *Id.* at 3–5.

Specifically, the article explains that the reverse false claim provision's clause referencing money owed "to the Government" means that the "statutory duty to refund" does "*not* apply to overpayments" that MCOs make. *Id.* at 4 (emphasis added); *see also* 31 U.S.C. § 3729(a)(1)(G) (imposing liability for knowingly avoiding "an obligation to pay or transmit money or property *to the Government*") (emphasis added). As the article puts it, MCOs are not "the Government." *See* Health Law Connections Article (Dckt. No. 87-1, at 4 of 8).

38

Maybe the article is onto something.  *See United State ex rel. Angelo v. Allstate Ins. Co.*, 106 F.4th 441, 450 (6th Cir. 2024) ("As a threshold matter, we note our sister circuits' concerns with assigning False Claims Act liability for payments owed to MAOs, which are private entities, and not the government.").

But it is hard to say when the one-sentence argument appears in a reply brief, and is supported by a citation to one article.  True, Defendants cited *Mbabazi* in their opening brief. *See* Defs.' Mem., at 18 (Dckt. No. 78-1).  But *Mbabazi* doesn't bind this Court.  And *Mbabazi* didn't explain *why* the rule it applied flowed from the statute.  *See Mbabazi*, 2021 WL 4453600, at *6.

For now, this Court does not have enough from the parties to assess the merits of the argument.  The opening brief offered only a teaser, and the reply gave a morsel, without much to chew on.  So, the Court denies the motion to dismiss on this point, without prejudice. Defendants remain free to tease it out and tee it up at the summary judgment stage.

For now, the claims against Caremark based on the excluded-provider lists stay in the case.

## III.    The Copay Cards (Scheme #3)

The third scheme involved the copay cards.  *See* Third Am. Cplt., at ¶¶ 174–232 (Dckt. No. 67).  The complaint alleges that CVS Specialty Pharmacies and CVS Retail Pharmacies (collectively, "CVS Pharmacies") improperly accepted copay cards (which drug manufacturers issue) from government healthcare beneficiaries.  *Id.*

Defendants challenged that claim, too.  *See* Defs.' Mem., at 18–20 (Dckt. No. 78-1). Before getting to the meat and potatoes of the argument, this Court needs to set the table and explain how the False Claims Act interacts with the anti-kickback statute.

The anti-kickback statute is a criminal fraud statute. *See United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1112 (N.D. Ill. 2018). It is "designed to prevent Medicare and Medicaid fraud." *See United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015).

The idea is that health care providers should help patients make decisions in the best interests of health, not based on the provider's pocketbook. *See id.* For example, a drug salesman can't buy a doctor a steak dinner each time the doctor prescribes the drug to a Medicaid patient.

To that end, the statute prohibits "knowingly and willfully" offering, soliciting, or receiving "any remuneration" in return for "purchasing" any federally reimbursed "item." *See* 42 U.S.C. § 1320a-7b(b)(1)–(2); *see also Derrick*, 318 F. Supp. 3d at 1112; *United States ex rel. Suarez v. AbbVie Inc.*, 2019 WL 4749967, at *5 (N.D. Ill. 2019).

Congress amended the anti-kickback statute in 2010 and forged a connection to the False Claims Act. *See United States ex rel. Greenfield v. Medco Health Sols, Inc.*, 880 F.3d 89, 95 (3d Cir. 2018). The statute provides that a violation of the anti-kickback statute gives rise to a claim under the False Claims Act. "A claim that includes items or services resulting from a violation" of the anti-kickback statute "constitutes a false or fraudulent claim for purposes" of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g); *see also Greenfield*, 880 F.3d at 95.

In other words, the statute provides that claims for payment made as part of illegal kickbacks are "false" for purposes of the False Claims Act. *See Greenfield*, 880 F.3d at 95; *see also Prose*, 17 F.4th at 739 ("The [False Claims] Act makes it unlawful knowingly (1) to present or cause to be presented a *false* or fraudulent claim for payment to the United States, (2) to make or use a *false* record or statement material to a *false* or fraudulent claim, or (3) to use a *false*

record or statement to conceal or decrease an obligation to pay money to the United States.")
(emphasis added).

Invoking this framework, Defendants argue that Gill's FCA claim against CVS
Pharmacies based on the copay-coupon scheme fails, because the complaint does not plead a
predicate violation of the anti-kickback statute. *See* Defs.' Mem., at 18–20 (Dckt. No. 78-1).
This Court agrees.

Pharmaceutical manufacturers – the companies that make the drugs – sponsor the copay
cards. *See* Third Am. Cplt., at ¶ 174 (Dckt. No. 67). In other words, the *drug-makers* pay for the
copay discounts that patients receive – not the pharmacies. *Id.*

The *drug-makers* are the companies allegedly doing the kickbacks, not CVS Pharmacies.
The drug-makers are allegedly "pay[ing]" the coupon's value (the "remuneration"), to "induce"
the patient to take the drug. *See* 42 U.S.C. § 1320a-7b(b)(2)(B).

So, to establish a violation of the anti-kickback statute, Gill must show that the *drug-
makers* are the ones who "knowingly" did the illegal kickbacks. The drug-makers must
"knowingly" offer the remuneration to induce the Medicaid or Medicare patient to buy the drug
– a purchase which will, in turn, slap the federal government with a cost. *See id.*

But the complaint does not allege that the drug-makers were "knowingly" offering the
copay cards to federal healthcare beneficiaries. Instead, the complaint alleges that the drug-
makers took active steps to *prevent* federal healthcare beneficiaries from using the cards. *See*
Third Am. Cplt., at ¶ 181 (Dckt. No. 67). The complaint explains that drug manufacturers
implemented "electronic[]" methods to "*prevent* copay cards from being used for federally
funded prescriptions." *Id.* (emphasis added). According to the complaint, the methods were
"generally effective." *Id.*

41

Put differently, the complaint does not allege that the copay cards violated the anti-kickback statute, because the complaint does not allege that the copay card sponsors – the drug companies – knowingly induced federal healthcare beneficiaries to use the card. So, the complaint can't use the anti-kickback statute to tag CVS Pharmacies with False Claims Act liability.

In response, Gill argues that a drug manufacturer's "potential" anti-kickback statute liability is "irrelevant" to CVS's liability for its "*own* knowing and willful actions." *See* Pl.'s Resp., at 15 (Dckt. No. 86) (emphasis added).

Gill misses the mark. If Gill's theory of CVS's liability is a house, the drug manufacturer's liability is the critical concrete foundation.

Again, Gill's theory is that the copay cards – which the drug manufacturers issued – were illegal remuneration, in violation of the anti-kickback statute. *See* Third Am. Cplt., at ¶ 202 (Dckt. No. 67) (alleging that the copay cards were "tainted with remuneration" in violation of anti-kickback statutes). The illegal copay cards form the house's foundation. They create the basement.

Go up a level in the house, to the first floor. In this level, Gill alleges that CVS Pharmacies violated the False Claims Act by knowingly taking government money for drugs that patients funded with copay cards. *Id.* at ¶ 201 ("CVS Pharmacies submitted so many tainted copay card claims to government payers . . . ."). The illegal copay cards are the underlying "false claim" in the FCA claim. The illegal copay cards hold up the FCA claim. *See* 42 U.S.C. § 1320a-7b(g) (declaring that an illegal kickback under an anti-kickback provision is a "false or fraudulent claim" under the False Claims Act).

42

If the copay cards were never an illegal kickback to begin with – because the drug manufacturers who paid the remuneration didn't violate the anti-kickback statute, since the drug manufacturers didn't do anything "knowingly" – then the foundation collapses.

If the copay cards were not an illegal kickback, then the copay cards were not a "false claim" under the False Claim Act. So, the foundation crumbles, and the False Claims Act theory topples down.

The complaint's claims based on the copay cards are dismissed.

## IV.    Coram's FOCUS Care Program (Scheme #4)

Next, Defendants challenge the claims against Coram about its FOCUS Care program. *See* Defs.' Mem., at 22–26 (Dckt. No. 78-1). As a reminder, the FOCUS Care program involved Coram giving infusion therapy to uninsured patients for free. In exchange, the hospitals referred patients with insurance to Coram.

Defendants make four arguments.

### A.    Remuneration & Safe Harbor Provisions

First, Defendants argue that Gill does not allege an anti-kickback violation, because Gill does not allege that Coram offered "remuneration" – a key element. *Id.* at 23–25.

Remember, to state an anti-kickback violation, Gill must allege that Coram (1) knowingly and willfully; (2) offered or paid; (3) *remuneration*; (4) in return for purchasing or ordering any item or service for which payment may be made under a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b)(1)–(2); *Suarez*, 2019 WL 4749967, at *5.

The statute does not define "remuneration." *See United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1048 (6th Cir. 2023). And the Seventh Circuit does not appear to have squarely addressed the meaning of that term. But courts have interpreted the word broadly

to capture "anything of value." *See Derrick*, 318 F. Supp. 3d at 1113–14 (collecting cases); *cf. Martin*, 63 F.4th at 1048, 1050 (delineating the scope of "remuneration" to payments or transfers of value).

Although the statute does not define the outer limits, the statute does exclude some payments from its reach. In other words, the statute includes safe-harbor provisions. *See United States v. George*, 900 F.3d 405, 413 (7th Cir. 2018).

Two of the safe-harbor provisions are potentially in play here.

One of the safe-harbor provisions is the federally qualified health center provision. *Id.*; *see also* 42 U.S.C. § 1320a-7b(b)(3)(I).

The provision declares that "any remuneration" between a federally qualified health center (as defined in 42 U.S.C. § 1396d(l)(2)(B)(i)–(ii)) and an entity providing services to the health center is *not* illegal remuneration, as long as the deal helps the health center "maintain or increase" the availability of services to a "medically underserved population." *See* 42 U.S.C. § 1320a-7(b)(3)(I).

Federally qualified health centers receive certain grants under section 330 of the Public Health Service Act for helping medically underserved populations. *See* 42 U.S.C. § 1396d(l)(2)(B)(i)–(ii); *Three Lower Counties Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 297 (4th Cir. 2007); *Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 689 (7th Cir. 2013).

A second safe-harbor provision gives the HHS Secretary the power to define the statute's limits. The anti-kickback statute authorizes the Secretary to exempt remuneration categories from the statute's reach. *See* 42 U.S.C. § 1320a-7b(b)(3)(E).

The Secretary has done just that. *See* 42 C.F.R. § 1001.952 (listing things that are not "remuneration"). The regulations provide that "remuneration" does not include "any reduction

or waiver of a *Federal health care program beneficiary's* obligation to pay copayment," if certain prerequisites are satisfied. *Id.* at § 1001.952(k)(3) (emphasis added).

So, the statute focuses on waiving costs that federal health care program beneficiaries incur. The Court will call this safe-harbor the "cost-sharing" safe-harbor.

Coram argues that the complaint does not allege illegal remuneration because the contracts at issue fit into these two safe-harbor provisions. *See* Defs.' Mem., at 23 (citing 42 U.S.C. § 1320a-7b(b)(3)(I) and 42 C.F.R. § 1001.952(k)(3)).

Coram might be right – someday. Still, the safe-harbor provisions are affirmative defenses. *See United States v. George*, 171 F. Supp. 3d 810, 818 (N.D. Ill. 2016); *see also Derrick*, 318 F. Supp. 3d at 1114.

Complaints "do not have to anticipate affirmative defenses to survive a motion to dismiss." *See United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). Affirmative defenses typically come into play later in a case's life, when the motion-to-dismiss stage is in the rearview mirror.

At the same time, courts *can* bite at affirmative defenses when a complaint's allegations "set forth everything necessary to satisfy the affirmative defense." *See Lewis*, 411 F.3d at 842. But the complaint here doesn't put these safe-harbor affirmative defenses on the table.

First, the complaint does not allege that Coram signed each contract with a federally qualified healthcare center. *See* Third Am. Cplt., at ¶¶ 256–57 (Dckt. No. 67). If anything, Coram seems to concede that it did not. *See* Defs.' Mem., at 23–25 (Dckt. No. 78-1); Pl.'s Resp., at 21 (Dckt. No. 86) (raising the argument); Defs.' Reply, at 13–14 (Dckt. No. 87) (not responding).

Coram might have an argument to the extent that the claim involves federally qualified healthcare centers. But by the look of things, the claim sweeps more broadly and covers other medical providers, too.

Second, the complaint does not allege that Coram waived costs that federal health care beneficiaries would incur. That waiver is a prerequisite for the cost-sharing safe-harbor.

If anything, the complaint alleges the opposite. The complaint alleges that Coram provided free services to patients who did *not* have health insurance. *See* Third Am. Cplt., at ¶ 243 (Dckt. No. 67) ("That agreement provides that Coram will provide services for *uninsured* patients discharged from a signatory hospital facility.") (emphasis added); *see also* Pl.'s Resp. at 21 (Dckt. No. 86) (raising the argument); Defs.' Reply, at 13–14 (Dckt. No. 87) (not responding).

Defendants also rely on language from OIG-issued advisory opinions and publications. *See* Defs.' Mem., at 23–25 (Dckt. No. 78-1). According to Defendants, those publications sanctioned Coram's contracts. *Id.* at 24.

But Defendants don't explain why those OIG publications should have the force of law. *See id.* The argument is too skeletal to get any traction.

In sum, Defendants have not shown that the complaint itself anchors Coram in a safe harbor. Maybe Defendants will prevail on this point someday, but for now, the claim survives.

**B.** **"Knowing" Violations**

Next, Defendants argue that the claims against Coram rooted in the FOCUS Care program fail because the complaint does not allege that Coram "knowingly" and "willfully" violated the anti-kickback statute. *See* Defs.' Mem., at 25–26 (Dckt. No. 78-1); *see also* 42

U.S.C. § 1320a-7b(b)(2) ("Whoever *knowingly* and *willfully* offers or pays any remuneration[.]")
(emphasis added).

This Court disagrees. The complaint plausibly alleges that Coram knew it was doing
something illegal. Indeed, the complaint alleges that Coram's own employees sounded the
alarm. *See* Third Am. Cplt., at ¶ 260 (Dckt. No. 67) ("Internally, some Coram employees were
concerned about the legality of the FOCUS Care program.").

Specifically, a Coram Senior Vice President of Compliance "reported the issue" to Gill.
*Id.* Gill told the CVS Risk Assessment team. *Id.* And "the CVS Risk Assessment team
identified the FOCUS Care Program as a high compliance risk." *Id.* at ¶ 261.

These allegations plausibly allege the statue's willfulness requirement. The complaint
alleges that the company knew that it was driving down the wrong road and chose to stay on the
route. *See, e.g.*, *United States v. Mallory*, 988 F.3d 730, 736 (4th Cir. 2021) (an employee's
warning that an arrangement violated the anti-kickback provision was evidence of knowledge);
*United States v. Omnicare, Inc.*, 2013 WL 3819671, at *15 (N.D. Ill. 2013) (collecting cases).

Looking for an out, Defendants ask this Court to infer that outside counsel advised
Coram that FOCUS Care was lawful from the fact that Coram's practices continued. *See* Defs.'
Mem., at 25 (Dckt. No. 78-1).

Remember, CVS apparently "hired outside counsel to review Coram's FOCUS Care
Agreements." *See* Third Am. Cplt., at ¶ 261 (Dckt. No. 67). Outside counsel's diagnosis
remains a mystery. Gill and the CVS Risk Assessment team were not "privy to the results of the
outside counsel's purported review." *Id.* at ¶ 262.

At the motion-to-dismiss stage, this Court must make inferences in Gill's favor, not in Defendants' favor. So, the Court will not make that inference. Any argument about reliance on the advice of counsel is for another day.

## C. Kickbacks & Causation

Moving on, Defendants argue that the FOCUS Care program claims fail because the complaint does not allege that any claims were submitted to the government "resulting from" a FOCUS Care kickback. *See* Defs.' Mem., at 26 (Dckt. No. 78-1). Under the statute, "a claim that includes items or services *resulting from* a violation of [the anti-kickback provisions] constitutes a false or fraudulent claim [under the False Claims Act]." *See* 42 U.S.C. § 1320a-7b(g) (emphasis added).

To support the argument, Defendants cite one case from the Eighth Circuit. *See* Defs.' Mem., at 26 (Dckt. No. 78-1) (citing *United States ex rel. Cairns v. D.S. Medical LLC*, 42 F.4th 828 (8th Cir. 2022)). As Defendants explain, *Cairns* holds that the statute's "resulting from" language imposes a "but for" causation requirement. *Id.* Applying that rule here, Defendants argue that Gill fails to plead that Defendants would not have submitted claims to the government "but for" FOCUS Care's alleged kickback. *Id.*

As Defendants note, the Eighth Circuit has interpreted "resulting from" to require but-for causation. *See Cairns*, 42 F.4th at 831. The Sixth Circuit has, too. *See Martin*, 63 F.4th at 1052–53.

Even so, some courts have come out the other way. There is a circuit split over the causation standard in section 1320a-7b(g). *See id.* The Third Circuit has interpreted "resulting from" to mean something short of but-for causation. *See United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96–97 (3d Cir. 2018).

So, courts have gone in different directions, and landed in different places. *See United States ex rel. Fitzer v. Allergan, Inc.*, 2022 WL 846211, at *9 (D. Md. 2022) ("Courts around the country have struggled to define the standard of causation that is required to prove an FCA claim based on an AKS violation."); *see also United States ex. rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, 2021 WL 101193, at *10 (D. Minn. 2021) (collecting cases rejecting the "but-for" standard).

Another circuit court is poised to weigh in. The First Circuit agreed to hear an interlocutory appeal on the issue. *See United States v. Teva Pharms. USA*, Nos. 23-8028, 23-1958 (1st Cir.).

A reader wouldn't have known that this tension swirled after reading Defendants' three-sentence opening argument. *See* Defs.' Mem., at 26 (Dckt. No. 78-1). Defendants did not cite the Third Circuit's decision in *Greenfield*, let alone explain why the approach of the Eighth Circuit and Sixth Circuit is better.

Once again, the arguments are too cursory for this Court to pick a side. Maybe Defendants are right, but this Court does not have what it needs from the parties to weigh in. *See Texas Hill Country Landscaping, Inc.*, 522 F. Supp. 3d at 413.

For now, the motion to dismiss based on an alleged but-for causation standard is denied, without prejudice. Again, Defendants can raise it later if need be.

### D. Example Claims

Switching gears, Defendants argue that the complaint does not plead a "representative" example of supposedly induced claims. *See* Defs.' Mem., at 26 (Dckt. No. 78-1).

Courts in this district have interpreted the heightened pleading standard of Rule 9(b) to demand that a relator alleging a false claim scheme provide "representative examples" of the

claims that the defendant submitted. *See United States v. Addus HomeCare Corp.*, 2017 WL 467673, at *10 (N.D. Ill. 2017) (collecting cases); *see also Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 825 (N.D. Ill. 2016) ("In the FCA context, the particularity requirement means that a relator must plead at least some *actual examples* of false claims.") (emphasis added).

The "representative-example" rule might be the norm, but rules come with exceptions. The Seventh Circuit has rejected an across-the-board, in-every-case requirement that a relator recite, chapter and verse, the transaction details of an example claim. *See, e.g.*, *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854–55 (7th Cir. 2009); *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018); *United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021).

After all, a relator might not have access to the underlying transaction data. *See Berkowitz*, 896 F.3d at 841 (recognizing that "a party may make allegations on information and belief in the fraud context" when "the facts constituting the fraud are not accessible" to the party) (cleaned up). *But see United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 44 F.4th 646, 656 (7th Cir. 2022) ("[T]o defeat dismissal, 'specific representative examples' of false submissions are required.").

In other words, the courthouse door doesn't automatically slam shut if a relator can't identify a "*specific* false invoice[.]" *See Mamalakis*, 20 F.4th at 301 (emphasis added). A relator can get its foot in the door by including "particularized factual allegations that give rise to a plausible inference of fraud." *Id.*

The complaint here clears that bar. True, the complaint does not name any specific example of a claim that Coram submitted "on behalf of a specific patient" resulting from the underlying kickback. *Cf. United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772

F.3d 1102, 1107 (7th Cir. 2014).  But Gill doesn't have access to those billing records.  *See* Pl.'s Resp., at 24 (Dckt. No. 86); *see also* Third Am. Cplt., at ¶ 295 (Dckt. No. 67).

And Gill otherwise describes the scheme with enough "specificity to inject precision" into his fraud allegations.  *See Berkowitz*, 896 F.3d at 841 (cleaned up).

For example, Gill attached a sample FOCUS Care contract to his complaint.  *See* FOCUS Care Contract (Dckt. No. 67-1, at 129 of 150).  The agreement explicitly contemplated that the referrals would *include* Medicare recipients.  *Id.* at ¶¶ 2(g)(i), 4(b), 6(d) (132–35 of 150).  Indeed, Defendants don't dispute that the agreement envisioned as much.  *See* Pl.'s Resp., at 25 (Dckt. No. 86) (raising the argument); Defs.' Reply, at 16 (Dckt. No. 87) (failing to respond).

The complaint also alleges that Coram researched each hospital's payor mix, so Coram knew how many referrals would be for Medicare and Medicaid beneficiaries.  *See* Third Am. Cplt., at ¶ 252 (Dckt. No. 67).  Coram also demanded that the FOCUS Care agreements capture 95% of a hospital's infusion-care referrals.  *Id.*

Finally, the complaint alleges that Coram "submitted" claims for payment to the United States as a "result of referrals from hospitals that entered into FOCUS Care ICS Agreements." *Id.* at ¶ 264.

In sum, the complaint does not read like a fraud-fishing expedition.  Gill had a front row view as a compliance employee.  *Id.* at ¶ 260.  His complaint plausibly alleges that "the false records were actually presented to the government for reimbursement."  *See United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 84 (2d Cir. 2017).  Remember, the agreements themselves contemplated that the referrals would include Medicare patients.  *See* FOCUS Care Contract, at ¶ 2(g)(i) (Dckt. No. 67-1, at 132 of 150).

So, for now, the claim about Coram's FOCUS Care program survives.

51

V.      **Unlicensed Pharmacy Shipments from Out of State (Scheme #5)**

Defendants turn to the complaint's fifth alleged scheme.  *See* Defs.' Mem., at 26–29 (Dckt. No. 78-1).  As a reminder, the fifth scheme involved out-of-state CVS Specialty Pharmacies that shipped prescriptions into states where the shipping pharmacy did not hold the required nonresident license.  *See* Third Am. Cplt., at ¶ 265 (Dckt. No. 67).

Defendants make two arguments.  *See* Defs.' Mem., at 26–29 (Dckt. No. 78-1).  First, Defendants argue that the public-disclosure bar forecloses any claim.  *Id.* at 27–28.  Second, Defendants say that the complaint fails to allege a "false statement" or "materiality."  *Id.* at 29.

The Court starts and stops with the public-disclosure bar.

A.      **The Public-Disclosure Bar – Statutory History**

The False Claims Act tries to prevent "parasitic" lawsuits.  *See Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 (7th Cir. 2017).  It tries to keep "opportunistic plaintiffs" from taking advantage of what's already out there.  *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010) (citation omitted).  Sounding the alarm doesn't add much value when the alarm has already gone off.

Congress codified the so-called "public-disclosure bar" in the statute.  *See* 31 U.S.C. § 3730(e)(4); *see also Bellevue*, 867 F.3d at 716.  Essentially, a relator can't bring a claim based on information that was public knowledge.

Congress has tinkered with the statute in recent years, including an amendment in 2010. The textual history is potentially important.  When a relator's allegations span the pre- and post-amendment period, a court must examine both versions of the statute.  *See Bellevue*, 867 F.3d at 716.  Gill's allegations do just that.  *See* Third Am. Cplt., at ¶ 279 (Dckt. No. 67).

So, this Court will consider both the earlier version of the statute, as well as the current version.

The Seventh Circuit has already explained the evolution of the statutory text. *See Bellevue*, 867 F.3d at 717–18. The Seventh Circuit has summarized what changed, and what a court needs to do when a relator's allegations span the gap. *Id.*

There are three relevant changes.

First, the statute originally declared that the public-disclosure bar stripped a court of jurisdiction. *Id.* at 717; *see also* 31 U.S.C. § 3730(e)(4) (2009) ("No court shall have jurisdiction over an action . . . ."). In the amendment, Congress replaced the jurisdictional language. *See Bellevue*, 867 F.3d at 717. Now the statute directs a court to "dismiss" a claim when the public-disclosure bar applies. *Id.*; *see also* 31 U.S.C. § 3730(e)(4).

The Seventh Circuit has not decided whether the new language is jurisdictional. *See Bellevue*, 867 F.3d at 717. But the Seventh Circuit has explained that if any part of a relator's allegations occurred before the amendment, a court should treat the public-disclosure bar as a jurisdictional bar. *Id.* This Court will do so here.

Second, before the 2010 amendment, the public disclosure bar applied to the "public disclosure of allegations or transactions." *Id.*; *see also* 31 U.S.C. § 3730(e)(4)(A) (2009). The Seventh Circuit interpreted that phrase to reach allegations that were "*substantially similar*" to publicly disclosed allegations. *See Bellevue*, 867 F.3d at 718 (emphasis added) (citation omitted).

When Congress amended the statute, it expressly incorporated the "substantially similar" standard. *Id.*; *see also* 31 U.S.C. § 3730(e)(4)(A) (referencing "substantially the same allegations or transactions"). So, although this new language was a non-retroactive substantive

change – meaning that the pre-2010 statute governs conduct from that era, and the new statute governs recent conduct – the difference is "not significant." *See Bellevue*, 867 F.3d at 718 (cleaned up).

Finally, Congress amended the statute's definition of "original source." *Id.* The change was a "clarification," meaning that the change was "retroactive." *Id.* In other words, the language in the current version of the statute governs conduct that happened before the amendment. *Id.*

With that history aside, the Court turns to whether the public-disclosure bar is a basis for dismissal.

## B. Applying the Public-Disclosure Bar

Courts use a three-step framework to decide whether the public-disclosure bar applies. *Id.*

First, a district court must determine whether the relator's allegations have been "publicly disclosed." *Id.* If the answer is yes, then the district court must ask whether the lawsuit is "based upon," *i.e.*, "substantially similar" to the publicly disclosed allegations. *Id.* If so, the public-disclosure bar stands in the way of a claim, *unless* the relator is an "original source" of the information. *Id.* The relator bears the burden of proof at each step. *Id.*

Step one is up first: whether Gill's allegations are about something that was already publicly disclosed.

### 1. Step One: A Public Disclosure?

"The allegations in a complaint are publicly disclosed when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Id.* (cleaned up). "This definition presents two distinct issues: whether the relevant information was placed in the public

domain, and, if so, whether it contained the critical elements exposing the transaction as fraudulent." *Id.* (citation omitted).

### a.     Public Domain?

The first part of the equation is the existence of information in the public domain. Here, the information was indeed in the public domain. In fact, CVS put it there.

The three letters that CVS sent to the Office of Inspector General gave public officials the scoop. *See* Third Am. Cplt., at ¶¶ 275, 282–83 (Dckt. No. 67) (referencing the September and October letters); September Letter, at 1 (Dckt. No. 78-4); October Letter, at 1 (Dckt. No. 67-1, at 146 of 150); November Letter, at 1 (Dckt. No. 78-6).[2]

For example, the first letter alerted the OIG that CVS's internal review uncovered that "a number of pharmacies shipped prescriptions into states without having an appropriate nonresident license." *See* September Letter, at 2 (Dckt. No. 78-4).

The later two letters shared more information in response to the OIG's follow-up questions. *See* October Letter (Dckt. No. 67-1, at 146 of 150); November Letter, at 2 (Dckt. No. 78-6) ("CVS . . . has continued to consider whether refunds are owed to federal health care programs as a result of certain shipments made into states for which the Company did not hold a non-resident license at the time of the shipment.").

These letters put the information into the "public domain." *See Bellevue*, 867 F.3d at 718.

---

[2] Gill attached one of the three letters to his third amended complaint. *See* October Letter, at 1 (Dckt. No. 67-1, at 146 of 150). Defendants submitted the other two letters as exhibits supporting their motion to dismiss. *See* September Letter (Dckt. No. 78-4); November Letter (Dckt. No. 78-6). This Court can consider all three letters at the motion-to-dismiss stage because they "determine whether subject-matter jurisdiction" exists. *See Bellevue*, 867 F.3d at 715 n.1. Remember, the provision was jurisdictional before the 2010 amendment.

Indeed, the Seventh Circuit has explained that giving "information about fraudulent behavior" to a "competent public official" with "managerial responsibility for the very claims being made" makes information public. *See Glaser v. Wound Care Consultants*, 570 F.3d 907, 913 (7th Cir. 2009) (citation omitted). Giving information to a public official "authorized to act for and to represent the community" publicly discloses the information. *See United States v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999).

In sum, CVS's letters to the OIG metaphorically nailed the information to a posting board in the town square. Indeed, Gill seems to silently concede as much. *See* Defs.' Mem., at 27–28 (Dckt. No. 78-1) (arguing that the letters made information public); Pl.'s Resp., at 27–28 (Dckt. No. 86) (not responding).

### b. "Critical Elements"

The next part of the equation is whether the information contained "the critical elements exposing the transaction as fraudulent." *See Bellevue*, 867 F.3d at 718.

The D.C. Circuit boiled the inquiry down to a math equation in *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994); *see also United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003) (citing *Springfield*).

Imagine that $X + Y = Z$. *See Springfield*, 14 F.3d at 654. Z represents the allegation of fraud. *Id.* X and Y represent the essential elements. *Id.* Information discloses a fraudulent transaction publicly when it puts X and Y into the public domain. *Id.* Someone could look at X and Y and figure out that something fraudulent happened. *Id.*

Gill argues that the letters didn't include the fraud's "critical elements" in one short sentence. *See* Pl.'s Resp., at 28 (Dckt. No. 86). He urges this Court to believe that "[r]ather than

disclose the 'critical elements' of the fraud to the relevant agencies, CVS's so-called disclosures concealed and withheld critical information from the Government." *Id.*

But Gill does not explain which "critical elements" of the fraud are missing. If Gill provided something that was "critical," he didn't explain what it was.

In sum, the two requirements of the public-disclosure bar's first step (public domain and critical elements) are both satisfied.

### 2. Step Two: Substantially Similar Allegations

That's the first step when figuring out if the public-disclosure bar applies. *See Bellevue*, 867 F.3d at 718. The next step is to determine whether the lawsuit is "based upon, *i.e.*, substantially similar to" the publicly disclosed allegations. *Id.* (cleaned up).

To answer the question, courts consider several factors. *Id.* at 719. Those factors include "whether relators present genuinely new and material information beyond what has been publicly disclosed; whether relators allege a different kind of deceit; whether relators' allegations require independent investigation and analysis to reveal any fraudulent behavior; whether relators' allegations involve an entirely different time period than the publicly disclosed allegations; and whether relators supplied vital facts not in the public domain." *Id.* (cleaned up).

Gill's complaint alleges the same "kind of deceit" that CVS fessed up to in its letters. *See id.* Indeed, some language in Gill's complaint almost echoes language in the September OIG letter. *Compare* Third Am. Cplt., at ¶ 265 (Dckt. No. 67) (alleging that CVS "shipped tens of thousands of prescriptions across state lines into states where the shipping pharmacy did not hold the required nonresident license to dispense prescriptions"), *with* September Letter, at 2 (Dckt. No. 78-4) (acknowledging that "a number of pharmacies shipped prescriptions into states without having an appropriate nonresident license").

Gill disagrees. *See* Pl.'s Resp., at 27–28 (Dckt. No. 86).

First, Gill argues that his complaint's allegations are not "substantially similar" to CVS's letters because the letters did not reveal that the fraudulent transactions took place over a "multi-year period," like his complaint alleges. *Id.*

To be sure, allegations may not be substantially similar to publicly disclosed allegations if they cover an "entirely different" period of time from the publicly disclosed allegations. *See Bellevue*, 867 F.3d at 719. Indeed, the Seventh Circuit has explicitly found allegations to "not [be] substantially similar because they covered an entirely different time period." *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 281 (7th Cir. 2016) (explaining that *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 829–33 (7th Cir. 2013), held that allegations were "not substantially similar because they covered an entirely different time period").

But the time periods here aren't "entirely different." Although Gill argues that his allegations extend the time period that CVS publicly disclosed, he acknowledges that the time periods meaningfully overlap. *See* Pl.'s Resp., at 27–28 (Dckt. No. 86). So, Gill cannot rely only on the cases showing that "entirely different" time periods are enough, because the time periods here overlap. And he does not cite any other case law supporting his argument that allegations spanning overlapping time frames should not be considered substantially similar. *See id.*

This Court will not do the research for Gill. The burden to overcome the public-disclosure bar and establish jurisdiction belongs to Gill. *See Bellevue*, 867 F.3d at 718. He does not meet that burden here.

Next, Gill argues that his allegations are not "substantially similar" because CVS represented that the shipment volume was "small," and his complaint alleges that CVS knew that the real issue was "thousands of shipments." *Id.*

But again, Gill does not offer this Court any case law backing up that the number of transactions at issue can meaningfully distinguish information. *See id.* He again fails to develop a meaningful argument that his allegations are not substantially similar to the publicly disclosed allegations.[3]

So, the Court is left to conclude that Gill's allegations are "substantially similar" to those in CVS's letters.

### 3. Step Three: Original Source

The public-disclosure bar includes one final step. The relator's claim can go forward if he is "an original source of the information upon which the lawsuit is based." *Id.* (citation omitted). Basically, a relator can't be blamed if the alarm already went off if the relator *himself* is the one who first sounded the alarm.

The statute defines "original source." *See* 31 U.S.C. § 3730(e)(4)(B). The relator must show that he (1) "has knowledge that is independent of and *materially* adds to the publicly disclosed allegations or transactions," and (2) "has voluntarily provided the information to the Government before filing an action." *Id.* (emphasis added); *see also Bellevue*, 867 F.3d at 720.

A relator does not "materially add" to a public disclosure when the relator's allegations

---

[3] An argument might swirl around the case law for another litigant to seize. *See, e.g.*, *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012) ("[I]t is crucial to consider whether the disclosures correspond in *scope* and breadth.") (emphasis added); *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 580 (9th Cir. 2016) (concluding that allegations were not "substantially similar" to public reports because they differed "in both *degree* and kind") (emphasis added). Maybe not. *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 920–21 (7th Cir. 2009) (finding that allegations were "substantially similar" to publicly disclosed allegations even though the relator's complaint "add[ed]" a "few" allegations) (emphasis added) (pre-2010 amendment).

are "substantially similar" to the publicly disclosed allegations. *See Bellevue*, 867 F.3d at 721

("[W]e found that because the plaintiff's allegations were 'substantially similar to' the publicly

disclosed allegations, the plaintiff did not 'materially add' to the public disclosure and could not

be an original source."). In other words, a court's holding in the "substantially similar" step of

the analysis might become dispositive at this step of the analysis, too.[4]

      Because Gill's allegations are substantially similar to CVS's letters, Gill did not

---

[4] A careful reader might wonder how much work the "original source" carveout to the public-disclosure bar really does. Recall that the public-disclosure bar slams the courthouse door shut if the complaint's allegations are substantially similar to allegations that were publicly disclosed. But the statute provides for two "original source" exceptions for a plaintiff to get his foot in the door, despite the public-disclosure bar.

The first is straightforward. A plaintiff is excepted from the public-disclosure bar if the plaintiff had voluntarily disclosed the information to the government prior to the public disclosure in question. *See* 31 U.S.C. § 3730(e)(4)(B)(i). In other words, a plaintiff is an original source when he told the government the information *before* the public disclosure happened.

The second lane is a bit more complicated (and the one at issue in this case). A plaintiff is excepted from the public-disclosure bar if the plaintiff knew the information in the public disclosure from an independent source (*i.e.*, not the public disclosure) and materially adds to the public disclosure. *See* 31 U.S.C. § 3730(e)(4)(B)(2). Here's the rub. Under this second lane, to be exempted from the public-disclosure bar, the plaintiff must materially add to the public disclosure. But the public-disclosure bar only kicks in when the allegations are substantially similar to the public disclosure. And the Seventh Circuit has explained that if the allegations are substantially similar, then by definition a relator's new allegations don't materially add anything. The same substantial similarity that activates the public-disclosure bar also means that the new allegations don't materially add anything. So, a relator who triggers the public-disclosure bar can never meet the second "original source" carveout.

And this may be by design. Before Congress amended the public-disclosure bar in 2010, the statute only provided for one "original source" exemption. It was much closer to the second exemption the Court has described here. A plaintiff was excepted from the public-disclosure bar if he knew the information in the public disclosure from an independent source. *See* 31 U.S.C. § 3730(e)(4)(B) (1994). Under that regime, a plaintiff with knowledge of wrongdoing could wait until someone else publicly disclosed the allegations and then leech onto those allegations, because independent knowledge would exempt him from the public-disclosure bar. After Congress amended the statute, a plaintiff with independent knowledge has two options. Either (1) voluntarily provide the information to the government before someone else makes a public disclosure, or (2) be the second mover, but materially add new allegations that were not yet public. In either case, the plaintiff must be the first mover, either as to the entire allegation or to some new subset of allegations. If the plaintiff waits to leech onto already public allegations and finds out he has nothing new to add, the public-disclosure bar will slam the door. There is no carveout for that plaintiff.

"materially add" to the public disclosure. *See id.* So, Gill is not an "original source." *Id.* In turn, the public-disclosure bar precludes his FCA claims based on the interstate shipping. *See id.* Those claims are dismissed.

## VI. Gill's Employment Claims

Finally, Defendants ask this Court to dismiss Gill's three retaliation claims. *See* Defs.' Mem., at 29–30 (Dckt. No. 78-1). As a reminder, Gill brought retaliation claims under the federal False Claims Act, Illinois common law, and the Illinois Whistleblower Act. *See* Third Am. Cplt., at ¶¶ 322, 815–820 (Dckt. No. 67).

Defendants make an argument about causation, and they try to hit two birds with one stone. Defendants moved to dismiss the federal False Claims Act and the Illinois Whistleblower Act for lack of causation. *See* Defs.' Mem., at 30 (Dckt. No. 78-1). They argue that the complaint's allegations do not "plausibly establish causation." *Id.*

The federal False Claims Act prohibits an employer from retaliating against an employee "*because of* lawful acts done by the employee" that were (a) "in furtherance of an action" under the FCA or (b) "other efforts to stop" the employer from violating the FCA. *See* 31 U.S.C. § 3730(h)(1) (emphasis added). In other words, a former employee must allege[5] that he "engaged in protected conduct" and was fired "because of that conduct." *See Sibley*, 44 F.4th at 661.

The Illinois Whistleblower Act is similar, but uses different phraseology. The state statute prohibits an employer from retaliating against an employee "*for* refusing to participate in an activity that would result in a violation of a State or federal law, rule or regulation." *See* 740 ILCS 174/20 (emphasis added). To state a claim, the employer must have retaliated because the

---

[5] Rule 9(b)'s heightened pleading requirement does not apply to section 3730(h) retaliation claims. *See Sibley*, 44 F.4th at 661–62.

employee did not want to join hands in an illegal venture. *Cf. Williams v. Office of Chief Judge of Cook Cnty.*, 839 F.3d 617, 627 (7th Cir. 2016) (describing the inquiry as whether an employer "had a retaliatory motive").

Gill adequately pleads that he engaged in conduct that receives protection under both statutes. He alleges that he refused to mislead New Hampshire public officials in September 2017 and refused to oversee a sham investigation in May 2018. *See* Third Am. Cplt., at ¶¶ 298, 300 (Dckt. No. 67). Defendants do not dispute this point. *See* Defs.' Mem., at 29–30 (Dckt. No. 78-1).

But Gill does not adequately plead that CVS subjected him to "severely deteriorated" work conditions *because* of his refusals. Indeed, the paragraphs in the "retaliation" section of Gill's third amended complaint stand in stark contrast to the earlier paragraphs describing CVS's five schemes. *See* Third Am. Cplt., at ¶¶ 295–309 (Dckt. No. 67).

The details are far and few between. They don't measure up, even when compared to the lower pleading standard of Rule 8.

For example, the complaint gives no hints about *who* created the "intolerable work conditions." *Id.* at ¶ 307. Instead, the complaint breaks every English teacher's number one rule. It leads with the passive voice. For example, the complaint says that Gill "*was* asked to perform unethical acts." *Id.* at ¶ 297 (emphasis added). He "*was* assigned to oversee a sham investigation." *Id.* at ¶ 300 (emphasis added).

True, in other paragraphs the complaint places the blame at the feet of Gill's "supervisors" and "superiors." *Id.* at ¶¶ 301–05. But the complaint does not identify those supervisors. *See id.*

Again, Rule 8 is not the most demanding standard, and a plaintiff does not have to include heaps of details. But the use of the passive voice sticks out like a sore thumb, especially given the level of detail in the other parts of the complaint.

The lack of identifiable supervisors raises another looming question: did those supervisors *know* about Gill's allegedly protected activity? After all, a supervisor cannot have retaliated *because of* the protected activity if he did not *know* about the protected activity.

In other words, who took what actions? Who knew what? When did they know it? Without allegations that answer those questions, this Court can't make any inferences. There is no basis for such an inference. This Court cannot "plausibly infer" that the supervisors acted with a retaliatory motive based on the limited information at hand.

"Drawing an inference of retaliation" would require a "leap in logic" that this Court can't take. *Cf. Carter v. Chi. State Univ.*, 778 F.3d 651, 659 (7th Cir. 2015). Maybe Gill knows facts that would support a retaliation claim, but if so, he didn't share them.

In sum, Gill does not plausibly allege a causal link to support his statutory retaliation claims. This defect undermines his common law claim, too. *See Perez v. Staples Contract & Com. LLC*, 31 F.4th 560, 575–76 (7th Cir. 2022) (considering an Illinois common law and Illinois Whistleblower Act retaliation claim together when determining whether there was sufficient evidence of a retaliatory motive).

The Court dismisses Gill's three retaliation claims.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.

Summarizing where things stand is a bit of a challenge. The complaint includes 309 paragraphs of facts with five schemes. Then, the complaint includes 41 counts that rely on those five schemes. Giving a count-by-count explanation of what survived, and what didn't, is not particularly helpful. So the Court will summarize the lay of the land by addressing each of the schemes.

The motion to dismiss the federal claim under the False Claims Act is hereby denied.

The motion to dismiss the state law claims is granted in part, and denied in part.

In Scheme #1, the Court dismisses the state-statute FCA claims rooted in the credit-balance scheme, other than the claims under Delaware's statute. So, the claims under Delaware's statute, and under the federal FCA survive. The Court also dismisses the Scheme #1 claims that Gill alleged against CVS Specialty and Omnicare.

The Court dismisses the excluded-provider scheme claims alleged against CVS Retail, Omnicare, and Coram. That's Scheme #2. The excluded-provider scheme claims alleged against Caremark survive.

The Court dismisses the claims based on the copay-card scheme. That's Scheme #3.

The claims about Scheme #4 (the FOCUS Care program) survive.

The Court dismisses the claims based on the prescription-drug out-of-state shipping scheme. That's Scheme #5.

Finally, the Court dismisses Gill's retaliation claims.

Date:  August 26, 2024

_____

Steven C. Seeger
United States District Judge